No. 23-3371

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION, SORA KUYKENDALL, and SASHA REED, individually and on behalf of a class of similarly situated individuals, | ) Appeal from the United States<br>) District Court for the Southern<br>) District of Illinois<br>)<br>)<br>) |
| Plaintiffs-Appellees, | ) No. 3:18-cv-00156-NJR<br>) |
| v. | )<br>) |
| STEVEN BOWMAN, MELVIN HINTON, and LATOYA HUGHES, | )<br>) The Honorable<br>) NANCY J. ROSENSTENGEL, |
| Defendants-Appellants. | ) Chief Judge. |

**BRIEF AND REQUIRED SHORT
APPENDIX OF DEFENDANTS-APPELLANTS**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

**CHRISTINA T. HANSEN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-6569 (office)
(872) 272-0819 (cell)
Christina.Hansen@ilag.gov

Attorneys for Defendants-Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

JURISDICTIONAL STATEMENT .............................................................................. 1

ISSUES PRESENTED FOR REVIEW ........................................................................ 4

STATEMENT OF THE CASE ...................................................................................... 5

The December 2019 Preliminary Injunction ............................................................ 5

The August 2021 Trial ................................................................................................ 8

The August 2021 Preliminary Injunction ............................................................... 17

Post-August 2021 Preliminary Injunction Proceedings ........................................ 19

The February 2022 Memorandum and Order ........................................................ 20

Post-February 2022 Proceedings ............................................................................ 22

Appointment of the Co-monitors ............................................................................ 23

Contempt Proceedings ............................................................................................. 26

Defendants' Motion to Vacate the Enforcement Orders ....................................... 31

SUMMARY OF ARGUMENT .................................................................................. 34

ARGUMENT ............................................................................................................. 36

I.    The district court's enforcement and contempt orders exceeded the
      constraints on prospective relief in the PLRA. .............................................. 36

      A.    The February 2022 injunction was a preliminary injunction and
            thus automatically expired in May 2022. ............................................... 39

      B.    The district court erred by retroactively modifying the February 2022
            preliminary injunction into a permanent injunction. ............................ 40

      C.    The court erred by entering contempt and enforcement orders that
            were based on an expired preliminary injunction. ................................ 42

II.   The district court's November 2023 finding of contempt was an abuse of
      discretion, and its finding that defendants failed to make reasonable efforts
      to comply with its orders was clearly erroneous. ............................................ 45

III.    The district court committed reversible error by determining that
        defendants acted with deliberate indifference to plaintiffs' serious medical
        needs. ............................................................................................................ 47

        A.      Deliberate indifference is akin to criminal recklessness and requires
                proof that a prison official subjectively knew of and disregarded a
                risk to an inmate's health or safety. ......................................................... 47

        B.      The district court clearly erred by finding that defendants acted with
                deliberate indifference. ............................................................................. 50

CONCLUSION ............................................................................................................ 53

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
        TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*,
724 F.3d 854 (7th Cir. 2013) .................................................................47

*Ahlman v. Barnes*,
20 F.4th 489 (9th Cir. 2022) .................................................................37

*Alloway v. Hodge*,
72 F. App'x 812 (10th Cir. 2003) ..........................................................41

*Armstrong v. Newsome*,
58 F.4th 1283 (9th Cir. 2023) ...............................................................43

*Banks v. Booth*,
3 F.4th 445 (D.C. Cir. 2021) .............................................................37, 42

*Benjamin v. Jacobson*,
172 F.3d 144 (2d Cir. 1999) ..................................................................36

*Califano v. Yamasaki*,
442 U.S. 602 (1979) ...............................................................................36

*Doe v. Cook Cnty.*,
798 F.3d 558 (7th Cir. 2015) ...........................................................40, 43

*Estelle v. Gamble*,
429 U.S. 97 (1976) ............................................................................47, 48

*Farmer v. Brennan*,
511 U.S. 825 (1994) ......................................................................47, 48, 49

*Fed. Trade Comm'n v. Trudeau*,
579 F.3d 754 (7th Cir. 2009) .................................................................45

*Howe v. Hughes*,
74 F.4th 849 (7th Cir. 2023) .................................................................43

*Lee v. Young*,
533 F.3d 505 (7th Cir. 2008) .................................................................49

*Lindell v. Frank*,
377 F.3d 655 (7th Cir. 2004) .................................................................36

*Lion Health Servs., Inc. v. Sebelius*,
    635 F.3d 693 (7th Cir. 2011)..............................................36

*Mayweathers v. Newland*,
    258 F.3d 930 (9th Cir. 2001)..............................................38

*Petties v. Carter*,
    836 F.3d 722 (7th Cir. 2016)..........................................48, 49

*Phillips v. Sheriff of Cook Cnty.*,
    828 F. 3d 541 (7th Cir. 2016)..............................................49

*Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*,
    525 F.3d 533 (7th Cir. 2008)..............................................45

*Rasho v. Jeffreys*,
    22 F.4th 703 (7th Cir. 2022) ........................................ passim

*Rosario v. Brawn*,
    670 F.3d 816 (7th Cir. 2012)..............................................49

*Smith v. Edwards*,
    88 F.4th 1119 (5th Cir. 2023) ........................................37, 38

*Spallone v. United States*,
    493 U.S. 265 (1990) ......................................................45

*U.S. v. Sec'y, Fla. Dep't of Corrs.*,
    778 F.3d 1223 (11th Cir. 2015)....................................37, 40, 42

*Victory v. Berks Cnty.*,
    789 F. App'x 328 (3d Cir. 2019)..............................38, 40, 42, 45

*Westefer v. Neal*,
    682 F.3d 679 (7th Cir. 2012)..........................................36, 43

*Whiting v. Wexford Health Sources, Inc.*,
    839 F.3d 658 (7th Cir. 2016)..........................................48, 49

*Wilson v. Seiter*,
    501 U.S. 294 (1991) ......................................................48

**Statutes**

18 U.S.C. § 3626(a)...........................................................36

18 U.S.C. §  3626(a)(1) ...................................................2, 36, 37

18 U.S.C. § 3626(a)(1)(A) ....................................................... 40, 43

18 U.S.C. § 3626(a)(2) ..................................................36, 37, 41, 45

18 U.S.C. § 3626(b)(2) .........................................................37, 40

18 U.S.C. §§ 3626(b)(2) ............................................................. 40

28 U.S.C. § 1291 ....................................................................... 3

28 U.S.C. § 1292(a)(1) .............................................................. 42

28 U.S.C. § 1331 ........................................................................ 1

28 U.S.C. § 2107(a) .................................................................... 3

42 U.S.C. § 1983 ..................................................................... 1, 5

**Other Authoritie**s

U.S. Const. amend. VIII ........................................................1, 47

Fed. R. App. P. 4(a)(1)(A) ............................................................ 3

Fed. R. Civ. P. 23(b)(2) ............................................................1, 5

Fed. R. Civ. P. 25(d) ................................................................... 1

Fed. R. Civ. P. 58 ...................................................................... 3

# JURISDICTIONAL STATEMENT

In January 2018, Plaintiffs-Appellees Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed brought this class action on behalf of themselves and a putative class of inmates seeking evaluation and treatment for gender dysphoria within the Illinois Department of Corrections ("Corrections") against then-Governor Bruce Rauner; John Baldwin, the former Department Director; Dr. Steve Meeks, the Department Medical Director; and Dr. Melvin Hinton, its Acting Statewide Mental Health Supervisor, each sued in his official capacity only. Doc. 1.[1] Plaintiffs sought declaratory and injunctive relief under 42 U.S.C. § 1983, claiming that the Department was deliberately indifferent to their serious medical needs in violation of their rights under the Eighth Amendment to the United States Constitution. *Id.* at 36-38.[2] The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs' claim raised a federal question.

The district court dismissed with prejudice plaintiffs' claim against the then-Governor for failure to state a claim and entered judgment in his favor. Doc. 97 at 9. The court later certified the class under Fed. R. Civ. P. 23(b)(2) and dismissed Stamps, who had been released from the Department's custody. Doc. 213.

---

[1] The record on appeal, which consists of the district court docket, is cited as "Doc. __ at __," consistent with the file-stamp at the top of each page.

[2] By operation of law, Latoya Hughes, the Department's Acting Director, and Dr. Steven Bowman, its Medical Director, replaced Baldwin and Dr. Meeks as defendants. *See* Fed. R. Civ. P. 25(d); Doc. 556.

On August 9, 2021, after a bench trial, Docs. 319-28, the district court issued a preliminary injunction against defendants, Docs. 331-32, 336. On February 7, 2022, the court issued a memorandum and order "more fully summariz[ing] the August 2021 bench trial testimony and the depositions and exhibits submitted at trial, factual findings, and conclusions of law supporting the preliminary injunctive relief previously ordered." Doc. 383 at 1-2. The court also imposed an additional "Preliminary Injunction" against defendants. Doc. 384; *see* Doc. 383 at 70-87. No final relief or separate judgment order was entered on the docket at that time. In November 2022, plaintiffs moved for a finding of contempt, seeking, among other things, modifications to the "preliminary injunctions" that the court had entered. Doc. 455 at 1-2. While taking the motion under advisement, the district court entered three additional injunctions, which were styled as "enforcement orders." Docs. 522, 552, 584. Defendants moved to vacate those enforcement orders, arguing that the court erred by entering orders to enforce the preliminary injunctions, which had expired in May 2022, and that the enforcement orders were invalid under 18 U.S.C. § 3626(a)(1). Doc. 587.

On November 16, 2023, the district court issued a memorandum and order that: (1) denied defendants' motion to vacate; (2) entered judgment pursuant to its February 7, 2022 memorandum and order; (3) granted in part and denied in part plaintiffs' motion for sanctions; and (4) directed the clerk to modify the docket to reflect that the February 2022 "Preliminary Injunction" was a permanent injunction. Doc. 678. Through that order, the court disposed of all claims against all parties. In

a separate judgment order under Fed. R. Civ. P. 58 that same day, the court granted "permanent injunctive relief" and retained jurisdiction of the matter "to enforce and ensure compliance with its injunctive relief." Doc. 679. No motion to alter or amend the judgment was filed.

On December 14, 2023, defendants filed a notice of appeal, Doc. 699, which was timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a)(1)(A) because it was filed within 30 days of the district court's entry of the judgment order. Accordingly, this court has subject matter jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether a post-trial preliminary injunction entered by the district court expired by operation of law under the Prison Litigation Reform Act 90 days after it issued, such that it was an abuse of discretion for the court to issue additional orders to enforce it.

2.     Whether the district court's contempt finding was clearly erroneous because the finding was based on noncompliance with invalid orders, and, in any case, the record demonstrates that defendants took steps to reasonably and diligently comply with the court's orders.

3.     Whether the district court clearly erred by finding that defendants were deliberately indifferent to the medical needs of inmates with gender dysphoria because the record showed that they took reasonable steps to improve care for the class.

## STATEMENT OF THE CASE

Plaintiffs, who are incarcerated transgender women, brought this action for declaratory and injunctive relief under 42 U.S.C. § 1983 on behalf of themselves and a putative class, claiming that defendants were deliberately indifferent to their serious medical needs in violation of their rights under the Eighth Amendment to the United States Constitution. Doc. 1 at 1-2. The district court certified the class, defined as "all prisoners who have requested evaluation and treatment for gender dysphoria," under Fed. R. Civ. P. 23(b)(2). Doc. 213 at 11.

### The December 2019 Preliminary Injunction

In May 2019, plaintiffs moved for a preliminary injunction under Fed. R. Civ. P. 65(a). Doc. 123. After a two-day hearing, Docs. 157-58, the district court granted a preliminary injunction. Docs. 186-87. The court found that the World Professional Association for Transgender Health ("WPATH") sets the "appropriate benchmark" for treating gender dysphoria in its *Standards of Care for the Health of Transgender and Gender Diverse People*, which provided the "highest level of health care for transgender people." Doc. 186 at 31. The court further found that the *Standards of Care* set minimum qualifications for mental health providers who treat gender dysphoria, including that they must hold a master's degree in behavioral science, be familiar with the Diagnostic Statistical Manual of Mental Disorders, have documented supervision in psychotherapy, understand "the variations of gender identities and gender expressions," "undertake continuing education in the assessment and treatment of gender dysphoria," "have cultural competence," and be "aware of the growing body of literature" on gender issues. *Id.* at 4.

In addition, the district court found that appropriate treatment for gender dysphoria involved: (1) cross-sex hormone therapy; (2) psychotherapy; (3) gender affirming surgery, including reconstruction of the genitalia and breast removal or chest reconstruction surgery; and (4) social role transition, or "living in the role congruent to one's affirmed identity," which in prison settings included access to commissary items matching one's gender identity and use of the inmate's preferred pronouns. *Id.* at 4. The court found that hormone therapy should be prescribed in accordance with the Endocrine Society's guidelines. *Id.* at 5-6. Those guidelines provided that new patients starting hormone therapy should undergo quarterly "baseline" blood tests to monitor hormone levels for the first year, receiving any needed dosage adjustments until they achieve "a target hormone level," followed by yearly blood tests to monitor the continued efficacy and safety of their treatment. *Id.* at 6.

The district court then concluded that plaintiffs were likely to succeed in showing that defendants were deliberately indifferent to their serious medical needs. *Id.* at 32-33. In doing so, the court focused on certain areas of concern regarding the Department's treatment for gender dysphoria. *Id.*

First, the court found that under the Department's then-operative policy, the "Transgender Committee," an interdisciplinary team that oversaw all aspects of treatment, included members who were not qualified to treat gender dysphoria. *Id.* at 7-8, 34. The court thus ordered defendants to cease allowing the Transgender Committee to make medical decisions regarding gender dysphoria and to develop a

policy to ensure that medical professionals who are qualified to treat gender dysphoria make treatment decisions. *Id.* at 37; Doc. 212 at 1. The court also ordered defendants to develop a policy to ensure that class members had access to clinicians who met the competency requirements in the *Standards of Care*. Doc. 186 at 38; Doc. 212 at 2.

Second, the court found that plaintiffs were likely to establish that defendants delayed or denied medical treatment for gender dysphoria, including hormone therapy. Doc. 186 at 32-33. The court ordered defendants to allow class members to obtain evaluations for gender dysphoria upon request or clinical indications of the condition. *Id.* at 38; Doc. 212 at 2. The court further ordered defendants to ensure that timely hormone therapy was provided when medically necessary, and that hormone levels were routinely monitored and dosages appropriately adjusted. Doc. 186 at 37; Doc. 212 at 1.

Third, the court found that plaintiffs were likely to establish that defendants failed to allow adequate social transition. Doc. 186 at 34-35. The court ordered defendants to "cease depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance." *Id.* at 37; Doc. 212 at 1-2. The court also ordered defendants to develop a policy that would "allow transgender inmates medically necessary social transition," including by making individualized decisions on whether to house them in men's or women's prisons, avoiding cross-gender unclothed searches, and providing them with access to gender affirming clothing and

grooming items.  Doc. 186 at 38; Doc. 212 at 2.  Additionally, the court ordered

defendants to report on the Department's efforts to "train all correctional staff on

transgender issues," including the harms that may result when staff or other inmates

misgender and harass transgender inmates.  Doc. 186 at 38; Doc. 212 at 2.  The court

acknowledged that implementation of its order would "take time."  Doc. 186 at 38.

**The August 2021 Trial**

In August 2021, the district court held a four-day bench trial.  *See* Docs. 319-

20, 324, 327.  Plaintiffs presented the testimony of several witnesses, including Dr.

Vin Tangpricha, a specialist in endocrinology and the treatment of transgender

individuals, Doc. 353 at 9-114; Dr. Randi Ettner, a clinical and forensic psychologist

specializing in the assessment and treatment of gender dysphoria, Doc. 325 at 5-56;

Doc. 353 at 114-149; and James Evans Aiken, a criminal justice consultant, Docs. 348

at 7-67.

Dr. Tangpricha testified that the Endocrine Society's guidelines set "the

minimum requirement for adequate and safe care for people with gender dysphoria."

Doc. 353 at 15-16.  Under those guidelines, effective treatment required transgender

women to take both estradiol and a testosterone blocker to achieve target blood

hormone levels, and transgender men to take testosterone dosages to achieve a target

testosterone level.  *Id.* at 17.  Additionally, the guidelines provided that upon initial

prescription, hormone levels were to be checked via blood test before beginning, then

every three months, with hormone dosages appropriately titrated based on the test

results, to achieve hormone levels within the target range and monitor for any harmful effects, then annually. *Id.* at 23.

Dr. Tangpricha testified that he reviewed 100 class members' medical files for August 2019 to August 2020 and he found that 8 had hormone levels within the target range. *Id.* at 50. He opined that class members did not consistently take blood tests to monitor the efficacy and safety of their hormone therapy, and when blood tests were given, medical providers "rarely" responded to a class member's test results by titrating hormone dosages as needed. *Id.* at 50-51. After reviewing more recent medical records for 91 class members, Dr. Tangpricha concluded that while the "frequency of blood testing" had increased in the previous six months, only 11 of 91 class members had achieved target hormone levels. *Id.* at 51. Dr. Tangpricha opined that the medical providers were not appropriately titrating hormone dosages for the class members whose hormone levels had remained out of range and that some class members were not given blood tests at the appropriate intervals. *Id.* at 51-52.

Dr. Ettner acknowledged that plaintiffs had received more treatment since December 2019, but opined that they were denied adequate social transition because they could not access some medically necessary commissary items and were subjected to cross-gender searches, and had not been evaluated for gender affirming surgeries. Doc. 353 at 123-26. Regarding transfers, Dr. Ettner conceded that Monroe and Vision were transferred to Logan Correctional Center ("Logan"), a women's prison, but stated that "there could be a more therapeutic way of setting this up for

individuals." *Id.* at 125. She further opined that although WPATH training had been provided to Department medical and mental health providers, those providers remained unqualified to treat gender dysphoria. *Id.* at 145-48; Doc. 325 at 29-30.

Aiken opined that allowing transgender women who were incarcerated in men's prisons to have access to gender affirming commissary items and same-sex searches did not raise security concerns. Doc. 348 at 12, 17-18. Aiken acknowledged that under the Prison Rape Elimination Act, housing decisions had to be made on a case-by-case basis and it was appropriate in some cases for transgender women to be housed in men's facilities. *Id.* at 18-19. He also acknowledged that he had never personally been involved in transferring transgender inmates to women's facilities, but nonetheless opined that if such a transfer was medically prescribed, the necessary "security systems" to facilitate it could be built. *Id.* at 13, 24.

Defendants then presented the testimony of Dr. Shane Reister, the Department's Southern Regional Psychologist Administrator, Doc. 325 at 58-105; Doc. 354 at 4-27; Dr. Lamenta Conway, its Deputy Chief of Health Services, Doc. 354 at 27-132; and Dr. William Puga, its Chief of Psychology, Doc. 349 at 5-132. The Department's outside consultant Dr. Erica Anderson, who a clinical psychologist focused on transgender healthcare, also testified. *Id.* at 132-96.

Dr. Puga testified that the Department began reviewing its policies related to the treatment of gender dysphoria in late 2019. Doc. 349 at 15-18; *see* Doc. 348 at 116-17. In January 2020, the Department contracted with Dr. Anderson and Wendy Leach, a consultant with the Moss Group, to help with the process. Doc. 349 at 22,

135-37.  Dr. Anderson explained that because the criminal justice system has, historically, been "binary in every way," the process required "monumental change." *Id.* at 139, 144.  Additionally, the onset of the Covid-19 pandemic in early 2020 slowed the Department's progress, as medical administrators and staff had to shift focus to emergency pandemic-related policies and treatment.  *Id.* at 20-21.

Ultimately, the Department adopted Administrative Directive 04.03.104 (eff. Apr. 1, 2021) ("A.D. 04.03.104") and implemented the following steps.

***The Transgender Committee.***  The Department disbanded the Transgender Committee in favor of a new, bifurcated committee structure designed to separate decisions regarding direct medical and mental health care from social accommodation decisions, which involved operational and security considerations.  Doc. 348 at 350, 353-54; Doc. 349 at 140-41.  Under the new system, the Transgender Health and Wellness Committee ("Health Committee"), comprised of only medical and mental health professionals, set treatment standards and oversaw "the medical and mental health care" of transgender inmates, while the Transgender Administrative Committee ("Administrative Committee"), which included non-medical administrators, reviewed "the safety and security needs" of transgender inmates. Doc. 354 at 35-37; *see* A.D. 04.03.104 at 2-3, 10-11.

The Department contracted with Dr. Ravi Iyengar, an endocrinologist and gender dysphoria specialist, to serve as a consultant on the Health Committee.  Doc. 354 at 37-38, 46-48; *see* Doc. 349 at 148.  Dr. Anderson also participated as a nonvoting "coach and a mentor" on the Health Committee and served as a resource

to the facility medical providers who presented at the meetings.  Doc. 354 at 51; Doc. 349 at 140-43.  Dr. Etter, one of plaintiffs' witnesses, acknowledged that Drs. Anderson and Iyengar were experts in transgender care.  Doc. 353 at 138-40.

The Administrative Committee served as the "operational arm of the management" of transgender care offering input on issues such as placement and commissary.  Doc. 349 at 31-33.  The Administrative Committee included both medical professionals and security experts who addressed operations issues, which involve "security concerns that are beyond the purview of a medical person."  Doc. 354 at 39.  Dr. Puga testified that the committee structure reflected that there was "a lot of overlap" between medical and security-related issues concerning social transitioning, such as transfers and gender affirming commissary.  Doc. 349 at 36-37, 128-29; *see id.* at 141.  Dr. Conway testified that the security administrators never addressed issues concerning medical or mental health treatment.  Doc. 354 at 42-43.  Dr. Anderson also attended the Administrative Committee meetings.  Doc. 354 at 51.

***Qualifications of Mental Health and Medical Providers.***  Facility mental health providers, who were employed by the Department's medical contractor Wexford Health Sources, Inc. ("Wexford"), either had a masters-level license and a clinical license or were supervised by clinically licensed providers.  Doc. 325 at 61. Dr. Reister testified that the mental health providers who treated class members had volunteered or expressed interest in working with the class.  *Id.* at 62-63.  Facility mental health providers developed treatment plans with their patients, but Dr. Reister was available to consult if requested.  *Id.* at 74-75.  Additionally, Dr. Reister

led a monthly transgender care case conference, which Dr. Anderson also attended, to connect providers, address any questions or concerns, and develop best treatment practices. *Id.* at 64-65; Doc. 349 at 141-44. Mental health providers were required to attend at least six conferences per year. Doc. 325 at 64-65.

On the medical side, board-certified medical directors, employed by Wexford, provided direct medical care to the class. Doc. 354 at 35. Dr. Conway testified that the Department required all new physician hires to express a willingness to provide transgender care, and had taken steps to remove any physicians who had expressed hostility toward transgender patients from its prisons. *Id.* at 44-45, 66.

Dr. Anderson arranged for WPATH to customize a two-part training program for all Department mental health and medical providers through its Global Education Institute, which the Department had offered in Fall 2020 and Winter and Spring 2021. *Id.* at 62; Doc. 349 at 145, 153, 156. The online training was designed to provide a "foundation in transgender healthcare," including the *Standards of Care*. Doc. 349 at 145-47. Dr. Reister also administered at least biannually a separate 10-hour Department training focused on transgender care in corrections settings. *Id.* at 62, 71-73. Dr. Conway testified that all physicians, healthcare administrators, majors, lieutenants, and wardens, were required to participate in the WPATH training, though the Department did not review records to ensure that everyone attended. *Id.* at 44-45. Dr. Conway testified that Wexford had also provided its own training to medical directors and other healthcare providers regarding hormone therapy. Doc. 354 at 53.

***Hormone Therapy.*** After the December 2019 preliminary injunction issued, prison medical providers no longer needed committee approval to prescribe hormone therapy. Doc 348 at 350. Doctors were expected to continue hormone therapy for any inmate who came into custody with a prescription for hormones, and to issue a new prescription upon an inmate's diagnosis of gender dysphoria. Doc. 354 at 36-37. Additionally, the Department contracted with Dr. Brian Layden, at the University of Illinois Chicago Transgender Health Endocrinology Clinic ("UIC clinic"), to provide direct patient care to class members who had more complicated medical concerns and to consult on cases managed by Department medical directors. *Id.* at 46-49.

Dr. Conway testified that the Department contracted with Southern Illinois University to develop a continuous quality improvement processes to monitor inmate medical care, and would develop one relating to transgender care. Doc. 354 at 54-55. This auditing tool would collect all data points for class members so that the Health Committee could track each member's treatment and keep track of class-wide statistics. *Id.*

***Surgery.*** Under the April 2021 Directive, facility medical providers would present requests for surgery to the Health Committee, who would vote on the requests. Doc. 226-9 at 7-8; Doc. 354 at 57-58. Dr. Conway testified that the Health Committee considered whether the patient met the criteria in the WPATH *Standards of Care*. Doc. 354 at 58. If the Committee approved surgery, then the mental health provider would submit letters of support to the surgeon. *Id.* The

Department established a relationship with Dr. Loren Schechter, a WPATH-certified surgeon, to perform surgeries. *Id.* at 50; *see* Doc. 349 at 148.

Dr. Conway testified that the Health Committee had approved six inmates for surgery, but none had completed a surgical consultation. *Id.* She explained that the pandemic delayed surgical care, because inmates were transported only for emergency medical procedures during that time. *Id.* at 59-60. Dr. Conway also stated that the Department could not move forward with surgeries until it had finalized a contract with Wexford for pre-surgical hair removal and completed development of a post-surgical care area near Dr. Schechter's surgical center, which was expected to occur in January 2022. *Id.* at 60-64. Dr. Conway testified that patients in the non-prison population also generally faced long waits for surgical care. *Id.*

*Transfers.* Typically, mental health providers presented an inmate's transfer request to the Administrative Committee. Doc. 349 at 38-39. Four transgender women, in fact, had been transferred to Logan before the December 2019 preliminary injunction issued. *Id.* at 24. Dr. Puga testified that the Administrative Committee had since identified additional transgender inmates who requested transfers, but a Department-wide hold on transfers through March 2021 due to the Covid-19 pandemic delayed their consideration. *Id.* at 24-25; Doc. 348 at 94, 113-14. After the hold ended, three more transgender women were moved to Logan. Doc. 349 at 25-27.

Dr. Puga also testified that the Committee considered a requester's history of sexual violence and predator status when it decided transfer requests. *Id.* at 40. The

Department also worked with the Moss Group to develop the Prison Rehabilitation and Identity Sensitive Mentoring ("PRISM") program, a special housing unit at Centralia Correctional Center designed to provide a more supportive milieu where inmates would receive training and be willing to work on projects such as peer education on anti-racism, anti-transphobia, anti-heterosexism, and anti-sexism. Doc. 354 at 24; *see* Doc. 369-6.

***Gender Affirming Commissary.*** Dr. Puga testified that the Administrative Committee had compiled a list of items that it sought to make available to transgender women at male facilities. Doc. 349 at 33-34. Each facility stocked its own commissary, so class members could raise issues with commissary at the facility level and escalate their concerns to the Administrative Committee. *Id.* at 34-35.

***Cross-gender Searches.*** Dr. Puga testified that under the revised policy, transgender inmates could ask to be searched by a same-sex officer. Doc. 349 at 35-36. Compliance with the policy was expected to be handled at the facility level. *Id.* However, Dr. Puga testified that the Administrative Committee had faced challenges identifying officers who were available and willing to conduct those searches. *Id.* at 36. Additionally, the Department was updating its electronic inmate database, Offender 360, as a way to allow transgender inmates to request to be searched by officers of the same sex. Doc. 349 at 44-45.

***Correctional Staff Training***. Dr. Reister testified that the Department implemented, as part of its annual training cycle, staff training on transgender issues. Doc. 325 at 67-68. The training segment educated staff on appropriate

terminology and the psychological harm caused by misgendering.  Doc. 325 at 67-70.

Dr. Reister was also developing an inmate training designed to address transphobia

within the prison population.  *Id.* at 67-70.

**The August 2021 Preliminary Injunction**

Following trial, the district court issued an order stating its preliminary

findings of fact and conclusions of law.  Doc. 331.  While the court found that the

Department had made "some positive changes," *id.* at 3-5, it also found that A.D.

04.03.104 was "not being fully implemented" and thus had "not resulted in improved

treatment and care of members of the class," *id.* at 6.  The court decided that

defendants continued to violate the class members' constitutional rights by delaying

hormone therapy for some inmates and failing to follow the Endocrine Society's

guidelines for administering hormone care, including by monitoring and titrating

hormone therapies for efficacy and safety.  *Id.* at 8.  The court also found that

defendants had delayed evaluations for surgery.  *Id.*  Lastly, it determined that

defendants failed to provide medically necessary social transition, by not ensuring an

adequate supply of gender affirming commissary items, continuing to subject

transgender inmates to cross-gender searches, and not providing transgender

inmates with access to private showers.  *Id.*

The district court issued a second preliminary injunction, "in addition to the

previous preliminary injunction [from December 2019] which continues in force."

Doc. 332 at 1.  This new preliminary injunction required defendants to ensure

completion of laboratory tests related to hormone therapy for:  (1) two named

plaintiffs within 7 days; (2) all class members receiving hormone therapy within 14 days, with additional testing every 3 months until all levels were "within an appropriate range"; (3) all new hormone therapy patients within 21 days, with the same follow-up testing; and (4) thereafter all class members receiving hormone therapy annually.  Doc. 332 at 1-2.  The second preliminary injunction also required defendants to:  (5) evaluate the surgery request of any class member who had hormone levels within the appropriate range within 120 days and provide prompt written decision; (6) ensure that class members could choose the gender of the officers who searched them and that their preferences were honored; (7) evaluate all outstanding transfer requests within 120 days and provide written explanation in each case that a transfer was denied; (8) grant immediate access to gender affirming commissary items and provide lists of available gender affirming items; (9) ensure that all healthcare providers that treat class members had taken WPATH training and were committed to continuing education on issues of transgender health; and (10) provide immediate access to private showers for all class members.  *Id.* at 2-3; Doc. 336 (making correction).

The district court also ordered defendants, within 120 days, to finalize certain "ongoing" projects that were discussed at trial:  (1) the contract for hair removal services; (2) Dr. Shechter's contract to conduct approved surgeries; (3) the continuing quality improvement tool; and (4) written standards for the Health Committee to apply when evaluating requests for surgery.  Doc. 332 at 3-4.  Defendants were also ordered to implement:  (5) the PRISM program; (6) additional and ongoing training

for all correctional staff on transgender issues and awareness; (7) training for staff and inmates at Logan on incoming transgender inmates; and (8) the transgender identification policy, as a means to minimize the risk that class members would be subjected to cross-gender searches. *Id.* at 4. Finally, the court reiterated that its findings were preliminary, stating that, "obviously, I am going to have to continue to follow up with permanent injunctive relief and may at some point consider the appointment of an independent monitor to ensure ongoing compliance, but that is an issue for another day." Doc. 334 at 219.

**Post-August 2021 Preliminary Injunction Proceedings**

In compliance with the deadlines set in the second preliminary injunction, defendants reported to the court that they had completed the blood testing related to hormone therapy. Doc. 355 at 1-2. Plaintiffs acknowledged that the laboratory tests were done, and that class members with elevated prolactin were referred to the UIC clinic, but reported that less than 10% of those receiving hormone therapy had hormone levels within the appropriate range. Doc. 359 at 4.

In a status report filed 120 days after the preliminary injunction, defendants explained that the Department had purchased body scanners to facilitate searches of transgender inmates, completed all then-pending surgical evaluations and transfer requests, finalized a contract for laser hair removal services at Logan, finalized arrangements for Dr. Schechter to consult on and provide surgical care, completed a continuing quality improvement program and begun to implement the audit with information obtained from electronic medical files from Logan, and finalized written

standards for assessing surgery requests.  Doc. 369 at 2.  Additionally, defendants

reported that the Department had transferred 18 inmates into the PRISM program.

*Id.* at 3-4.  Defendants also reported that they expected to complete mandatory staff

training by March 2022, had contracted with an outside contractor to provide

training for inmates at Logan regarding new transfers of transgender inmates, and

were working with the Moss Group to develop future training tools.  *Id.*  The

Department had also finalized its plan to allow class members to specify their gender

preference for searches on their identification cards.  *Id.* at 2-5.

A week later, the district court acknowledged that defendants had

"demonstrate[d] progress," but found that they still had not "fully implemented the

requirements of the August 2021 order."  Doc. 370 at 4.  The court notified the

parties that it would appoint co-monitors to oversee compliance with the August 2021

preliminary injunction and to assess and advise the court on whether to order further

revisions to the Department's policies on gender dysphoria treatment.  Doc. 370.

Although the court stated that it was in "the post-trial remedial phase," it had not

entered any final relief.  *See id.* at 1, 5.

**The February 2022 Memorandum and Order**

In February 2022, the district court made additional factual findings and

reaffirmed its conclusion that the Department's administrative directives "did not

result in improved treatment and care" for class members.  Doc. 383.  Specifically,

the court concluded that the administrative directives, as written, impermissibly

permitted non-medical administrators "to block transfer requests even if the medical

or mental health providers recommend transfer as part of an individual's treatment," did not guarantee that a transgender inmate's choice of gender of the officer conducting a "pat down or strip search" would be honored, and needed to address concerns about the initial placement of transgender inmates when they enter the Department's custody. *Id.* at 65, 69. The court concluded that defendants had to make "further revisions" and "implementation 'on the ground' of revised policies," to ensure that class members had "timely decisions and action on requested treatment for gender dysphoria — including hormone therapy, surgery requests, placement, transfer, commissary, and search accommodations;" — and that only qualified professionals could make treatment decisions. *Id.* at 66, 68.

The district court ordered that the "previous preliminary injunctions" would remain in effect and reaffirmed that it would appoint "a monitor (special master) to oversee the Department's compliance" with its preliminary injunctions. *Id.* at 70. The court explained that the appointed co-monitors would also "assess and advise the Court on what revisions to [Department] policies and Administrative Directives [were] necessary in order to remedy the unconstitutional treatment of transgender prisoners" and would "work with the parties to accomplish those revisions." Doc. 383 at 70.

The district court also issued a third preliminary injunction, which restated its December 2019 and August 2021 preliminary injunctions, and added items of additional relief. Doc. 384. Specifically, the court ordered defendants to ensure that medical providers conducted all necessary follow up medical tests or treatments to

address any irregularities identified when monitoring hormone therapy and provided all medically necessary hair removal services. *Id*. at 92. Beyond that, the court ordered items of "follow up" relief, requiring defendants to report on: (a) laboratory tests relating to hormone therapy; (b) the Health Committee's decisions on class members' requests for surgery; (c) the steps taken to implement and train staff on policies to avoid cross-gender searches; (d) any transfers that had occurred since October 2021; (e) the availability of gender affirming commissary items at each facility; (f) efforts to ensure that medical providers attended WPATH training and were committed to continuing education on transgender health; and (g) measures taken at each prison to ensure access to private showers. *Id*. at 6-10. Defendants were also ordered to report again on the status of the "projects" discussed at trial. *Id*. at 84-87; Doc. 384 at 10-15.

**Post-February 2022 Proceedings**

In compliance with the new preliminary injunction, defendants reported in March 2022 that the Department had completed quarterly blood tests on each class member taking hormone therapy and referred any patients with abnormal results to the UIC clinic for follow-up treatment. Doc. 393. Among other status updates, defendants also submitted declarations from the wardens at prisons housing transgender inmates, which described the private shower accommodations that the facilities were offering to transgender inmates. Doc 400-1 at 2-43; *see* Doc. 397; Doc. 414.

**Appointment of the Co-monitors**

In April and May 2022, the district court appointed two co-monitors to oversee and advise it and the parties regarding defendants' "compliance with the Court's Preliminary Injunctions (Docs. 212, 332, 336, 384)" and "implementation of the [Department]'s April 2021 revised Administrative Directives regarding transgender prisoners." Doc. 418 at 1-2; Doc. 423 at 1-2. The court also directed the co-monitors to "assess and advise" on "whether further revisions to the [Department]'s policies [were] necessary so as to remedy the unconstitutional treatment of transgender prisoners in IDOC facilities." *Id.* Each co-monitor submitted an initial 90-day report. *See* Docs. 439, 444.

Dr. Amanda L. Harris, the co-monitor addressing hormone therapy, surgery, and transfers, reported that the Department was partially compliant with the orders related to hormone therapy and surgery, but "non-compliant/unable to assess compliance" regarding transfers. Doc. 439 at 1-2. Dr. Harris reported that approximately 65% of class members reportedly received hormone therapy, but many had not achieved target hormone levels. *Id.* at 6-8. Dr. Harris also reported that while the Health Committee had approved 17 class members for surgery, no completed surgeries had been reported. *Id.* at 11. On transfers, Dr. Harris also stated that the Administrative Committee had approved 6 out of 58 transfer requests, but expressed concern regarding plaintiffs' allegations that some transgender men who were incarcerated in Logan's D-wing had been coerced to withdraw their request for surgery in order to be transferred to a less restrictive unit in the prison. *Id.* at 12.

Defendants acknowledged Dr. Harris's finding that only a small percentage of class members had attained target hormone levels, but noted that the laboratory results did not analyze the duration of each class member's hormone therapy, account for recent medication changes, or consider the member's medication compliance and thus did not necessarily indicate that medical staff had failed to appropriately titrate hormones. Doc. 446 at 1. Additionally, defendants reported that, to improve care, Dr. Conway, as Health Committee Chair, and a designee had begun meeting with facility medical providers to review abnormal laboratory results and create patient plans, and the UIC clinic had agreed to provide direct care for a greater number of patients. *Id.* at 2. Defendants also explained that none of the 17 approved surgeries had occurred because Dr. Schechter, the sole WPATH-certified surgical provider in the State, had moved his practice, which caused a delay. *Id.* at 2-3. Defendants also addressed Dr. Harris's concern that transgender men were coerced to cancel surgery, explaining that six transgender inmates were housed in D-wing, Logan's "maximum security" general population unit, and their housing assignment was based on their security classifications and other security-related concerns, without regard to whether they had requested surgery. *Id.* at 4; Doc. 446-1.

Co-monitor julie graham, MFT, who monitored same-gender searches, staff training, access to private showers, and gender affirming commissary, reported that the Department had made "a good faith effort towards compliance," and described the administrative staff as "cooperative," "forthcoming," "action oriented," and

"genuinely trying to comply." Doc. 444 at 4-6. Graham reported that the

Department was "mostly" compliant with the prohibition on cross-gender searches,

having implemented an appropriate policy and generally honored class members'

gender preferences, but reported that some transgender women complained of long

waits for a female officer. *Id.* at 7-8. Graham also reported partial compliance with

the training requirements because although the Department had presented

mandatory employee training sessions, it had difficulties tracking attendance. *Id.* at

12-13. Graham also voiced concern that the material was a "mismatch" for its

audience. *Id.* at 14.

Graham reported difficulty measuring compliance with the private shower

mandate because class members had subjective expectations of privacy and some of

their complaints of noncompliance warranted further investigation. *Id.* at 16-18.

Graham deemed the Department non-compliant with the court's mandate to provide

gender affirming commissary, but attributed the deficiency to supply chain issues

and the need to provide more variations of the items that were stocked. *Id.* Lastly,

graham relayed class members' reports that prison staff and other inmates continued

to misgender and stigmatize them. *Id.* at 24-30.

In response, defendants reported that the Department had verified that over

80% of its staff (11,439 of 13,936 staff members) had completed the staff training,

and many of those who had not done so were on non-working statuses. Doc. 448 at 1-

2. Defendants also reported that the Department had piloted a small-group staff

training at Logan (totaling 80 trained staff members). *Id.* at 4. To address graham's

other concerns, the Department engaged the Moss Group for a system-wide needs-assessment to improve its sensitivity training, created a written handout as a reference for staff on addressing transgender issues, and continued to work with its vendors to improve commissary offerings. *Id.* at 2-3. Defendants later updated that a project manager would begin monitoring commissary stock of gender affirming items at all facilities. Doc. 454 at 3. And in December 2022, defendants also reported that the Department had a fully operational body scanner at five prisons (which housed 60% of the class) to facilitate searches when same-gender officers were unavailable. Doc. 492 at 2. Additionally, defendants reported that the Department had initiated investigations into the allegations of staff misconduct that were relayed to graham. *Id.* at 2-3.

**Contempt Proceedings**

In November 2022, plaintiffs moved for a finding of contempt, arguing that defendants failed to make adequate progress toward compliance in every category of care. Doc. 455 at 2; Docs. 509-18. Plaintiffs also submitted "recommendations for modifications to preliminary injunctions," that would require defendants to, among other things, adopt plaintiffs' proposed revisions to the April 2021 directive and implement a number of other policy changes and requirements. Doc. 485.

Defendants responded that contempt was unwarranted because they had complied with the specific directives of the February 2022 preliminary injunction, and where they encountered obstacles, they made reasonable, good faith efforts to resolve those issues. Doc. 462 at 15-17. Defendants also argued that plaintiffs'

requested relief would require the Department to create new positions, revise its staff discipline policies, and impose other requirements that would significantly interfere with prison officials' discretion to craft policies in violation of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1). Doc. 499 at 2-6. Defendants submitted an additional status report, advising the court that three class members had been scheduled for surgery during the following month and others would be scheduled for consultations with Dr. Schechter. Doc. 505 at 1. Defendants further reported that all five body scanners were being utilized; a "FAQ" handout addressing transgender accommodations, reviewed by graham, had been circulated to all staff; and a pamphlet titled "Transgender Tool Kit" was finalized for print and distribution to all transgender inmates. *Id.* at 2-4.

In the meantime, Dr. Harris filed a second report, relating that the Department had made "good progress toward" developing its continuing quality improvement tool, which identified all class members at each facility and tracked compliance with mental health and medical treatment, surgery, operations, and training. Doc. 502 at 1. Dr. Harris further reported that 123 of 167 class members (73.7%) were receiving hormone therapy, and most patients had achieved or were "working steadily toward their goal." *Id.* at 3-6. Dr. Harris reported, however, that progress on gender affirming surgeries remained slow, with 16 class members approved and progressing toward surgeries but none completed. *Id.* at 6. And Dr. Harris reported that the Administrative Committee considered, but "very rarely

approved" requests for transfers, commonly citing security concerns, behavioral issues, and hormone non-compliance as reasons for the denials. *Id*. at 7.

In January 2023, the district court stated that it had expected more "progress" toward "compliance with the Preliminary Injunctions," and entered its first enforcement order. Doc. 522 at 1. Noting that defendants had already voluntarily assigned a designee to work with graham on commissary issues, the court ordered defendants to do the same on the other "nine categories of concern set forth in the Preliminary Injunctions": hormone treatment, gender affirming surgery, the quality assurance tool for transgender care, transfers, conditions/placement at Logan and the PRISM program, showers, cross-gender searches, training, and the transgender identification policy. *Id*. at 2. The court also entered additional injunctive relief, setting deadlines and reporting requirements for all "categories of concern," and ordering defendants to identify additional available surgeons to achieve compliance with its deadlines for surgical consultations. *Id*. at 3. The court further ordered defendants to reach agreement with plaintiffs and the monitors on a list of "items to be included in a gender affirming kit for all class members as standard issue medical care," setting a deadline for distribution of the kit, *id*. at 4, and to certify that its auditing tool was working, *id*. at 3-4.

Defendants then identified a designee responsible for each "area of concern," Doc. 531 at 2; submitted certifications of compliance from each facility concerning the private shower mandate, Doc. 540-1, and search protocols, Doc. 543-1; provided updated laboratory reports for class members on hormone therapy, Doc. 537;

submitted a copy of the staff training program, Doc. 524-6; and confirmed that the Department had a working continuing quality improvement tool that covered mental health, medical, and operations functions, Doc. 540 at 5. Defendants also provided reports on the class members' placement in Logan's "D wing," Doc. 524 at 2-3; Doc. 535; and the Administrative Committee's decisions regarding transfers, Doc. 532. On surgical care, defendants reported that Dr. Schechter had doubled his operating room time, and "believe[d] that he [would] be able to proceed with the remaining [Department] surgeries" and explained that initiating a new arrangement with a new surgeon would take considerable time. Doc. 540 at 2-4. Defendants also reported that Dr. Schechter had completed 3 surgeries, scheduled 3 consultations, and had 10 patients left to schedule for consultations. *Id*. at 3.

In late March, the district court held a hearing on the continued contempt motion. Doc. 582. After the hearing, the court issued a second enforcement order, which acknowledged compliance with its directives on hormone therapy, but noted that "progress ha[d] continued to be sluggish in several key areas," including identifying new surgical providers and completing surgeries; providing training programs to staff and Logan inmates; and ensuring the availability of gender affirming commissary items and clothing. Doc. 552 at 2. The court noted that class members continued "to report incidents of noncompliance" with the prohibition on cross-gender searches and the requirement of private showers, despite the Department's certifications of compliance from each facility on those issues. *Id*. The court ordered additional injunctive relief, including requiring the parties to agree on

"procedures and deadlines to transfer any class member from a facility that fails to provide him/her/them with a private shower," or fails to comply with the court's search provision, "to a facility where compliance has been achieved." *Id.* at 6-7. The court ordered defendants to report on when a new surgical provider would start accepting class members as patients, provide a timeline by which the Department would reconsider all denials that it had issued on class members' requests for prison transfers, and develop "internal training for administrative staff to hold their subordinates accountable in the areas on which they are trained," as requested by graham. *Id.* at 4-8.

Pursuant to the order, defendants provided an updated transfer report, Doc. 562 at 1, and the parties acknowledged that the Administrative Committee had issued a decision on all pending transfer requests, Doc. 564 at 1-2. Defendants also reported that 13 surgical consultations had been scheduled with Dr. Schechter. Docs. 571-72. Defendants also addressed training, stating that staff training was completed in April 2023, the curriculum for inmate training at Logan would be complete by June 2023, and Logan inmates would complete training by September 2023. Doc. 562 at 1-2. Defendants further reported that correctional administrators had received training on staff accountability and discipline, but that those areas would continue to be reinforced in roll call memoranda to staff and at subsequent wardens' meeting. *Id.* at 2.

After another hearing on the continued motion for contempt, the district court issued a third enforcement order in May 2023. Doc. 584. The court expressed

concern that the number of transfer requests that the Administrative Committee considered did not accurately account for all class members who wished to transfer and noted that defendants had not identified any additional surgeons to perform approved surgeries. *Id.* at 5-9. The court entered additional injunctive relief, including ordering defendants to: (1) provide a "monthly census list" of class members; (2) submit quarterly laboratory results for class members on hormone therapy; (3) file in June a surgery schedule and a list of additional surgeons for the class; (4) provide by June 15 a complete audit/compliance tool; (5) give written notice to all class members who were denied transfers of their right to request reconsideration; (6) develop, with class counsel and co-monitors, "objective criteria to guide transfer decisions"; (7) propose a compliance deadline for distributing a "gender-affirming commissary kit" to all class members as a medical provision; (8) continue to address all complaints that arise relating to private showers and cross-gender searches; (9) report on progress toward all-staff training; and (10) complete all-inmate trainings on transgender issues by the end of September 2023. *Id.* at 9-15.

**Defendants' Motion to Vacate the Enforcement Orders**

Defendants moved to vacate the district court's enforcement orders, arguing that the orders did not comply with the PLRA, and requested an evidentiary hearing before the court entered any further orders or permanent relief. Doc. 587. Specifically, defendants argued that the enforcement orders improperly sought to enforce preliminary injunctions that had already expired and imposed additional

injunctive relief without making the factual findings required by the PLRA. Doc. 587 at 2; *see* 18 U.S.C. §§ 3626(a)(1), (2). Defendants also contended that the enforcement orders were tailored to the co-monitors' recommendations, rather than any constitutional requirement. Doc. 587 at 2.

In November 2023, the district court denied defendants' motion to vacate the enforcement orders and ordered the clerk to modify the docket to reflect that the February 2022 "preliminary injunction" was actually a permanent injunction. Doc. 678; *see* 2/7/22 docket entry 384 ("permanent injunction (to be interpreted in accordance with the Court's Order at Doc. 678)"). The court reasoned that the February 2022 order included "final" findings of fact and conclusions of law, establishing that defendants violated plaintiffs' Eighth Amendment rights. Doc. 678 at 13. The court further stated that the February 2022 injunction satisfied the PLRA's requirements because the relief granted was necessary, narrowly tailored, and the least intrusive means of remedying the Eighth Amendment violations. *Id.* at 11-16. The court also stated that the parties "understood the injunctive relief as permanent," as defendants continued to acknowledge the role of the co-monitors, engaged in status conferences, and responded to plaintiffs' motion for contempt. *Id.* at 15.

The court also concluded that because it had issued a permanent injunction, it had the inherent authority to enforce the February 2022 injunction through the enforcement orders and contempt. *Id.* at 16-22. The court explained that its enforcement orders did "not attempt to issue additional or new prospective injunctive

relief," but were instead "aimed at enforcing the terms of the already imposed permanent injunctive relief." *Id.* at 18. Lastly, the court found that the defendants were in contempt of court for failure to show reasonable diligence in complying with the February 2022 injunction, but declined to impose sanctions because of the "confusion" that it "unintentionally infused into this case concerning the nature of the operative injunction" and the considerable time that had passed since the filing of the contempt motion. *Id.* at 25.

## SUMMARY OF ARGUMENT

The district court made procedural and substantive errors that warrant vacatur of the November 2023 judgment and finding of contempt, as well as the January, April, and May 2023 enforcement orders that preceded it.  To begin, the district court abused its discretion by entering orders to enforce the February 2022 injunction more than 90 days after the injunction had issued.  Because the February 2022 injunction was a preliminary injunction, it automatically expired after 90 days by operation of law under the PLRA and thus could not be enforced beyond May 2022 absent further action by the court within that 90-day period.  As a result, to impose further injunctive relief, the court had to make separate findings that such relief was necessary, narrowly tailored, and the least intrusive means of remedying a still-ongoing Eighth Amendment violation.  Because the court did not make those findings in the enforcement orders, or the November 2023 permanent injunction, all of those orders should be vacated.

Additionally, the November 2023 finding of contempt was an abuse of discretion because it was based on noncompliance with the court's expired February 2022 preliminary injunction and corresponding enforcement orders.  And, in any case, the finding that defendants failed to exercise reasonable diligence to comply with the court's orders is not supported by the record, which shows that defendants complied with the court's reporting requirements and acted diligently to comply with the preliminary injunctions, even after they had expired.

But even if this court were to find that the February 2022 injunction was a permanent injunction, contrary to its clear terms, that order should be reversed and the injunction vacated. The evidence presented at trial did not support a finding that defendants recklessly disregarded a risk of harm to the class. On the contrary, the evidence showed that defendants undertook reasonable measures to address the deficiencies in medical treatment and accommodations that the district court identified, even if some of those efforts ultimately fell short.

# ARGUMENT

## I. The district court's enforcement and contempt orders exceeded the constraints on prospective relief in the PLRA.

In all cases, injunctive relief "should be no more burdensome than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (7th Cir. 2011). This rule applies with special force in the context of prison administration. *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (injunction must not be broader than necessary to remedy constitutional violation). Indeed, Congress enacted the PLRA to expedite prison litigation and curb judicial overreach into the management of prisons. *See Benjamin v. Jacobson*, 172 F.3d 144, 182 (2d Cir. 1999) ("Congress meant to get the federal courts out of the business of running jails."). To meet these objectives, 18 U.S.C. § 3626(a) further narrows the requirements for injunctive relief in two important respects that are relevant here.

*First*, the PLRA provides that prospective relief "shall extend no further than necessary to correct the violation of a Federal right." 18 U.S.C. § 3626(a)(1)(A); *see* 18 U.S.C. § 3626(a)(2) (preliminary injunctions also must be narrowly tailored). Emphasizing the importance of narrowly tailored relief, the PLRA requires district courts to make specific findings that any injunction is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A); *see Westefer*, 682 F.3d at 683 (injunctive requirements that exceeded constitutional minimum were invalid); *Lindell v. Frank*, 377 F.3d 655, 660 (7th Cir. 2004)

(overbroad injunction held invalid). These findings are designed to ensure that district courts do not overreach on issues of prison administration and management. *See Rasho v. Jeffreys*, 22 F.4th 703, 712 (7th Cir. 2022) (PLRA's "limit on remedies" ensures that prison officials maintain "substantial discretion over the institutions they manage"). Failure to make these findings entitles a defendant to "immediate termination of any prospective relief." 18 U.S.C. § 3626(b)(2).

*Second*, the PLRA limits the duration of preliminary injunctions to 90 days. 18 U.S.C. § 3626(a)(2). Unlike Fed. R. Civ. P. 65(a), which allows preliminary injunctions to remain in effect until a final decision, the PLRA sets an automatic 90-day expiration, unless the district court "makes the findings required under subsection (a)(1) for the entry of prospective relief *and* makes the order final" within that 90 days. 18 U.S.C. § 3626(a)(2) (emphasis added); *see Ahlman v. Barnes*, 20 F.4th 489, 493 (9th Cir. 2022). In other words, the district court must enter permanent relief within 90 days or the preliminary injunction expires "by its own terms." *Smith v. Edwards*, 88 F.4th 1119, 1124-25 (5th Cir. 2023); *Banks v. Booth*, 3 F.4th 445, 448 (D.C. Cir. 2021) (preliminary injunction automatically expired after 90 days); *U.S. v. Sec'y, Fla. Dep't of Corrs.*, 778 F.3d 1223, 1227 (11th Cir. 2015) (preliminary injunction "automatically passed on to injunction heaven" 90 days after it issued). In this way, the PLRA limits the harmful effects of potentially unjustified or overbroad temporary relief by requiring a final, appealable order within 90 days of the preliminary injunction. *See* 18 U.S.C. § 3626(a)(1). While several courts have recognized that the automatic expiration of a preliminary injunction does not

preclude a court from entering successive preliminary injunctions before entering final relief, in all cases, the court must review and reenter the injunction. *See Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001) (PLRA "imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted"); *Smith*, 88 F.4th at 1127 (plaintiff "could have sought" to extend duration of expired preliminary injunction).

The district court did not comply with the requirements for converting a preliminary injunction to a permanent injunction. The district court did not make the necessary finding that the injunction complied with section 3626(a) or make the relief final. Instead, the court issued a series of preliminary injunctions in December 2019, August 2021, and February 2022, without entering any final relief. As a result, all of those preliminary injunctions had expired by operation of law under the PLRA by May 2022 and could not be enforced after that date. The district court's subsequent orders to enforce the February 2022 injunction after it had expired were therefore invalid. *See Victory v. Berks Cnty.*, 789 F. App'x 328, 333 (3d Cir. 2019) (enforcement order expired with preliminary injunction). And, as the district court acknowledged, Doc. 678 at 18-19, the enforcement orders were not entered as additional prospective relief, but were instead entered to enforce the February 2022 injunction, *see* Docs. 522, 552, 584. As a result, the enforcement and contempt orders should be vacated because they were all based on a preliminary injunction that had expired months or years earlier.

## A.	The February 2022 injunction was a preliminary injunction and thus automatically expired in May 2022.

The district court erred when it concluded that the February 2022 injunction was a permanent injunction.  By its own terms, the February 2022 injunction was a preliminary injunction.  Doc 383 at 87 ("Court will enter the terms of the *preliminary* injunctive relief set forth above in a separate document.") (emphasis added); Doc. 384 at 1 (titled "Preliminary Injunction").  Indeed, in its November 2023 order, the court acknowledged that "throughout its February 2022 Order," it did *not* indicate that it intended to enter a permanent injunction, but instead "referred to either 'preliminary relief' or simply 'injunctive relief'; outlined the standard for preliminary injunctive relief; and titled the accompanying injunction a 'Preliminary Injunction.'" Doc. 678 at 10; *see* Doc. 383 at 63.  Moreover, the February 2022 order provided that the court would appoint a monitor to oversee compliance with the preliminary injunctions and make recommendations regarding the Department's administrative directives, *see* Doc. 383 at 68, 70, thus signaling that a final, permanent injunction eventually would follow.

Indeed, while the district court stated, in retrospect, that it intended its February 2022 order to provide "closure on the merits after the bench trial," 678 at 11, the court did *not* enter a final judgment at that time.  And the court continued to refer to the February 2022 order as a "preliminary injunction" throughout the following year.  For example, in January 2023, on consideration of plaintiffs' contempt motion, the court stated that "progress has been made toward compliance with the *Preliminary Injunctions*."  Doc. 522 at 1 (emphasis added); Doc. 584 at 3

39

("the February 7, 2022 Preliminary Injunction [gave] Defendants 14 days to report measures taken to comply").

Beyond that, the February 2022 injunction did not include the findings that are required to enter permanent injunctive relief under the PLRA. *See* 18 U.S.C. § 3626(b)(2) (injunction entered without need-narrowness-intrusiveness finding is subject to "immediate termination"). The PLRA requires specific findings that the ordered relief was necessary, narrowly tailored, and the least intrusive means to correct the violation of a federal right. 18 U.S.C. § 3626(a)(1)(A); *see Doe v. Cook Cnty.*, 798 F.3d 558, 565 (7th Cir. 2015) ("A bald declaration of compliance, without the findings required by statute, is ineffectual under § 3626(a)."); *Victory*, 789 F. App'x at 334 (recitation of PLRA need-narrowness-intrusiveness standard does not satisfy § 3626(a)(1)). But the February 2022 preliminary injunction, like the prior December 2019 and August 2021 preliminary injunctions, did not make that finding. *See* Doc. 186; Doc. 331; Doc. 383 at 64-70. Because the February 2022 injunction was a preliminary injunction, it therefore expired by operation of law on May 8, 2022 — 90 days after its entry. *See* 18 U.S.C. § 3626(a)(2); *see also Sec'y, Fla. Dep't of Corrs.*, 778 F.3d at 1227 (appeal from expired preliminary injunction was moot).

## B. The district court erred by retroactively modifying the February 2022 preliminary injunction into a permanent injunction.

Nor could the district court retroactively convert the February 2022 preliminary injunction into a permanent injunction, as it purported to do. *See* Doc. 678 at 26. Even if, as the court concluded, its reasons for entering the February 2022

preliminary injunction would have also satisfied the legal standard for a permanent injunction, *id.* at 11-13, the court erred by altering the relief that had been provided in a long-expired injunction. *Alloway v. Hodge*, 72 F. App'x 812, 817 (10th Cir. 2003) (PLRA requires court to make preliminary injunction permanent "in a timely manner"); *see also* 18 U.S.C.§ 3626(a)(2) (preliminary relief automatically expires unless the court "makes the order final *before the expiration of the 90-day period*") (emphasis added).

The February 2022 injunction, moreover, was not "understood to be permanent injunctive relief," as the court surmised. Doc. 678 at 11, 15. On the contrary, defendants expected the court, after evaluating the co-monitors' assessment of "what revisions to [Department] policies and Administrative Directives [were] necessary," Doc. 383 at 70, to either replace the preliminary injunction with a permanent injunction and final judgment or allow the injunction to expire. Indeed, in their response to plaintiffs' contempt motion, defendants specifically addressed that "no permanent injunction has entered, nor has there been any final relief set." Doc. 462 at 1. Plaintiffs too acknowledged that no final relief had been entered in their contempt motion by seeking relief for alleged non-compliance with the "preliminary injunctions." Doc. 455 at 1-2. It is clear that neither party understood the February 2022 order to be a permanent injunction.

Additionally, by retroactively modifying the injunction over a year after it had automatically expired, the district court prejudiced defendants. By making the February 2022 injunction a permanent injunction and entering a final judgment *after*

the time for appealing that order had expired, the court unfairly altered defendants'
expectations and appeal rights. To be sure, defendants could have appealed the
February 2022 preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). But the calculus
for appealing a preliminary injunction differs from that for appealing final relief
because of the limited duration of preliminary injunctions under the PLRA. *See
Banks*, 3 F.4th at 448 (preliminary injunction automatically expires after 90 days,
mooting an appeal). That is particularly true here because defendants had already
adopted A.D. 04.03.104 and committed to working with the Department's experts to
complete the course of implementation that it had described at trial. The relevant
considerations in deciding whether to appeal from a preliminary injunction and a
permanent injunction are decidedly different and by purporting to retroactively
convert the February 2022 preliminary injunction into a permanent injunction, the
district court deprived defendants of the opportunity to fully assess whether to
appeal.

  **C.**  **The court erred by entering contempt and enforcement orders
that were based on an expired preliminary injunction.**

  Because the February 2022 injunction had expired automatically in May 2022,
the district court lacked the inherent authority to enforce that injunction through
the January, April, and May enforcement orders. *See Sec'y, Fla. Dep't of Corrs.*, 778
F.3d at 1229 (expired preliminary injunction has no "legal effect on the parties");
*Victory*, 789 F. App'x at 333 (upon expiration of preliminary injunction, order to
implement plan for compliance with the injunction also expired). Indeed, the district
court acknowledged that there had to be an operative injunction in order for it to

exercise its enforcement authority.  Doc. 678 at 17.  The court therefore erred in issuing the enforcement orders, as well as the November 2023 contempt finding.

And the putative enforcement orders, which themselves did not comply with the PLRA, could not operate independently as preliminary or permanent injunctions. Again, prospective relief relating to prison conditions is circumscribed by the PLRA, which requires the court to make need-narrowness-intrusiveness findings.  18 U.S.C. § 3626(a)(1)(A) ("a court shall not grant or approve any prospective relief unless" it makes the requisite findings); *see also Howe v. Hughes*, 74 F.4th 849, 857 (7th Cir. 2023) ("any injunction with respect to prison conditions must "meet the need-narrowness-intrusiveness test); *Cook Cnty.*, 798 F.3d at 566-67 (court order was invalid because it did not include requisite findings under section 3626(a)(1)).  Thus, modifications to preliminary injunctions that extend beyond the initial relief imposed must contain specific findings supporting the items of injunctive relief.  *See Armstrong v. Newsome*, 58 F.4th 1283, 1297 (9th Cir. 2023).

But here, the district court acknowledged that the orders did not contain the findings necessary under the PLRA, concluding instead that they were properly "aimed at enforcement" of its prior injunction.  Doc. 578 at 18-19.  And beyond that, the enforcement orders imposed new duties and obligations on defendants that went beyond the relief in the preliminary injunctions without any findings mooring those conditions to any Eighth Amendment requirement.  *See Rasho*, 22 F.4th at 711-12 (PLRA required showing that injunction was narrowly tailored to achieving constitutional minimum); *Westefer*, 682 F.3d at 684 (same).  For example, the

enforcement orders modified the relief regarding gender affirming commissary by requiring defendants, for the first time, to reach an agreement with plaintiffs and co-monitors on items to be included "in a gender affirming kit for all class members as standard issue medical care" and set a deadline for distribution of the kit. Doc. 522 at 4. That relief imposed an additional burden relative to the court's prior orders to provide "access to gender affirming items in commissary." Doc. 679 at 3; *see* Doc. 384 at 4 (provide "access to gender items in the commissary"). And the court ordered the Department to "create an internal training for administrative staff to hold their subordinates accountable" regarding the staff training. Doc. 552 at 8; Doc. 584 at 14. This additional relief was ordered after defendants reported compliance with the court's order to "finalize and implement additional ongoing training for correctional staff on transgender issues and awareness." Doc. 384 at 5; *see* Doc. 584 at 13 (initial staff training was provided in 2022).

The January, April, and May 2023 orders thus improperly imposed additional, onerous requirements on defendants without making any findings that these new obligations were necessary, narrowly tailored, or the least intrusive means of remedying an ongoing constitutional violation. *See Rasho*, 22 F.4th at 711 (relief must be limited to constitutional violation). As a result, the enforcement orders not only are invalid because they were entered to enforce the expired February 2022 injunction, but also because they do not comply with the PLRA.

II. **The district court's November 2023 finding of contempt was an abuse of discretion, and its finding that defendants failed to make reasonable efforts to comply with its orders was clearly erroneous.**

A court has the inherent power to enforce its orders through contempt. *Spallone v. United States*, 493 U.S. 265, 276 (1990). A finding of contempt may issue upon clear and convincing evidence that (1) the court issued an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply. *Prima Tek II, LLC v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008). A contempt finding will be reversed only if it was an abuse of discretion. *Id.* at 541-42. A district court abuses its discretion when it makes an error of law or when it makes a clearly erroneous finding. *Fed. Trade Comm'n v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009).

As discussed, by the time that the district court entered the finding of contempt, the February 2022 injunction had expired. *See* 18 U.S.C. 3626(a)(2). As a result, the district court abused its discretions by enforcing the injunction through contempt. *See Victory*, 789 F. App'x at 333 (court abused its discretion in granting contempt motion for noncompliance with order that lacked legal effect).

Further, contrary to the district court's finding, the record demonstrates that defendants made diligent efforts to comply with the court's preliminary injunctions, even after they had expired, as well as the enforcement orders. Indeed, graham reported from the outset that Department officials had made "a good faith effort

towards compliance," and described the administrative staff as "cooperative," "forthcoming," "action oriented," and "genuinely trying to comply" with the court's orders. Doc. 444 at 4-6. That cooperation also was reflected in defendants' status reports on compliance, in which they met all of the court's reporting requirements and took additional steps to address any deficiencies in its provision of care. *See, e.g.*, Docs. 202, 210, 355, 446. For example, when Dr. Harris reported that a high percentage of class members receiving hormone therapy had not achieved target hormone levels, Doc. 439 at 5-8, defendants responded by increasing centralized oversight over its medical providers and referring more cases to the UIC clinic, Doc. 446 at 1-2. Similarly, when graham reported issues with gender affirming commissary items, Doc. 444 at 16-18, defendants continued to work with its vendors to improve commissary offerings, Doc. 448 at 2-3, and established a project manager to monitor stock of gender affirming items across all facilities, Doc. 454 at 3.

Additionally, even regarding the district court's order to identify additional surgical providers, Doc. 522 at 3, defendants did not flout the court's authority. Rather, defendants reported that Dr. Schechter had doubled his operating room time, and "believe[d] that he [would] be able to proceed with the remaining [Department] surgeries." Doc. 540 at 2-3. Defendants also raised a concern that undertaking new arrangements with a new surgeon at a different medical facility would take considerable time, *id.*, demonstrating that noncompliance with that directive was not intended to thwart progress on providing surgical care. On balance, the record thus

demonstrates that defendants made reasonable and diligent efforts to comply with all of the court's orders.

## III. The district court committed reversible error by determining that defendants acted with deliberate indifference to plaintiffs' serious medical needs.

Even if the court concludes that district court's attempt to retroactively convert its February 2022 injunction into a permanent injunction was proper, this court should reverse and vacate the injunction. When reviewing an injunction, this court "review[s] the district court's factual findings for clear error, its entry of the injunction for abuse of discretion, and its legal conclusions *de novo*." *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854, 863 (7th Cir. 2013). Because defendants did not recklessly disregard the class's medical needs, the district court clearly erred in finding that they violated the Eighth Amendment.

### A. Deliberate indifference is akin to criminal recklessness and requires proof that a prison official subjectively knew of and disregarded a risk to an inmate's health or safety.

The Eighth Amendment prohibits cruel and unusual punishments. U.S. Const. amend. VIII. Among the punishments the amendment forbids is the "unnecessary and wanton" infliction of suffering caused by an official's deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). To establish deliberate indifference, inmates must prove that the prison official both knew of and disregarded an excessive risk to their health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Supreme Court has rejected an objective test for deliberate indifference, holding that the Eighth Amendment mandates an inquiry into the defendant's state

of mind because the amendment "does not outlaw cruel and unusual conditions; it outlaws cruel and unusual punishments." *Id.* "If the pain inflicted is not formally meted out *as punishment* by the statute or sentencing judge, some mental element must be attributed to the official" for the amendment to apply. *Wilson v. Seiter*, 501 U.S. 294, 299-300 (1991) (emphasis in original). That subjective component must be satisfied regardless of whether the claim is brought on an individual or system-wide basis. *Id.* at 300; *Rasho*, 22 F.4th at 711.

Courts therefore perform a two-step analysis when assessing an Eighth Amendment claim alleging a deprivation of medical care, "first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (*en banc*). In this appeal, defendants challenge the district court's conclusion that plaintiffs met their burden to prove the subjective component — deliberate indifference.

Deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835; *see Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("evidence of medical negligence is not enough to prove deliberate indifference"). Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. The Supreme Court has instead adopted criminal recklessness as the test for deliberate indifference under the Eighth Amendment. *Farmer*, 511 U.S. at 839-40;

*see Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008) ("negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense").

The failure to take steps to correct systemic deficiencies in medical care may indicate that an official acted with a sufficiently culpable mental state. *Phillips v. Sheriff of Cook Cnty.*, 828 F. 3d 541, 554 (7th Cir. 2016). But a finding of deliberate indifference does not turn on whether the measures that were taken ultimately were successful. *Rasho*, 22 F.4th at 711. Rather, the question is whether the response was so deficient as to evince subjective recklessness. *Petties*, 836 F.3d at 728 (objective recklessness "is insufficient to make out a claim"); *see Farmer*, 511 U.S. at 844 (official response may defeat deliberate indifference "even if the harm ultimately was not averted"); *Whiting*, 839 F.3d at 664 (jury could not infer deliberate indifference from evidence that chosen treatment did not work).

Thus, an official's response to a risk of harm can defeat an allegation of deliberate indifference even if the risk of harm is not ultimately averted. *Farmer*, 511 U.S. at 844; *Rasho*, 22 F.4th at 711. The deliberate indifference standard imposes a "high hurdle" and requires a showing "approaching a total unconcern for the prisoner's welfare," *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (internal quotations and citation omitted), ensuring that "the mere failure [] to choose the best course of action does not amount to a constitutional violation," *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002).

## B. The district court clearly erred by finding that defendants acted with deliberate indifference.

As noted, this court reviews the district court's findings of fact for clear error. *ARC Welding Supply Co., Inc. v. Am. Welding & Gas, Inc.*, 924 F.3d 322, 325 (7th Cir. 2019). A factual finding is clearly erroneous when, although there is evidence to support it, a review of the entire record leaves this court "with the definite and firm conviction that a mistake has been committed." *Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 868 (7th Cir. 2012) (internal quotations omitted).

The district court's finding that defendants acted with deliberate indifference is clearly erroneous on this record. The district court concluded that defendants were aware that plaintiffs "were not receiving adequate medical care or social transition for their gender dysphoria," yet "allowed these conditions to persist." Doc. 383 at 64. But as this court recognized in *Rasho*, deliberate indifference does not turn on whether defendants' efforts "fell short," but on whether they "undertook reasonable measures" to address any systemic deficiencies in care. 22 F.4th at 711.

And here, the evidence showed that defendants had taken numerous steps to improve the quality of the Department's treatment of gender dysphoria prior to the entry of the February 2022 injunction. Beginning in January 2020, the Department worked with expert consultants, Dr. Anderson and Leach, to revise its policies and procedures and improve the quality of gender dysphoria care for class members. Doc. 349 at 22, 133-35. Under the revised policy, facility mental health providers were preparing treatment plans, Doc. 325. at 74-75, and medical directors were providing hormone therapy without the need for committee approval, Doc. 348 at 350. All

healthcare providers, along with Department administrators, were provided a two-day WPATH training program, which covered the *Standards of Care*, along with additional training provided by Dr. Reister and Wexford. Doc. 354 at 53, 62; Doc. 349 at 145, 153, 156.

In addition, the Department had also contracted with several experts, including Drs. Anderson, Iyengar, and Layden, to consult with medical and mental health providers. Doc. 354 at 46-49, 64-65, 74-75; Doc. 349 at 141-44, 148. The Department was also finalizing partnerships with the UIC clinic to provide direct patient hormone therapy, and Dr. Schechter to provide gender affirming surgery. Doc. 354 at 46-49, 50. And among other things, the Department was developing the PRISM program to provide a more supportive milieu for class members and other inmates, Doc. 354 at 24; *see* Doc. 369-6; took steps to increase offerings of gender affirming commissary, Doc. 349 at 34-35; created a policy, through its identification card system, to allow transgender inmates to choose the gender of the officer who searched them, Doc. 349 at 44-45; and implemented training for correctional staff, Doc. 325 at 67-70.

These measures show that defendants did not disregard a substantial risk of harm, but instead pursued an array of measures designed to improve the level of care provided to the class and comply with the prior preliminary injunctions. Even if some of the Department's efforts ultimately proved unsuccessful, those efforts cannot support a finding of deliberate indifference unless they were so deficient as to justify the inference that defendants knew that their efforts would be ineffective but

pursued them anyway. *See Whiting*, 839 F.3d at 664 (deliberate indifference requires evidence that defendant knew treatment would be ineffectual "but persisted in this course of treatment anyway"). A "lack of a sense of urgency" or belief that defendant "could have done more" does not satisfy that standard. *Rasho*, 22 F.4th at 711.

Given the multitude of measures that defendants took to comply with the preliminary injunction, the court's determination that they acted with deliberate indifference because the Department's new administrative directive "did not result in improved treatment and care of members of the class," Doc. 383 at 66, was clearly erroneous, *see Rasho*, 22 F.4th at 711; *Farmer*, 511 U.S. at 844 (official response may defeat deliberate indifference "even if the harm ultimately was not averted"); *Whiting*, 839 F.3d at 664 (jury could not infer deliberate indifference from evidence that chosen treatment did not work).

## CONCLUSION

For the foregoing reasons, Defendants-Appellees Latoya Hughes, Steven Bowman, and Melvin Hinton ask this court to reverse the judgment and vacate the district court orders of January 24, 2023, April 4, 2023, May 11, 2023, and November 16, 2023.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

Attorneys for Defendants-Appellees

/s/ Christina T. Hansen
**CHRISTINA T. HANSEN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-6569 (office)
(872) 272-0819 (cell)
Christina.Hansen@ilag.gov

February 23, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Fed.

R. App. P. 32(a)(5) and 7th Cir. R. 32 and the type style requirements of Fed. R. App.

P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface

using Microsoft Word 365, in 12-point Century Schoolbook BT font, and complies

with Fed. R. App. P. 32(a)(7)(B)(i) in that the brief contains 12,649 words.

/s/ Christina T. Hansen
CHRISTINA T. HANSEN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5659 (office)
(872) 272-0819 (cell)
Christina.Hansen@ilag.gov

# REQUIRED SHORT APPENDIX OF DEFENDANTS-APPELLANTS

1. February 7, 2022 Memorandum and Order (Doc. 383) ............................................A1

2. February 7, 2022 Injunction (Doc. 384).................................................................A88

3. January 24, 2023 Memorandum and Order (Doc. 522).......................................A101

4. April 4, 2023 Memorandum and Order (Doc. 552) ............................................A107

5. May 11, 2023 Memorandum and Order (Doc. 584) ...........................................A116

6. November 16, 2023 Memorandum and Order (Doc. 678) ..................................A131

7. November 16, 2023 Judgment Order (Doc. 679) ...............................................A157

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,[1]
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

        Plaintiffs,

v.

                                 Case No. 3:18-CV-00156-NJR

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

        Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

On August 5, 2021, at the conclusion of a four-day bench trial, the undersigned issued a verbal ruling for specific preliminary injunctive relief in this case, later set forth in the written Order/Preliminary Findings of Fact and Conclusions of Law dated August 9, 2021. (Doc. 331; Doc. 349, pp. 972-92).[2] That Order noted that the previous (December 2019) Preliminary Injunction continues in force. (Doc. 212). And, of course, at this time the injunctive relief issued in August 2021 remains in effect.

---

[1] The named Plaintiffs, and many members of the Plaintiff class, use chosen names reflecting their gender identity rather than their given names at birth. Throughout this Order, the Court refers to each Plaintiff by their chosen name, which may not match the name in IDOC records.

[2] *See also* Preliminary Injunction at Doc. 332 and correction at Doc. 336, separately setting forth the additional preliminary injunctive relief pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019).

**A1**

This Memorandum and Order more fully summarizes the August 2021 bench trial testimony and the depositions and exhibits submitted at trial, factual findings, and conclusions of law supporting the preliminary injunctive relief previously ordered. *See* Docs. 331, 332, and 336. The Court does not repeat all of its findings from August 2021 because they are incorporated into this Memorandum and Order. The preliminary injunctive relief is set forth again below; of course, certain deadlines have already passed. The Court will summarize progress made to date toward compliance with the ordered injunctive relief, as well as areas where compliance has not yet been achieved. And, as discussed below, in light of the parties' supplemental filings, the Court finds further injunctive relief is warranted.

## INTRODUCTION

This litigation was brought on behalf of a class of Plaintiffs, consisting of all prisoners in the custody of the Illinois Department of Correction ("IDOC") who have requested evaluation or treatment for gender dysphoria. (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. The named Defendants are, respectively, the IDOC Chief of Health Services, IDOC Chief of Mental Health, and the IDOC Director, all sued in their official capacity.

Plaintiffs assert that Defendants' policies and practices subject the class to a substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria, in violation of their rights under the Eighth Amendment. (Doc. 1, p. 36). They seek injunctive relief to remedy the flaws in IDOC's treatment of transgender inmates. (Doc. 1, pp. 36-38). Problems include: IDOC's use of a committee of

unqualified officials to make decisions regarding the medical treatment, security, and placement of transgender inmates; widespread delays or denials in evaluating prisoners for gender dysphoria and in providing hormone therapy and hormone monitoring; failure to consider or provide gender-affirming surgery as part of medically necessary treatment for gender dysphoria; failure to accommodate and facilitate social transition for individuals with gender dysphoria, such as failing to allow access to gender-affirming clothing and grooming items, failing to make individualized housing placement decisions, and permitting cross-gender strip searches; and failing to provide access to medical and mental health providers competent to treat gender dysphoria.

## PROCEDURAL HISTORY

After a two-day evidentiary hearing completed on August 1, 2019, the Court granted preliminary injunctive relief. (Docs. 186, 187, amended on March 4, 2020. *See* Doc. 212). The class, defined as "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria," was certified in an order dated March 4, 2020. (Doc. 213).

The initial Preliminary Injunction ordered Defendants to: cease the policy and practice of allowing the Transgender Care Review Committee ("TCRC") to make medical decisions regarding gender dysphoria; to develop a policy to ensure that treatment decisions for inmates with gender dysphoria are made by medical professionals qualified to treat gender dysphoria; to ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments and routine monitoring of hormone levels; to cease the policy and practice of depriving

**A3**

gender dysphoric prisoners of medically necessary social transition and to develop a policy to allow such transition (including individualized placement decisions, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items); to develop policies and procedures allowing transgender inmates access to clinicians who meet the WPATH[3] competency requirements; to allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications; and to advise the Court regarding steps taken to train all correctional staff on transgender issues. (Doc. 212).

A four-day bench trial was held from August 2 to 5, 2021, and culminated in the second order for preliminary injunctive relief. (Docs. 331, 332).[4] On August 18, 2021, the Court corrected an error in the Preliminary Injunction. (Doc. 336).

On August 16, 2021, at the Court's direction, Plaintiffs submitted a post-trial brief outlining the deficiencies in IDOC's new Administrative Directives of April 1, 2021, and requested additions/changes to the injunctive relief. (Doc. 335). Defendants responded to that brief on September 7, 2021. (Doc. 346).

Subsequently, Defendants filed status reports setting forth steps they have taken toward compliance with the preliminary injunctive relief ordered by the Court. (60-day Status Reports at Doc. 355 and Sealed Doc. 357; Plaintiffs' Response at Doc. 359); (120-day Status Report at Doc. 369).

---

[3] World Professional Association for Transgender Health. This organization's Standards of Care for the treatment of gender dysphoria are the benchmark for appropriate care of individuals with this diagnosis. (Doc. 186, pp. 3-4, 31).
[4] *See also* Preliminary Injunction at Doc. 332 and correction at Doc. 336.

## FACTUAL BACKGROUND

### *Treatment of Gender Dysphoria*

As previously set forth in the first order for preliminary injunctive relief (Doc. 186, pp. 3-6), gender dysphoria is a condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender. (Doc. 157, p. 95; Doc. 158, p. 14);[5] *see also Campbell v. Kallas*, 936 F.3d 536, 538 (7th Cir. 2019). Gender dysphoria is considered a serious medical condition with psychiatric components; it has been removed from the mental and behavioral disorders in the World Health Organization Classification of Diseases and the Diagnostic and Statistical Manual of Mental Disorders. (Doc. 158, p. 95; Doc. 325, p. 538-39; Doc. 353, p. 379).

The World Professional Association for Transgender Health ("WPATH") is a professional association dedicated to understanding and treating gender dysphoria. (Doc. 157, p. 98). WPATH dictates medically accepted Standards of Care for treating gender dysphoria. (*Id*. at 7). According to WPATH, its Standards of Care are "the highest standards of health care" for transgender people. (Doc. 123, Ex. 13, p. 8). IDOC purports to follow the Standards of Care and has updated its mental health standards operating procedure manual to incorporate them. (Doc. 143, Ex. 4, pp. 4, 10). According to WPATH, treatment options for gender dysphoria include social role transition, cross-sex hormone therapy, psychotherapy, and surgery. (Doc. 158, p. 14).

---

[5] Docs. 157 and 158 are the transcripts of the Preliminary Injunction Evidentiary Hearing on July 31 and August 1, 2019.

WPATH lists the minimum qualifications a mental health professional must attain in order to assess and treat gender dysphoria. (*Id.* at 25). Specifically, a person must: hold a master's degree in behavioral science; be familiar with the Diagnostic and Statistical Manual of Mental Disorders ("DSM") or the International Classification of Diseases; have documented supervision in psychotherapy; understand the variations of gender identities and gender expressions; have continuing education in the assessment and treatment of gender dysphoria; have cultural competence; and be aware of the growing body of literature in the area. (Doc. 158, pp. 25-26). Individuals who are new to the field should work under the supervision of someone with competence who is regarded as an expert in gender dysphoria. (*Id.* at 26).

**Social Role Transition**

Social role transition is living in the gender role congruent to one's affirmed identity. For instance, in the case of a transgender woman, social transition would include wearing a female hairstyle, female clothing, and makeup, and using a feminine name, female toiletries, and a female bathroom. (Doc. 158, p. 16). In a prison setting, social transition would require a transgender woman be afforded the same commissary items that female prisoners can access, have means to safe and effective hair removal, be referred to by a female name, and be permitted to wear makeup or clothing that affirms her gender. (*Id.* at 17).

**Psychotherapy**

Psychotherapy helps individuals become more resilient, deal with stigma, manage family situations, and cope with the social problems that are attendant to gender

dysphoria. (Doc. 158, p. 14).

**Surgery**

There are different surgical options for transgender individuals, including reconstruction of the genitalia, also known as gender-affirming surgery. (Doc. 158, pp. 20, 90). Reconstruction eliminates the major source of hormones that contribute to and cause gender dysphoria. (*Id.* at 20-21). After reconstruction, the urogenital organs function and appear the same as one's peers. (*Id.*). Medicare declared gender-affirming surgery to be medically necessary and safe in 2014. (*Id.* at 88). Studies indicate that less than one percent of patients who undergo gender-affirming surgery around the world experience regret. (*Id.* at 90). Other studies show suicide and self-harm dramatically decrease following reconstruction surgery. (*Id.*). Other surgical options include removal of the breasts and chest reconstruction. (*Id.* at 21).

**Cross-Sex Hormone Therapy**

Cross-sex hormone therapy involves taking hormones to masculinize or feminize the body. (Doc. 158, p. 14). An individual should not begin hormone therapy unless he or she has well-documented gender dysphoria above the age of majority and has no significant mental health concerns that prevent him or her from giving informed consent. (*Id.* at 19). Hormone therapy is often a necessary component of treating gender dysphoria. (Doc. 157, p. 156).

The Endocrine Society Guidelines are internationally recognized baseline guidance for the adequate treatment of gender dysphoria. (Doc. 157, p. 91). Hormone therapy that falls below the Guidelines is considered less-than-adequate treatment.

**A7**

(Doc. 157, pp. 98-99). The Guidelines state that once a person begins hormone therapy, they should undergo baseline lab testing to monitor hormone levels. (Doc. 157, p. 102). Hormone levels need to be checked every two to three months for the first year of treatment, and dosages should be adjusted accordingly until a target hormone level is achieved. (*Id.*). After this period, hormone levels should be checked once or twice each year. (*Id.*). An individual who suddenly stops taking hormones is at risk for serious medical or mental health complications. (*Id.* at 103).

Spironolactone and Estradiol are the two main agents involved in hormone therapy for transgender women. (*Id.* at 103-04). Spironolactone is a testosterone blocker, and Estradiol is estrogen. (*Id.* at 104, 109). Estradiol is administered at a starting dose of two milligrams and titrated to four or six milligrams. (*Id.* at 104). Four milligrams typically results in target concentrations. (*Id.* at 105). For transgender men, hormone treatment involves testosterone injections. (*Id.* at 106).

Spironolactone is a diuretic that can elevate potassium levels and cause heart arrhythmias, kidney failure, and death. (Doc. 157, p. 107). Estradiol enlarges the pituitary gland, which can cause blindness if the gland gets too big. (*Id.* at 107-08). Thus, monitoring hormone levels, as well as levels of potassium, creatinine (a kidney function marker), and prolactin, is important for efficacy and safety. (*Id.* at 107-08).

There are other forms of estrogen besides Estradiol, but the Endocrine Society Guidelines do not recommend them because they are very difficult to monitor. (*Id.* at 109-110). For example, Premarin and Menest, which are conjugated estrogens, are not naturally produced by the body; they come from pregnant horse urine. (Doc. 157, p. 110).

**A8**

Transgender individuals may receive hormone therapy but still experience symptoms of gender dysphoria because their body does not match their gender identity. (Doc. 157, p. 109). Hormone therapy does not shrink genitals or make them disappear. (*Id.*).

### *IDOC's Policies on Transgender Inmates*

At the time of the July-August 2019 evidentiary hearing, IDOC's policies and procedures for evaluating and treating inmates with gender dysphoria were set forth in Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders" ("the GID Directive"), effective May 1, 2013. (Doc. 186, pp. 7-8); (Doc. 1, p. 17; Doc. 123-10; Doc. 143, p. 3). The GID Directive created a Gender Identity Disorder Committee ("GIDC") to review transgender inmates' "placements, security concerns and overall health-related treatment plans…and to oversee the gender related accommodation needs of these offenders." (Doc. 123-10, pp. 3-4; Doc. 348, p. 303). But Defendants represented that as of June 2019, the GID Directive was "under revision," and IDOC officials were following the revised draft policy even though it had not been officially implemented. (Doc. 143, p. 3; Doc. 143-2).

The 2019 revised draft of Administrative Directive 04.03.104 replaced the GIDC with the Transgender Care Review Committee ("TCRC"),[6] tasked with "reviewing placements, security concerns, and overall health related treatment plans of transgender

---

[6] The TCRC is frequently referred to as the "Transgender Committee" in the transcripts and other documents of record. The Court will refer to this committee by its acronym in order to distinguish it from the differently-named committees which replaced it under the newer Administrative Directive adopted in April 2021.

offenders and offenders diagnosed with Gender Dysphoria, and to oversee [their] gender related accommodations[.]" (Doc. 143-2, p. 3). The TCRC had five voting members: IDOC's Chief of Psychiatry (Dr. William Puga, TCRC Chair), Chief of Health Services (Dr. Steve Meeks), Chief of Mental Health Services (Dr. Melvin Hinton), Chief of Operations (Mr. Eilers), and Transfer Coordinator (Ms. Wortley) (Doc. 158, pp. 102, 146-52). None of these individuals met WPATH's minimum qualifications for treating transgender people; two had no medical training (Doc. 158, pp. 146-51).

The TCRC met once each month to review inmates' treatment and care, reviewing about 20 cases at each meeting, including treatment plans and inmate requests for surgery and/or transfers. (*Id.* at 105; Doc. 348, p. 322-23). IDOC's therapists would present issues to the TCRC on behalf of the inmate. (*Id.* at 111-13). The TCRC reviewed information about each inmate, including the inmate's treatment plan, but did not review an inmate's complete medical records. (*Id.* at 113, 163). The TCRC generally allotted six minutes to hear an inmate's case. (*Id.* at 162). The TCRC decided issues based on a majority vote of its five members, but nonmedical members did not vote on medical issues. (*Id.* at 157, 187). After the TCRC rendered a decision, the inmate's therapist or physician was responsible for carrying out the plan. (*Id.* at 113). There was no formal appeals process for challenging the TCRC's decisions. (*Id.* at 160-61).

Following the December 2019 Preliminary Injunction, on April 1, 2021, IDOC adopted two new Administrative Directives: (1) Administrative Directive ("AD") 04.03.104, entitled "Evaluation, Treatment and Correctional Management of Transgender Offenders" (Tr. Ex. 600), and AD 05.01.113 "Searches of Offenders." (Tr. Ex. 601).

**A10**

(Doc. 353, p. 502). IDOC began to implement changes under these policies governing care of transgender inmates. (Doc. 348, pp. 304-05; testimony of Dr. Melvin Hinton). The former TCRC was broken into two separate committees, the Transgender Health and Wellness Committee ("THAWC" or "THAW Committee") and the Transgender Administrative Committee ("TAC"). (Doc. 348, pp. 304-05). Each committee meets monthly. All requests for gender-affirming surgery must go to the THAWC, which decides whether to approve surgery and addresses other medical and mental health care concerns. (*Id.* at 314-15, 352). The TAC focuses on safety and security matters, handling nonmedical, non-mental health related issues including inmate transfer requests (such as when a transgender woman seeks a transfer from a men's to a women's facility) and what gender-affirming commissary items will be available to transgender inmates. (*Id.* at 352-53).

Although the duties are divided in an attempt to separate medical and mental health issues from security considerations, the identity of members on each committee is similar to those previously serving on the TCRC. Dr. Puga, Dr. Hinton, Dr. Conway (Deputy Chief of Health Services), and Dr. Shane Reister (Southern Regional Psychologist Administrator) all served on the former TCRC and now serve on the THAW Committee. Dr. Puga, Dr. Conway, and Dr. Reister also serve on the TAC along with other officials including the chief of operations' designee, chief of women's services, and transfer coordinator. (Doc. 354, pp. 787-88, 822-25). Administrative Directive 05.01.113 sets forth revised procedures governing searches of transgender prisoners.

**A11**

**TRIAL TESTIMONY**

*Plaintiffs' Evidence*

**Marilyn Melendez**

Melendez is a 27-year-old IDOC inmate housed at Pontiac Correctional Center ("Pontiac") at the time of her testimony on August 2, 2021. (Doc. 347, p. 32, 46). She was also at Pontiac, a male facility, when she testified at the evidentiary hearing on July 31, 2019. (Doc. 186, p. 19; Doc. 157, pp. 13-16, 40). She explained she was assigned male at birth but identified at a young age as female. *Id.* Her mother started her on hormones, testosterone blockers, and estrogen at age eight or nine, but at age 13—after starting to develop breasts—she was unable to continue that treatment due to cost. Melendez then went through male puberty, growing taller, developing muscles and a deep voice, and began experiencing erections. *Id.* She "felt like a monster," endured taunting from peers, and got into fights and drugs, which led to her incarceration in 2012. (Doc. 186, p. 19; Doc. 157, p. 16). Upon entering prison, Melendez told prison officials that she was transgender, but she was not evaluated for gender dysphoria or hormone therapy for three years. (Doc. 186, p. 19; Doc. 157, pp. 16-20; Doc. 347, pp. 32-33, 67). In March 2015 she was diagnosed with gender dysphoria, but the TCRC did not initially approve her for hormone therapy; she started that treatment in July or August 2015. (Doc. 186, p. 20; Doc. 157, pp. 21-22).

Melendez testified in 2019 that her hormone dosage seemed inadequate, as she was still growing excess facial and body hair and was experiencing frequent erections. (Doc. 186, p. 20; Doc. 157, pp. 23-25). She had requested gender-affirming surgery but

**A12**

was told IDOC would not pay for it. (Doc. 186, p. 20; Doc. 157, p. 26). Her request for hair removal was denied, and she was unable to access commissary products available to females. She was not allowed to have a bra until two years after requesting one and has been unable to obtain other gender-affirming clothing or undergarments. (Doc. 186, p. 21; Doc. 157, pp. 29-30, 32-36, 48). Melendez has been strip-searched by male correctional officers in front of male inmates. IDOC staff have laughed at her, verbally harassed and groped her, and have frequently misgendered her, including calling her "it" and "he-she." (Doc. 186, p. 21; Doc. 157, pp. 36-38, 52). These conditions have caused Melendez severe psychological distress including suicidal ideation, as well as physical discomfort. (Doc. 186, pp. 21-22; Doc. 157, pp. 27, 33-34, 38-39, 48).

On August 2, 2021, Melendez testified that the care she is presently receiving is worse than it was in July 2019. (Doc. 347, p. 33). Her hormone therapy has been interrupted at least twice for lengthy periods. In February 2020, her medication was interrupted for a month and a half when she was placed in segregation, despite her submitting several letters and grievances seeking to have her prescriptions restored. (Doc. 347, pp. 33-41, 79; Plaintiffs' Exhibits 470, 471, 472, 473, 475). In August 2020 her refill of hormones was delayed for three weeks and she was completely without medication for a week. (Doc. 347, pp. 39-40, 76-78). There have been other delays in timely providing her with refills so that the medications may be properly taken together. (*Id.* at 79-80). She had been switched from Premarin to Estradiol and then back to Premarin between July and October 2019. (*Id.* at 41-42). Her current therapy consists of 5 mg Estradiol and 200 mg Spironolactone daily, but she still has excessive hair growth and

frequent erections. (*Id.* at 42-43). Her treating physician, Dr. Tilden, has not looked into why Melendez continues to have these issues, has not altered her dosages, and will not disclose her testosterone or estrogen levels. (*Id.* at 44-46, 80-81). She has had blood work about four times since July 2019 but is unsure whether she was tested for hormone levels. (*Id.* at pp. 45, 81). She has not succeeded in requesting copies of her medical records due to COVID-19 related law library restrictions. (*Id.* at 86-87).

Melendez had requested gender-affirming surgery as of July 2019 but was not evaluated for it. (*Id.* at pp. 46-47). She asked her mental health professional (Ms. Yuhas) to pursue a surgery evaluation and received a letter on October 14, 2020, informing her that the TCRC would consider her surgery request on January 5, 2021. (Doc. 347, pp. 48-49; Pl. Ex. 477). In March 2021, Ms. Yuhas told Melendez her surgery was approved and she was on the waiting list, but nothing further had happened as of August 2, 2021, and she had not been shown any paperwork to confirm the approval or describe what type of surgery was approved. (Doc. 347, pp. 50, 88-91; Def. Ex. 623).

Melendez continues to experience humiliation and disrespect as a result of being housed with male inmates. (Doc. 347, pp. 52-53). Before coming to court for trial, she was strip searched by a female officer for the first time, but only after she showed this Court's Order to the lieutenants in charge. (*Id.* at 53, 94). A few weeks earlier Melendez requested to be searched by a female officer but was threatened with mace and a beating if she did not submit to a strip search by a male officer during a shakedown. (*Id.* at 54). All other strip searches of Melendez at Pontiac since the Preliminary Injunction in December 2019 had been performed by male officers, despite her attempts to inform staff of the

**A14**

Preliminary Injunction. (Doc. 347, pp. 54-55, 92-93). In July 2021, Melendez spoke with Warden Leonta Jackson during his tour of the gallery with other officials, telling him about the misgendering and strip searches, and she showed him the Preliminary Injunction Order. Jackson grabbed Melendez's copy of the Order, threw it off the gallery, and said that she was a man, she is in a male institution, she has a penis, and she will be searched by men. (*Id.* at 55, 69-70).

Melendez testified at trial that the mistreatment and harassment she experiences from some IDOC officers is worse than in July 2019. (*Id.* at 56). The officers who try to be respectful and use her proper pronouns are ridiculed by other officers. Certain staff make a point of calling Melendez derogatory names and write her a disciplinary ticket if she says anything back. She is regularly misgendered both verbally and in documents, including those written by medical and mental health staff. (*Id.* at 56-57, 101-02).

As of July 2019, Melendez had not requested to transfer to a women's facility because she had heard of problems experienced by other transgender women there. By the time of trial, she had changed her mind due to the worsening treatment by Pontiac staff and the lack of consequences for the harassers. (Doc. 347, pp. 57-58). Melendez requested a transfer, but in December 2020 was told that before it could be considered, she would have to sign out of protective custody and go to general population, where she would risk physical assault. (*Id.* at 58-60, 99-100; Pl. Ex. 476).

The commissary made makeup items available for purchase in March 2021, well over a year after the Court's initial Preliminary Injunction. As of the time of trial, however, female undergarments, shoes, and hair products were not available. (*Id.* at 60-

**A15**

61, 94-98). New male undergarments are given to inmates every six months, but Melendez has not received a new bra since 2018. (Doc. 347, p. 62).

Melendez initially hoped that things would improve after the December 2019 Preliminary Injunction but became increasingly exhausted and hopeless when conditions instead became worse. (*Id.* at 62-63). She attempted suicide in August 2020. Her current mental health professional, Joe Ramos, does not want to talk about her anxiety or depression related to her gender dysphoria and tells her it is not his field or expertise. Every time Melendez sees Ramos he asks her about her religious beliefs; for example, he asked in June 2021 how God would feel about her "desecrating the temple" of her body by transitioning. (*Id.* at pp. 63-65). She has attended the "GIFT" program, a group for transgender prisoners that started in 2020, but states it was not therapeutic. (*Id.* at pp. 82-84).

Overall, Melendez's care and treatment in prison has not meaningfully changed since the December 2019 injunction; the only difference she has observed is that makeup was added to the commissary. (*Id.* at pp. 67-68).

Melendez had not heard of IDOC's new Administrative Directive, the Transgender Administrative Committee ("TAC") or the Transgender Health and Wellness Committee ("THAWC") and would not know how to contact those committees in order to request treatment. (Doc. 347, pp. 65-66, 91).

### Sora Kuykendall

Kuykendall, age 29, did not testify in the 2019 evidentiary hearing that led to the first Preliminary Injunction (Doc. 212) but submitted a sworn declaration setting forth her

**A16**

experience during her incarceration. (Doc. 123-6; Doc. 186, pp. 25-26). At the time of her trial testimony in August 2021, Kuykendall had been housed in Menard Correctional Center ("Menard"), a male prison, since entering IDOC custody in November 2014. (Doc. 347, pp. 104-05).

Kuykendall first identified as a girl at about age five but was never evaluated for gender dysphoria because her family did not support her gender identity. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, pp. 105-07). She became extremely depressed when she went through puberty, acted out, cut herself, and attempted suicide. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, p. 106).

Kuykendall asked for hormone therapy soon after her placement at Menard in November 2014. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, pp. 107-08, 143). IDOC officials denied her hormone therapy request and refused to evaluate her for gender dysphoria. Only after she attempted to castrate herself was Kuykendall evaluated and diagnosed with gender dysphoria in February 2015, and she began taking hormones (Spironolactone and Menest) that month. (Doc. 123-6; Doc. 186, p. 25; Doc. 347, pp. 108-10, 144-46). The dosage for her testosterone blocker was too low, however, and she experienced more facial hair growth; nothing was done despite her many requests over seven months for a dosage adjustment. (Doc. 347, pp. 110, 147). Her estrogen was later changed to Premarin. *Id.* She has not received regular monitoring for blood hormone levels. (Doc. 126, p. 2; Doc. 186, p. 25; Doc. 347, p. 110). In 2020, she was still receiving conjugated estrogen rather than the recommended Estradiol and her requests to switch medications were denied until after her August 2020 deposition for this case. (Doc. 347, pp. 111-14, 150-51).

At some time in 2020 she had blood work and was told her estrogen level was fine at 33, but she believes the correct level should be between 150 to 200.[7] (Doc. 347, pp. 114-15). She was given a breast exam while a male officer was in the room, in disregard of her privacy concerns, and was threatened with having her hormones discontinued if she refused the exam. (*Id.* at 115-16, 153-54). Kuykendall is currently taking 8 mg of Estradiol and 200 mg of Spironolactone per day but does not know the results of her blood work in 2021. (*Id.* at 123-24, 151-52). Her mood improved after her Estradiol dosage was increased in the fall of 2020. (*Id.* at 168).

As of July 2019, Kuykendall's repeated requests since 2015 for gender-affirming surgery and hair removal had been denied without any evaluation. (Doc. 126, p. 3; Doc. 186, p. 25; Doc. 347, pp. 126-27). In 2021, she was told she would be evaluated for surgery in January, but it was rescheduled to July 2021 and then put off again. (Doc. 347, pp. 127-29, 159-64). She has not met with anybody on the THAW Committee and has not received any response. (*Id.* at 129-31). If she does not receive gender-affirming surgery, she will almost certainly kill herself. (*Id.* at 132).

Kuykendall was given a bra 10 months after starting hormone therapy after multiple requests. (Doc. 347, pp. 111, 148-50). When she went to commissary in July 2021 there were no female items available; she has no underwear. (*Id.* at 124-25, 140, 164-65). She also has no hair removal products other than an electric razor, and she uses nail clippers to pull hair out of her face. (*Id.* at 126).

---

[7] Testimony by Plaintiffs' expert Dr. Vin Tangpricha, both in 2019 and 2021, established that under the Endocrine Society Guidelines, the target blood estrogen/estradiol level for a transgender female is 100-200 picograms per milliliter. (Doc. 157, pp. 121-22; Doc. 353, p. 384).

Kuykendall has been subjected to strip searches by male officers in the presence of male inmates, causing her to feel violated and unsafe, and triggering crying and shaking. (Doc. 126, pp. 3-4; Doc. 186, p. 26; Doc. 347, pp. 111, 117). In December 2019, when faced with a strip search by male officers before visiting her mother, she tried to refuse the visit but was told she would be searched anyway and sent to segregation. (Doc. 347, pp. 117-18). Since then, she has refused visits in order to avoid being strip searched. (*Id.* at 118, 154-55). Her March 2017 grievance asking to be strip searched by a female officer was unanswered. (Doc. 126, pp. 3-4; Doc. 186, p. 26).

Kuykendall continues to experience depression, anxiety, and daily thoughts of self-harm related to her gender dysphoria, constant misgendering, and verbal harassment. (Doc. 126, pp. 3-4; Doc. 186, p. 26; Doc. 347, pp. 118-19, 137-38). In January 2021, when she disclosed her suicidal thoughts and her planned method to a mental health professional, she was placed on crisis watch despite her protests that her suicidal thoughts were nothing new and she did not feel that she would go through with it. (Doc. 347, pp. 119-20, 157-59). The crisis watch cell was dirty and contaminated with feces on the wall; she was denied soap and eating utensils and had only a smock to wear that did not cover her breasts. (Doc. 347, pp. 119-22, 156-57). Because of the noise and these conditions, she was unable to use her primary coping mechanism of meditation. She was not given her hormones for the six days she was on crisis watch and was unable to shave or use nail clippers to remove her facial hair. This experience left her in a worse mental state than when she began crisis watch. (*Id.* at 119-22). She is cautious about what she says to mental health providers about her suicidal thoughts because of her fear of being

returned to crisis watch. (Doc. 347, pp. 170-71).

Kuykendall would like to be housed in a female facility to escape the sexual harassment, groping, beatings, hostility, and threats to her safety in Menard. (Doc. 347, pp. 132-35, 139, 172-75). Male prisoners have exposed themselves to her on multiple occasions. Her transfer requests have not been granted. She had not used the shower at Menard since 2014 (with one exception in 2015 while she was in the medical unit), because showers are open to view by male inmates and staff; instead, she washes her body and hair in her cell. (*Id.* at 136, 170-71).

Since filing this lawsuit, Kuykendall's gender dysphoria symptoms have worsened, and her care and treatment has not substantially improved. (*Id.* at 140-42).

**Xavier Ball**

Xavier Ball, age 30, has been incarcerated since 2010, currently at the Illinois River Correctional Center ("IRCC"). (Doc. 347, pp. 176, 191). She realized she was different from other boys at age 13. She first heard the term gender dysphoria after arriving at Pinckneyville Correctional Center ("Pinckneyville") in March 2016. About a year later, she started attending a support group for transgender inmates. (Doc. 347, pp. 177-78).

Ball first requested hormone therapy in 2016 at Pinckneyville, but her repeated requests were denied without explanation. (*Id.* at 178-80). She was transferred to Danville Correctional Center in early 2018 and was able to start hormone therapy in January 2019. (*Id.* at 180-81, 192). She did not, however, stay on hormones for long (six weeks to three or four months). (*Id.* at 181-84, 193). In February 2019, Ball was transferred to IRCC and made the decision to stop hormone therapy while she became accustomed to the new

**A20**

prison, out of concerns for her safety and social isolation. (Doc. 347, pp. 181-84). In late 2019 or early 2020, she requested to start hormone therapy again but was initially denied because she had been on suicide watch and was seen as unstable. (*Id.* at 184-88, 194-95). Ball made six successive requests for hormone therapy and was denied each time with no explanation. (*Id.* at 188-89, 196-97). During that time, she was stressed, depressed, angry, sad, and frustrated to the extent she felt like giving up her quest for treatment. She was finally allowed to resume hormone therapy in late June 2021. (*Id.* at 189-90).

Like Melendez, Ball had not heard of the changes in the committee structures (TAC and THAWC) under the revised Administrative Directives and would not know how to contact those committees regarding transgender issues. (*Id.* at 190-91).

**London Fulton**

London Fulton has been in IDOC custody since May 2019 and at the time of trial was incarcerated at Pontiac. (Doc 347, pp. 198, 204). Assigned male at birth, she realized at age seven that she didn't feel like a boy. She was first diagnosed with gender dysphoria in January 2012, at age 17, while incarcerated in the Cook County Jail. She was able to receive hormone therapy in Cook County at that time. (Doc 347, pp. 199-201). Fulton was also on hormone therapy in IDOC facilities in 2014 and 2015, and again at the Cook County Jail from 2017 to 2019 before her current IDOC custody. (*Id.* at 202-04).

When Fulton was transferred from Cook County to Stateville in May 2019, she was told she could not restart hormone therapy until after she arrived at her IDOC parent facility and was re-diagnosed with gender dysphoria. (*Id.* at 205). But Stateville staff continued the medication she had taken at Cook County for depression (Remeron) about

a week after her arrival. (Doc. 347, pp. 204-05). She was devastated and traumatized from losing the hormone therapy she had been on consistently for two years, and her anxiety and depression intensified. (*Id.* at 206-07). At the time of Fulton's testimony in August 2021, 26 months later, she had still not received the hormone treatment she requested numerous times during her IDOC custody. (*Id.* at 207-08, 222, 224-25).

At her first institution, Menard, Fulton had to wait five months for a response to her medication request and did not see the doctor who could prescribe hormones until May 2020, nearly a year after her arrival. (*Id.* at 208-09). Dr. Siddiqui questioned Fulton's decision to go on hormones, tried to persuade her not to take them, and did not listen to her. (*Id.* at 209-10, 232). The appointment was so distressing that Fulton refused to get the hormone prescription even though she wanted it, because if she took it, she would have to see Dr. Siddiqui going forward. (*Id.* at 211). A mental health provider arranged for Fulton to see a nurse practitioner instead, but in June 2020 she learned her prolactin level was elevated, which prevented her from getting the hormone prescription. (*Id.* at 212-13). She went off her other medications, but her prolactin level remained too high. About seven months later, in January 2021, she was sent to get an MRI to rule out a tumor as the cause of the high prolactin. The MRI came back negative, but Fulton still was not restarted on hormones. (Doc 347, pp. 213-14, 227). She contests the accuracy of a March 2021 IDOC medical record that stated she did not want to get back on hormones at that time. (*Id.* at 228-32; Def. Ex. 670). She filed several grievances at Menard regarding the lack of transgender treatment but got no response. (Doc. 347, pp. 215-16).

Fulton was transferred to Pontiac on May 25, 2021. (Doc. 347, p. 216). Prior to her

transfer, Fulton had to undergo a strip search at Menard by male guards; when she protested the attempt to conduct the search in full view of male inmates, a lieutenant had her searched behind a barrier wall. (*Id.* at 217-18). On the day Fulton was taken to this Court from Pontiac for the trial, she was strip searched by male officers after being told she didn't have a court order to be strip searched by a female, despite the fact that Marilyn Melendez was allowed to be searched by a female guard on the same day to go on the same transport. (*Id.* at 218-19).

After two months at Pontiac, Fulton still had not seen a professional about receiving treatment for her gender dysphoria and had not been able to restart hormone therapy. (*Id.* at 219-21). Nor had she been able to access any female items from the commissary (makeup and sports bras) because she did not yet have a permit. (*Id.* at 221-22, 227-28). Her inability to get hormone treatment has added to her depression. (*Id.* at 223). The single time she discussed possible gender-affirming surgery with a professional (at Menard), Fulton was told a prerequisite to being considered was that she had to be on hormones for a certain period. (*Id.* at 223-24). The same condition applied to being considered for a transfer to a female prison; thus, Fulton has been blocked from these potential accommodations. (Doc. 347, pp. 223-24).

**Janiah Monroe**

Janiah Monroe testified at the July 2019 evidentiary hearing. (Doc. 157, pp. 184-222; Doc. 186, pp. 16-18). She has been in IDOC custody since 2008. At the time of the 2021 trial, she was at Logan Correctional Center ("Logan"), a female prison, where she had been for about two years (she was housed there at the time of the July 2019 hearing).

**A23**

(Doc. 157, p. 184; Doc. 348, pp. 271-72, 283). Since her transfer to Logan, Monroe spent about a month in the Elgin mental health facility after a suicide attempt. (Doc. 348, pp. 272-73).

Monroe was assigned male at birth but knew from the age of three that she was a female. She played with her girl cousins rather than with her brothers and wore female clothing when she could get away with it. Her family was very religious and disapproving of homosexuals, and her father beat her when she would exhibit feminine characteristics. (Doc. 157, pp. 185-87; Doc. 186, pp. 16-17).

Monroe began taking hormones and birth control pills obtained from her friends at about age eleven. (Doc. 157, p. 188; Doc. 186, p. 17). She felt "horrible" being perceived as a male when she identified as a woman, and she began to hate herself, her body, and the way she sounded and looked. (Doc. 157, pp. 188-89; Doc. 186, p. 17). This distress led her to attempt suicide while she still lived with her family. (Doc. 157, pp. 189-90; Doc. 186, p. 17).

Monroe entered IDOC custody in 2008. At Stateville, her first institution, she identified as transgender and requested gender reassignment surgery, hormone therapy, and electrolysis. (Doc. 157, pp. 191-92; Doc. 186, p. 17). She also disclosed at intake that she had been experiencing suicidal thoughts. She was told by mental health officials that IDOC would not provide hormone therapy unless she had legally been on this treatment before incarceration. (Doc. 157, pp. 192-93; Doc. 186, p. 17). Her inability to obtain any treatment for her gender dysphoria was "[e]xcruciatingly painful" for her, leading her to attempt self-castration six times and other self-harm. She chewed through her arteries in

**A24**

both arms, chewed out a vein, carved a swastika in her wrist to show her hate for her body, and hung herself. (Doc. 157, pp. 193, 200-02; Doc. 186, p. 17).

IDOC eventually diagnosed Monroe with gender dysphoria in 2012, and she began hormone therapy in April that year. (Doc. 157, pp. 199-200: Doc. 186, p. 18). The hormone therapy helped her to some extent, but she described it in July 2019 as "putting a Band-Aid on a wound that needs stitches," and she believed her dosages were inadequate because her hormone levels would fluctuate up and down. (Doc. 157, pp. 202-03; Doc. 186, p. 18). Her dosages were adjusted after her transfer to Logan, and she was on the maximum dosage of Spironolactone (100 mg twice a day) as of July 2019. (Doc. 157, pp. 204-05). But she has continued to cut her genitals, hoping they would become infected so IDOC would be forced to remove them. *Id.* She also has attempted suicide approximately four times because her needs for surgery and social transition have been overlooked. (Doc. 348, pp. 273-74). As of July 2019, she had never been evaluated for gender-affirming surgery despite making numerous requests and filing at least 10 grievances. (Doc. 157, pp. 213-14; Doc. 186, p. 18).

Monroe testified in August 2021 that she was told by Dr. Conway and Dr. Horn in June 2021 that she was medically approved for the gender-confirmation surgery she had first requested in 2008. She understood the next steps to be a meeting with Dr. Puga and Dr. Reister for their approval, followed by evaluation by the surgeon. (Doc. 348, pp. 268-71). Surgery would eliminate officials' fear that Monroe could get another Logan inmate pregnant and, most importantly, would help her mind and body align with each other so she could exist in peace. (*Id.* at 275). Based on Monroe's past experience of promised

changes not being implemented by IDOC, she does not trust that she will be able to have gender-affirming surgery. (Doc. 348 at p. 289-90).

Monroe was housed in various men's prisons for the first decade of her incarceration, where she was subjected to verbal harassment and multiple physical and sexual assaults at the hands of other inmates and IDOC officers. (Doc. 157, pp. 193-96; Doc. 186, p. 17). When she stood up for herself in the face of abuse, some officers would purposely place her in a cell with a known violent inmate, laugh at her when she called for help, and then not punish the other inmate for the assault. (Doc. 157, p. 197; Doc. 186, p. 17). She was often punished when she defended herself against assaults; her grievances over mistreatment were denied or ignored. (Doc. 157, pp. 197-98; Doc. 186, p. 17).

Monroe requested a transfer to a female facility in approximately 2010 or 2011 but was not transferred to Logan until after she filed a lawsuit over a sexual assault by a male officer, which led to another suicide attempt. (Doc. 157, pp. 194-96). At Logan, she has access to the female undergarments, grooming items, and makeup available to other women prisoners, in contrast to having only a bra while in the male prisons. (Doc. 157, p. 204; Doc. 186, p. 18). She is now searched by female officers; at the male prisons she was always searched by male officers who often commented inappropriately on her body during a strip search or groped her during pat downs. *Id.* As of July 2019, however, she was still misgendered and disrespected by some Logan staff, especially when it first became known she is transgender. (Doc. 157, pp. 207-10). By August 2021, the misgendering had diminished but still occurred; Monroe believes prison staff who misgender her now are doing so deliberately. (Doc. 348, pp. 287-88).

Monroe has had complaints filed against her by other inmates at Logan. (Doc. 157, pp. 210-12, 221). One was by a woman with whom she had a consensual sexual relationship. IDOC determined the allegation of sexual assault was false. (Doc. 348, p. 292). Monroe believed the accuser was jealous of her friendship with another woman and testified that Logan inmates often file false PREA[8] complaints. (*Id.* at 293-94). Monroe feels that because she is transgender, she has been punished more harshly than female prisoners for the same sexual misconduct charges. (*Id.* at 276-77). She has had only one disciplinary ticket for fighting during her time at Logan, when another inmate spit in Monroe's face and she pushed her back. (*Id.* at 283-84, 294-95). She has had about 15 tickets for "intimidation and threats." (*Id.* at 292-93).

Monroe testified in July 2019 that during her entire time at Logan, her penis has not been fully functioning. (Doc. 157, p. 222; Doc. 186, p. 18). Even though she is in a women's prison, she has only been allowed to be in general population "like everybody else" for short durations and is given hoop after hoop to jump through to have restrictions lifted. (Doc. 348, pp. 275, 292). In August 2021, Monroe was in restricted housing where she was unable to socialize or be outside her cell for more than one hour per day. (*Id.* at 278-79). Other inmates in such placement would get moved out after 30 days, but Monroe at one point had been kept there for eight or nine months without another incident and still was not moved. *Id.* Her extended time in near isolation led to a suicide attempt. (*Id.* at 280).

There are currently four other transgender women at Logan; two are housed in a

---

[8] Prison Rape Elimination Act.

**A27**

unit designated for transgender people and those who want to be housed with them. (Doc. 348, pp. 285-86, 300). Monroe would like to be housed there but has not been given the opportunity. (*Id.* at 285-86, 298-300). As of August 2021, she was no more socially integrated than she had been in July 2019. (*Id.* at 289).

**Dr. Melvin Hinton (Party Defendant, Called by Plaintiffs as Adverse Witness)**

Dr. Hinton is IDOC's Chief of Mental Health, a position he has held since 2012. (Doc. 348, pp. 302-03). He is responsible for overseeing mental health staff for all IDOC facilities. He has served on the various committees on transgender care since their inception in 2014. (*Id.* at 303). He is a voting member of the THAW Committee. (*Id.* at 303-04, 309). The THAWC determines whether to approve transgender prisoners' requests for surgery. (*Id.* at 314). He is aware that if gender dysphoria is not adequately treated, it can lead to severe mental decompensation and increased risk of suicide. He also is aware of transgender prisoners in IDOC who have attempted suicide and self-harm. (*Id.* at 306-08). He read the transcript from the August 2019 evidentiary hearing (as ordered), in which class members testified that they would kill themselves if they didn't get gender-affirming surgery, and acknowledged that two years later, none of the individuals had yet received such surgery although one person's process of evaluation was underway. (Doc. 348, pp. 311-14).

Dr. Hinton acknowledged that between December 2019 and June 2021, thousands of prisoners were transferred between different IDOC facilities; hundreds of transfers took place each month between August 2020 and February 2021, and the monthly transfers between March 2021 and May 2021 numbered at least 1,000. (*Id.* at 316-21;

Exhibits 507, 508). According to Defendants' pretrial brief, however, no transgender inmate was transferred to a facility matching their gender identity between December 2019 and June 2021. (Doc. 348, p. 327). Dr. Hinton participated in a March 2020 TCRC meeting, during which the committee considered and denied a transgender inmate's renewed request for transfer to a women's prison even though the inmate had attempted suicide three times. (Doc. 348, pp. 329-32; Exhibit 453). In April 2020, the person attempted suicide again. A month later, she again sought a transfer to a female facility. The request was denied, but the plan was to transfer her to a residential treatment unit (in a male facility) for a higher level of mental health care, which was done in June 2021 after yet another suicide attempt. (Doc. 348, pp. 334-40, 347-49; Exhibits 141, 466, 402). Dr. Hinton maintained that "routine" transfers were on hold during the COVID-19 pandemic but transfers still took place for urgent or emergent reasons. (Doc. 348, pp. 346-47). Under the former committee structure (the TCRC), Dr. Hinton did vote to approve one transgender inmate's transfer to Logan, but he voted to deny other requested transfer(s). (*Id.* at 355-56).

Dr. Hinton admitted that this Court's December 2019 Preliminary Injunction ordered IDOC to immediately cease the policy and practice of allowing the transgender committee (TCRC) to make medical decisions regarding gender dysphoria. (Doc. 348, pp. 340-41). Yet despite the order and Defendants' representation of compliance in January 2020, the TCRC, which included Dr. Hinton as a voting member, continued to make medical decisions on gender dysphoria as late as June 2020, according to his June 2020 deposition. (*Id.* at 341-42). He maintained that under both the old and new

**A29**

committee structures, he did not have input into whether hormone therapy would be approved, but he weighed in on mental health issues coming before the committee. (Doc. 348, pp. 349-50, 353-54). Dr. Hinton testified that under the current policies, the treating physician makes the decision whether to prescribe hormones for an individual. (*Id.* at 354). Two medical doctors, Dr. Puga and Dr. Conway, serve on the THAWC. *Id.*

Work began on revising the transgender administrative directives and committee structure immediately after the December 2019 Preliminary Injunction. (*Id.* at 350-53). Dr. Puga and Dr. Reister, as well as other IDOC officials, were involved in the development, and outside experts and resources were consulted. Dr. Hinton had input but was not charged with authoring the new directives. *Id.* The TCRC was disbanded and replaced with the two committee structure, in order to separate administrative and nonmedical/non-mental health issues from the health and wellness concerns. (*Id.* at 352-53).

Dr. Hinton participated in an online two-part training session put on by WPATH (the GID Foundations Course in September-November 2020) and stated that close to 100 percent of mental health treating professionals have had some type of online WPATH training. (Doc. 348, pp. 361-62; Doc. 353, p. 374). Inmates who have problems with a mental health provider can use the grievance process to raise complaints, and there is a training/orientation and quality assurance process for those providers within IDOC. (Doc. 348, pp. 362-65).

*Plaintiffs' Experts*

**James Aiken**

James Aiken, who testified on August 3, 2021, is a criminal justice consultant who has 50 years of experience in the field, including as a warden in the South Carolina Department of Corrections, Deputy Regional Administrator in the Indiana Corrections system, and Director of Corrections for the U.S. Virgin Islands. (Doc. 348, pp. 241-42, Pl. Ex. 446). He has taught and provided technical assistance in many states on improving prison security and stabilizing problematic prison systems. (*Id.* at 243-45). He served on the commission that developed standards for implementing the PREA. (*Id.* at 243). At Plaintiffs' request, he evaluated the treatment of transgender prisoners with gender dysphoria in IDOC's custody regarding their vulnerability to violence/intimidation, as well as housing and commissary issues and searches, including review of IDOC's administrative directives and other records. (*Id.* at 244-45).

Aiken prepared an Expert Witness Report dated August 31, 2020. (Doc. 236-1).[9] In it, he concluded that there is no security justification for denying transgender prisoners medically necessary social transition (including gender-affirming clothing and grooming items, and being addressed by a name and pronouns consistent with their affirmed gender); there are no legitimate security reasons for denying transgender prisoners medically-recommended housing placements (aligning with the prisoner's gender

---

[9] Aiken's report and his opinions set forth in the report were referenced during his trial testimony (Doc. 348, pp. 244-47, 249-52), but the report was not admitted as a trial exhibit. The report was previously filed of record by Defendants as an exhibit to their motion to bar some expert opinions, and the Court uses that document number (Doc. 236-1) in citing to Aiken's report.

**A31**

identity rather than their genital status); and providing transgender prisoners the option of being searched by correctional staff of the same gender is supported by sound correctional practices. (Doc. 236-1, pp. 5-19).

Aiken testified to his opinion that transgender prisoners' medical needs take priority with respect to access to gender-affirming commissary items, and prison officials have the responsibility to provide access to those items in a safe, secure manner. He was not aware of any security reason to deny transgender inmates access to gender-affirming items. (Doc. 348, pp. 245-46). His report notes:

> Sourcing medically necessary items that meet a facility's security needs is an essential function of a prison healthcare system, and this task is commonly performed for other medically necessary devices like casts, canes, walkers, and back braces. It is an operational/security mandate to accommodate the medical needs of the prisoners.

(Doc. 236-1, p. 7).

As to housing placement, if a medical decision has been made regarding housing of a transgender person for social transitioning, sound correctional practice is to implement the placement and build the security system to protect the transgender person, as well as other inmates and staff. (Doc. 348, pp. 246-47). In Aiken's experience, placement of transgender women in a female facility reduces the possibility of random and systemic violence. (*Id.* at 247). Aiken's report points to the recommendation set forth by the Prison Rape Elimination Commission that prisons should make an individualized determination about how to ensure the safety of each inmate, and placement of transgender, LGBTQ, or other gender-nonconforming inmates in a particular facility or unit should not be made solely on the basis of the person's sexual orientation, genital

status, or gender identity. (Doc. 236-1, p. 9; Doc. 348, pp. 253-54). He notes that Department of Justice regulations also reject the practice of housing transgender prisoners solely based on their genital status. *Id.*, citing 28 C.F.R. § 115.42(c) and (e). Aiken observed that IDOC's policy of housing transgender prisoners solely on the basis of their genital status failed to comply with these regulations. (Doc. 236-1, p. 9). Aiken further expressed concern that IDOC's decision-making process regarding housing transgender prisoners improperly relied on security-related concerns to deny placements recommended by medical staff and allowed non-medical correctional staff to vote down such transfers. (Doc. 236-1, pp. 11-13; Doc. 348, pp. 255-57). He opined that IDOC was not adequately considering the elevated risk of sexual and physical assault faced by transgender women housed in male prisons when making transfer decisions. (Doc. 236-1, pp. 14-15).

Aiken testified that allowing a transgender prisoner to choose the gender of the guard who will conduct a body search does not jeopardize the security of an institution. Further, the practice eliminates conflict and accusations of illicit conduct by staff that may occur with cross-gender searches. (Doc. 348, pp. 251-52). Aiken's report noted that IDOC staff conducted searches of prisoners according to the gender of the facility (*e.g.*, male officers search a transgender woman housed in a male prison), contrary to PREA standards limiting cross-gender searches except in exigent circumstances. (Doc. 236-1, pp. 16-17). In the context of cross-gender searches, a prisoner's "gender" is based on their gender identity. (Doc. 236-1, 17).

The Plaintiffs' testimony demonstrated to Aiken that IDOC staff are not putting

**A33**

into practice the policies that are intended to address the vulnerability of transgender inmates. (Doc. 348, pp. 248, 261-62). Aiken had reviewed IDOC's new administrative directives and noted that having a policy is only the first step in making changes; it will be necessary for all officials from the top down to personify and model the changes, engaging staff in discussions to manage change, reinforcing behavior, and moving staff into compliance and commitment to the policy. (Doc. 348, pp. 249-50, 252). He acknowledged that the 2021 Administrative Directive gives transgender inmates a choice on the gender of the person who will search them but testified that he didn't see that being practiced, and Plaintiffs' testimony demonstrated that the directive was not always followed. (*Id.* at 265-66).

**Dr. Vin Tangpricha**

Dr. Vin Tangpricha is a medical doctor specializing in endocrinology and the treatment of transgender individuals with gender dysphoria and is a professor of medicine at Emory University. He reviewed medical records of Plaintiff class members, prepared a report (Doc. 123-2) supporting Plaintiffs' motion for preliminary injunction, and testified at the evidentiary hearing in 2019, as well as at the August 2021 bench trial. (Doc. 157, pp. 88-184; Doc. 186, pp. 11-14; Doc. 353, pp. 376-481).

Dr. Tangpricha testified at trial that he has treated roughly 400 transgender patients over the past 10 years. (Doc. 353, p. 377). He co-authored the WPATH standards of care, is a past president of WPATH and serves on its board, and was a co-author of the Endocrine Society Guidelines for treatment of transgender people, which sets forth the minimum standards for care of gender dysphoria. (Doc. 157, pp. 91-92; Doc. 353, pp. 378,

382). The first version of the Guidelines was published in 2008, and an updated version was published in 2017 (Doc. 157, p. 145).

Dr. Tangpricha testified that if a transgender person is on hormone therapy but their blood hormone levels are not within the guidelines set by the Endocrine Society, the individual is not receiving effective care. (Doc. 353, pp. 384, 386, 388). A transgender female should have a blood testosterone level of less than 50 nanograms[10] per deciliter and Estradiol between 100-200 picograms per milliliter. (Doc. 353, p. 384; Doc. 157, pp. 121-22).[11] For a transgender man, the testosterone level should be between 400-700 nanograms per deciliter. *Id.* If these levels are not achieved with the initial hormone medication at maximum dosages, the guidelines indicate a switch to a different medication regimen is in order. (Doc. 353, pp. 386-87, 389). Blood hormone levels should be monitored every three months so the clinician can adjust the hormone dosages. (*Id.* at 390). For safety reasons, transgender women must be monitored for kidney function, prolactin, and potassium levels, and transgender men must have their blood counts monitored. (*Id.* at 385).

If a person has a hormone-sensitive cancer or blood clots, those conditions should be treated before starting hormone therapy. (*Id.* at 391). No other medical conditions would justify denying or discontinuing hormone therapy to treat gender dysphoria. (Doc. 353, pp. 391-92). An elevated prolactin level may be caused by another medication

---

[10] The bench trial transcript (Doc. 353, p. 384) erroneously stated the testosterone level should be below 15 nanograms per deciliter. (*See* Doc. 336).
[11] The Court notes that Dr. Tangpricha testified to these target blood hormone levels in 2019, as well as in 2021.

or a brain tumor; screening (such as an MRI to rule out a tumor) must be done to determine the cause, but a transgender woman could still be given Spironolactone to start hormone therapy. (*Id.* at 393-95). A transgender person on hormone therapy faces several health risks if therapy is suddenly stopped, including increased anxiety, depression, more self-harm, hot flashes, sweats, and loss of bone density. (Doc. 353, p. 397).

When Dr. Tangpricha testified at the July 2019 evidentiary hearing, he stated that IDOC was "rarely" doing blood work for transgender prisoners. When lab tests were done, hormone levels in 90 percent of the tests were not in the accepted guideline ranges; he found no evidence that doses were being adjusted to achieve proper blood levels; and safety monitoring was not being done. (Doc. 157, pp. 142-44; Doc. 353, pp. 398-400). Two of the named Plaintiffs were on conjugated estrogen, which is not a recommended therapy. Dr. Tangpricha concluded in 2019 that hormone therapy for the Plaintiff class did not meet the Endocrine Society Guidelines and put their health at risk. (Doc. 157, pp. 142-44; Doc. 353, p. 400).

Dr. Tangpricha prepared an updated report in August 2020, summarizing his review of medical records for the Plaintiff class between August 2019 and August 2020. (Doc. 353, pp. 400-01). As of August 2020, only one named Plaintiff (Janiah Monroe) was receiving blood tests to monitor hormones at the recommended frequency and had hormone levels in the proper range, but none of the safety blood tests had been done (for potassium, creatinine, and prolactin). (*Id.* at 402). The other four named Plaintiffs were not given blood tests at the recommended frequency and did not have hormone levels within the guideline ranges. (Doc. 353, p. 402). Two named Plaintiffs continued to be on

conjugated estrogen. Dr. Tangpricha found no evidence that medical providers had taken any action in response to the blood tests or to symptoms reported by two individuals (continued frequent erections, breast pain, and headaches) that should have prompted further testing. (Doc. 353, pp. 402-04). For the larger Plaintiff class, out of the "several dozen" sets of medical records he reviewed, only six showed both the Estradiol and testosterone levels within the guideline ranges. (*Id.* at 405). Five people on hormones had undergone no blood tests at all, and another 15 had only one instance of blood work. Hormone doses were only "very rarely" adjusted to try to get blood levels within the correct range. Dr. Tangpricha concluded that the Plaintiff class's hormone therapy had not meaningfully changed since he testified in July 2019 and "remained woefully inadequate." (*Id.* at 405).

Dr. Tangpricha prepared his most recent report in June 2021, analyzing medical records for the named Plaintiffs and other class members from August 2020 to June 2021. (*Id.* at 406-07). Of the named Plaintiffs, Melendez's most recent blood work was in March 2020, showing Estradiol at a "very low" level of 49, only half the guideline level, and it had dropped from the year before. Her testosterone level was higher than the guideline range. (*Id.* at 408). Additional records produced after June 2021 showed that Melendez was still on the same hormone dosages that resulted in levels outside the recommended ranges, and she continued to have distress from experiencing erections. She had not had repeat blood testing for hormone levels since 2020—even though some other blood work was done in February 2021. (*Id.* at pp. 408-10).

As of June 2021, Kuykendall's most recent blood work from October 2020 showed

**A37**

testosterone levels in the guideline range, but her estrogen level was "extremely low," having dropped significantly from her November 2019 test. (*Id.* at 410). Her prolactin level was more than twice the normal level, yet no provider had questioned her about symptoms or recommended any tests to determine why prolactin was elevated, nor had her Estradiol dose been adjusted. (Doc. 353, pp. 410-11). After Dr. Tangpricha's June 2021 report, he obtained blood test records from May 2021 on Kuykendall, which showed her Estradiol and testosterone were within the guideline ranges for the first time since 2015, but her prolactin level had not been checked. (*Id.* at 413). Dr. Tangpricha concluded her hormone therapy was inadequate and put her at risk because it should not have taken six years to achieve therapeutic hormone levels, and nothing had been done to investigate the cause of her elevated prolactin.

Monroe's records showed blood work from March 2021 with testosterone in the guideline range, but her Estradiol level was too low and showed a decline of nearly 50 percent within the past two years. (*Id.* at 414). Her May 2021 blood tests showed the same results, there had been no adjustment in her medications, and she was still having "intense symptoms of gender dysphoria." (*Id.* at 414-15).

Sasha Reed's last blood work was done in June 2020; it showed Estradiol within the proper range, but her testosterone was too high. (*Id.* at 415-16). Her prolactin levels were checked in August and September 2020 and were elevated, but as of June 2021 she had not been given an MRI to confirm or rule out a pituitary tumor. Additional records produced since June 2021 showed no further blood or diagnostic testing, placing her at risk.

**A38**

Lydia Vision's records as of June 2021 showed no blood testing since November 2019 and no safety lab testing in over a year. Her testosterone was last checked in April 2018 and the level was 54, above the guideline range. (Doc. 353, pp. 416-17). Newer records since June 2021 showed Vision's testosterone within the guideline range but her Estradiol had decreased to below the guideline range, despite her being on a higher than maximum dose of oral Estradiol. She had not been put on a different estrogen medication as the Endocrine Society Guidelines recommend. Her Spironolactone had been decreased without any explanation in the records. (Doc. 353, p. 417).

Based on this review, Dr. Tangpricha concluded *none* of the five named Plaintiffs was receiving adequate hormone therapy, despite his testimony nearly two years prior that specified what needed to be done to properly treat these individuals, as well as other members of the Plaintiff class. (*Id.* at 418).

Dr. Tangpricha also reviewed medical records produced for over 100 class members and concluded their treatment was likewise still inadequate. (*Id.* at 418-19). Only eight individuals had hormone levels in the correct range, blood work was not done often enough and did not always check levels of all hormones, and there was rarely any response to the lab results. After June 2021, Dr. Tangpricha received additional records on over 90 class members, which showed an increase in the frequency of blood testing in the past six months but revealed that out of 91 people, only 11 had hormone levels within the guideline ranges. (*Id.* at 419). Conjugated estrogen had been discontinued, but potassium and kidney levels were still not being measured, and no changes were made to hormone dosages in response to blood tests. (Doc. 353, pp. 419-24; Exhibits 488A, 488B,

488C, 488D).

Dr. Tangpricha testified in detail about the medical records of three individuals.[12] (Doc. 353, pp. 420-47). Two of the transgender women's medical records reflected their diagnoses as "GID" (Gender Identity Disorder), an outdated and no longer medically accepted term. (*Id.* at 424-25, 445). The first individual's hormone levels were not in the correct range in October 2020, yet the provider documented her condition as "GID stable, good," and did not recommend any change in her hormone dosages. (*Id.* at 425-26). This person's April 2021 lab tests showed her hormone levels were even farther outside the guideline ranges, with the testosterone level having tripled to 729. (*Id.* at 427-28; Exhibits 488E, 488F). Her clinic notes dated June 18, 2021, showed the same Estradiol and testosterone levels, with another note, "Transgender, good, stable. Leaving in August." (*Id.* at 328-29).

The second individual started hormone therapy around February 2020, but no blood work was done until October 2020 when she should have been tested at least three times in that interval. (*Id.* at 429-33; Exhibits 489A, 489B). Her Estradiol level was 36, less than half of the target 100-200 range, her testosterone level was not tested, and her prolactin level was very high at 21.3. (Doc. 353, pp. 431-32). Nothing was done to investigate the reason for the elevated prolactin,[13] no testing had been done for other

---

[12] While these individuals' names are redacted from the official transcript, the redacted and unredacted transcripts confirm the testimony covered records for three people. (Doc. 353, p. 446).
[13] Dr. Tangpricha noted that this individual was on a medication, Remeron, which is known to increase prolactin, but her records contained no evidence that her provider had considered changing that medication or taking any other steps to address her elevated prolactin. (Doc. 353, pp. 437-38).

safety issues (potassium and kidney function), and her hormone dosages were not adjusted in response to the labs. Her October 2020 evaluation of suicide potential ranked her at 10 out of 10 for both depression and anxiety, which are known symptoms of untreated gender dysphoria, yet she was described in November 2020 as "GID good, stable." (Doc. 353, pp. 433-38; Exhibits 489C, 489D, 489E). No additional blood tests had been done since October 2020, and in May 2021 her hormone dosages were the same as in May 2020. (Doc. 353, pp. 436-37).

The third individual had formerly been on hormone therapy, but her estrogen was discontinued, causing her to undergo unwanted physical changes and experience depression, anger, and frustration. (*Id*. at 438-47; Exhibits 491A, 490A, 490B, 490C). As of August 2020, she had been off estrogen for two and a half years and had been told the reason was because her A1C level (a marker for diabetes control) was elevated. According to Dr. Tangpricha, elevated A1C is not a medically accepted reason to discontinue hormone therapy because diabetes can be treated alongside gender dysphoria. (Doc. 353, pp. 440). Discontinuing hormones for a person with gender dysphoria would be expected to increase anxiety and depression—as this individual reported—and creates a risk of osteoporosis and bone loss. (*Id*. at 440-41). Her March 2021 records showed she still was not receiving hormone therapy and had contacted mental health about the matter. (*Id*. at 441-42). On April 20, 2021, she reported to mental health that she was still upset about not receiving hormone therapy. (*Id*. at 443). Her A1C had reached a normal level but hormones had not been restarted. (*Id*. at 442-45). She was again prescribed Estradiol and Spironolactone, at a time when her A1C level had gone back to above normal. (Doc. 353,

**A41**

pp. 445-46, 457).

Dr. Tangpricha testified these records indicate the medical providers were not qualified to properly administer hormone therapy because no medication adjustments were made when tests showed hormone levels out of therapeutic ranges, blood tests were not being done at proper intervals and often did not include safety monitoring, and when safety substances were tested, providers were not reacting to results such as elevated prolactin with further diagnostic measures. (*Id.* at 426, 429, 438, 446, 477-78). These three individuals' cases were not "outliers" but were typical of the problems found in records for many of the 90-plus class members. (*Id.* at 446-48). Dr. Tangpricha concluded that IDOC has not meaningfully improved hormone therapy for Plaintiff class members during the two years since the 2019 hearing (that led to the Court's first Preliminary Injunction). In his opinion, Plaintiffs are still being placed at risk with ineffective and unsafe treatment. (*Id.* at 447).

**Dr. Randi Ettner**

Dr. Ettner testified for the Plaintiffs in the 2019 evidentiary hearing and again at the August 2021 trial. (Doc. 158, pp. 4-100; Doc. 186, pp. 14-16; Doc. 353, pp. 481-516; Doc. 325, pp. 523-574). She is a clinical and forensic psychologist specializing in the assessment and treatment of gender dysphoria. (Doc. 158, p. 5; Doc. 353, p. 482). She has treated over 3,000 patients with gender dysphoria including imprisoned individuals, has consulted with prisons on policies for transgender inmates, and has authored numerous peer-reviewed publications on transgender health. (Doc. 158, pp. 7-8; Doc. 353, pp. 482-85). She has been involved with WPATH since 1992, holding leadership positions

including chairing the committee for incarcerated persons since 2009 and co-authoring the new update of the WPATH Standards of Care. (Doc. 353, pp. 485-86).

Prior to the 2019 hearing, Dr. Ettner personally evaluated each named Plaintiff and reviewed their medical records, concluding that each has severe gender dysphoria that IDOC is not adequately treating by delaying hormone therapy or denying it altogether for reasons that are not medically justified, failing to facilitate social transition, and failing to assess them for surgical intervention. (Doc. 158, pp. 9-10, 34-44, 38; Doc. 186, p. 14). Her review of records of other Plaintiff class members showed the same pattern of inadequate treatment. (Doc. 158, pp. 10-12, 37-38; Doc. 186, p. 14). Dr. Ettner concluded that none of the members of the former TCRC were competent to treat gender dysphoria, and IDOC mental health staff, in general, were likewise not competent to treat gender dysphoria. (Doc. 158, pp. 50-51, 55-56; Doc. 186, p. 15). In sum, she opined that transgender inmates in IDOC facilities were at risk for self-harm, psychological decompensation, and suicide because of the deficiencies in medical treatment for gender dysphoria. (Doc. 158, pp. 58-59; Doc. 186, pp. 15-16; Doc. 353, pp. 489-90).

Since the 2019 hearing, Dr. Ettner has spoken to all the named Plaintiffs, visited Monroe in prison, talked with two other Plaintiff class members, and reviewed "tens of thousands" of documents including medical and mental health records, transcripts, Administrative Directives, emails, and recordings of committee meetings. (Doc. 353, pp. 486-89). She testified in August 2021 that she had "slightly" changed her conclusion regarding the adequacy of the named Plaintiffs' care since 2019. (*Id*. at 490). As of August 2021, Monroe and Vision had obtained a transfer, Vision had begun hormone treatment,

**A43**

there was "some recognition" that the named Plaintiffs require surgery, and Vision had met with a surgeon. (Doc. 353, p. 490). But Dr. Ettner still maintained that care of the named Plaintiffs and the wider class fell below the WPATH Standards of Care and was inadequate because they have not had sufficient social transition including access to commissary items, were subject to searches and pat downs by male officials, had not been evaluated for surgery, and were not receiving adequate endocrine treatment. (Doc. 353, pp. 490-94). For the individuals who had been transferred to a women's prison, Dr. Ettner had concern whether adequate training had been done so that the transgender prisoners could be successfully integrated into the facility. (*Id.* at 491-92).

Class members' records were "peppered with examples" of prisoners being denied hormone treatments based on psychological factors such as not being "stable," having engaged in self-harm, or getting disciplinary tickets—none of which are reasons to withhold hormones—and instead underscore the need for hormone treatment for a person with gender dysphoria. (Doc. 353, pp. 494-95; Doc. 325, pp. 541-44). Dr. Ettner cited several examples of mental health providers failing to understand the difference between symptoms of gender dysphoria and separate psychological concerns, as well as many examples of misgendering and lack of basic understanding and vocabulary surrounding gender dysphoria. (Doc. 353, pp. 495-97; Doc. 325, pp. 549-51).

Dr. Ettner saw no developments since 2019 to change her opinion that IDOC's treating staff lack the expertise to provide adequate treatment to class members with gender dysphoria. (Doc. 353, pp. 514-16). While WPATH certification is not a requirement for a provider to render adequate care to transgender prisoners, a provider should have

**A44**

experience, qualifications, and understanding about what constitutes adequate care. (Doc. 325, pp. 568-69). In her opinion, IDOC providers have not displayed minimal competence in treating gender dysphoria, and members of the THAW Committee are not providing adequate care for transgender prisoners. (Doc. 325, pp. 568-69).

Dr. Ettner testified that IDOC's process for approving individuals for gender-affirming surgery does not align with the WPATH Standards of Care because the template for the assessment by the prisoner's mental health professional is inadequate to inform the surgeon about the patient's needs. (Doc. 353, pp. 497-500). The surgical assessment/referral should include a thorough psychological review of the therapist's interaction with the patient; the provider should know the patient well or have followed him/her over a period of time; and there should be a second independent review by a different provider. (Doc. 325, p. 572-74). Dr. Ettner saw no indication that this type of assessment had occurred for any of the class members seeking surgery, and it was unclear whether individuals met with the same provider consistently who was able to get to know the patient over a period of time. (*Id.* at 573-74).

Dr. Ettner discussed the IDOC's recently revised Administrative Directives[14] and the procedures under those documents. (Doc. 353, pp. 502-11). She concluded that the Directives are not consistent with the WPATH Standards of Care because they provide that medical decisions are still made by a committee of people who are not the treating providers for the transgender individuals; they do not include shared decision-making

---

[14] "Evaluation, Treatment, and Correctional Management of Transgender Offenders" (Exhibit 600) and "Searches of Offenders" (Exhibit 601).

that honors the patient's decision on medically indicated treatment; and in practice, inappropriate criteria such as a person's sexual activity, disciplinary tickets, ordinal crime, and physical stature are used to deny medical treatment. (Doc. 353, pp. 502-09).

Dr. Ettner opined that a decision whether to transfer a transgender prisoner to a facility matching their expressed gender is a medical decision, because it facilitates social role transition, which is a medical accommodation. (Doc. 325, pp. 529-31, 562-63). Likewise, access to gender-affirming commissary items and the ability to choose the gender of the officer who conducts a body search are part of medical treatment for gender dysphoria. (*Id*. at 531-32). Cross-gender body searches do not align with the standards of care or gender-affirming care.

Dr. Ettner concluded in 2019 that the TCRC members did not meet the qualifications set forth in the WPATH Standards of Care,[15] and in 2021 she opined that the officials still have not met those criteria although they have gained some knowledge. (Doc. 353, pp. 512-13; Doc. 325, pp. 544-45). Some committee members have taken the WPATH GEI (Global Education Initiative) Foundations Course, which is introductory level training in the field of transgender healthcare, and participated in other meetings, but those sessions do not confer expertise to qualify as a mental health professional under the WPATH Standards. (Doc. 353, pp. 513-14).

In her reviews of records and interactions with the named Plaintiffs since the 2019 hearing, Dr. Ettner observed that they and other class members have suffered harm

---

[15] Dr. Ettner referred specifically to the minimum criteria in the Standards of Care at 22 and 23 for a qualified mental health professional who can assess and treat gender dysphoria.

**A46**

including emotional and psychological decompensation (major depressive disorders, anxiety, trauma, self-harm, suicidal ideation, and suicide attempts) due to inappropriately treated or untreated gender dysphoria. (Doc. 325, pp. 533-36).

*Defendants' Evidence*

**Dr. Shane Reister**

Dr. Reister, a Licensed Clinical Psychologist, has been the Southern Regional Psychologist Administrator for IDOC since 2013 and previously worked in IDOC for five years as a Wexford Health Sources contract employee. He is responsible for overseeing mental health services for 11 prisons and two boot camps, as well as for quality assurance and trainings. (Doc. 325, pp. 576-78, 609). Dr. Reister participated on the former TCRC and is a voting member of both the THAWC and TAC based on his appointment to the TAC by Dr. Puga (TAC co-chair) and his appointment to the THAWC by Dr. Bowman (*Id.* at 614-17). He updates trainings and consultations with IDOC clinicians based on problems that come to the attention of those committees. Dr. Reister assisted in drafting the April 2021 Administrative Directive (Exhibit 600) and emphasized the need for access to surgeries for transgender inmates, based on his research. (*Id.* at 594-96).

Dr. Reister consults with mental health providers throughout the state on transgender care issues, holding monthly transgender care case conferences for providers (who must attend at least 50 percent of these), and he visits facilities to assist clinicians if they request help. (*Id.* at 577-78, 582-85, 611-12; Doc. 354, p. 633). Each inmate's treatment plan is created by the on-site mental health provider in consultation with the patient. (Doc. 325, pp. 592-93). Dr. Reister will consult with the provider and the client in the event

**A47**

of a disagreement over treatment if the matter is brought to his attention. (*Id.* at 593-94).

Dr. Reister attended the two-part GEI special training that WPATH conducted for IDOC and has attended other WPATH conferences. (Doc. 325, p. 578). He has been a WPATH member but is not certified by WPATH. WPATH offered its entry-level GEI training to IDOC on three different occasions, and it was mandatory for mental health providers. (*Id.* at 619-20; Exhibits 510, 511, 512).

Most of the IDOC mental health providers who treat gender dysphoria have volunteered to do so based on their interest. (*Id.* at 581-82). Yet five of the providers who volunteered to give transgender care never attended the "mandatory" WPATH training. (Doc. 354, p. 629; Exhibit 513). The providers who refused to treat Melendez for gender dysphoria, one of whom (Ramos)[16]—who recently asked her what Jesus would want and told her to learn to live in the body she has—did not participate in the WPATH training. (Doc. 325, pp. 622-23). Ramos had three opportunities to take the training since he was hired in 2020 yet did not. (Doc. 354, p. 628). For the providers who did attend the online training, there was no test or follow-up to ascertain whether the provider engaged with the training or absorbed the material, and there has been no formal training on how to implement the new Administrative Directives. (*Id.* at 630-31).

The mental health providers in IDOC are Wexford Health Sources employees, most of whom have master's level licensing. Dr. Reister does not supervise or hire these Wexford employees but does consult with them. (Doc. 325, pp. 579, 610). In addition to the WPATH GEI training, Dr. Reister developed a 10-hour training on transgender care

---

[16] (Melendez testimony, Doc. 347, pp. 63-65).

in corrections, which is given over two days and is offered two or three times per year. (Doc. 325, pp. 580, 585-86, 589-91). Dr. Reister consulted outside providers in developing his staff training programs. (Doc. 325, pp. 603-04). Dr. Reister also consults with Dr. Erica Anderson (a consultant for IDOC discussed below) on a weekly basis. (*Id.* at 592).

In addition to training mental health staff, Dr. Reister provides a recorded annual training on transgender matters for all IDOC staff including new employees on issues such as misgendering and respect for transgender inmates. (*Id.* at 586-89, 605-07). The transgender portion of the training runs for about an hour and 20 minutes. (*Id.* at 608). As of the August 2021 trial, he had not yet been able to update this training to include the April 1, 2021 Administrative Directives. (*Id.* at 596-97; Doc. 354, p. 631). IDOC staff are responsible for reviewing all administrative directives on their own. (Doc. 325, pp. 606-07).

Dr. Reister has disseminated information on the additional commissary items that are to be available to transgender prisoners but was unaware until hearing Plaintiffs' testimony that some facilities still did not have some items in stock and were not providing undergarments to transgender prisoners as required. (*Id.* at 599-600).

Under the new THAWC, hormone treatment decisions are made by the site provider rather than by the committee, but the committee still must give final approval to transfers and surgery requests after the site provider presents a case. (*Id.* at 614). Under the former TCRC, the committee would handle between six and 10 cases per month. With the new THAWC structure, the process has been slower in considering surgery requests. (Doc. 325, pp. 601-02).

**A49**

Dr. Reister sent out a survey in August 2021 in order to make a complete list of transgender individuals and what surgical procedures they want. (Doc. 325, p. 602). Prior to 2020, Dr. Reister had conducted a comprehensive survey of all known transgender prisoners in IDOC, which he shared in April 2021 with Dr. Conway, Dr. Puga, and Dr. Anderson so that the THAW Committee would have a list of all prisoners requesting surgeries. (Doc. 354, pp. 634-36; Ex. 509). The survey showed that 28 of the 139 prisoners listed had requested hormones but had not received treatment. Dr. Reister did not know whether follow-up had been done to see why those people were not on hormones. (*Id.* at 637). Fifty-one of the individuals on the list had requested a facility transfer, and 97 of the 139 had a desire for surgery. No surgeries had been approved as of the August 2021 trial, but four surgery requests had been reviewed. (*Id.* at 637-39).

Dr. Reister is developing the PRISM program—a special housing unit located in Centralia Correctional Center—in consultation with the Moss Group, to address safety concerns of transgender prisoners housed in facilities that do not align with their gender identity. (*Id.* at 648-51). Prisoners accepted for placement in the unit must agree to take part in peer education on anti-racism, anti-transphobia, anti-heterosexism, and anti-sexism; staff and inmates will participate in training in these areas. Inmates in the unit may be transgender or cisgender and are referred for transfer to the unit by on-site staff.

**Dr. Lamenta Conway**

Dr. Conway is a board-certified physician in internal medicine who has been the IDOC's Deputy Chief of Health Services since September 2019, with responsibility to improve inmates' health. (Doc. 354, pp. 652-53). Her 22 years of experience is primarily

**A50**

in academic medicine. She cared for transgender patients in her earlier primary care practice but was not involved in diagnosing gender dysphoria. (Doc. 354, p. 691). She was assigned responsibility for care of transgender inmates around the time of this Court's December 2019 Preliminary Injunction. (*Id.* at 653).

One of the first changes made after that injunction was for the TCRC to stop making decisions on whether an inmate would get hormone therapy; going forward those decisions are made by the treating medical provider. (*Id.* at 657-58). The COVID-19 pandemic slowed progress on revising policies and changing to the dual committee structure of the THAWC and TAC. (*Id.* at 658-60). Dr. Conway chairs the THAWC and serves with Dr. Puga, Dr. Reister, and Dr. Anderson on both committees. (*Id.* at 660-63). Their membership on both committees provides oversight because inmates' medical concerns are affected by the operational and safety matters that are the province of the TAC, but no operational staff are included in the THAWC.

After the committee change took effect, the THAWC discussed several requests for transfer to Logan from inmates who had not previously identified as transgender and had not requested hormone therapy, some of whom were designated as sexually dangerous persons.[17] (*Id.* at 664-66).

In order to comply with the Preliminary Injunction's requirement that decisions on treatment for gender dysphoria are to be made by medical professionals who are qualified to treat the condition, Dr. Conway ensures that newly hired physicians have

---

[17] Prisoners designated as "Sexually Dangerous Persons" are not eligible for transfer away from Big Muddy Correctional Center. (Doc. 354, p. 666).

proper credentials. (Doc. 354, pp. 667-68). Some physicians have been terminated. (*Id.* at 668-69). Dr. Conway advocated for WPATH training for medical providers, noting that self-study is not adequate for the highly specialized area of hormone care and surgical care for transgender patients. (*Id.* at 694-95). The WPATH GEI Foundations course has been offered to medical directors, providers, health care administrators, and operational staff including majors, lieutenants, and wardens. (*Id.* at 668-69). Wexford has updated its policy on transgender care and has trained providers on hormone therapy. (*Id.* at 677).

The THAWC had its first meeting in April 2021 and held four meetings prior to the bench trial. (*Id.* at 661-62). The main role of the THAWC is to make sure that gender-affirming surgery is provided without barriers and in alignment with the WPATH recommendations. The patient must have capacity to give informed consent, have lived in their gender role for over a year, been on hormone therapy, and any psychiatric issues must be under reasonable control or care. (*Id.* at 681-82). The THAWC also assists with management of hormone therapy in challenging cases. (*Id.* at 697). Surgery requests are presented to the THAWC by the mental health provider who has been caring for the patient; the medical provider may also participate in the presentation. (*Id.* at 681-82, 714-15). Letters of support from both the mental health provider and medical provider are prepared after THAWC approval, based on templates provided by Dr. Conway, and are given to Dr. Loren Schechter, who will perform gender-affirming surgeries. (*Id.* at pp. 715-16, 740). The THAWC approved two inmates—whose cases had been considered before the pandemic—for surgery in May 2021. Four others were approved in July 2021, and three patients were denied approval for surgery at that time. (*Id.* at 682-

83, 725-26, 731-33). One was denied based on concern over medication compliance and high testosterone levels; the other two had never previously identified as transgender, were only recently diagnosed with gender dysphoria, were not on hormone therapy, and had expressed interest in surgery but had not actually requested it. (Doc. 354, pp. 731-35).

Some inmates whose surgery requests had been previously considered and denied by the former TCRC have not yet been reconsidered by the THAWC, while newer requests were considered ahead of them. (*Id.* at 747-48). Dr. Conway stated the committee needs to catch up and re-present those cases "fairly quickly." (*Id.* at 730-31). Similarly, the THAWC needs to address and fix the situation of the 28 prisoners who have been diagnosed with gender dysphoria and have not been put on hormone therapy. (*Id.* at 748).

Work is underway to arrange for hair removal for surgery patients, and for post-operative care at an appropriate facility, but these provisions have not been finalized as of August 2021. (*Id.* at 685-88, 721). When surgery is approved, the patient must be approved for Medicaid coverage, which is a process for all inmates who get inpatient treatment outside IDOC. (*Id.* at 689, 722-23).

Dr. Ravi Iyengar, an endocrinologist, sits on the THAWC to advise and educate the members on issues relating to hormone therapy. He is also available for clinical case conferences. (Doc. 354, pp. 662, 670-72, 697-98). An interagency agreement is being finalized with the University of Illinois Department of Endocrinology, under which a team headed by Dr. Brian Layden will provide direct care for all transgender prisoners in the state and participate in case conferences. (*Id.* at 670-73). Dr. Schechter (the surgeon) will conduct the final evaluation for inmates who are approved for gender-affirming

**A53**

surgery. Dr. Schechter also will sit on the THAWC and will provide educational videos for surgery candidates. (Doc. 354, pp. 674, 682, 685). Dr. Erica Anderson has consulted on revising the committee structure and participates in THAWC meetings as a non-voting member. (*Id.* at 674-75).

To address the Court's mandate to provide timely hormone therapy, Dr. Conway is initiating a continuous quality improvement ("CQI") process, which should catch those cases where the inmate has requested but not been given hormone treatment and address problems of labs not being done timely. (*Id.* at 678-79). Southern Illinois University is contracted to work with IDOC on the CQI system to cover transgender health care, as well as overall health care in IDOC. *Id.* At the time of trial, the CQI system had not yet been drafted or implemented. (*Id.* at 713-14).

The TAC is responsible for addressing the transfer aspect of social transition for transgender prisoners, but the THAWC is responsible for looking at the mental health and stability of inmates seeking a transfer and for referring cases to the TAC where transfer is needed. (*Id.* at 679-80). The TAC deals with issues related to searches, gender-appropriate commissary, placement, and transfers, which are also aspects of medical care. (*Id.* at 679-80, 696).

New inmates undergo an initial medical exam and mental health screening within 24 hours of entry to IDOC and, if indicated, a more comprehensive mental health evaluation is to be done within seven days. Inmates may or may not identify themselves as transgender during intake, and Dr. Conway was unsure whether psychiatry has oversight in place to make sure the intake procedures are followed. (Doc. 354, pp. 705-

710). The THAWC is supposed to be notified of every inmate who identifies as transgender. (Doc. 354, pp. 746-47). Hormone therapy is to be continued if the new inmate had previously been prescribed such medication, but if a prescription cannot be verified, the person must go through the process to be evaluated by an IDOC provider before hormone therapy can be given. (*Id.* at 709-11).

### Dr. William Puga

Dr. Puga is a physician specializing in psychiatry who has practiced since 1990. (Doc. 349, p. 763). He worked for Wexford as a treating psychiatrist in two Illinois prisons for a year before becoming the IDOC's Chief of Psychiatry in March 2018. (*Id.* at 764-65). Dr. Puga is responsible for overseeing psychiatric care in all IDOC facilities, where the providers include approximately 50 Wexford contract psychiatrists, as well as other mental health staff. (*Id.* at 765-66).

Dr. Puga was chair of the former TCRC and was involved with other IDOC officials in revising policies on transgender inmates, beginning in September 2019 and continuing after the December 2019 Preliminary Injunction, though the process was slowed by the pandemic. (*Id.* at 770-80). Four transgender women prisoners were transferred to Logan before the revised Administrative Directives were adopted in April 2021, and four more transgender women have been moved or assigned to Logan since then. (Doc. 349, pp. 781-84). In June 2021, Dr. Puga met with the newly formed transgender committee at Logan to prepare them to assist transgender inmates transferring there, and he has had follow-up communication with them regarding ongoing supervision and assistance. (Doc. 349, pp. 784-86, 880-82). The Logan committee

includes mental health and medical professionals, security, and education staff.

Dr. Puga serves on the THAWC as a voting member and is co-chair of the TAC along with co-chair Mike Chappell, a security specialist assigned to the committee by the Chief of Operations. (Doc. 349, pp. 787-88). Other members of the TAC are Dr. Conway (Deputy Chief of Health Services), Twyla Pillow (Transfer Coordinator), Tangenise Porter (Chief of Women's Services), Dr. Reister, Deputy Director Smith, and Ryan Nottingham. (*Id.* at 822-23). The THAWC members are Dr. Puga, Dr. Conway, Dr. Hinton, Dr. Reister, and a Regional Nursing Administrator and medical consultants as appointed by the Medical Director. (*Id.* at 823-24). The former TCRC was made up of Dr. Puga, Dr. Hinton, Twyla Pillow, Mike Chappell, and Dr. Meeks (former Medical Director) who was replaced on the TCRC by Dr. Conway, and Dr. Reister. (*Id.* at 824-25).

Dr. Puga testified that he thinks IDOC addressed the problems identified in the 2019 Preliminary Injunction, which ordered Defendants to cease mechanically assigning housing assignments based on a prisoner's genitalia and/or physical size or appearance. (*Id.* at 835-36). The April 2021 Administrative Directive states that transgender prisoners are not to be assigned to gender-specific facilities based solely on their external genitalia, specifies new prisoners must have medical and mental health screenings at intake, and includes procedures to follow when a prisoner first identifies as transgender. (Doc. 349, pp. 836-42). But when the co-chair of the TAC, Mr. Chappell, described the current practice in his July 2021 deposition, he confirmed that the TAC is not consulted about the initial housing placement of a newly arrived transgender prisoner, and the new prisoner

will be assigned based on his/her genitalia alone.[18] (Doc. 349, pp. 842-43). Only if a transfer is requested by a transgender prisoner already in IDOC will the matter be brought to the THAWC and the TAC. *Id.* Under the directive, the TAC is only authorized to make transfer decisions, not initial placement decisions. (*Id.* at 844-45). As of the August 2021 trial, Dr. Puga had provided only limited training for staff on how to implement the new Administrative Directives. (*Id.* at 848-49).

Dr. Puga acknowledged that despite his testimony in July 2019 that IDOC had a quality assurance program in place to ensure that WPATH standards of care were followed for transgender prisoners, no quality assurance program specific to transgender prisoners existed then or currently. (*Id.* at 831-34). Dr. Puga was informed in April 2020 by Dr. Reister, with reference to inmate London Fulton, that Dr. Siddiqui continued to not prescribe hormones despite directions from Wexford. Dr. Puga then referred the matter to Dr. Conway. (*Id.* at 868-69). At the mental health weekly administrative meeting on May 1, 2020, Dr. Reister again brought up Dr. Siddiqui's delay in giving hormone treatment to a transgender prisoner (London Fulton) and the doctor's alleged comment that "it won't hurt to be a straight man a little longer." (Doc. 349, pp. 869-70). Dr. Hinton responded that immediate action should be taken regarding this patient, and he understood Dr. Puga was doing so. *Id.* Dr. Puga recalled referring the matter to

---

[18] Dr. Puga and Mr. Chappell both noted a recent exception where a transgender woman assigned male at birth and who had previously been housed at Logan, was released from IDOC and then was assigned back to Logan upon her re-entry to IDOC custody. In that case, an informal meeting of the TAC was convened and voted to make the initial placement of the individual at Logan rather than at a male facility. (Doc. 349, pp. 841-43). There was one other instance of a new incoming transgender inmate being assigned to a facility matching their expressed gender, and the new Administrative Directive does not provide for this situation. (Doc. 349, pp. 886-87).

Dr. Conway but he did not follow up with Dr. Siddiqui.[19] Dr. Conway had the authority to interface with Wexford directors on matters involving their providers, and Defendants introduced her email regarding a follow up meeting. (Doc. 349, pp. 876-77; Ex. 636).

Dr. Puga believes that the training component of the Preliminary Injunction was satisfied by bringing the WPATH two-day online training to IDOC staff, which he attended. (*Id.* at 857-62). But some staff members' certificates of attendance for the WPATH training (Dr. Siddiqui and Mike Chappell) appear to be contradicted by electronic sign-in sheets showing that those individuals did not sign into the session on the day of the training. *Id.* Dr. Puga explained that some staff at the facility signed in under one person's name and other participants were present in the room.

After the April 2021 Administrative Directives, all commissary items available to women prisoners at Logan are to be made available to transgender women housed in men's prisons, however, not all items are currently in stock there. (*Id.* at 789-92). A survey of transgender men at Logan did not indicate problems with access to men's commissary items there. (*Id.* at 799-80).

Dr. Puga has been notified that cross-gender searches have still occurred even though they are prohibited under the new Administrative Directive, and he has alerted operations staff to the problem. (Doc. 349, pp. 792-93).[20] On cross-examination, it was

---

[19] As set forth above, London Fulton testified at the bench trial that she still was not receiving hormones and refused to see Dr. Siddiqui after his comments to her. (Doc. 347, pp. 208-11).
[20] The Directive on "Searches of Offenders" prohibits cross-gender *strip* searches. (Ex. 601, p. 2). It also provides that if an offender "claims to identify as transgender, yet has not been confirmed as such, [and] expresses concern for the gender of the staff performing a strip search, staff shall proceed with the search" and prepare a report for the TAC to review and take appropriate action. (Ex. 601, p. 11). Once a prisoner has been officially designated as transgender and listed as such

**A58**

pointed out that the Directive on transgender offenders permits a pat or body search to be performed on a transgender prisoner by either male or female staff in a male prison, but only female staff should perform a pat or body search in a female facility. (Doc. 349, pp. 850-51; Exhibit 600, p. 9).

When an attorney for Kuykendall sought assurance that her client would not be subjected to a strip search by a male guard before a July 2021 in-person visit at Menard, the request was rejected by a lower-level official with a statement that the search "will be performed by a male officer since this is a male facility;" the Menard official attached the new April 2021 Administrative Directive as support. (*Id.* at 854-55, 878-79). Only when the matter was referred to Dr. Puga was it clarified to facility staff that a transgender prisoner is given the choice of which gender officer will search them. (Doc. 349, pp. 854-55, 878; Ex. 516). The process to follow in the event no female officer is available to search a transgender woman is still being refined. (Doc. 349, p. 793). Work is underway to allow identification of inmates as transgender in the "Offender 360" database, which is available to IDOC staff, and on the inmate's ID card if the person is willing to be publicly identified as transgender. (*Id.* at 801-04).

An inmate's request for transfer is presented to the TAC via the "DOC-400" form;[21] the person's diagnosis and medical/mental health history is presented by the mental health provider, and a representative from the warden's office and medical is often there.

---

in the Offender 360 database, his or her ID card should specify the gender of staff who will perform strip searches. (*Id.*; Ex. 600, pp. 8-9).

[21] The DOC-400 is to be a "comprehensive snapshot" of the individual, including diagnostic criteria and checklists of prescribed medication, completed by the mental health provider in coordination with the physician. (Doc. 349, p. 795).

(Doc. 349, pp. 794-95). Dr. Puga, along with Dr. Reister and Chief Porter of the women's division, conducts an interview of the prisoner to consider the factors listed in the Administrative Directive (Exhibit 600) regarding placement and programming. (*Id.* at 796-97). An individual's "predator" designation is not an absolute bar to transfer if there is reason to re-evaluate that status. *Id.* An individual's body size will not prevent her transfer to Logan. (*Id.* at 797-98). There is an appeal process for reconsideration of rejected transfer requests. (*Id.* at 804-05).

Dr. Puga acknowledged receiving a copy of Dr. Reister's comprehensive survey of transgender inmates in April 2021, which reported that 28 of the 135 prisoners were interested in (and apparently not on) hormone therapy, about 70 percent had requested surgery, and 37 percent wanted a transfer. (*Id.* at 872-74; Exhibit 509). Since that time, Dr. Puga had never added this data to a meeting discussion agenda and had not forwarded it to anyone for follow up. (Doc. 349, pp. 874-75).

**Dr. Erica Anderson**

Dr. Anderson, Defendants' final witness, is a clinical psychologist with 40 years' experience in her field as a university professor, healthcare executive, and over the last 10 years, as a consultant on transgender issues. Transgender herself, she has treated hundreds of transgender patients with gender dysphoria and trauma. (Doc. 349, pp. 890-91, 907). She has served as a consultant to the IDOC since January 2020, contracted through December 2021, to assist in improving the delivery of transgender health care. (*Id.* at 891-92). She worked with IDOC officials and Wendy Leach of the Moss Group (another IDOC consultant) to propose changes to bring IDOC policies into compliance

**A60**

with the Court's 2019 Preliminary Injunction, and she helped draft the April 2021 Administrative Directives. (Doc. 349, pp. 893-96; Ex. 600). She recommended the change to the two-committee structure set forth in that directive—to separate medical/mental health care decisions from security/administration issues—and she serves as a nonvoting advisor and participant in the THAWC and the TAC. (*Id.* at 897-902). She participates in Dr. Reister's telephonic case conferences with treating mental health staff and convenes weekly with Dr. Puga, Dr. Reister, and Dr. Conway on matters relating to the new policies. (*Id.* at 898, 906).

Dr. Anderson created the customized GEI training program on WPATH standards of care that IDOC medical and mental health treating professionals have participated in, first offered in late 2020 and conducted twice in 2021. (*Id.* at 902-04, 910-11, 913). At the time of her trial testimony, she was the president of USPATH (the U.S. affiliate of WPATH) and on the board of WPATH. She suggested Dr. Ravi Iyengar and Dr. Loren Schechter as endocrinology and surgical consultants, respectively, for IDOC. (*Id.* at 905).

No training on matters relating to transgender prisoners had yet been prepared or offered to correctional officers and non-medical/mental health IDOC staff, though proposals for such training have been solicited. (*Id.* at 912-13).

Dr. Anderson agreed that a transgender person could be highly distressed if they are prevented from making social transition changes to live in their affirmed gender. (*Id.* at 918). She acknowledged that despite the new directive's provisions on access to gender-affirming commissary items, providing hormone treatment in accordance with endocrine guidelines, prevention of cross-gender searches, and housing assignments, the

written policies have not yet been implemented. (Doc. 349, pp. 918-43, 948-49, 951-53).

LEGAL STANDARDS

*Eighth Amendment Deliberate Indifference*

The Eighth Amendment prohibits cruel and unusual punishment and "imposes a duty upon states to provide adequate medical care to incarcerated individuals." *Boyce v. Moore,* 314 F.3d 884, 888-89 (7th Cir. 2002). Deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). Deliberate indifference has two elements. The first is whether the prisoner has an "objectively serious medical condition." *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). The second element requires a showing that a prison official has subjective knowledge of—and then consciously disregards—an excessive risk to inmate health. *Greeno,* 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

Here, Plaintiffs point to pervasive deficiencies in delivery of medically necessary care and treatment on a systemic, statewide level in IDOC correctional institutions. *See, e.g., Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983); *Cleveland–Perdue v. Brutsche,* 881 F.2d 427, 430–31 (7th Cir. 1989) (recognizing claims of systemic health care deficiencies as a distinct category of deliberate indifference claims, as opposed to one based on "isolated instances of indifference to a particular inmate's medical needs"). In

Page 62 of 87

**A62**

this context, deliberate indifference can be demonstrated by "proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care[,]" or by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff" which result in an excessive risk of serious harm. *Wellman*, 715 F.2d at 272; *see also Rasho v. Jeffreys*, 22 F. 4th 703, 710 (7th Cir. 2022) ("persistence in a course of action known to be ineffective" can support an inference of deliberate indifference) (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016); *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016)).

*Injunctive Relief*

Preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Under Federal Rule of Civil Procedure 65, the party moving for an injunction has the burden of showing that it has some likelihood of succeeding on the merits, that no adequate remedy at law exists, and that it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant establishes these elements, the Court must then balance the potential harm to the movant if the preliminary injunction were wrongfully denied against the potential harm to the non-movant if the injunction were wrongfully granted. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). The Court should also take into consideration the effect that granting or denying the injunction will have on the

**A63**

public. *Girl Scouts*, 549 F.3d at 1086.

The Prison Litigation Reform Act ("PLRA") applies to suits filed by incarcerated people and limits the equitable relief a district court can order. 42 U.S.C. § 1997e & 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted)).

DISCUSSION

Defendants long ago conceded that Plaintiffs' gender dysphoria is a serious medical condition. (Doc. 186, pp. 29-30). In issuing the December 2019 Preliminary Injunction, the Court concluded that Plaintiffs met their burden of showing a likelihood of success on the merits of their deliberate indifference claim. (Doc. 186, p. 35). The evidence at the August 2021 trial amply demonstrated that Defendants were aware that Plaintiffs were not receiving adequate medical care or social transition for their gender dysphoria and have suffered serious harm including suicide attempts as a result—yet they allowed these conditions to persist over the two-year period following the 2019 evidentiary hearing that culminated in the first Preliminary Injunction.

The Court adopts the discussion of the claims in its previous orders (Doc. 186; Doc. 331) regarding Plaintiffs' entitlement to injunctive relief here. As previously noted,

Plaintiffs' 2021 trial testimony underscored the irreparable harm that they have experienced and continue to suffer from—anxiety, depression, suicidal ideation and suicide attempts, and self-mutilation—due to Defendants' failure to provide even minimally adequate treatment of their gender dysphoria. Monetary damages cannot compensate for these harms. The balance of harms and the public interest continue to weigh heavily in favor of granting injunctive relief, and the trial evidence and supplemental filings demonstrate that constitutional violations persist.

As the Court stated previously in its Preliminary Findings of Fact and Conclusions of Law (Docs. 331, 332), the new Administrative Directives do not comply with the Court's previous order that medical treatment decisions regarding gender dysphoria must be made only by medical professionals who are qualified to treat gender dysphoria. (Doc. 212, p. 1). Social transition (including housing in a facility matching one's gender identity and access to gender-affirming clothing and other items) is a medically necessary component of treatment for some prisoners with gender dysphoria, yet under the TAC, nonmedical staff continue to have the power to block transfer requests even if the medical or mental health providers recommend transfer as part of an individual's treatment. Further, the Administrative Directives as currently written do not guarantee that a transgender prisoner's choice of gender of the officer who will conduct a body search (pat down or strip search) will be honored. Again, this can be a medically necessary accommodation. Testimony demonstrated that the April 2021 Administrative Directives are not sufficient to inform prison staff of class members' right to choose the searching officer's gender prior to undergoing a search, and cross-gender searches are still routine.

**A65**

Following trial, as set forth on the record (Doc. 349, pp. 972-92) and in the Preliminary Findings of Fact and Conclusions of Law (Doc. 331), the Court concluded that adoption of IDOC's new Administrative Directives (Exs. 600 & 601) did not result in improved treatment and care of members of the class and that further revisions of the Administrative Directives and implementation "on the ground" of revised policies was necessary to ensure constitutionally adequate treatment of Plaintiff class members.

The undersigned acknowledged that it would take time to analyze the flaws in the new policy, and the Court wanted the parties' input on the process. The Court's verbal rulings on the last day of trial and Preliminary Findings of Fact and Conclusions of Law (Doc. 331) were issued because the Court felt that certain issues could not wait, because, as explained at the time, the evidence introduced at trial showed serious ongoing violations of the Eighth Amendment.

The Court has now reviewed the parties' supplemental briefing on the April 2021 Administrative Directive 04.03.104. Plaintiffs submitted their detailed revisions, and Defendants set forth their counterproposal. Plaintiffs' most sweeping proposed change to Administrative Directive 04.03.104 is abolition of the two-committee ("THAWC" and "TAC") structure. (Doc. 335, pp. 4-7). The purpose of that proposed change is to ensure that only qualified medical providers will make treating decisions for prisoners with gender dysphoria ("GD"), as the Court ordered in December 2019. Plaintiffs urge that the THAWC/TAC division has not resulted in substantive changes in how decisions are made. Instead, it merely reshuffles the deck and keeps the same "cast of characters" in place to make decisions. For example, transfer, placement, and commissary issues fall

**A66**

within the range of medical treatment for GD yet are under the control of TAC, which includes members not qualified to make medical decisions. Plaintiffs assert that the once-per-month committee meetings are too infrequent and perpetuate the problem of decisions being made without considering a prisoner's full medical and mental health record.

In place of the committees, Plaintiffs suggest that IDOC hire or appoint two new professionals, the Transgender Mental Health Lead (TMHL) and Transgender Medical Lead (TML), both qualified to treat gender dysphoria, to oversee services statewide for transgender prisoners. They also suggest a new position of Surgical Consultant.

In response, Defendants urge that overall, Plaintiffs' proposed revisions to AD 04.02.104 go way too far. (Doc. 346, pp. 3-5, 8-10). They warn that an injunction that does not defer to IDOC on how to plan and implement the relief ordered would run afoul of the constraints of the PLRA and *Westefer v. Neal*, 682 F.3d 670 (7th Cir. 2012). (Doc. 346, pp. 10-12). On the proposal for new positions (TMHL, TML, and Surgical Consultant), Defendants advise that IDOC cannot unilaterally create a new position and that the agency must go through state-required procedures for approval (*see* Doc. 346-2, Declaration of Mandy Page), so this will not be a timely fix for the problems Plaintiffs identify. In fact, gaining approval for any new position will take about four to nine months for an "exempt" position and six to 12 months for a "term" position. Finally, Defendants argue that replacing the THAWC and TAC committees with the proposed new positions will be unworkable, as well as cause significant delay. Defendants also point out that the proposed lead positions won't report to anyone and don't provide for

**A67**

collaborative decision-making or training for other providers.

Defendants' point regarding constraints on what the Court can order here is well taken. While changes certainly need to be made to accomplish the relief the Court has ordered, the Court simply cannot, under Seventh Circuit jurisprudence, implement the wide-sweeping revisions to Administrative Directive 4.03.104 Plaintiffs seek. *Westefer*, 682 F.3d 670; *Rasho v. Jeffreys*, 22 F.4th 703, 2022 WL 108568, at *5 (7th Cir. 2022). And, of course, any relief ordered here must be limited to the class as defined in this litigation.

How the Administrative Directives should be revised is an issue for the Monitor (Special Master)[22] to explore with the parties. (Doc. 370, p. 14). The focus must be on the *outcome*—that is, what new Administrative Directives will achieve. As explained previously and in this Order, class members must have timely decisions and action on requested treatment for gender dysphoria—including hormone therapy, surgery requests, placement, transfer, commissary, and search accommodations. And qualified professionals who are competent to make medical decisions on treatment for gender dysphoria must be the ones making decisions. These requirements likely will require some restructuring of the TAC so that medically necessary placements recommended by a treating professional cannot be vetoed by non-medical staff, but the Court leaves that up to the Monitor to analyze and make appropriate proposals.

The Court also learned at the time of trial that IDOC had offered training to its medical and mental health providers, including the two-day entry level WPATH Global

---

[22] As more fully discussed below, the Court advised the parties in December 2021 that a Monitor (Special Master) will be appointed in this case. (Doc. 370).

Education Initiative ("GEI") training, Dr. Reister's training on transgender issues for mental health staff, and Dr. Reister's annual hour and twenty-minute training for all IDOC staff. (Doc. 325, pp. 604-08). While the GEI training was described as "mandatory" for mental health providers, the Court expressed concern in August 2021 that several providers—including individuals who had problematic interactions with named Plaintiffs—never attended this training. As previously explained, besides all required personnel not participating, there was no verification that those who joined the virtual training paid attention during the course, and there was no quiz to verify a basic understanding of the materials. Again, Dr. Ettner testified that recent comments by medical staff and mental health professionals in the records suggest that many still lack the most *basic* understanding of GD. (Doc. 323, pp. 515-516). And, at the time of trial, IDOC had offered no training for correctional officers or other staff regarding the new Administrative Directives.

The Court makes one final observation on a matter with respect to the need to revise IDOC's policies that should receive priority treatment. The Monitor must promptly address concerns about initial placement of incoming transgender inmates that came out at trial. (Doc. 349, pp. 836-42). This testimony indicated that in spite of purported revisions to the policies, incoming inmates were continuing to be assigned to facilities based on their genitalia and would then have to go through TAC to obtain a transfer at some later date. Some provision needs to be made to determine on a timely basis the initial assignment of a transgender inmate to a prison matching their gender identity, as well as other matters, without inordinate delay.

As previously stated, the undersigned finds that the evidence introduced at trial shows serious ongoing violations of the Eighth Amendment. It was for that reason the Court ordered immediate injunctive relief and outlined additional injunctive relief that was needed but would take time when the trial concluded. (Docs. 331, 332; 349, pp. 972-992).

Since the conclusion of trial, the Court advised the parties on December 13, 2021, that it will appoint a Monitor (Special Master) to oversee Defendants' compliance with the injunctive relief ordered. (Doc. 370). The Monitor also will assess and advise the Court on what revisions to IDOC policies and Administrative Directives are necessary in order to remedy the unconstitutional treatment of transgender prisoners in IDOC custody outlined by this Court and work with the parties to accomplish those revisions. Nonetheless, the Court sets forth below what has and has not been accomplished since trial and orders additional action by Defendants.

## INJUNCTIVE RELIEF

Following the presentation of evidence by the parties during the bench trial held from August 2 to 5, 2021, the Court issued factual findings, **CONTINUED** its previous Preliminary Injunction (Doc. 212), and **ORDERED** additional relief to members of the class. (Docs. 331, 332, and corrected at Doc. 336).

*Relief Ordered on August 9, 2021:*

1.  Plaintiffs Sora Kuykendall and Sasha Reed shall, within **7 days** of the date of this Order, be given lab tests to check their prolactin levels. If those levels are still elevated, they shall be given an MRI test within **5 days** of receipt of the prolactin results.

2.  Each member of the Plaintiff class who is currently receiving hormone therapy shall, within **14 days** of the date of this Order, be given blood tests to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males). Thereafter, if the hormone levels are not within the appropriate range set forth by the Endocrine Society Hormone Guidelines (for transgender females, testosterone of less than 50 nanograms/deciliter [as corrected on August 18, 2021, at Doc. 336] and estradiol between 100-200 picograms/milliliter; for transgender males, testosterone levels between 400-600 nanograms/deciliter), Defendants shall ensure that the individual's hormone medication is titrated following receipt of the blood work results and blood work repeated at least every **3 months** until the levels are within an appropriate range.

3.  Any Plaintiff class member who has requested hormone therapy to date shall, within **21 days** of the date of this Order, get baseline blood work done and hormone therapy started within **14 days** thereafter, with follow-up blood work at least every **3 months** until the levels are within an appropriate range.

4.  Each Plaintiff class member receiving hormone therapy shall get blood work done at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and shall be treated as medically indicated by the results. No Plaintiff class member shall be prescribed conjugated estrogen.

5.  Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender-affirming surgery, shall be evaluated for such surgery within **120 days** of the date of this Order with inmates being evaluated in *chronological* order of the date of the inmate's original request for surgery. Each class member so evaluated shall be provided a prompt written notification of the decision and, if surgery is denied, the written notification shall include an explanation of the reasons for denial and a timeframe to request another evaluation thereafter.

6.  Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested.

7.  Each Plaintiff class member who has requested transfer to a facility matching his or her expressed gender (female facility for transgender

**A71**

women, male facility for transgender men) shall be evaluated for transfer within **120 days** of the date of this Order, with inmates being evaluated in *chronological* order of the date of the inmate's original request for transfer. Each class member so evaluated and denied transfer shall be promptly provided with a written explanation of each reason for the denial and allowed to request another evaluation for transfer within **180 days** thereafter.

8.  Each Plaintiff class member shall immediately be provided with access to gender-affirming items in the commissary and shall immediately be provided with a list of available gender-affirming items. Defendants shall immediately ensure all approved gender-affirming items are available at the commissary at each class member's institution. Defendants shall, within **30 days** of the date of this Order, provide the Court with a list of all commissary items available at each facility.

9.  Defendants shall immediately ensure that medical care and mental health treatment of Plaintiff class members shall be conducted only by medical staff and mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health. Similarly, medical providers and mental health professionals who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria shall have no contact with any member of the class from this date forward.

10. Defendants shall immediately ensure that transgender inmates are allowed access to a private shower.

The Court acknowledged in its August 2021 preliminary ruling that Defendants had made some progress toward compliance with the Court's Orders for preliminary injunctive relief (Docs. 186, 187, amended at Doc. 212) and recognized that the COVID-19 pandemic caused some of the delays in accomplishing compliance. (Doc. 331). Urging that the progress should continue, the Court ordered the following additional injunctive relief, to be completed within **120 days** (on or before **December 7, 2021**), with respect to projects that were "in progress" as of the time of trial:

**A72**

1. Finalize the contract with Wexford to provide hair removal services to Plaintiff class members;

2. Finalize the contract with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are approved to receive such surgery;

3. Finalize and implement the CQI (Continuing Quality Improvement) program for transgender care;

4. Finalize IDOC's written surgical standards for transgender care;

5. Finalize and implement the PRISM project (the special population program) (discussed in Doc. 326, pp. 640, 648-49, 651)

6. Finalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment;

7. Finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates;

8. Finalize and implement IDOC's transgender identification policy.

A status report concerning this relief was filed on December 8, 2021 (Doc. 369).

The Court furthered ordered Defendants to provide the Court and Plaintiffs' counsel with a report (filed under seal) on the status of each Plaintiff class member's (1) hormone levels; (2) status of any request for transfer; and (3) status of any request for surgery within **60 days** (on or before October 8, 2021). A status report on these issues was filed on October 8, 2021 (Doc. 355; Doc. 357 (supporting information)). Plaintiffs responded to Defendants' status report on October 27, 2021 (Doc. 359).

The Court allowed Plaintiffs additional time to file supplemental evidence obtained in late-produced documents referenced in the motion for sanctions filed a day before trial commenced (Doc. 316). The Court also invited supplemental briefing

concerning the new Administrative Directives and invited Plaintiffs to request additional injunctive relief and offered Defendants an opportunity to seek clarification of the Court's Order. Plaintiffs filed a post-trial brief on August 16, 2021 (Doc. 335), and Defendants responded on September 7, 2021 (Doc. 346).

*Additional New Injunctive Relief*

Now, having reviewed the parties' post-trial briefing and status reports, the Court finds it necessary to modify some of the previously ordered relief. Specifically, with respect to the "immediate" relief ordered in August 2021, the Court provides the following additional injunctive relief.

First, in addition to the relief ordered in paragraph 2 regarding blood work to assess hormone levels and titration of hormone medication (*see* p. 71 above), the Court **FURTHER ORDERS** that:

> Defendants shall ensure that any necessary follow-up medical tests/treatment to address the results of potassium, creatinine, and prolactin level testing for transgender females and hemoglobin/hematocrit for transgender males takes place on a timely basis (for example, MRI tests for transgender females with elevated prolactin levels).

Moreover, in addition to the injunctive relief ordered in paragraph 1 concerning "in progress" projects as of August 9, 2021 (specifically, hair removal services, *see* Doc. 332, p. 3, para. 1), the Court **FURTHER ORDERS** that:

> Defendants shall ensure the availability to class members of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within **30 days** of the date of this Order.

**A74**

*Follow-Up Injunctive Relief – Class Members Kuykendall and Reed*

The Court ordered Defendants to test the prolactin level of Plaintiffs Sora Kuykendall and Sasha Reed by August 9, 2021. (Doc. 332, p. 1, para. 1). Defendants reported on October 8, 2021 (Doc. 355, p. 1) that the tests were completed as ordered and were in normal range. The results were provided to Plaintiffs' counsel. Nothing further is required from Defendants on this item.

*Follow-Up Injunctive Relief – Blood Work for Class Members Receiving Hormone Therapy*

The Court ordered Defendants to ensure that each member of the Plaintiff class who was receiving hormone therapy shall have blood work done to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males), and that each individual's hormone medication is titrated following receipt of the blood work results *and blood work repeated at least every 3 months until the levels are within an appropriate range* (emphasis added) (Doc. 332, pp. 1-2, para. 2).[23] Unfortunately, while Defendants appear to have partially complied with this portion of injunctive relief (they report that labs were drawn for initial results) (*see* Doc. 355, p. 2; Doc. 357), it is unknown whether blood work was done again three months later as ordered (in November 2021)[24] or whether any doses have been titrated or follow up tests or treatment ordered. In October 2021, Plaintiffs challenged Defendants' compliance with the lab work directive, noting that at that time

---

[23] Today the Court also ordered Defendants to ensure necessary follow-up medical tests and treatment take place on a timely basis.

[24] Of course, on the three-month timeline, blood work would be due to be completed again this month, February 2022.

**A75**

63 class members had elevated prolactin levels. Although most of those individuals had been "referred to endo," it is not clear when such referrals were made, to whom they were made, if any of them have been seen by an endocrinologist, or what, if anything has been done to address the elevated prolactin levels. Plaintiffs also noted that the overwhelming majority of class members continue to have hormone levels outside of the ranges recommended by the Endocrine Society Guidelines. In fact, Plaintiffs asserted that fewer than 15 class members—less than 10 percent of the class—had hormone levels within the recommended ranges.

Defendants shall provide an update to the Court on this issue (whether blood work was done in November 2021 and is scheduled for February 2022, whether any doses have been titrated or follow up tests or treatment ordered, what has been done to address elevated prolactin levels, and whether class members with hormone levels outside of the recommended ranges have been brought within range) within **14 days** of the date of this Order.

### *Follow-Up Injunctive Relief – Blood Work for Class Members Requesting Hormone Therapy*

The Court also ordered Defendants to conduct baseline blood work and start hormone therapy for any Plaintiff class member who has requested hormone therapy by August 30, 2021, and to start hormone therapy within 14 days thereafter, with follow-up blood work conducted at least every three months thereafter until the hormone levels are within an appropriate range (Doc. 332, p. 2, para. 3).

While Defendants reported that baseline blood tests were done for those inmates

who did not refuse blood work (*see* Doc. 355, p. 2; Doc. 357), the Court has not been informed whether (or when) hormone therapy started or whether there has been any follow up blood work or medication titration. Defendants shall provide an update to the Court on this issue within **14 days** of the date of this Order.

*Follow-Up Injunctive Relief – Annual Blood Work for Class Members*

Defendants were ordered to conduct blood work for each Plaintiff class member receiving hormone therapy at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and to treat each Plaintiff as medically indicated (and to not prescribe conjugated estrogen—*see* summary of Dr. Tangpricha's testimony, above). (Doc. 332, p. 2, para. 4). As this was ordered in August 2021, the timeframe for completion is months away, in August 2022. Nonetheless, the Court directs Defendants to provide updated information concerning blood work as set forth above.

*Follow-Up Injunctive Relief – Surgery*

The Court ordered Defendants to have Plaintiff class members whose hormone levels were within appropriate range and who had requested gender-affirming surgery to be evaluated for surgery by December 7, 2021, in chronological order of the inmate's original surgery request. (Doc. 332, p. 2, para. 5). As of October 8, 2021, IDOC was working through prior requests. Twenty-six inmates had been discussed in three meetings; 10 more inmates had been approved to move forward. (Doc. 355, p. 3). As of December 8, 2021, Defendants reported:

All surgical requests received to present have been considered by the Transgender Health and Wellness Committee (THAW). Letters providing the decision and explanation in the event of a denial have been sent to the individuals. They were also informed that they can request gender-affirming surgery again at the recommended interval. If any other recommendations were made, they were included in the same letter.

(Doc. 369, p. 2, para. 5).

Plaintiffs challenged Defendants' October 2021 assertions regarding surgical evaluations, pointing out numerous inconsistencies and a lack of supporting documentation. (Doc. 359, pp. 7-8).

Defendants shall provide an update on the status of those approved for surgery, including whether any preliminary treatment—such as hair removal—has occurred, whether any surgeries have occurred, and the plans for post-surgery facility placement and treatment. Defendants shall also provide a detailed explanation as to why individual requests for surgery were denied (between August 9, 2021, and today) and report when those individuals can request re-evaluation. These status updates are due within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Searches*

The Court ordered Defendants to allow Plaintiff class members to choose the gender of the officer who will search their person and to ensure that searches were conducted by an officer of the requested gender. (Doc. 332, p. 2, para. 6). Defendants report that body scanners will be deployed in five prisons (Doc. 369), but the Court is unsure whether this covers all class members. It is likewise not clear whether all cross-gender searches have ceased (discussed below).

The Court orders Defendants to clarify these issues and to provide an update on steps taken to implement, inform, and train staff on policies to avoid cross-gender searches within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Transfers*

The Court ordered Defendants to evaluate Plaintiff class members who have requested transfer to a facility matching the inmate's expressed gender for transfer by December 7, 2021, in chronological order of the inmate's original transfer request. (Doc. 332, pp. 2-3, para. 7).

Defendants reported that initial evaluations were in progress as of October 8, 2021 (Doc. 355, p. 2). As of that date, five transgender females were at Logan (Doc. 359, p. 5), and three more were expected to be transferred by mid-October 2021. At that point, Defendants reported that the TAC had reviewed 16 class members who requested transfer. Defendants also reported that two additional transgender females had been interviewed and would proceed to the TAC for an official determination. Two more transgender inmates were to be interviewed soon for probable transfer, and approximately 12 class members were pending determination at the October TAC. Thirty-nine other class members had been approved to enter the PRISM program once it is finalized. (Doc. 355, p. 2).

As of December 8, 2021, Defendants reported that the TAC:

> has considered all gender-affirming transfer requests made up until the present. Letters to requesting individuals explaining either the granting or denial of the transfer requests have been issued. Several class members have been transferred to facilities consistent with their gender.

**A79**

(Doc. 369, p. 2).

On October 27, 2021, Plaintiffs responded to Defendants' initial status report and challenged some of its assertions and pointed out numerous inconsistencies in the record. (Doc. 355).

Defendants shall provide an update on the status of evaluations for transfer that have occurred since October 8, 2021 (as previously ordered), including detailed reasons for any denials, within **30 days** of the date of this Order. Defendants also shall address the numerous inconsistencies identified by Plaintiffs in October 2021. (Doc. 359).

*Follow-Up Injunctive Relief – Commissary Items*

Defendants were ordered to make gender-affirming commissary items available to the Plaintiff class and to provide class members with a list of available items. The Court further ordered Defendants to provide a list of all items available at each facility by September 9, 2021. (Doc. 332, p. 3, para. 8). In that September 2021 report (Doc. 351), Defendants reported that not all items were available.

Defendants shall provide the Court with an updated list of all commissary items available at each facility and an explanation of when any unavailable items will be stocked within **14 days** from the date of this Order.

*Follow-Up Injunctive Relief – Medical and Mental Health Providers*

The Court ordered that Plaintiff class members should be treated only by medical and mental health providers who have taken WPATH training and are committed to continuing education on transgender health issues. The Court also ordered that providers whose beliefs prohibit their treatment of inmates with gender dysphoria shall have no

**A80**

contact with any Plaintiff class member. (Doc. 332, p. 3, para. 9).

Defendants have not provided an update on compliance with this item. The Court orders Defendants to report whether changes have been made to ensure compliance with the relief ordered within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Showers*

The Court ordered that transgender inmates should have immediate access to a private shower. (Doc. 332, p. 3, para. 10). Plaintiffs' counsel reported in October 2021 (Doc. 359, p. 8) that Defendants had produced a photograph of a sheet that IDOC personnel had placed over the shower cell in Menard Correctional Center, where named Plaintiff Sora Kuykendall was housed. (Doc. 359-7). Plaintiffs asserted that the photograph makes clear that the sheet covering is see-through (indeed it is) and, as a result, Sora Kuykendall did not take a shower at any point between the time the Preliminary Injunction was entered on August 9, 2021, and her transfer to Logan in late October 2021. It appears other Plaintiff class members housed at Menard remain without access to a private shower. Thus, Defendants have not complied with the Court's Order. Defendants shall inform the Court of measures taken at each prison housing transgender inmates to provide them access to a private shower within **14 days** from the date of this Order.

As for the other injunctive relief that was ordered to be completed by December 7, 2021, some progress has been made, but there is more to be done.

*Follow-Up Injunctive Relief – Contract for Hair Removal Services*

Defendants were ordered to finalize the contract with Wexford to provide hair

removal services to Plaintiff class members by December 7, 2021. (Doc. 332, p. 3, para. 1). Defendants reported on December 8, 2021 (Doc. 369) that an electrolysis machine was purchased for Logan for hair removal to be done onsite.

This is certainly progress, but it is not clear whether treatment has begun. And what about Plaintiff class members who are not at Logan? Defendants shall provide an update on these matters within **30 days** of the date of this Order.

And, as set forth above, today the Court has ordered Defendants to ensure the availability of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within **30 days** of this Order.

*Follow-Up Injunctive Relief – Contract with Dr. Schechter*

Defendants were ordered to finalize the contract with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are approved for surgery. (Doc. 332, p. 3, para. 2). In a status report filed on December 8, 2021 (Doc. 369, p. 3, para. 2), Defendants clarified that no contract is necessary for Dr. Schechter to perform surgery for approved class members. Defendants further advised that approved surgeries will be paid for by IDOC or Medicaid. Defendants have contracted with Dr. Schechter, however, to provide expert surgical consulting to IDOC and its medical providers. Dr. Schechter is also providing in-person education to class members to discuss what gender-affirming surgery will involve.

This appears to be full compliance and, unless anything has changed since Defendant's status report, no update is needed on this item.

**A82**

*Follow-Up Injunctive Relief – CQI Program for Transgender Care*

Defendants were ordered to finalize and implement the CQI (Continuing Quality Improvement) program for transgender care by December 7, 2021. (Doc. 332, p. 4, para. 3). Defendants reported on December 8, 2021 (Doc. 369, p. 3, para. 3) that the CQI tool is complete, and implementation of the tool is underway.

Defendants shall provide an update on the progress made since December 2021 within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Written Surgical Standards for Transgender Care*

Defendants were ordered to finalize IDOC's written surgical standards for transgender care by December 7, 2021 (Doc. 332, p. 4, para. 4) Defendants reported on December 8, 2021 (Doc. 369, p. 3, para. 4) that the guidelines (Doc. 369-5) are complete. This appears to be full compliance.

*Follow-Up Injunctive Relief – PRISM Project*

Defendants were ordered to finalize and implement the PRISM project (the special population program discussed in the summary of Dr. Reister's testimony above). (Doc. 332, p. 4, para. 5). On December 8, 2021 (Doc. 369, pp. 3-4, para. 5), Defendants reported that the program (Doc. 369-6) has been finalized and will be located in Centralia Correctional Center. Staff members have been trained on transgender issues as part of the PRISM project. Defendants further reported that prisoners who are part of the PRISM project but who do not identify as transgender also will be trained on transgender issues.

Eighteen inmates had been transferred to the program as of December 8, 2021, and other inmates had been approved to transfer to the program after the initial group. The

**A83**

Court understands that completion of the project is planned in phases to allow for additional staff training. Ultimately, PRISM will house up to 100 inmates in four dedicated housing units at Centralia.

This appears to be full compliance. Nonetheless, the Court orders Defendants to provide an additional update on the PRISM project within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Training for Correctional Staff*

Defendants were ordered to finalize and implement additional and ongoing training for all correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment by December 7, 2021. (Doc. 332, p. 4, para. 6). On December 8, 2021 (Doc. 369, p. 4, para. 6), Defendants reported they had contracted with an outside group, Queer Works,[25] to train all IDOC staff by March 30, 2022. A link to the training was sent to all IDOC employees. (Doc. 369-7). In addition, Defendants contracted with Moss Group to do future trainings directed to transgender issues at Logan, as well as men's facilities.

This is progress. Defendants shall provide an update to the Court on the status of training actually completed (and scheduled to be completed this year) within **30 days** of the date of this Order.

---

[25] Queer Works is a 501(c)(3) organization with headquarters in the Coachella Valley. Its mission is to ameliorate disparities faced by transgender, gender non-binary and intersex people as well as help reduce similar disparities among our lesbian, gay and bisexual communities. https://www.queerworks.org/ (last accessed Feb. 3, 2022).

**A84**

*Follow-Up Injunctive Relief – Training for Inmates and Staff at Logan Correctional Center*

Defendants were ordered to finalize and implement training for inmates and staff at Logan regarding incoming/transferred transgender inmates by December 7, 2021 (Doc. 332, p. 4, para. 7). Defendants reported on December 8, 2021 (Doc. 369. p. 4, para. 7), that its contract with Queer Works—discussed above with respect to employee training— also will provide training to Logan inmates to educate on the harms caused by misgendering and harassment. This training is available on the inmate channel at Logan. And, similar to the training for all correctional staff discussed above, the Moss Group will conduct future training for Logan employees.

Defendants also reported that Logan staff have taken further steps to welcome class members transferred for gender-affirming social transition, including:

    **a.** The Mental Health Administrator (MHA) meets with each individual to review the gender identity form and to provide orientation and disclosure regarding support services;

    **b.** The MHA provides information as to gender-affirming surgery either during intake or after new identification of transgender individuals;

    **c.** The MHA screens housing unit peers to create a LGBTQIA+-friendly environment with individuals who have no disciplinary issues and can provide guidance on success at Logan;

    **d.** The mental health staff participate in statewide case conference calls with other institutions regarding the care and concerns of transgender prisoners;

    **e.** Two primary Mental Health Practitioners oversee the transgender specialized caseload;

    **f.** Staff participate in weekly multidisciplinary meetings to coordinate transgender care;

**A85**

**g.** The MHA reviews all incident reports pertaining to individuals identified as transgender to determine needs for additional services, placement recommendations, or referral to the TAC or THAWC;

**h.** Celebration of PRIDE month included [sic] round table meetings with allies and/or self-identified LGTBQIA+ individuals;

**i.** Celebration of transgender awareness week;

**j.** Preferred names are included in communications and updates to administration;

**k.** The Warden and MHA review requests to ensure equivalent access to services are provided to transgender and cisgender women; and

**l.** And there is more, including a training for crisis team members specific to transgender individuals.

(Doc. 369, pp. 4-5, para. 7).

This is yet another sign of progress. Defendants shall report on the status of training actually completed (and scheduled to be completed this year) within **30 days** of the date of this Order.

*Follow-Up Injunctive Relief – Transgender Identification Policy*

Defendants were ordered to finalize and implement IDOC's transgender identification policy by December 7, 2021 (Doc. 332, p. 4, para. 8). On December 8, 2021 (Doc. 369, pp. 5-6, para. 8), Defendants reported that this item has been finalized and implemented. Specifically, Defendants developed a form for gender identification change ("DOC 0655-Gender Identification Change: Mental Health Authority to B of I"). (Doc. 369-9). The Mental Health Authority completes this form and forwards it to the Bureau of Identification, which changes the prisoner identification card and gender in

**A86**

Offender 360, the IDOC prisoner tracker. This should result in clarity as to the inmate's choice of gender of the officer who will conduct a search of the inmate's person. This process then triggers a commissary prompt to allow transgender commissary access. Forms had already been submitted on behalf of all transgender inmates.

Defendants shall update the Court within **30 days** of the date of this Order on whether this policy has eliminated cross-gender body searches.

The status reports ordered above from Defendants shall be filed under seal to the extent they contain individuals' names or private health information or reveal other confidential information about an individual, such as the person's transgender status.

Finally, the Court invites Defendants to advise the Court whether the contract with Dr. Anderson was renewed (and whether any other changes have occurred with respect to transgender issues since trial). The Court **FURTHER ORDERS** Defendants to work with the Monitor (once appointed) to develop and implement new Administrative Directives that cure the deficiencies outlined above and to ensure the comprehensive training is provided to all staff tasked with responsibility of implementing those directives. Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

**IT IS SO ORDERED.**

**DATED:  February 7, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

**A87**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

       Plaintiffs,

v.

       Case No. 3:18-CV-00156-NJR

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

       Defendants.

## PRELIMINARY INJUNCTION

**ROSENSTENGEL, Chief Judge:**

Pursuant to Rule 65(d)(1)(C) of the Federal Rules of Civil Procedure and *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court issues the following preliminary injunctive relief. This Order incorporates the preliminary injunctive relief ordered on December 19, 2019 (Docs. 186, 212), on August 9, 2021 (Doc. 332, corrected at Doc. 336), and the additional relief ordered this date in February 2022 (Doc. 383). Each of these preliminary injunctions **CONTINUES** in force.

### I. FIRST PRELIMINARY INJUNCTION

On **December 19, 2019**, Defendants were **ORDERED** to immediately:

1. cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria and develop a

policy to ensure that decisions about treatment for gender dysphoria are made by medical professionals who are qualified to treat gender dysphoria;

2. ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels; and

3. cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance.

And **FURTHER ORDERED** to:

1. develop policies and procedures which allow transgender inmates access to clinicians who meet the competency requirements stated in the WPATH Standards of Care to treat gender dysphoria;

2. allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications of the condition;

3. develop a policy to allow transgender inmates medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items; and

4. advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering and harassment—by both IDOC staff and other inmates.

(Docs. 186, 212).

## II. SECOND PRELIMINARY INJUNCTION

On **August 9, 2021**, the Court **ORDERED** the following additional relief:

1. Plaintiffs Sora Kuykendall and Sasha Reed shall, within **7 days** of the date of this Order, be given lab tests to check their prolactin levels. If those levels are still elevated, they shall be given an MRI test within **5 days** of receipt of the prolactin results.

2. Each member of the Plaintiff class who is currently receiving hormone therapy shall, within **14 days** of the date of this Order, be given blood tests to assess hormone levels, as well as potassium, creatinine, and prolactin

levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males). Thereafter, if the hormone levels are not within the appropriate range set forth by the Endocrine Society Hormone Guidelines (for transgender females, testosterone of less than 50 nanograms/deciliter [as corrected on August 18, 2021, at Doc. 336] and estradiol between 100-200 picograms/milliliter; for transgender males, testosterone levels between 400-600 nanograms/deciliter), Defendants shall ensure that the individual's hormone medication is titrated following receipt of the blood work results and blood work repeated at least every **3 months** until the levels are within an appropriate range.

3. Any Plaintiff class member who has requested hormone therapy to date shall, within **21 days** of the date of this Order, get baseline blood work done and hormone therapy started within **14 days** thereafter, with follow-up blood work at least every **3 months** until the levels are within an appropriate range.

4. Each Plaintiff class member receiving hormone therapy shall get blood work done at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and shall be treated as medically indicated by the results. No Plaintiff class member shall be prescribed conjugated estrogen.

5. Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender-affirming surgery, shall be evaluated for such surgery within **120 days** of the date of this Order with inmates being evaluated in *chronological* order of the date of the inmate's original request for surgery. Each class member so evaluated shall be provided a prompt written notification of the decision and, if surgery is denied, the written notification shall include an explanation of the reasons for denial and a timeframe to request another evaluation thereafter.

6.  Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested.

7. Each Plaintiff class member who has requested transfer to a facility matching his or her expressed gender (female facility for transgender women, male facility for transgender men) shall be evaluated for transfer within **120 days** of the date of this Order, with inmates being evaluated in *chronological* order of the date of the inmate's original request for transfer.

**A90**

Each class member so evaluated and denied transfer shall be promptly provided with a written explanation of each reason for the denial and allowed to request another evaluation for transfer within **180 days** thereafter.

8. Each Plaintiff class member shall immediately be provided with access to gender-affirming items in the commissary and shall immediately be provided with a list of available gender-affirming items. Defendants shall immediately ensure all approved gender-affirming items are available at the commissary at each class member's institution. Defendants shall, within **30 days** of the date of this Order, provide the Court with a list of all commissary items available at each facility.

9. Defendants shall immediately ensure that medical care and mental health treatment of Plaintiff class members shall be conducted only by medical staff and mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health. Similarly, medical providers and mental health professionals who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria shall have no contact with any member of the class from this date forward.

10. Defendants shall immediately ensure that transgender inmates are allowed access to a private shower.

(Doc. 332, corrected at Doc. 336).

Also on **August 9, 2021**, the Court ordered the following additional injunctive relief, to be completed within **120 days** (on or before **December 7, 2021**), with respect to projects that were "in progress" as of the time of trial:

1. Finalize the contract with Wexford to provide hair removal services to Plaintiff class members;

2. Finalize the contract with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are approved to receive such surgery;

3. Finalize and implement the CQI (Continuing Quality Improvement) program for transgender care;

**A91**

4. Finalize IDOC's written surgical standards for transgender care;

5. Finalize and implement the PRISM project (the special population program) (discussed in Doc. 326, pp. 640, 648-49, 651)

6. Finalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment;

7. Finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates;

8. Finalize and implement IDOC's transgender identification policy.

(Doc. 332).

### III. NEW INJUNCTIVE RELIEF

1. In addition to the relief ordered on August 9, 2021 in paragraph 2 regarding blood work to assess hormone levels and titration of hormone medication (*see* pp. 2-3 above),

the Court **FURTHER ORDERS** that:

> Defendants shall ensure that any necessary follow-up medical tests/treatment to address the results of potassium, creatinine, and prolactin level testing for transgender females and hemoglobin/hematocrit for transgender males takes place on a timely basis (for example, MRI tests for transgender females with elevated prolactin levels).

2. In addition to the injunctive relief ordered on August 9, 2021 in paragraph 1

concerning "in progress" projects (specifically, hair removal services, *see* Doc. 332, p. 3,

para. 1), the Court **FURTHER ORDERS** that:

> Defendants shall ensure the availability to class members of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within **30 days** of the date of this Order.

**A92**

### IV. FOLLOW UP TO INJUNCTIVE RELIEF ORDERED ON AUGUST 9, 2021

1.     *Follow Up Injunctive Relief – Blood Work for Class Members Receiving Hormone Therapy*

Defendants were ordered to ensure that each member of the Plaintiff class who was receiving hormone therapy shall have blood work done to assess hormone levels and safety levels, and that each individual's hormone medication is titrated following receipt of the blood work results *and blood work repeated at least every 3 months until the levels are within an appropriate range* (emphasis added) (para. 2, pp. 2-3 above; and Doc. 332, pp. 1-2, para. 2).[1]

Defendants shall provide an update to the Court on this issue (whether blood work was done in November 2021 and is scheduled for February 2022, whether any doses have been titrated or follow up tests or treatment ordered, what has been done to address elevated prolactin levels, and whether class members with hormone levels outside of the recommended ranges have been brought within range) within **14 days** of the date of this Order.

2.     *Follow Up Injunctive Relief – Blood Work for Class Members Requesting Hormone Therapy*

The Court also ordered Defendants to conduct baseline blood work and start hormone therapy for any Plaintiff class member who has requested hormone therapy by August 30, 2021, and to start hormone therapy within 14 days thereafter, with follow-up blood work conducted at least every three months thereafter until the hormone levels are

---

[1] Today the Court also ordered Defendants to ensure necessary follow-up medical tests and treatment take place on a timely basis.

**A93**

within an appropriate range (Doc. 332, p. 2, para. 3).

While Defendants reported that baseline blood tests were done for those inmates who did not refuse blood work (*see* Doc. 355, p. 2; Doc. 357), the Court has not been informed whether (or when) hormone therapy started or whether there has been any follow up blood work or medication titration. Defendants shall provide an update to the Court on this issue within **14 days** of the date of this Order.

3.    *Follow Up Injunctive Relief – Annual Blood Work for Class Members*

Defendants were ordered to conduct blood work for each Plaintiff class member receiving hormone therapy at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and to treat each Plaintiff as medically indicated (and to not prescribe conjugated estrogen—*see* summary of Dr. Tangpricha's testimony, above). (Doc. 332, p. 2, para. 4). As this was ordered in August 2021, the timeframe for completion is months away, in August 2022. Nonetheless, the Court directs Defendants to provide updated information concerning blood work as set forth above.

4.    *Follow Up Injunctive Relief – Surgery*

The Court ordered Defendants to have Plaintiff class members whose hormone levels were within appropriate range and who had requested gender-affirming surgery to be evaluated for surgery by December 7, 2021, in chronological order of the inmate's original surgery request. (Doc. 332, p. 2, para. 5).

Defendants shall provide an update on the status of those approved for surgery,

**A94**

including whether any preliminary treatment—such as hair removal—has occurred, whether any surgeries have occurred, and the plans for post-surgery facility placement and treatment. Defendants shall also provide a detailed explanation as to why individual requests for surgery were denied (between August 9, 2021, and today) and report when those individuals can request re-evaluation. These status updates are due within **30 days** of the date of this Order.

5.    *Follow Up Injunctive Relief – Searches*

The Court ordered Defendants to allow Plaintiff class members to choose the gender of the officer who will search their person and to ensure that searches were conducted by an officer of the requested gender. (Doc. 332, p. 2, para. 6). Defendants report that body scanners will be deployed in five prisons (Doc. 369), but the Court is unsure whether this covers all class members. It is likewise not clear whether all cross-gender searches have ceased (discussed below).

The Court orders Defendants to clarify these issues and to provide an update on steps taken to implement, inform, and train staff on policies to avoid cross-gender searches within **30 days** of the date of this Order.

6.    *Follow Up Injunctive Relief – Transfers*

The Court ordered Defendants to evaluate Plaintiff class members who have requested transfer to a facility matching the inmate's expressed gender for transfer by December 7, 2021, in chronological order of the inmate's original transfer request. (Doc. 332, pp. 2-3, para. 7).

Defendants shall provide an update on the status of evaluations for transfer that

have occurred since October 8, 2021 (as previously ordered), including detailed reasons for any denials, within **30 days** of the date of this Order. Defendants also shall address the numerous inconsistencies identified by Plaintiffs in October 2021. (Doc. 359).

7.    *Follow Up Injunctive Relief – Commissary Items*

Defendants were ordered to make gender-affirming commissary items available to the Plaintiff class and to provide class members with a list of available items. The Court further ordered Defendants to provide a list of all items available at each facility by September 9, 2021. (Doc. 332, p. 3, para. 8). In that September 2021 report (Doc. 351), Defendants reported that not all items were available.

Defendants shall provide the Court with an updated list of all commissary items available at each facility and an explanation of when any unavailable items will be stocked within **14 days** from the date of this Order.

8.    *Follow Up Injunctive Relief – Medical and Mental Health Providers*

The Court ordered that Plaintiff class members should be treated only by medical and mental health providers who have taken WPATH training and are committed to continuing education on transgender health issues. The Court also ordered that providers whose beliefs prohibit their treatment of inmates with gender dysphoria shall have no contact with any Plaintiff class member. (Doc. 332, p. 3, para. 9).

Defendants have not provided an update on compliance with this item. The Court orders Defendants to report whether changes have been made to ensure compliance with the relief ordered within **30 days** of the date of this Order.

**A96**

9.      *Follow Up Injunctive Relief – Showers*

The Court ordered that transgender inmates should have immediate access to a private shower. (Doc. 332, p. 3, para. 10). Defendants have not complied with the Court's Order.

Defendants shall inform the Court of measures taken at each prison housing transgender inmates to provide them access to a private shower within **14 days** from the date of this Order.

10.     *Follow up Injunctive Relief – Contract for Hair Removal Services*

Defendants were ordered to finalize the contract with Wexford to provide hair removal services to Plaintiff class members by December 7, 2021. (Doc. 332, p. 3, para. 1). Defendants reported on December 8, 2021 (Doc. 369) that an electrolysis machine was purchased for Logan for hair removal to be done onsite. However, it is not clear whether treatment has begun or how treatment will be made available to class members not housed at Logan.

Defendants shall provide an update on these matters within **30 days** of the date of this Order.

And, as set forth above, today the Court has ordered Defendants to ensure the availability of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery, within **30 days** of this Order.

11.     *Follow Up Injunctive Relief – Contract with Dr. Schechter*

Defendants appears to be full compliance with the order to arrange with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are

approved for surgery. (Doc. 332, p. 3, para. 2). Unless anything has changed since Defendant's status report (Doc. 369, p. 3, para. 2), no update is needed on this item.

12.     *Follow Up Injunctive Relief – CQI Program for Transgender Care*

Defendants were ordered to finalize and implement the CQI (Continuing Quality Improvement) program for transgender case by December 7, 2021. (Doc. 332, p. 4, para. 3). Defendants reported on December 8, 2021 (Doc. 369, p. 3, para. 3) that the CQI tool is complete, and implementation of the tool is underway.

Defendants shall provide an update on the progress made since December 2021 within **30 days** of the date of this Order.

13.     *Follow Up Injunctive Relief – PRISM Project*

Defendants were ordered to finalize and implement the PRISM project (the special population program discussed in the summary of Dr. Reister's testimony above). (Doc. 332, p. 4, para. 5). Defendants appear to be in full compliance and implementation is ongoing. (Doc. 369, pp. 3-4, para. 5; Doc. 369-6).

Nonetheless, the Court orders Defendants to provide an additional update on the PRISM project within **30 days** of the date of this Order.

14.     *Follow Up Injunctive Relief – Training for Correctional Staff*

Defendants were ordered to finalize and implement additional and ongoing training for all correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment by December 7, 2021. (Doc. 332, p. 4, para. 6).

Defendants shall provide an update to the Court on the status of training actually completed (and scheduled to be completed this year) within **30 days** of the date of this

**A98**

Order.

15.  *Follow Up Injunctive Relief – Training for Inmates and Staff at Logan Correctional Center*

Defendants were ordered to finalize and implement training for inmates and staff at Logan regarding incoming/transferred transgender inmates by December 7, 2021 (Doc. 332, p. 4, para. 7).

Defendants shall report on the status of training actually completed (and scheduled to be completed this year) within **30 days** of the date of this Order.

16.  *Follow Up Injunctive Relief – Transgender Identification Policy*

Defendants were ordered to finalize and implement IDOC's transgender identification policy by December 7, 2021 (Doc. 332, p. 4, para. 8).

Defendants shall update the Court within **30 days** of the date of this Order on whether this policy has eliminated cross-gender body searches.

The updated status reports ordered above from Defendants shall be filed under seal to the extent they contain individuals' names, private health information, or could reveal other confidential information about an individual such as the person's transgender status.

Finally, the Court invites Defendants to advise the Court whether the contract with Dr. Anderson was renewed (and whether any other changes have occurred with respect to transgender issues since trial). The Court **FURTHER ORDERS** Defendants to work with the Monitor (once appointed) to develop and implement new Administrative Directives that cure the deficiencies outlined above and to ensure the comprehensive

**A99**

training is provided to all staff tasked with responsibility of implementing those directives.

**IT IS SO ORDERED.**

**DATED:  February 7, 2022**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

**A100**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

      Plaintiffs,

v.

                                  Case No. 3:18-CV-00156-NJR

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

A status conference was held on January 19, 2023, via videoconference, attended by Co-Monitors Dr. Amanda Harris and julie graham, as well as counsel for the parties. This was a continuation of the Status Conference held on December 15, 2022. The Plaintiffs' Motion for Finding of Contempt (Doc. 455) remains under advisement, and another status hearing has been set for February 21, 2023. (Doc. 521).

The Court recognizes that progress has been made toward Defendants' compliance with the Preliminary Injunctions. Nonetheless, 18 months have now passed since the August 2021 trial in this matter, and the Court expected that more progress would have been made by now. It is encouraging that the parties will be meeting

1

**A101**

regularly to work with the Co-Monitors on policy revisions and other matters that must be addressed in order to ensure correction of the unconstitutional treatment of Plaintiff class members and provide for their safety while in custody.[1] **These meetings should continue on a monthly basis, on dates to be determined by counsel and the Co-Monitors.**

The Court encourages the named defendants or other IDOC administrators to participate in the upcoming meetings between counsel and the Co-Monitors, as appropriate.

The Court finds that IDOC's designation of a single staff person to be the "point person" on commissary matters for accountability and communication with Co-Monitor graham and counsel has proven very helpful in moving toward compliance in that area. In order to facilitate similar accountability in the other areas where injunctive relief has been ordered, Defendants are **ORDERED** to designate an individual within their ranks to serve as the responsible point of contact with the Co-Monitors and counsel, with regard to each other category of concern set forth in the Preliminary Injunctions (hormone treatment, gender affirming surgery, CQI program for transgender care, transfers, conditions/placement at Logan and in PRISM, showers, searches, training—for staff and inmates—and the transgender identification policy). Such designations shall be filed with the Court by **February 8, 2023**.

In order to keep these efforts on track and provide measurable benchmarks, the

---

[1] The parties advised the Court that the next meeting between counsel and the Co-Monitors is scheduled for February 7, 2023.

A102

Court finds it appropriate to adopt the following schedule. (See Docs. 506, 506-1, Joint Proposed Schedule Pursuant to Doc. 494). The parties and Co-Monitors are **ORDERED** to do the following:

1. **HORMONE THERAPY:**

   a. Defendants shall perform baseline blood work for any class member not in range by **February 28, 2023**.

   b. Class members already on hormone therapy as of December 14, 2022, whose levels remain out of range shall have dosages adjusted and be referred to an endocrinologist by **March 21, 2023**.

   c. Defendants shall conduct baseline blood work for any class member who newly requests hormone therapy by **February 28, 2023**. Hormone therapy shall be started for this group by **March 21, 2023**.

   d. Defendants shall file quarterly updates regarding blood levels of all class members to the Court under seal and to Co-Monitor Harris, beginning with the next scheduled 3-month blood draws.

2. **GENDER AFFIRMING SURGERY**:

   a. Defendants shall file under seal a list of providers contacted for gender affirming surgery, no later than **February 28, 2023.**

   b. For the class members approved for surgery as of January 4, 2023, Defendants shall schedule a consultation with Dr. Schechter to take place no later than **March 8, 2023**. If Dr. Schechter cannot schedule such consultations by that date, Defendants shall schedule consultations with new/additional providers to take place no later than **April 7, 2023**.

   c. For class members who have requested surgery as of January 4, 2023, but have not yet been approved or denied, by **March 8, 2023**, Defendants shall provide each individual with a written decision either approving or denying surgery along with the bases for denial, including next steps.

3. **CQI:**

   a. By **February 28, 2023**, Defendants shall certify to the Court that IDOC has a working audit/compliance tool.

**A103**

b.  By **March 8, 2023**, Defendants shall provide the revised audit/compliance tool to Plaintiffs' counsel and to Co-Monitor Harris for review and comment.

4.  **TRANSFERS:**

By **February 1, 2023**, Defendants shall update and file under seal the chart showing transfer requests by class members (Doc. 464) and approval or denial, and shall provide copies of the associated documentation for denials to Plaintiffs' counsel and to the Co-Monitors.

5.  **ISOLATION AT LOGAN**:

By **February 1, 2023**, Defendants shall provide documentation to the Co-Monitors, to Plaintiffs' counsel, and file under seal, for each class member housed on D-Wing, explaining why the individual is housed there; and shall provide the daily schedule of D-Wing (times of dayroom access, showers, yard time, and times/locations of meals).

6.  **COMMISSARY:**

The parties shall confer together with the Co-Monitors, to reach agreement on the items to be included in a gender-affirming kit for all class members as standard-issue medical care; and shall set compliance deadlines for this kit to be distributed to all class members and to any new transgender person entering IDOC custody. Issues for discussion include what to do if different class members want different items, and whether replenishment of such items for class members will be honored as medical care.

7.  **SHOWERS:**

a.  By **February 28, 2023**, Defendants shall file a new certification from each IDOC facility that houses at lease one class member that such facility provides a private shower for each class member.

b.  Plaintiffs' counsel shall advise the Court and Co-Monitor graham within **seven days** of their receipt of any reports of noncompliance with the private shower requirement.

c.  The parties and Co-Monitors shall discuss and agree on the procedures and deadlines to transfer any class member from a facility that fails to timely certify the provision of a private shower, to a facility where compliance was certified.

**A104**

8. **SEARCHES:**

   a. By **February 28, 2023**, Defendants shall file a certification letter from each IDOC facility housing at least one class member, that such facility will conduct timely searches only by a person of the same gender as the class member or by using a body scanner.

   b. The parties and Co-Monitors shall discuss and agree on the procedures and deadlines to transfer any class member from a facility that fails to timely certify the search provisions above, to a facility where compliance was certified.

9. **TRAINING:**

   a. By **February 8, 2023**, Defendants shall file, under seal if necessary, a copy of the Moss Group test training used in September 2022.

   b. By **February 8, 2023**, Defendants shall report the status of the training program being developed by the Moss Group for all incarcerated persons at Logan (to be approved by Co-Monitor julie graham) and the date by which such training will be completed. The parties and Co-Monitor graham shall discuss and agree on the date by which the training of incarcerated persons at Logan will be completed.

   c. The parties and both Co-Monitors shall discuss and agree on the date by which additional WPATH training will be completed for all medical and mental health providers serving class members. Defendants shall file certificates of completion by medical/mental health staff no later than **June 30, 2023**.

10. **ADDITIONAL MATTERS & REPORTING:**

   a. The parties and Co-Monitors shall discuss and set timeframes for Defendants to provide copies to Co-Monitor graham and Plaintiffs' counsel of all class member grievances concerning staff conduct relating to the issues in this case, and for Defendants to provide copies to Co-Monitor graham and Plaintiffs' counsel, and file under seal, of any investigation or disciplinary actions taken against a staff member for violations of AD 03.02.108 (Standards of Conduct) relating to the issues in this case.

**A105**

b. Starting January 2023 and on a monthly basis, Defendants shall provide Plaintiffs' counsel with updates to the IDOC transgender databases for medical care and accommodation.

c. Defendants shall provide to Plaintiffs' counsel any other documents provided to the Co-Monitors, at intervals agreed upon by the parties and Co-Monitors.

d. Defendants shall continue to consult with Co-Monitor graham on the contents and finalization of the "FAQ" handout for transgender/gender nonconforming individuals in custody.

**IT IS SO ORDERED.**

**DATED:   January 24, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

6

**A106**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

      Plaintiffs,

v.                        Case No. 3:18-CV-00156-NJR

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

A Status Conference was held on March 31, 2023, via videoconference, attended by Co-Monitors Dr. Amanda Harris and julie graham, as well as counsel for the parties. This was another continuation of the Status Conference held on December 15, 2022, which was continued on January 19, 2023, and February 21, 2023. Plaintiffs' Motion for Finding of Contempt (Doc. 455) remains under advisement. Another status conference will be held via video on **Wednesday, April 26, 2023, at 10:30 a.m.**

Following the January 19 Status Conference, the Court entered an Order setting deadlines for certain actions, reports, and certifications to be completed (Doc. 522). **That Order, which contains future deadlines and directives, remains in effect.** Reports have

**A107**

mostly been submitted timely, and some progress has been made in certain areas. For example, as discussed by Co-Monitor Dr. Harris, hormone therapy for class members has improved, referrals to the endocrinology consultant have been made, and regular monitoring indicates that a majority of class members receiving hormone therapy are achieving therapeutic levels.[1]

Unfortunately, however, progress has continued to be sluggish in several key areas, including scheduling consultations for class members who have been approved for gender affirming surgery; finding additional providers for less complicated surgeries; providing training programs to IDOC staff and to inmates at Logan; and ensuring the availability of gender affirming commissary items and clothing. Class members continue to report incidents of noncompliance with the Court's Orders (and stated IDOC policies) prohibiting cross-gender body searches. (*See* Doc. 546). **This is not acceptable**. Privacy for class members while showering has still not been achieved in some locations despite Defendants' certifications of compliance. (Doc. 546). Co-Monitor graham is addressing these issues institution-by-institution—however, private showers and elimination of cross-gender body searches should have been accomplished *long ago*.

The parties' attorneys (and some IDOC representatives) held one meeting with the Co-Monitors in February 2023 to work on substantive matters, and these meetings will continue on a monthly basis. Defendants, as ordered, have identified a "point person" for

---

[1] As previously ordered, Defendants are to file quarterly updates regarding blood hormone levels for all class members. (Doc. 522). The first of these was due in January 2023 and was produced in February 2023.

2

**A108**

accountability and communication in these areas of concern:

> **Brittney Schroeder**, commissary;
>
> **Dr. Lamenta Conway**, hormone therapy and gender affirming surgery;
>
> **Dr. William Puga**, CQI program for transgender care, transfers, and the transgender ID policy;
>
> **Justin Hammers**, showers, searches, and training;
>
> **Dr. Shane Reister**, PRISM program;
>
> **Michael Long**, conditions at Logan Correctional Center.

(Doc. 531, p. 2).

In order to step up the pace of progress in achieving constitutionally adequate conditions of confinement for the class, **the Court expects that the appropriate "point person" will participate[2] in any meeting between counsel and the Co-Monitors at which his/her designated area will be discussed**.[3] It is imperative that these meetings are attended by the IDOC official(s) who have decision-making responsibility and accountability on the matter under discussion, and that participating officials are informed on the health care issues involved in all aspects of the ordered preliminary injunctive relief. **To that end, the parties are ORDERED, at least 10 days before any scheduled meeting, to meet and confer to confirm which individuals from IDOC will be in attendance. The participating individuals may be identified by name or by position.**

---

[2] Participation may be achieved remotely by video or telephone.

[3] The parties report that their next meeting to address issues related to compiling and updating the list of persons in custody included in the class is set for April 14, 2023. They anticipate meeting in May to address commissary and gender affirming items.

**A109**

The Court finds it necessary to adopt the following schedule, to ensure continued timely progress and provide measurable benchmarks. Future timelines set forth in the Order of January 24, 2023 (Doc. 522) are included below. The parties and Co-Monitors are **ORDERED** to do the following:

1.  **HORMONE THERAPY:**

    Defendants shall continue to monitor class members' blood hormone levels every three months and shall file quarterly updates regarding blood levels of all class members to the Court under seal and to Co-Monitor Harris.

2.  **GENDER AFFIRMING SURGERY**:

    a.  Defendants were ordered to file under seal by February 28, 2023, a list of providers contacted for gender affirming surgery. This was not done because Defendants represented that Dr. Schechter would be able to provide all approved surgeries for class members. However, only three individuals have undergone surgery to date, out of the 16 people whose surgery requests have been approved. **Defendants are ORDERED to report whether and when another surgical provider at Rush Medical Center will start accepting patients for gender affirming surgery, no later than April 14, 2023. If availability of another provider at Rush cannot be confirmed by that date, then Defendants shall file under seal a list of other providers contacted for gender affirming surgery, no later than April 14, 2023**.

    b.  Defendants were ordered to schedule, for the class members approved for surgery as of January 4, 2023, a surgical consultation with Dr. Schechter to take place no later than March 8, 2023. It appears that only three out of the remaining 13 approved individuals have had their consultations to date. It is unclear whether the additional 10 consultations have occurred or are scheduled. **Defendants are ORDERED to schedule consultations with Dr. Schechter for these individuals, to take place no later than April 7, 2023 (as previously ordered), and to provide the consultation dates to Plaintiffs' counsel and Co-Monitor Harris.**

    c.  Defendants state they complied with the order to provide written decisions by March 8, 2023, to each class member who had requested surgery as of January 4, 2023, but had not previously been approved or denied. Any written decision denying surgery was to include the basis for denial,

**A110**

including next steps. **Defendants shall provide copies of these communications to Plaintiffs' counsel no later than April 7, 2023**. Going forward, for any decisions made since January 4 on gender affirming surgery requests by class members, Defendants shall provide Plaintiffs' counsel a copy of each written decision issued to a class member.

3. **CQI:**

Defendants have certified to the Court that IDOC has a working audit/compliance tool and have provided the revised audit/compliance tool to Co-Monitor Harris for review and comment, but Plaintiffs' counsel did not receive it. Co-Monitor Harris reports that clarification is needed because all class members were not included in the tool provided to her. By **April 14, 2023**, Defendants shall provide the revised audit/compliance tool in its native format to Plaintiffs' counsel and to Co-Monitor Harris for review. Defendants shall also communicate and provided updates to Co-Monitor Harris and Plaintiffs' counsel as all class members are added to the CQI tool.

4. **TRANSFERS:**

a. By February 1, 2023, Defendants were to update and file under seal the chart showing transfer requests by class members and whether requests were approved or denied, including copies of the associated documentation for denials, and to provide this documentation to Plaintiffs' counsel and to the Co-Monitors. Defendants complied (Docs. 531, 532), but the documentation showed only a small number of transfer requests were considered between October 2022 and February 2023, and it was unclear whether reconsideration had taken place for those whose transfer requests were denied during 2021-2022. The list also contained incorrect information on the location of several class members. The parties are **ORDERED** to confer on this matter and propose a schedule for IDOC to promptly reconsider transfer requests from class members who have been denied, and to timely consider new requests from class member who seek to move to a different facility as part of their social transition. The proposed schedule shall be filed with the Court on or before **April 25, 2023**. Also by that date, Defendants shall file under seal any update to the transfer information filed at Doc. 532.

b. Defendants shall consider offering a transfer to individual class members where appropriate, to facilitate improved care and social transition, and shall consult with Plaintiffs' counsel and Co-Monitor Harris on criteria and situations where a transfer offer should be made.

**A111**

c. The current committee structure for deciding on class members' transfer requests, and the qualifications of the individuals involved continues to be a concern in light of the slow pace of action on class members' transfer requests, and merits continued attention from the parties and Co-Monitors to devise possible solutions.

5. **ISOLATION AT LOGAN**:

Defendants provided documentation to the Co-Monitors and Plaintiffs' counsel regarding class members housed on Logan's D-Wing. The explanation that D-Wing is the location where incoming transferred inmates are housed until an appropriate placement is made is satisfactory at this time.

6. **COMMISSARY:**

The parties are continuing to confer with each other and the Co-Monitors to achieve adequate commissary supplies of gender affirming items throughout IDOC facilities and to reach agreement on the items to be included in a gender-affirming kit for all class members as standard-issue medical care. Co-Monitor graham is consulting with Ms. Schroeder on the overall commissary supply issues including inventory tracking, surveying class members to identify desired items, and gender affirming clothing needs. More work is needed in this area and is ongoing. The parties shall continue this process and shall set compliance deadlines for the gender-affirming kit to be distributed to all class members and to any new transgender person entering IDOC custody. Issues for discussion include what to do if different class members want different items, and whether replenishment of such items for class members will be honored as medical care. The parties shall be prepared to report on progress in this area at the next status hearing.

7. **SHOWERS:**

a. Defendants have filed new certifications from each IDOC facility that houses at least one class member that such facility provides a private shower for each class member. (Docs. 540, updated at Docs. 547-550)). Unfortunately, incidents of noncompliance have continued to occur. (Docs. 545, 546).[4] Co-Monitor graham has followed up these reports with individual facilities and achieved some corrections, but informs the Court that it will be necessary to address issues with each individual facility because general information from higher administration has not resulted in compliance with the Court's Order to provide private showers to class

---

[4] The parties' 14-day time frame to respond to Co-Monitor graham's notice of noncompliance regarding showers has not yet expired as of the date of this Order.

**A112**

members.

b. Plaintiffs' counsel shall advise the Court and Co-Monitor graham within **seven days** of their receipt of any reports of noncompliance with the private shower requirement.

c. The parties and Co-Monitors shall discuss and agree on the procedures and deadlines to transfer any class member from a facility that fails to provide him/her/them with a private shower, to a facility where compliance has been achieved. A joint status report on this issue shall be filed by **April 25, 2023**.

8. **SEARCHES:**

a. Defendants submitted the certification letters from each IDOC facility housing at least one class member that such facility will conduct timely searches only by a person of the same gender as the class member or by using a body scanner. (Doc. 543). Unfortunately, however, problems persist at some institutions (Doc. 546).[5] Co-Monitor graham will continue to follow up with the individual institutions to correct the problems identified, including availability of female officers to conduct searches, and adequate planning to ensure timely searches for pre-planned events such as court and medical writs.

b. The parties and Co-Monitors shall discuss and agree on the procedures and deadlines to transfer any class member from a facility that fails to comply with the search provisions above, to a facility where compliance has been achieved. A joint status report on this issue shall be filed by **April 25, 2023**.

9. **TRAINING:**

a. Defendants reported that training of IDOC staff who will conduct training of other staff at Logan should take place in the next two weeks. Defendants shall report to the Court, Plaintiffs' counsel, and the Co-Monitors, **on or before April 25, 2023**, on the content of that training and who participated, as well as the expected timeline for training of all Logan staff to be completed.

b. A timeline for training of all incarcerated persons at Logan (which is to be reviewed and approved by Co-Monitor graham) has still not been set. By

---

[5] The parties' 14-day time frame to respond to Co-Monitor graham's notice of noncompliance regarding searches has not yet expired as of the date of this Order.

**A113**

**April 25, 2023**, Defendants shall report the status of the training program being developed by the Moss Group for all incarcerated persons at Logan and the date by which such training will be completed. The parties and Co-Monitor graham shall discuss and agree on the date by which the training of incarcerated persons at Logan will be completed.

c.   It is clear to the Court that IDOC staff who deal with class members on a day-to-day basis must not only be given meaningful training on interacting with class members in a professional manner (e.g., refraining from misgendering, "outing," and harassing class members) **but also must be held accountable for misconduct and unprofessional behavior towards class members**. Supervisors and administrators must take these matters seriously, model professional behavior, and hold their staff accountable. While some IDOC-wide training has been completed as previously ordered, class members continue to experience unprofessional and threatening interactions with IDOC staff. Further training and steps to remedy these ongoing issues must continue to be a matter for the parties, including the named Defendants and the Co-Monitors, to address. Co-Monitor graham reports she has requested Chief Hammers to create an internal training for administrative staff to hold their subordinates accountable in the areas on which they are trained. Defendants shall report the status of developing this training component and the expected timeline to conduct the training by **April 25, 2023**.

d.   The parties and both Co-Monitors shall discuss and agree on the date by which additional WPATH training will be completed for all medical and mental health providers serving class members. Defendants shall file certificates of completion by medical/mental health staff no later than **June 30, 2023**.

10. **ADDITIONAL MATTERS & REPORTING (As Ordered in Doc. 522):**

a.   The parties and Co-Monitors shall discuss and set timeframes for Defendants to provide copies to Co-Monitor graham and Plaintiffs' counsel of all class member grievances concerning staff conduct relating to the issues in this case, and for Defendants to provide copies to Co-Monitor graham and Plaintiffs' counsel, and file under seal, of any investigation or disciplinary actions taken against a staff member for violations of AD 03.02.108 (Standards of Conduct) relating to the issues in this case.

b.   Continuing on a monthly basis, Defendants shall provide Plaintiffs' counsel with updates to the IDOC transgender databases for medical care and accommodation.

**A114**

c.  Defendants shall provide to Plaintiffs' counsel any other documents provided to the Co-Monitors, at intervals agreed upon by the parties and Co-Monitors.

d.  Defendants shall continue to consult with Co-Monitor graham on the contents and finalization of the "FAQ" handout for transgender/gender nonconforming individuals in custody. This should include information to class members on the procedure to request transfer to a different institution.

**IT IS SO ORDERED.**

**DATED:  April 4, 2023**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

**A115**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

       Plaintiffs,

v.                                                    Case No. 3:18-CV-00156-NJR

STEVEN BOWMAN,
MELVIN HINTON, and
LATOYA HUGHES,

       Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

A status conference and continuation of the hearing on Plaintiffs' Motion for Finding of Contempt was held on April 26, 2023, via videoconference, attended by Co-Monitors Dr. Amanda Harris and julie graham, as well as counsel for the parties. This was another continuation of the proceedings held on December 15, 2022, which continued on January 19, 2023, February 21, 2023, and March 31, 2023. Plaintiffs' Motion for Finding of Contempt (Doc. 455) remains under advisement. Another status conference will be held via video on **Friday, June 2, 2023, at 2:00 p.m. Central Time.**

Following the January 19 Status Conference, the Court entered an Order setting deadlines for certain actions, reports, and certifications to be completed (Doc. 522). A

**A116**

subsequent Order set forth directives following the March 31 Status Conference (Doc. 552). **Those Orders contain future deadlines and directives and remain in effect.**

**Summary of April 26, 2023 Hearing**

The parties and Co-Monitors met twice since the last status hearing. On April 14, 2023, their meeting included Dr. Puga and other IDOC officials, and it focused on a method to compile an accurate list of class members to track whether class members are receiving transgender related health care as ordered by the Court. The lack of an accurate, updated class list hinders the ability to monitor whether Defendants are making progress to comply with several provisions of the injunctive relief orders—such as medication monitoring, the Continuing Quality Improvement "CQI" tool, transfer requests, and accurate placement information to ensure gender affirming items are available where class members are located. An accurate list will also be needed for distribution of the "tool kit" under development for class members.

Counsel for the parties met again with the Co-Monitors on April 19, 2023, to discuss issues related to transfer requests from class members and whether there should be an "automatic transfer" for class member(s) away from facilities that have failed to comply with shower and search requirements. This issue will require further discussion to develop solutions that do not "reward" noncompliance or harm individual class members.[1]

---

[1] The parties' next meeting was scheduled to occur yesterday, May 10, where they planned to focus on potential revisions to the IDOC's Administrative Directive regarding transgender inmates. (Doc. 577). The Court is eager to hear the outcome of that meeting.

**A117**

Co-Monitor graham has investigated Plaintiffs' reports of shower noncompliance facility by facility, which has resulted in some corrections. This is time consuming for the Co-Monitor and frustrating for the Court as it should have been a straightforward matter for Defendants to provide private showers for class members as ordered *long ago.* In *August 2021*, the Court ordered Defendants to "immediately" allow transgender inmates access to a private shower (Doc. 332, p. 3). This directive was reiterated in the February 7, 2022, Preliminary Injunction which gave Defendants **14 days** to report measures taken to comply (Doc. 384, p. 10). Despite Defendants' assurances and certificates of compliance with the Court's Orders, members of the class continued to report instances of noncompliance at several institutions in late 2022 and early 2023. (*See* Doc. 455, Plaintiffs' Motion for Finding of Contempt; Docs. 444, 450, 460, 546, Co-Monitor graham's reports). For example, some shower doors at Pinckneyville currently have a large hole through which the person showering can be seen, and a solid metal plate in the upper door is not high enough to prevent viewing the person's chest area. (*See* Docs. 546, 559).

To be sure, some institutions have satisfactorily provided private showers, and IDOC officials have responded to Co-Monitor graham's inquiries with commitments and action to correct identified problems. But Defendants' persistent noncompliance in several prisons during the twenty months since the Court first ordered Defendants to remedy the lack of private showers is troubling to say the least. The parties' and Co-Monitors' reports demonstrate that to the extent Defendants have complied with the orders to provide private showers, many remedial actions have been taken only in response to the ongoing efforts of Co-Monitor graham, rather than on Defendants' own

initiative. Co-Monitor graham has operated as an ombudsperson taking on an active role in investigating, responding to class members' reports, and problem-solving on the private shower issue as well as complaints regarding body searches and other matters. As graham put it, this type of intervention is "not exactly what I thought I was doing" when she accepted the monitoring role.

Co-Monitor Harris has taken the lead on prompting Defendants to produce a comprehensive list of class members that can be regularly and accurately updated. The Co-Monitors' and parties' comments at the April 28, 2023, status hearing demonstrate that such a list is a necessary prerequisite to successfully monitor and achieve compliance with the medical provisions, class members' transfer requests, and other issues covered in the preliminary injunctions. Dr. Harris has received documentation on class members' hormone therapy showing improvement in that area, but the information provided does not give a comprehensive, individualized picture of each class member's care. She is working to develop a reporting system to aggregate available information on each class member including the specific medications provided, referrals to the endocrine clinic if applicable, where the person is housed, and whether they requested surgery or a transfer and the outcome of such request(s). Defendants have been providing Co-Monitor Harris with regular reports as previously ordered. Yet she is waiting to receive the monthly census list from the mental health department of each facility, which is expected to include all people diagnosed with or under evaluation for gender dysphoria or who are otherwise members of the class. As the mental health providers are the "front line" staff for individuals in custody who are experiencing gender dysphoria or are seeking gender

affirming care, it is hoped that these monthly census lists will provide an accurate picture of the class.

Defendants have provided Co-Monitor Harris with a sample of their CQI tool for transgender care, but have yet to supply her with complete information covering all class members.

Transfer requests by class members continue to be a concern. No transfer requests were considered at the March 2023 TAC meeting, and Defendants report there is no backlog of requests. A number of class members' transfer requests were denied during 2021-2022, however, and it appears they have not been brought up for reconsideration even when Defendants' transfer chart indicated this would be done. (Sealed Doc. 563, TAC Transfer List; *See also* Doc. 564, Joint Status Report). Further, Co-Monitor graham and Plaintiffs' counsel indicate that some class members may believe their transfer requests are awaiting consideration when they in fact are not. It appears that Defendants have not implemented steps to ensure that class members' denied transfer requests are brought up for reconsideration or to effectively inform individuals of the reconsideration process or timeline.[2] The mental health providers are the "gatekeepers" to submit transfer requests from class members, but it is unclear whether these providers are timely submitting requests from class members who want to transfer or advising them of the process to request a transfer. Defendants do not appear to have any tracking system to

---

[2] Defendants were ordered in August 2021 to evaluate pending transfer requests from class members seeking to move to a facility matching their gender identity by December 7, 2021, provide the individual with a written explanation of each reason for a denial, and allow the individual to again request a transfer within 180 days. (Doc. 332, pp. 2-3; Doc. 384, pp. 8-9).

prompt the re-evaluation of denied transfer requests once 180 days have elapsed since a denial. Plaintiffs' counsel notes that the denial letters sent to class members lack specifics on the reason(s) why the transfer was denied and what the individual must do to qualify for a transfer. Defendants do not appear to have adopted any concrete, objective, or transparent criteria for the TAC to apply when considering a transfer request. The lack of an accurate list of individuals belonging to the class is a hindrance.

It is imperative that Defendants quickly finalize and distribute the "tool kit" or "FAQ" handout for class members in consultation with Co-Monitor graham (*See* Doc. 552, p. 9). This handout must clearly explain class members' right to request a transfer, the process for submitting transfer requests, and the re-evaluation process if a transfer is denied. In addition, the parties—along with the Co-Monitors—should draft objective criteria for consideration and ultimate adoption to guide the TAC in making decisions on class members' transfer requests. These criteria should include consideration of an individual's safety, medically necessary social transition, and whether mental health issues may be improved by placing the individual in a facility matching their gender identity.

Co-Monitor graham reports that the availability of gender affirming commissary items is improving, but problems remain with timely stocking items on order. She continues to troubleshoot these issues. Again, inaccuracies in the list of class members in each facility prevents items from getting to those who need them.

Class members continue to report problems regarding searches, including delays while waiting for a female staff member to search a transgender woman, or a search being

**A121**

conducted by the wrong gender officer. Co-Monitor graham has followed up on these reports but has found it difficult to ascertain what happened, because class members often do not file grievances out of fear of retaliation or being "outed" as transgender. The parties plan continued discussion to agree on a process for Plaintiffs' counsel and Co-Monitor graham to receive copies of all grievances filed by class members relating to issues in this case (not limited to searches). The Court expects that reports of any noncompliance will continue to be filed by counsel and/or Co-Monitor graham. Plaintiffs' counsel should encourage class members to file grievances over instances of misconduct related to searches so that these issues are documented and addressed. Retaliation or other inappropriate conduct by IDOC staff against class members for filing grievances will not be tolerated.

Fortunately, progress is being made to provide training to IDOC employees at Logan, with sessions in June 2023 to train IDOC staff who will then conduct training of other employees. The curriculum for training individuals in custody at Logan should be completed by June 1, 2023, and this training should be completed by the end of September 2023.

**Documents Filed After the April 26, 2023 Status Hearing**

Defendants filed their report on April 28, 2023 (Docs. 571, 572), listing the in-person surgical consultations scheduled for 13 class members with Dr. Schechter, which will take place between June 15, 2023, and July 20, 2023.[3] The Court had previously

---

[3] This list of 13 individuals includes people who were approved for surgery as of January 4, 2023, as well as additional individuals who were approved for gender affirming surgeries in March

ordered Defendants to schedule these consultations to take place *no later than March 8, 2023* (Doc. 522), and then extended the deadline to April 28, 2023 (Doc. 557). The scheduled consultations are thus set to take place one and a half to three months *after* the Court's extended deadline. Further, Defendants did not comply with two previous orders (Docs. 522, 552) to report whether and when another surgical provider at Rush Medical Center will start accepting patients for gender affirming surgery, nor did they file a list of other providers contacted for gender affirming surgery if another Rush provider is not available. Instead, Defendants wish to continue working with Dr. Schechter, with whom they have a longstanding relationship to provide gender affirming surgery. *This track record does not demonstrate reasonable diligence* to comply with the ordered injunctive relief. In fact, Defendants have flouted this Court's Orders to identify additional providers, which it was hoped would result in meeting the surgical needs of the class in a more timely manner.

While the Court appreciates the value of having Dr. Schechter, a skilled gender-affirming surgeon, provide surgeries for class members, Defendants' schedule raises the question whether it is feasible for this single provider to timely perform the approved surgeries, let alone surgeries that may be approved in the future. Notably, the June-July 2023 schedule is just for class members' *consultations*—there is no indication of how soon the actual surgeries will be performed. Moreover, Defendants admit that some individuals who were previously approved for surgery have been dropped from the list

---

and April 2023 (Doc. 571). Defendants note that some individuals whose surgeries had been approved are omitted from the list because they have been released from custody. *Id.*

because their impending release dates from IDOC custody would not allow for surgery and the necessary follow-up care. Had Defendants scheduled surgical consultations in a timely manner as the Court ordered, these class members might not have lost their opportunity for this medically necessary treatment. This clearly constitutes harm to the affected class members.

Under these circumstances, the Court must hold Defendants to their previously-ordered obligation to explore the availability of other surgical providers, both at Rush Medical Center and other locations, particularly for less-complicated surgery such as mastectomies for transgender men and orchiectomy for transgender women. Plaintiffs are encouraged to suggest other potential providers as well.

If Defendants again fail to comply with the Court's directives and schedule set forth below, ***they will be held in contempt, and the Court will impose appropriate sanctions***. Sanctions may include requiring Defendants to pay the Co-Monitors' (Special Masters') fees (*See* Docs. 457, 558, 561) and the imposition of fines where a particular prison continues to have verified reports of noncompliance with the orders for injunctive relief as discussed above.

The Court finds it necessary to adopt the following additional schedule, to ensure timely progress and provide measurable benchmarks. Future timelines set forth in the Orders of January 24, 2023 (Doc. 522) and April 4, 2023 (Doc. 552) are included below. The parties and Co-Monitors are **ORDERED** to do the following:

1. **PLAINTIFF CLASS IDENTIFICATION/RECORDKEEPING:**

    On a monthly basis, Defendants shall promptly provide the mental

**A124**

health departments' monthly census list of individuals in custody who are members of the Plaintiff class, including their locations, to both Co-Monitors and Plaintiffs' counsel.

## 2. HORMONE THERAPY:

Defendants shall continue to monitor class members' blood hormone levels every three months as previously ordered, and shall file quarterly updates regarding blood levels of all class members to the Court under seal and to Co-Monitor Harris.

## 3. GENDER AFFIRMING SURGERY:

a. Defendants shall provide to Plaintiffs' counsel, the Co-Monitors, and file under seal by **June 30, 2023,** the dates on which the individuals whose consultations are set for June 15, 2023 and June 22, 2023 (in Doc. 572) will undergo gender affirming surgery. Defendants will supplement this information as additional surgeries are scheduled for the class members having consultations in July 2023, and for any other class members who are newly scheduled for surgical consultations and surgery.

b. Defendants shall report by **June 1, 2023**, **whether and when another surgical provider at Rush Medical Center will start accepting patients for gender affirming surgery. If availability of another provider at Rush cannot be confirmed by that date, then Defendants shall file under seal a list of other providers contacted for gender affirming surgery, no later than June 15, 2023**.

c. Defendants shall continue to provide Plaintiffs' counsel with copies of future written decisions issued to class members on their requests for gender affirming surgery.

## 4. CQI:

By **June 15, 2023**, Defendants shall provide the *complete* audit/compliance tool in its native format, including data on all class members (not merely a sample) to Plaintiffs' counsel and to Co-Monitor Harris for review. Defendants shall also communicate and provide updates to Co-Monitor Harris and Plaintiffs' counsel as class members are added to or removed from the CQI tool.

**A125**

5. **TRANSFERS:**

    a. Defendants shall issue written notice to all class members who requested and were denied a transfer and who are still in custody, to inform them of the right to request reconsideration after six months from the denial. The notice shall specify the reason for the prior denial, explain the issues that must be resolved before a transfer may be approved, and explain the process to resubmit a transfer request. The parties and Co-Monitors shall confer on the boilerplate contents of this notification letter. Notices shall be provided by **June 1, 2023** to class members whose transfer requests were denied on or before October 31, 2022. Going forward, this notice shall be provided to class members whose transfer requests were denied, after the 180 days has elapsed, informing the individual that they may submit a request for reconsideration of the transfer denial and including the information set forth above. Defendants shall provide copies of these letters to Plaintiffs' counsel, to both Co-Monitors, and to the mental health provider assigned to the individual receiving the notice.

    b. By **June 15, 2023**, Defendants shall file under seal with the Court a list of the class members who received the first round of notices (those due by June 1, 2023) and their current location. Thereafter, Defendants shall report quarterly the list of class members who were sent this notice during the previous period (due starting October 1, 2023, and thereafter on January 1, April 1, July 1, etc.).

    c. The parties and Co-Monitors shall continue discussions to formulate objective criteria to guide the TAC in making decisions on class members' transfer requests. These should include consideration of an individual's safety, medically necessary social transition, and whether mental health issues may be improved by placing the individual in a facility matching their gender identity, as well as other relevant issues. They should be prepared to update the Court on this issue at the next status hearing on June 2, 2023, at which the Court may set a date for a written report on this matter.

    d. Along with developing objective criteria to guide transfer decisions, the parties and Co-Monitors shall continue discussion on when and under what circumstances it would be appropriate for Defendants to offer a transfer to individual class members to facilitate improved care and social transition as well as safety.

**A126**

e.  As previously noted (Doc. 552, p. 6), the current TAC committee structure for deciding on class members' transfer requests, and the qualifications of the individuals involved continues to be a concern in light of the slow pace of action on class members' transfer requests, and merits continued attention from the parties and Co-Monitors to devise possible solutions.

6. **COMMISSARY:**

The parties and Co-Monitors shall continue working to achieve adequate commissary supplies of gender affirming items throughout IDOC facilities and to reach agreement on the items to be included in a gender-affirming kit for all class members as standard-issue medical care. By the **June 2** continued hearing, the parties and Co-Monitors shall propose compliance deadlines for the gender-affirming commissary kit to be distributed to all class members and to any new transgender person entering IDOC custody. Issues to be resolved include what to do if different class members want different items, and whether replenishment of such items for class members will be honored as medical care.

7. **SHOWERS:**

a.  As noted above, reports of noncompliance with the Court's Orders to provide private showers to class members continue to occur. (Docs. 545-550, 553, 559, 569-570, 573). Co-Monitor graham will continue to follow up on these reports, and the Court expects Defendants and the officials at each facility to promptly respond and address concerns. Going forward, the Court will accept Co-Monitor graham's certification if she finds that a facility is not in compliance with the private shower mandate, and may impose appropriate sanctions on Defendants if the facility is not promptly brought into compliance.

b.  Plaintiffs' counsel shall continue to advise the Court and Co-Monitor graham within **seven days** of their receipt of any reports of noncompliance with the private shower requirement.

c.  The parties and Co-Monitors shall continue discussions on procedures and deadlines to offer a transfer to any class member away from a facility that fails to provide them with a private shower, to a facility where compliance has been achieved. The parties shall file another joint status report on this issue by **June 30, 2023**.

8. **SEARCHES:**

   a. Reports of problems relating to the avoidance of cross-gender searches have continued from some institutions (Docs. 546, 573). These matters are complicated by class members' reluctance to file grievances, and by class members who do not wish to be publicly identified as transgender out of fear of discrimination or safety issues. Co-Monitor graham will continue to follow up with the individual institutions to correct the problems identified, including availability of female officers to conduct searches, and adequate planning to ensure timely searches for pre-planned events such as court and medical writs.

   b. The parties and Co-Monitors shall continue discussions on procedures and deadlines to offer a transfer to any class member from a facility that fails to comply with the search provisions, to a facility where compliance has been achieved. The parties shall file another joint status report on this issue by **June 30, 2023**.

9. **TRAINING:**

   a. Training of IDOC staff at Logan is underway, including training of those IDOC employees who in turn will conduct training of other staff members at Logan. Defendants shall report to the Court, Plaintiffs' counsel, and the Co-Monitors, **on or before June 30, 2023**, on the content of that training, who participated, whether the training of all Logan staff has been completed and if not, when it will be completed.

   b. Design of the training program for all incarcerated persons at Logan should be finalized by June 1, 2023 and Defendants report all incarcerated persons at Logan should have finished the training by the end of September 2023. Defendants shall update the Court on progress at the June 2, 2023 continued hearing.

   c. Defendants shall also update the Court at the June 2, 2023 continued hearing on the status of training provided to all IDOC staff at all institutions regarding interactions with the transgender and gender-nonconforming population. Initial training was provided by the Moss Group in 2022. Has any refresher been given to staff and if so, when? Are Defendants tracking employees' completion of this training and are new hires also undergoing this training?

d.  In response to the Order of April 4, 2023 (Doc. 552, p. 8, sec. 9.c.), Defendants reported on April 25, 2023 (Doc. 562) that IDOC plans to release a "roll call memorandum" to all facilities to be read at each shift, to reiterate the Standards of Conduct expected of all staff, and will address accountability for subordinates at the next Wardens' meeting. By **June 1, 2023**, Defendants shall file a copy of the roll call memorandum with the Court and provide it to Plaintiffs' counsel and the Co-Monitors. Defendants shall update the Court at the June 2, 2023 continued hearing as to how the matter was addressed at the Wardens' meeting and what further steps will be taken to train administrators and subordinate staff on interacting with class members in a professional manner, holding staff accountable for misconduct and unprofessional behavior, and the expected timeline to conduct further training.

e.  As previously ordered (Doc. 552, p. 8, sec. 9.d.), the parties and both Co-Monitors shall discuss and agree on the date by which additional WPATH training will be completed for all medical and mental health providers serving class members. Defendants shall file certificates of completion by medical/mental health staff no later than **June 30, 2023**.

10. **ADDITIONAL MATTERS & REPORTING:**

a.  The parties shall file a notice advising the Court of the date of each monthly (or more frequent) meeting between counsel, the Co-Monitors, and the appropriate IDOC officials, and the anticipated topic(s) for discussion, as soon as each date is set.

b.  As previously ordered (Docs. 522, 552), the parties and Co-Monitors shall discuss and set timeframes for Defendants to provide copies to Co-Monitor graham and Plaintiffs' counsel of all class member grievances concerning staff conduct relating to the issues in this case, and for Defendants to provide copies to Co-Monitor graham and Plaintiffs' counsel, and file under seal, of any investigation or disciplinary actions taken against a staff member for violations of AD 03.02.108 (Standards of Conduct) relating to the issues in this case.

c.  As previously ordered (Docs. 522, 552), on a monthly basis, Defendants shall provide Plaintiffs' counsel with updates to the IDOC transgender databases for medical care and accommodation.

**A129**

d.  As previously ordered (Docs. 522, 552), Defendants shall provide to Plaintiffs' counsel any other documents provided to the Co-Monitors, at intervals agreed upon by the parties and Co-Monitors.

e.  As previously ordered (Docs. 522, 552), Defendants shall continue to consult with Co-Monitor graham on the contents and finalization of the "FAQ" or "tool kit" handout for transgender/gender nonconforming individuals in custody. This should include information to class members on the procedure to request transfer to a different institution. By **June 1, 2023**, Defendants shall submit a copy of this handout to the Court if it has been finalized, or shall report on the expected timeline for its completion if it is not yet finalized.

**IT IS SO ORDERED.**

**DATED:  May 11, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

**A130**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

      Plaintiffs,[1]

v.

                                Case No. 3:18-CV-00156-NJR

STEVEN BOWMAN,
MELVIN HINTON, and
LATOYA HUGHES,

      Defendants.[2]

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

As context for this Order, this case proceeds as a certified class action consisting of

all prisoners in custody of the Illinois Department of Corrections ("IDOC") who have

requested evaluation or treatment for gender dysphoria. (Doc. 213). To manage this case,

and in light of the serious deficiencies in IDOC's treatment of transgender prisoners, the

Court has issued several injunctive orders, entered enforcement orders, and required

ongoing status reporting. (*See* Docs. 186, 187, 211, 212, 332, 336, 384, 522, 552, 584).

---

[1] The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. Like many members of the Plaintiff class, the named Plaintiffs use chosen names reflecting their gender identity rather than their legal names or given names at birth.
[2] The named Defendants are the IDOC Chief of Health Services, the IDOC Chief of Mental Health, and the IDOC Acting Director, respectively, all sued in their official capacities.

**A131**

Early in this litigation, the Court held an evidentiary hearing to determine the appropriateness of preliminary injunctive relief. (Docs. 157, 158). On December 19, 2019, as a result of a two-day hearing, the Court issued its first Preliminary Injunction Order. (Docs. 186, 187 (amended on March 4, 2020, at Doc. 212)). In that Order, the Court thoroughly summarized the evidence presented at the hearing and noted that the parties agreed that gender dysphoria qualified as a serious medical condition. (Doc. 186). The Court analyzed Plaintiffs' likelihood of success on the merits of its deliberate indifference claim, assessed the showing of irreparable injury and inadequate remedy at law, and balanced the possible harms and the public interest. The ordered injunctive relief included disbanding the Transgender Care Review Committee for medical decisions related to treatment of gender dysphoria, ensuring timely hormone therapy and proper monitoring, ending the practices preventing necessary social transition, crafting procedures permitting access to clinicians who are competent and qualified in treating gender dysphoria,[3] providing a path for evaluation for gender dysphoria, determining placement on an individual basis, avoiding cross-gender strip searches, creating access to gender-affirming clothing and grooming items, and developing training for correctional staff on transgender-related issues.

This case proceeded to a four-day bench trial in August 2021. The testimony at that trial made clear that IDOC demonstrated only minimal progress since the inception of

---

[3] The World Professional Association for Transgender Health ("WPATH") organization developed the Standards of Care for the treatment of gender dysphoria, which are the benchmark for appropriate care of individuals with this diagnosis. (Doc. 186, pp. 3-4, 31). To be considered competent and qualified, clinicians must meet the WPATH competency requirements.

the case, even with the prior preliminary injunctive relief. (Docs. 319-328, 331, 332, 336). While IDOC highlighted some progress, the Court recognized that serious constitutional violations abounded—delays in treatment, unmonitored hormone levels, lack of documentation or adjustment to dosages based on bloodwork, denial of hormone therapy for treatment of gender dysphoria for some class members, lack of surgical consultation, inconsistent access to gender affirming commissary items, cross-gender strip searches, inappropriate shower accommodations, and persistent harassment, humiliation, and misgendering. Days after trial, the Court issued an order reflecting its preliminary findings of fact and conclusions of law, foreshadowing its ultimate decision, and ordered preliminary injunctive relief to immediately address some of the most egregious constitutional violations demonstrated at trial until the Court could finalize its findings. (Docs. 331, 332, 336). In December 2021, the Court announced its intention to appoint a Special Master or Monitor to oversee Defendants' compliance with the ordered injunctive relief, to track implementation of IDOC's revised Administrative Directives regarding transgender prisoners and advise the Court and the parties as to the overall progress in remedying the unconstitutional treatment of class members. (Doc. 370). Ultimately, the Court decided that the path towards justice required further injunctive relief.[4] (Docs. 331, 332, 336).

      To draw the curtain on the bench trial, the Court entered its Final Findings of Fact

---

[4] The undersigned issued a verbal ruling for specific preliminary injunctive relief at the close of the bench trial on August 5, 2021, later set forth in the Order of August 9, 2021, the Preliminary Findings of Fact and Conclusions of Law. (Docs. 331; 349, pp. 972-92). Moreover, a correction to the ordered injunctive relief was made on August 18, 2021, to reflect the correct target testosterone level for transgender females undergoing hormone treatment. (Doc. 336).

and Conclusions of Law on February 7, 2022 ("February 2022 Order") holding that IDOC violated the class members' Eighth Amendment rights through deliberate indifference to their need for adequate treatment of gender dysphoria. (Doc. 383). Along with that Order, the Court issued more injunctive relief to remedy the constitutional violations proven by Plaintiffs at trial ("operative injunction").[5] (Doc. 384). Within the following few months, the Court also appointed two Co-Monitors, Dr. Amanda Harris and julie graham, MFT. (Docs. 418, 423). As Co-Monitors, they submit reports detailing their observations regarding compliance, or lack thereof, with the ordered injunctive relief. (*Id.*). Generally, Dr. Harris oversees Defendants' implementation of the ordered relief regarding medical aspects of gender-affirming care, and julie graham maintains responsibility for oversight of IDOC's compliance with the search, private shower, and training provisions. (*Id.*).

After the entry of the operative injunction, the parties and the Co-Monitors continued to work towards compliance with the granted injunctive relief. But in November 2022, Plaintiffs filed a Motion for Finding of Contempt listing a slew of disheartening deficiencies in administering and monitoring hormones, scheduling surgery consultations and surgeries, providing gender-affirming commissary items, cross-gender searches, private showering, coordinating social transition, and training prison staff. (Doc. 455). Defendants responded to that motion asserting that, although Plaintiffs preferred a swifter pace, they made diligent, ongoing efforts to comply with the timelines and actions set by the Court. (Doc. 462).

---

[5] This document carries the title of "Preliminary Injunction," which fuels Defendants' argument in the pending motion to vacate, but the implication of the Order will be discussed further below.

The Court continued to hold the motion under advisement. Discouragingly, IDOC's continued lack of progress towards the ordered injunctive relief necessitated additional enforcement orders to keep efforts on track and provide measurable benchmarks for the formidable work ahead. (Docs. 522, 552, 584). Along with several status conferences, the Court entered these orders with deadlines for certain actions, reports, and certifications to be completed. (*Id.*). The Court also sternly warned of a contempt finding and possible sanctions for continued non-compliance with its operative injunction. (*Id.*).

Now, after issuance of the enforcement orders and over a year after entry of the operative injunction, Defendants argue that the injunctive relief issued by the Court automatically expired 90 days after issuance, and the Court's recent enforcement orders erroneously attempt to execute the expired injunctions along with imposing additional obligations that exceed the limitations in the Prison Litigation Reform Act ("PLRA"). (Doc. 587). For example, Defendants urge that the Court impermissibly required specific actions within specific timeframes instead of permitting Defendants discretion to plan and execute remedial measures. (*Id.*). According to Defendants, Plaintiffs also cannot prove a continuing constitutional violation (deliberate indifference to a serious medical need). (*Id.*). As such, Defendants move to vacate the Court's enforcement orders (Docs. 522, 552, 584), request an acknowledgement that the operative injunction (Doc. 384 (incorporating Docs. 186, 187, 211, 212, 226)) is expired and has no effect, and seek permission to provide updated evidence of IDOC's ongoing efforts before entering further relief. (Doc. 587). Simultaneously, Defendants ask the Court to stay compliance

**A135**

with the challenged orders. (Doc. 588). Plaintiffs filed timely responses to both motions. (Docs. 597, 598).

**MOTION TO VACATE (DOC. 587)**

### I. Legal Standard

Under Federal Rule of Civil Procedure 60, a court may relieve a party from a final judgment, order, or proceeding because the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or for any other reason that justifies relief. FED. R. CIV. P. 60(b)(5)-(b)(6). For the first ground for vacating an order in Rule 60(b)(5), a party must show that it has achieved that the objectives of the order or decree. *Shakman v. Pritzker*, 43 F.4th 723, 728 (7th Cir. 2022). Consideration of a motion under Rule 60(b)(5) does not permit re-litigation of issues which the judgment already resolved. *Money Store, Inc. v. Harriscorp Finance, Inc.*, 885 F.2d 369, 372 (7th Cir. 1989). In some circumstances, cases involve more than one final decision, for example, post-judgment orders entered pursuant to the jurisdiction a court has retained to enforce a prior order, may be considered final orders. *See Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1064 (9th Cir. 2010).

### II. Discussion

In their Motion to Vacate, Defendants argue that no final order issued after the bench trial, all imposed preliminary injunctions expired within 90 days after issuance, and the newly imposed obligations in subsequent enforcement orders exceed the limitations imposed by the PLRA. Defendants also assert that the Court has erred by

continuing and incorporating older preliminary injunctions that already expired.

Moreover, Defendants assert that the imposition of any additional injunctive relief against them, through the enforcement orders, lacks a finding that such relief is narrowly drawn, extends no further than necessary to correct the violation of a constitutional right, and is the least intrusive means necessary to correct the violation of the constitutional right as required by the PLRA, under 18 U.S.C. § 3626(a). What's more, Defendants accuse the Court of conflating the Plaintiffs' and Co-Monitors' suggestions with what is constitutionally required, without making the statutorily required findings that such relief is necessary to remedy a constitutional harm. As such, Defendants contend that the Court has erred by entering orders contrary to the plain language of the PLRA and impermissibly infringing upon Defendants' discretion. Defendants also emphasize that they have attempted to deferentially alert the Court as to these issues in multiple ways before formally seeking to vacate the orders.

     **a.** *Injunctive Relief Standards*

Preliminary injunctions are temporary injunctions issued before or during trial to prevent an irreparable injury from occurring before the court has a chance to decide the case.[6] To issue preliminary injunctive relief, courts engage in a muti-step inquiry. *International Ass'n of Fire Fighters, Local 365 v. City of East Chicago,* 56 F.4th 437, 446 (7th Cir. 2022). At the threshold, the injunction-seeking party must show some likelihood of succeeding on the merits, that it lacks an adequate remedy at law, and it will suffer

---

[6] *See Preliminary Injunction*, BLACK'S LAW DICTIONARY (11th ed. 2019), accessed via Westlaw.

A137

irreparable harm if preliminary relief is denied. *Cassell v. Snyders,* 990 F.3d 539, 544-45 (7th Cir. 2021). From there, a court balances the irreparable harm the non-moving party will suffer if preliminary relief is granted against the irreparable harm to the moving party if relief is denied. *Id.* (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008)). A court also must consider the public interest, including any consequences of granting or denying injunctive relief to non-parties. *Id.*

In contrast, the issuance of a permanent injunction involves a trial on the merits.[7] In the case of a bench trial, a court issues findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a)(1), and enters a final order granting or denying the requested relief. The standard for permanent injunctive relief is similar to that of a preliminary injunction. But because permanent injunctive relief is a form of relief on the merits, a plaintiff must demonstrate not simply a probability of success on the merits but actual success. *Vaughn v. Walthall*, 968 F.3d 814, 824-25 (7th Cir. 2020). Thus, permanent injunctive relief is appropriate when the injunction-seeking party shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

---

[7] *See Permanent Injunction*, BLACK'S LAW DICTIONARY (11th ed. 2019), accessed via Westlaw (defining "permanent injunction" as "[a]n injunction after a final hearing on the merits").

"The PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context." *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012); 42 U.S.C. § 1997e & 18 U.S.C. § 3626. The PLRA delineates slightly different rules for preliminary and prospective injunctive relief. For preliminary injunctive relief, the PLRA dictates that it "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Further, a court must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system and respect the principles of comity within the statute in tailoring preliminary relief. *Id.* For preliminary injunctions subject to the PLRA, automatic expiration occurs after 90 days, unless the court makes the necessary findings for entry of prospective relief and makes the order final before expiration of the 90-day period. *Id.*

Similarly, the PLRA constrains the scope of prospective relief to only the extent necessary to correct the violation of the Federal right of particular plaintiffs. 18 U.S.C. § 3626(a)(1)(A). To grant prospective relief, a court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* In familiar fashion, the PLRA requires courts to afford substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the ordered prospective relief. *Id.* A defendant may move to terminate prospective relief that does not meet this standard. *Miller v. French*, 530 U.S. 327, 333 (2000). Section 3626(b)(2) provides that a defendant "shall be entitled to the immediate termination of any

**A139**

prospective relief" lacking the requisite narrowness-need-intrusiveness finding. But "prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right" and satisfies the narrowness-need-intrusiveness requirement. 18 U.S.C. § 3626(b)(3).

### b. February 2022 Order

The Court provides this brief explanation of the standards for injunctive relief, specifically under the PLRA, to lay the foundation for a necessary discussion clarifying the February 2022 Order (Doc. 383), the operative injunction (Doc. 384), and the effect of each on this case.

In its February 2022 Order, the Court endeavored to explain its final findings of fact and conclusions of law from the August 2021 bench trial. In doing so, the Court issued a ruling on the merits of the case finding that Defendants acted with deliberate indifference to Plaintiffs' serious medical need of gender dysphoria in violation of the Eighth Amendment. As a result, the Court ordered prospective injunctive relief as an equitable remedy to this constitutional violation. Admittedly, the Court, throughout its February 2022 Order, referred to either "preliminary relief" or simply "injunctive relief," outlined the standard for preliminary injunctive relief,[8] and titled the accompanying injunction a "Preliminary Injunction." Simply put, this was a mistake.

---

[8] Immediately after describing the standard for preliminary injunction, the Court referred to the narrowness-need-intrusiveness standard for prospective relief under the PLRA. (Doc. 383, p. 64). This inconsistency further signals the Court's intention to issue prospective or permanent relief, rather than preliminary relief.

**A140**

But from the substance of the February 2022 Order and operative injunction, along with the context and ongoing actions of the Court and the parties, it is clear that the relief was intended and understood to be *permanent* injunctive relief resulting from the evidence presented at the bench trial.

First, the Court's justification for injunctive relief provided in the February 2022 Order satisfied the requirements for permanent injunctive relief. In evaluating the prudence of preliminary injunctive relief, the Court found that remedies available at law inadequately compensated Plaintiffs' injuries, the balance of hardships between Plaintiffs and Defendants warranted a remedy in equity, and the injunction served public interest. (Doc. 383, p. 65). These are all necessary findings to satisfy permanent injunctive relief as well. To issue permanent injunctive relief, as opposed to preliminary relief, a court must find actual success on the merits of the claim rather than likelihood of success. In its February 2022 Order, the Court explicitly made such a finding. The Court held that, based on the evidence presented at trial thoroughly recounted in the Order, Defendants violated Plaintiffs' Eighth Amendment rights for failure to provide constitutionally required treatment for gender dysphoria and exhibited ongoing deficiencies in delivery of medically necessary treatments on a systemic, statewide level in IDOC correctional institutions. (Doc. 383, pp. 66, 70). With this finding, the permanent injunctive relief was appropriate and provided closure on the merits after the bench trial.

The February 2022 Order and subsequent operative injunction satisfy the PLRA's requirement that the granted prospective relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and represents the least

intrusive means necessary to correct the violation, as well as considering the adverse impact on public safety or operation of a criminal justice system. These narrowness-need-intrusiveness inquiries overlap significantly and can blend together. "What is important, and what the PLRA requires, is a finding that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." *Armstrong*, 622 F.3d at 1071.

In its Order, the Court thoroughly explained the evidence at trial and explicitly outlined the need for injunctive relief to correct the persistent unconstitutional treatment of Plaintiffs' serious medical condition of gender dysphoria. In the "Treatment of Gender Dysphoria" section of its February 2022 Order, the Court reiterated many of the principles established in its prior orders concerning the appropriate treatment for gender dysphoria, including the World Professional Association for Transgender Health ("WPATH") Standards of Care, which are considered the benchmark for appropriate care.[9] (Doc. 383, pp. 4 n. 3, 5-9). Thus, the Court has considered WPATH's Standards of Care as the constitutional floor of treatment for gender dysphoria. In its Order, the Court clearly tailored its injunctive relief in accordance with this constitutional floor, breaking down relief into categories reflected in WPATH's Standards of Care—social role transition, psychotherapy, surgery, and cross-sex hormone therapy. The Order reviewed the IDOC policies regarding transgender inmates and their various inadequacies along with the specific testimony at trial further substantiating those inadequacies. (*Id.* at pp. 9-

---

[9] Notably, as the Court asserted long ago in this case, Defendants do not offer any other standard of care that rivals that of WPATH, which could be an appropriate, accepted alternative and establish a lower constitutional floor. (Doc. 186, p. 31).

**A142**

61).

The February 2022 Order and operative injunction also incorporate relief that does not intrude upon IDOC's discretion to develop solutions, policies, and procedures to deliver constitutionally required care to transgender inmates. The Court identifies the primary focus of its ordered injunctive relief as *outcomes* that raise IDOC's treatment onto the constitutional floor, rather than prescribing the methods for *how* IDOC achieves those outcomes. (*Id.* at pp. 66-68). Lastly, the February 2022 Order clearly identifies and evaluates extensive testimony regarding public safety and institutional security implications related to the injunctive relief sought by Plaintiffs. (*Id.* at pp. 31-34). Ultimately, the Order, in aggregation, establishes that the granted relief satisfies the narrowness-need-intrusiveness requirement, along with consideration of public safety and institutional security. The Court provides this explanation to highlight the February 2022 Order's compliance with the PLRA's mandate for prospective relief. To be sure, in its Motion to Vacate, Defendants do not appear to challenge the February 2022 Order for lacking a narrowness-need-intrusiveness finding, but rather they argue that the subsequent enforcement orders lack such a finding—which the Court will address below.

Additionally, after the bench trial in 2021, the Court made preliminary rulings from the bench which support the notion that the February 2022 Order amounted to the Court's Final Findings of Fact and Conclusions of Law along with permanent injunctive relief. (Doc. 328). In reaching the decision to issue immediate interim preliminary relief, the Court stated, "So, obviously I am going to have to continue to follow up with permanent injunctive relief and may at some point consider the appointment of an

independent monitor to ensure ongoing compliance, but that's an issue for another day."

(*Id.* at pp. 7-8). The Court also said, "Notably, the request for preliminary injunctive relief

was vigorously opposed by counsel, as was permanent injunctive relief during this trial."

(*Id.* at pp. 4-5). Alluding to the permanent injunctive relief to come, the Court mentioned

that "there are simply some issues that have come to light in the past four days that are

so serious, *such serious violations of the Eighth Amendment*, that they must be immediately

addressed[,]" and further that, "I find that Defendants *continue to be deliberately indifferent

to Plaintiffs' serious medical condition*, that is gender dysphoria[.]" (*Id.* at pp. 9, 11-12)

(emphasis added). The Court immediately entered its Preliminary Findings of Fact and

Conclusions of Law, along with a Preliminary Injunction Order after the trial. (Docs. 331,

332). Eventually, the Court entered the February 2022 Order finalizing its findings from

the trial and allowing the forewarned injunctive relief to come to fruition.

Moreover, the Court's announcement that an independent monitor may be

appointed to ensure compliance with permanent injunctive relief paired with its eventual

appointment of independent monitors[10] points to the permanent nature of the Court's

injunction. In its Order explaining the need for a Monitor to oversee Defendants'

compliance, the Court stated that "the post-trial remedial phase of this matter is

sufficiently complex to exceed the Court's ability to effectively and timely evaluate the

records to determine whether Defendants are making adequate progress toward

---

[10] In an Order on December 13, 2021, the Court advised the parties of its intention to appoint a Monitor to oversee Defendants' compliance with its preliminary injunctions up until that point. (Doc. 370). In its February 2022 Order, it incorporated the use of the Monitor to assess and advise the Court on how to "remedy the unconstitutional treatment of transgender prisoners in IDOC custody…and work with the parties to accomplish those revisions." (Doc. 383, p. 70).

**A144**

compliance with the Court's orders." (Doc. 370, p. 5). Again, the Court recognizes its own mislabeling, but the context surrounding the February 2022 Order provides clarity as to the intended permanent nature of the relief granted.

In further evidence that the parties understood the injunctive relief as permanent, the Court points to the behavior of the parties from the issuance of the operative injunction until the filing of Defendants' present motion to vacate. Although Defendants contend that the operative injunction expired on May 8, 2022 (90 days after issuance), Defendants continued to acknowledge the role of the Co-Monitors, engaged in status conferences and many other communications with the Co-Monitors, Plaintiffs, and the Court, and responded to Plaintiffs' Motion for Finding of Contempt.

Despite these multiple opportunities, Defendants failed to raise any issue with the operative injunction as expired preliminary relief. Then, over *a year* after the issuance of the February 2022 Order and operative injunction, Defendants raised the argument that, under the PLRA, preliminary injunctive relief automatically expires after 90 days, and, as such, they have no further obligation to comply with the operative injunction without further hearings or findings by the Court. Unsurprisingly, Defendants' argument arrives on the heels of threatened sanctions for their continued noncompliance. This attempt is disingenuous, at best, given Defendants' behavior for over a year treating the February 2022 Order as prospective, permanent injunctive relief and understanding the Court's authority to ensure and monitor compliance with the ordered relief. To allow Defendants to raise this argument in such an untimely fashion would seriously disrupt this case. "A party's unreasonable delay in advancing a good ground for a change in a previous

**A145**

ruling is normally a compelling ground for deeming even a good ground waived." *Carr v. O'Leary*, 167 F.3d 1124, 1126 (7th Cir. 1999). Defendants are attempting to set this case back to square one, which is impermissible at this stage. Clearly, based on the context and behavior of the parties, the February 2022 Order and subsequent operative injunction, despite a mislabeling, actually provide permanent injunctive relief.

The Court recognizes that it should have issued an accompanying judgment in favor of Plaintiffs after its February 2022 Order. As described, the February 2022 Order included the Court's final findings of fact and conclusions of law after the August 2021 bench trial and granted permanent injunctive relief. This amounted to final judgment in favor of Plaintiffs.

### c. *Enforcement Orders & Prior Preliminary Injunction Orders*

As for the prior preliminary injunctions, regrettably, the Court recognizes its procedural failure to appropriately renew each injunction upon the automatic 90-day expiration encompassed in the PLRA. Again, the parties failed to raise this argument in a timely fashion for the Court to make necessary adjustments to those orders. Defendants contend that they raised the expiration argument in 2020 within their response to Plaintiffs' Renewed Request for Appointment of Independent Monitor. (Doc. 226). In its Order denying that request, the Court directed Defendants to raise this argument in an independent motion for the Court to evaluate. (Doc. 246). Defendants declined to do so. As such, the case proceeded under the assumption that the preliminary orders remained in effect. This was also a mistake.

The Court outright rejects Defendants' argument that the Court's recent

**A146**

enforcement orders (Docs. 522, 552, 584) were based on those initial injunctions. The Court reincorporated the terms of its prior, albeit expired, injunctions directly into the February 2022 Order and operative injunction, which constitute permanent, final injunctive relief, as explained above. The content of those orders became part of the permanent injunctive relief granted by the Court by their explicit reincorporation based on findings from the bench trial. As such, the enforcement orders were not based on the expired preliminary orders entered by the Court, but rather on the February 2022 Order and operative injunction. To the extent that Defendants argue the enforcement orders should be vacated under Rule 60(b)(5) because they are based on an earlier judgment that has been reversed or vacated, the Court disagrees.

Of course, when a court issues a permanent injunction, it automatically, with or without explicit reservation of jurisdiction, retains jurisdiction to enforce it. *McCall-Bey v. Franzen*, 777 F.2d 1178, 1183 (7th Cir. 1985). Federal courts are not reduced to issuing injunctions against state officers and crossing their fingers in hopes for compliance. *Hutto v. Finney*, 437 U.S. 678, 690 (1978). After issuance, an injunction may be enforced. *Id.* "An injunction is supposed to be a swift and effective remedy, summarily enforceable through contempt or other supplementary proceedings in the court that issued the injunction." *Id.*

Here, the Court has engaged in many efforts and supplementary proceedings to enforce its injunction and ensure compliance including reviewing briefing on Plaintiffs' contempt motion, hosting several status conferences and continued contempt hearings, and evaluating numerous reports from the Co-Monitors regarding areas of compliance and non-compliance. Its recent enforcement orders are a product of those efforts. All of

the requirements outlined in the enforcement orders are congruent with the spirit of the

February 2022 Order and operative injunction (the permanent injunctive relief in this

matter).

Defendants further argue that the enforcement orders must be terminated because

they prescribe prospective relief but do not contain the necessary PLRA narrowness-

need-intrusiveness findings. Defendants emphasize that the orders are not tied to

constitutional violations. Criticizing the enforcement orders, Defendants argue that the

Court impeded their discretion and ran afoul of the PLRA by mandating specific actions

and timelines. To this end, Defendants primarily take issue with the Court's direction to

contact other providers for gender-affirming surgery, despite their preference to work

with one trusted surgeon to set up pre- and post-surgical guidelines, training, and

accommodations, and to develop a gender-affirming kit for commissary items.

Defendants also heavily rely on the Seventh Court's decision in *Rasho v. Jeffreys*, 22 F.4th

703 (7th Cir. 2022), to argue that the Court is conflating the most effective or preferred

solution with what is constitutionally required.

But the Court's enforcement orders do not attempt to issue additional or new

prospective injunctive relief. Instead, the enforcement orders are aimed at enforcing the

terms of the already imposed permanent injunctive relief providing more clear and

specific ways to achieve those objectives given Defendants' continued failures and delays

in complying with their obligations under the operative injunction. Through the status

conferences/continued hearings on the contempt motion, and reflected in its

enforcement orders, the Court clearly believes that Defendants have failed to comply

**A148**

with its injunction in many ways. Notably, many of the deadlines within the enforcement orders are reporting deadlines to keep the Co-Monitors and Court apprised of Defendants' progress. Other deadlines relate to the previously ordered relief—like deadlines for blood hormone level monitoring, coordinating surgical consultations, and scheduling surgeries—and these deadlines are all imposed due to Defendants' active noncompliance with the operative injunction. For example, the operative injunction (as did the prior injunctions to no avail) directs Defendants to "ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels." (Doc. 384, p. 2). As Defendants have failed to act in such a "timely" manner, the Court's enforcement orders clarify the term "timely" and provide Defendants a reasonable opportunity to comply before fully finding them in contempt and issuing sanctions. Given the sequence of events justifying permanent injunctive relief and leading to the operative injunction, the Court believes it is within its equitable powers to clarify and create deadlines where Defendants have demonstrated a failure to comply. As with Defendants' arguments related to *Rasho*, the Court has made clear that its injunctive relief meets the constitutional floor for medical care and treatment of transgender inmates and aligns with the WPATH Standards of Care. Indeed, Defendants have never pointed to any standards that require less in adequately treating gender dysphoria.

The Court considers its enforcement orders an effort to allow Defendants to come into compliance within an extended time period before finding them in contempt, as well as a further clarification of its operative injunction for areas in which Defendants continue

**A149**

to miss the mark and complain about the difficulty in effecting compliance. But "[t]he scope of an injunction has no rigid perimeter, and a court may modify an injunction to adapt to changed circumstances" as well. *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 91 F.3d 914, 920 (7th Cir. 1996). Lack of full compliance can be the sort of changed circumstance that justifies extending a means contemplated by the original injunction or issuing additional substantive measures and injunctive relief. *Norman v. McDonald*, 930 F. Supp. 1219, 1227 (N.D. Ill. 1996); *see also Hutto*, 437 U.S. at 687 (a pre-PLRA case finding that the "long and unhappy history of the litigation" justified a comprehensive order with time limits to insure against the risk of inadequate compliance).

If the Court did modify its operative injunction, it would necessarily need to make the findings required in the PLRA (narrowness-need-intrusiveness). Again, the Court does not find that it modified its operative order and, as such, does not conclude that any such finding was required under the PLRA. *See* 18 U.S.C. § 3626(b)(2) (stating that a defendant is entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a narrowness-need-intrusiveness finding). Each enforcement order—especially the most recent—recounts the ongoing status conferences with the parties, describes the ongoing delays, announces the need for measurable benchmarks, provides ample leeway for Defendants' discretion in ordering reporting, conferral and discussion with the Co-Monitors and Plaintiffs to develop plans, and reiterates Defendants' ongoing obligations under the operative injunction. Thus, even if construed as modifications given Defendants' ongoing noncompliance, the orders meet the requirements under the PLRA for narrowness-need-intrusiveness. Notably,

**A150**

Defendants also complained, in their response to Plaintiffs' Motion for Finding of Contempt, that "the injunctive relief at issue is overly broad and not easy to measure." When a defendant argues that an injunction's vagueness makes it impossible to know how to precisely comply with a court's command, it is well within a court's authority to make a reasonable modification in response. *See United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 358 (7th Cir. 2019). So, in any event, a modification may be permissible here.

For these reasons, the Court denies Defendants' Motion to Vacate the Court's enforcement orders. (Doc. 587). With this denial, the Motion to Stay Compliance is also denied as moot. (Doc. 588).

It is also necessary to clarify two of Defendants' main areas of concern within the enforcement orders. With its direction to contact other providers for gender-affirming surgery consultations and surgeries, the Court was not attempting to frustrate Defendants' discretion by specifically prescribing that Defendants use additional surgeons, especially providers unvetted or unapproved. The Court was, however, ordering Defendants to evaluate other options, as their plan of using one surgeon to satisfy various components of the operative injunction is clearly ineffective and causing Plaintiffs to continue to suffer constitutional harms. Defendants can exercise their discretion as to which other medical providers to use, how to find those providers, and how to evaluate those providers. Moreover, regarding the "gender affirming kit," the Court has simply directed Defendants to create a list of gender-affirming versions of items already provided to cisgender inmates, such as grooming items and undergarments, and ultimately provide those items to class members. This aligns with

the relief ordered in the operative injunction and, as discussed by the Court earlier, provision of these items is necessary to meet the constitutional floor for treatment of gender dysphoria.

MOTION FOR FINDING OF CONTEMPT (DOC. 455)

## I.    <u>Legal Standard</u>

District courts possess inherent power to enforce their orders and ensure judicial proceedings are conducted in an orderly manner. *F.T.C. v. Think Achievement Corp.*, 144 F. Supp. 2d 1029, 1033-34 (N.D. Ind. 2001). A court's power to enforce its order by civil contempt rests within this inherent authority. *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 757 (7th Cir. 2008). To hold a party in contempt, the district court must identify an order or decree from the court which provides in specific detail an unequivocal command which the party in contempt violated. *Stotler and Co. v. Able,* 870 F.2d 1158, 1163 (7th Cir. 1989). Such violation need not be "willful" for the party to be in contempt, rather a court may find a party in civil contempt when that party failed to be "reasonably diligent and energetic in attempting to accomplish what was ordered." *Id.* The violation of a court order must be proven by clear and convincing evidence. *Goluba v. School Dist. of Ripon*, 45 F.3d 1035, 1037 (7th Cir. 1995).

## II.    <u>Discussion</u>

Plaintiffs argue that Defendants have not shown reasonable diligence in complying with the Court's unequivocal orders to provide constitutional care to the serious detriment of the class members. Relying on class members' accounts and Co-Monitor reports, Plaintiffs contend that Defendants failed to provide hormone therapy to

over a third of the Plaintiff class and less than 15 percent of all class members receiving

hormone therapy tested within the appropriate therapeutic range. Regarding gender-

affirming surgeries and pre-surgical hair removal, at the time of the motion[11] no class

member had received or had been scheduled for surgery or completed pre-surgical hair

removal. For class members who already received approval for surgery, none had

completed pre-surgical hair removal. Similarly, Plaintiffs reported slow or non-existent

efforts towards transferring transgender women out of male prisons, fostering social

transition, completing an efficacious PRISM program, providing appropriate

commissary items, mitigating search, shower, and safety issues, and educating staff.

On the other hand, Defendants argue that Plaintiffs appear concerned not with

compliance but with the amount of time it is taking to achieve compliance. Further,

Defendants state that speed should not be the primary concern when dealing with prison

policy changes or with medical care that results in irreversible changes to physical

anatomy. Defendants maintain that they have complied, within the limits of their control,

to provide timely hormone therapy. As for gender affirming surgeries, Defendants note

that the Court's order contained no requirement that surgeries occur within a certain

timeframe, and as such Plaintiffs cannot complain about the pace of providing surgery.

Defendants also fault Dr. Schechter's change of positions and hospitals as the hindrance

---

[11] Based on recent reporting by Co-Monitor Dr. Harris, some progress has been made in these areas. For surgery, in 2023, a total of six surgeries have been completed (four vaginoplasties and two chest reconstructions). An additional 17 individuals have been identified as able to progress to surgical consultation, 15 of whom have scheduled appointments (updates are pending as to whether any appointments have occurred, and some are scheduled as far out as April 2024). (Doc. 674).

to scheduling surgeries. With pre-surgical hair removal, Defendants argue that they complied with the Court's orders by finalizing a contract for hair removal services and making hair removal services available. Within the several other areas of the injunction (Continuing Quality Improvement program, transfers and social transition, PRISM program, commissary, searches and identification policies, showers, training), Defendants argue they have been dutifully compliant with the Court's unambiguous orders and acted with reasonable diligence, especially considering the lack of ordered timelines and generalized commands.

As is clear from the Co-Monitor's reporting and the status conferences with the parties, Defendants' efforts fall short of reasonable diligence and energy in attempting to accomplish the ordered relief. The Court has certainly alluded to this finding in its three enforcement orders. Instead, Defendants continue to create their own bottlenecks in effecting the ordered relief, such as limiting themselves to only one medical provider, Dr. Schechter, with an overly saturated surgical schedule for surgical consultations and surgeries of class members.[12] Moreover, Defendants' argument regarding Plaintiffs' desired rushed timing for prison policy changes and irreversible surgeries focuses only on the burden to Defendants in effecting these ordered changes, however, they fail to see that speed *is and should be* an obvious concern in rectifying *constitutional* harms. Their glacial pace ensures that class members continue to suffer from the same constitutional injuries the Court identified after the bench trial *more than two years ago*. To add insult to

---

[12] Defendants reported on June 1, 2023, that another provider was expected to join Dr. Schechter's practice on July 1, 2023. (Doc. 590). But that potential expansion of access to surgery has not been confirmed.

**A154**

injury, Defendants also boast that they have complied with the Court's ordered injunctive relief because the Court never specified deadlines, and then, in their Motion to Vacate, they criticize the Court for exceeding its authority under the PLRA by imposing deadlines for compliance. They want it both ways. But this cannot be so, as it would render a court's equitable powers useless.

The Court has reviewed clear and convincing evidence, from the motions, status conferences, and Co-Monitor reports, that leads the Court to believe that Defendants were (and perhaps still are) in contempt of the Court's operative injunction. But because of the confusion that this Court unintentionally infused into this case concerning the nature of the operative injunction, and given the considerable time that has passed since the issuance of the Court's enforcement orders and the filing of the Motion for Contempt Finding, the Court is inclined to avoid imposing sanctions at this time. Instead, the Court will set another status conference for the parties and the Co-Monitors to get this case back on track. After that status conference, Defendants must confer with the Co-Monitors to develop and propose a plan with reasonable timelines to achieve compliance in each of the areas identified in the operative injunction. The Court will consider the proposed timelines and either clarify or modify the operative injunction or enter another enforcement order with the timelines for compliance and reporting. To be sure, if Defendants remain in contempt, Plaintiffs are encouraged to file another motion, and the Court will not hesitate to investigate and issue sanctions as necessary to ensure compliance.

**A155**

CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion to Vacate (Doc. 587), **DENIES as moot** Defendants' Motion to Stay Compliance (Doc. 588), and **GRANTS in part and DENIES in part** Plaintiff's Motion for Contempt Finding (Doc. 455). Moving forward, the Court and the parties will take extra care to fully comply with the terms of the PLRA in relation to the permanent injunction. The Court will set another status conference for the parties and the Co-Monitors to get this case back on track and kickstart Defendants' proposed timeline for compliance.

Further, to clean up the mistakes reflected in the Court's February 2022 Order and the subsequent operative injunction, the Clerk's Office is **DIRECTED** to modify the docket text for the operative injunction to read "PERMANENT INJUNCTION (to be interpreted in accordance with the Court's Order at Doc. 678)." The Clerk's Office is also **DIRECTED** to enter judgment for Plaintiffs, as should have been done after the entry of the February 2022 Order. Judgment should be entered without closing the case as the Court retains jurisdiction to enforce and monitor compliance with its injunction.

The Court recognizes that these solutions are not perfect and apologizes for the procedural confusion created with its prior orders.

**IT IS SO ORDERED.**

**DATED:  November 16, 2023**

_Nancy J. Rosenstengel_

_____

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

**A156**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on behalf
of a class of similarly situated individuals,

     Plaintiffs,[1]

v.                      Case No. 3:18-CV-00156-NJR

STEVEN BOWMAN
MELVIN HINTON, and
LATOYA HUGHES,

     Defendants.[2]

## JUDGMENT IN A CIVIL ACTION

**DECISION BY THE COURT.**

     This action was tried to the Court. On February 7, 2022, the undersigned issued her

Final Findings of Fact and Conclusions of Law. (Doc. 383).

     **IT IS ORDERED AND ADJUDGED** that, pursuant to the Order entered on February

7, 2022, judgment is entered in favor of Plaintiffs and against Defendants. As such, permanent

injunctive relief is granted as outlined below.

     Defendants are **ORDERED** to:

---

[1] The named Plaintiffs are transgender women currently incarcerated in Illinois Department of Corrections ("IDOC") facilities. Like many members of the Plaintiff class, the named Plaintiffs use chosen names reflecting their gender identity rather than their legal names or given names at birth.
[2] The named Defendants are the IDOC Chief of Health Services, the IDOC Chief of Mental Health, and the IDOC Acting Director, respectively, all sued in their official capacities.

**A157**

1. Cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria and develop a policy to ensure that decisions about treatment for gender dysphoria are made by medical professionals who are qualified to treat gender dysphoria;

2. Ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and perform routine monitoring of hormone levels;

3. Cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance;

4. Develop policies and procedures that allow transgender inmates access to clinicians who meet the competency requirements stated in the World Professional Association for Transgender Health ("WPATH") Standards of Care to treat gender dysphoria;

5. Allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications of the condition;

6. Develop a policy to allow transgender inmates medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items; and

7. Advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering and harassment—by both IDOC staff and other inmates.

As part of the granted permanent injunctive relief, it is **FURTHER ORDERED** that:

1. Plaintiffs Sora Kuykendall and Sasha Reed shall be given lab tests to check their prolactin levels (as previously ordered, to have been completed by August 16, 2021) and, if those levels are (were) still elevated, they shall be given an MRI test within 5 days of receipt of the prolactin results.

2. Each member of the Plaintiff class who is currently receiving hormone therapy shall be given blood tests to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) (as previously ordered, to have been completed by August 23, 2021). Thereafter, if the hormone levels are not within the appropriate range set forth by the Endocrine Society Hormone Guidelines (for transgender females, testosterone of less than 50 nanograms/deciliter and estradiol between 100-200 picograms/milliliter; for transgender males, testosterone levels between 400-600 nanograms/deciliter), Defendants shall ensure that the individual's hormone medication is titrated following receipt of the blood work results and blood work

**A158**

repeated at least every 3 months until the levels are within an appropriate range.

3.  Any Plaintiff class member who has requested hormone therapy to date shall get baseline blood work done and hormone therapy started within 14 days thereafter, with follow-up blood work at least every 3 months until the levels are within an appropriate range (as previously ordered, to have been completed by August 30, 2021).

4.  Each Plaintiff class member receiving hormone therapy shall get blood work done at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and shall be treated as medically indicated by the results. No Plaintiff class member shall be prescribed conjugated estrogen.

5.  Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender-affirming surgery, shall be evaluated for such surgery, with inmates being evaluated in chronological order of the date of the inmate's original request for surgery (as previously ordered, to have been completed by December 7, 2021). Each class member so evaluated shall be provided a prompt written notification of the decision and, if surgery is denied, the written notification shall include an explanation of the reasons for denial and a timeframe to request another evaluation thereafter. Defendants shall provide an update on the status of those approved for surgery, including whether any preliminary treatment— such as hair removal—has occurred, whether any surgeries have occurred, and the plans for post-surgery facility placement and treatment. Defendants also shall provide a detailed explanation as to why individual requests for surgery were denied (between August 9, 2021, and February 7, 2022) and report when those individuals can request re-evaluation.

6.  Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested.

7.  Each Plaintiff class member who has requested transfer to a facility matching his or her expressed gender (female facility for transgender women, male facility for transgender men) shall be evaluated for transfer (as previously ordered, to have been completed by December 7, 2021), with inmates being evaluated in chronological order of the date of the inmate's original request for transfer. Each class member so evaluated and denied transfer shall be promptly provided with a written explanation of each reason for the denial and allowed to request another evaluation for transfer within 180 days thereafter.

8.  Each Plaintiff class member shall immediately be provided with access to gender-affirming items in the commissary and shall immediately be provided with a list of available gender-affirming items. Defendants shall ensure all approved gender-

**A159**

affirming items are available at the commissary at each class member's institution. Defendants shall provide the Court with a list of all commissary items available at each facility (as previously ordered, to have been completed by September 9, 2021).

9.  Defendants shall ensure that medical care and mental health treatment of Plaintiff class members shall be conducted only by medical staff and mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health. Similarly, medical providers and mental health professionals who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria shall have no contact with any member of the class.

10. Defendants shall ensure that transgender inmates are allowed access to a private shower.

11. Defendants shall finalize the contract with Wexford to provide hair removal services to Plaintiff class members (as previously ordered, to have been completed on or before December 7, 2021). Defendants are ordered to ensure the availability of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery (as previously ordered, to have been completed by March 9, 2022).

12. Defendants shall finalize the contract with Dr. Schechter to provide gender-affirming surgery to Plaintiff class members who are approved to receive such surgery (as previously ordered, to have been completed on or before December 7, 2021).

13. Defendants shall finalize and implement the CQI (Continuing Quality Improvement) program for transgender care (as previously ordered, to have been completed on or before December 7, 2021).

14. Defendants shall finalize IDOC's written surgical standards for transgender care (as previously ordered, to have been completed on or before December 7, 2021).

15. Defendants shall finalize and implement the PRISM project (as previously ordered, to have been completed on or before December 7, 2021).

16. Defendants shall finalize and implement additional and ongoing training for all correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment (as previously ordered, to have been completed on or before December 7, 2021).

17. Defendants shall finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates (as previously ordered, to have been completed on or before December 7, 2021).

**A160**

18. Defendants shall finalize and implement IDOC's transgender identification policy (as previously ordered, to have been completed on or before December 7, 2021).

19. Defendants shall ensure that any necessary follow-up medical tests/treatment to address the results of potassium, creatinine, and prolactin level testing for transgender females and hemoglobin/hematocrit for transgender males takes place on a timely basis (for example, MRI tests for transgender females with elevated prolactin levels).

20. Defendants shall ensure the availability to class members of all medically necessary hair removal services, in addition to and including hair removal to prepare for gender-affirming surgery (as previously ordered, to have been completed on or before March 9, 2022).

21. Defendants shall work with the Co-Monitors to develop and implement new Administrative Directives that cure prior deficiencies and to ensure that comprehensive training is provided to all staff tasked with responsibility of implementing those directives.

**IT IS FURTHER ORDERED AND ADJUDGED** that the Court retains jurisdiction

over this matter to enforce and ensure compliance with its injunctive relief.

**DATED:  November 16, 2023**

**MONICA A. STUMP,**
**Clerk of Court**

**By:  _s/ Deana Brinkley_**
       **Deputy Clerk**

**APPROVED:** _____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

## CERTIFICATE THAT ALL REQUIRED
## MATERIALS ARE INCLUDED IN THE APPENDIX

I hereby certify under Circuit Rule 30(d) that all of the materials required by

Circuit Rule 30(a) and 30(b) are included in the preceding appendix, which contains

the February 7, 2022 memorandum and order and injunction, the January 24, 2023

memorandum and order, the April 4, 2023 Memorandum and Order, the May 11,

2023 memorandum and order, and the November 16, 2023 memorandum and order

and judgment.

/s/ Christina T. Hansen
CHRISTINA T. HANSEN
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5659 (office)
(872) 272-0819 (cell)
Christina.Hansen@ilag.gov

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on February 23, 2024, I electronically filed the foregoing

**Brief and Appendix of Defendants-Appellees** with the Clerk of the Court for the

United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

I further certify that the other participant in this case, named below, is a

CM/ECF users and thus will be served by the CM/ECF system:

Amelia Bailey
amelia.bailey@kirkland.com

Camille E. Bennett
cbennett@aclu-il.org

Michelle T. Garcia
mgarcia@aclu-il.org

Abby L. Parsons
aparsons@kslaw.com

Alexis A. Picard
apicard@aclu-il.org

Mason Strand
mstrand@aclu-il.org

**CHRISTINA T. HANSEN**
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-6569 (office)
(872) 272-0819 (cell)
Christina.Hansen@ilag.gov