No. 23-3371

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

JANIAH MONROE, MARILYN MELENDEZ, LYDIA HELENA VISION,
SORA KUYKENDALL, and SASHA REED,
individually and on behalf of similarly situated individuals,
Plaintiffs-Appellees,

v.

STEVEN BOWMAN, MELVIN HINTON, and LATOYA HUGHES,
Defendants-Appellants.

On Appeal from the United States District Court for the
Southern District of Illinois
Case No. 18-cv-00156-NJR
The Honorable Nancy J. Rosenstengel

**BRIEF OF PLAINTIFFS-APPELLEES AND SUPPLEMENTAL APPENDIX**

Amelia H. Bailey
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
312-862-2000
amelia.bailey@kirkland.com

Brent P. Ray
KING & SPALDING LLP
110 N. Wacker Dr., Ste. 3800
Chicago, IL 60606
312-995-6333
bray@kslaw.com

Abby L. Parsons
KING & SPALDING LLP
1100 Louisiana St., Ste. 4100
Houston, TX 77002
713-752-3294
aparsons@kslaw.com

Camille E. Bennett
   *Counsel of Record*
Michelle Teresa García
Alexis Picard
Mason Strand
ROGER BALDWIN FOUNDATION
   OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
cbennett@aclu-il.org
mgarcia@aclu-il.org
apicard@aclu-il.org
mstrand@aclu-il.org

*Attorneys for Plaintiffs-Appellees*

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-3371

Short Caption: Monroe v. Hughes

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, individually and on behalf

of a class of similarly situated individuals

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties Union Foundation, Kirkland & Ellis LLP,

King and Spalding LLP, Kennedy Hunt P.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Camille E. Bennett     Date: 1/5/24

Attorney's Printed Name: Camille E. Bennett

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 150 N. Michigan Ave., Ste. 600

Chicago, IL 60601

Phone Number: 312-201-9740 x336     Fax Number: 312-535-6571

E-Mail Address: cbennett@aclu-il.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-3371

Short Caption: Monroe v. Hughes

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, individually and on behalf

of a class of similarly situated individuals

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties Union Foundation, Kirkland & Ellis LLP,

King and Spalding LLP, Kennedy Hunt P.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Michelle T. Garcia     Date: 1/5/24

Attorney's Printed Name:  Michelle T. Garcia

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address:  150 N. Michigan Ave., Ste. 600

Chicago, IL 60601

Phone Number: 312-201-9740 x319     Fax Number: 312-535-6571

E-Mail Address: mgarcia@aclu-il.org

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-3371

Short Caption: Monroe v. Hughes

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, individually and on behalf

    of a class of similarly situated individuals

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties Union Foundation, Kirkland & Ellis LLP,

    King and Spalding LLP, Kennedy Hunt P.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Alexis A. Picard    Date: 1/5/24

Attorney's Printed Name: Alexis A. Picard

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✔]

Address: 150 N. Michigan Ave., Ste. 600

    Chicago, IL 60601

Phone Number: 312-201-9740 x327    Fax Number: 312-535-6571

E-Mail Address: apicard@aclu-il.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: __23-3371_____

Short Caption: __Monroe v. Hughes_____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, individually and on behalf

    of a class of similarly situated individuals

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties Union Foundation, Kirkland & Ellis LLP,

    King and Spalding LLP, Kennedy Hunt P.C.

(3)      If the party, amicus or intervenor is a corporation:

      i)      Identify all its parent corporations, if any; and

          N/A

      ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

          N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: __/s/ Mason B. Strand_____  Date: __1/5/24__

Attorney's Printed Name:  __Mason B. Strand_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address:  __150 N. Michigan Ave., Ste. 600__

    __Chicago, IL 60601__

Phone Number:  __312-201-9740 x313__    Fax Number:  __312-535-6571__

E-Mail Address: __mstrand@aclu-il.org__

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-3371

Short Caption: Monroe v. Hughes

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

        Janiah Moore, Marilyn Melendez, Lydia Helena Vision, Sora Kuykenall, and Sasha Reed, individually and on behalf of

        a class of similarly situated individuals

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

        Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties union Foundation, Kirkland & Ellis LLP

        King and Spalding LLP, Kennedy Hunt P.C.

(3)      If the party, amicus or intervenor is a corporation:

        i)      Identify all its parent corporations, if any; and

             N/A

        ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

             N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A

Attorney's Signature: /s/ Brent P. Ray        Date: 1/18/2024

Attorney's Printed Name: Brent P. Ray

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ✓ No ☐

Address: 110 N. Wacker Drive, Suite 3800

       Chicago, IL 60606

Phone Number: 312-995-6333        Fax Number: 312-995-6330

E-Mail Address: bray@kslaw.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-3371

Short Caption: Monroe v. Hughes

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, individually and on behalf

of a class of similarly situated individuals

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties Union Foundation, Kirkland & Ellis LLP,

King and Spalding LLP, Kennedy Hunt P.C.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

      N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Abby L. Parsons      Date: 4/25/2024

Attorney's Printed Name: Abby L. Parsons

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 1100 Louisiana Street, Suite 4100

Houston, TX 77002

Phone Number: 713-751-3200      Fax Number: 713-751-3290

E-Mail Address: aparsons@kslaw.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-3371

Short Caption: Monroe v. Hughes

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Janiah Monroe, Marilyn Melendez, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, individually and on behalf

of a class of similarly situated individuals

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Roger Baldwin Foundation of ACLU, Inc., American Civil Liberties Union Foundation, Kirkland & Ellis LLP,

King and Spalding LLP, Kennedy Hunt P.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Amelia H. Bailey    Date: 4/25/2024

Attorney's Printed Name: Amelia H. Bailey

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address: 300 N. LaSalle St.

Chicago, IL 60654

Phone Number: 312-862-2000    Fax Number: 312-862-2200

E-Mail Address: amelia.bailey@kirkland.com

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS.................................................................................... ii

TABLE OF CONTENTS ........................................................................................... ix

TABLE OF AUTHORITIES........................................................................................ xi

JURISDICTIONAL STATEMENT .............................................................................1

STATEMENT OF THE ISSUES .................................................................................4

STATEMENT OF THE CASE.....................................................................................4

    December 2019 Preliminary Injunction.................................................................4

    August 2021 Trial and Preliminary Injunction ....................................................8

    The Post-Trial February 2022 Order and the Mislabeled Permanent Injunction...............11

    Post-February 2022 Order and Injunction: Appointment of Monitors and Reports ..........15

    Plaintiffs' November 2022 Motion for a Finding of Contempt .........................16

    December 2022 through May 2023 Status Conferences and Orders..................16

    Defendants' Motion to Vacate the Enforcement Orders ....................................17

    November 16, 2023 Orders.................................................................................18

SUMMARY OF ARGUMENT...................................................................................22

ARGUMENT ...........................................................................................................24

I.    The district did not abuse its discretion in refusing to vacate its orders. ...........24

    A.    Defendants do not acknowledge the standard of review for denial of their Rule 60(b) motion or address the district court's ruling.................................24

        1.    The February 2022 Order was a permanent injunction satisfying PLRA standards. The February 2022 Order included findings for permanent injunctive relief. .......................................................26

        2.    Defendants ignore the PLRA findings of the February 2022 Order. .........28

B.    Because the February 2022 Order was a permanent injunction, the PLRA's 90-day "expiration" for preliminary injunctions is irrelevant.............................................30

C.    Defendants' claimed lack of understanding of the February 2022 Order is not credible....................................................................................................................31

II.    Defendants fail to show how the district court's mislabeling of the February 2022 injunction and later correction, affected their substantial rights........................................32

III.    The district court had the authority to enforce its February 2022 injunction. ..................34

IV.    This Court lacks jurisdiction over the district court's contempt finding, or the argument should be deemed waived. ................................................................................36

V.    The district court properly found that Defendants' failure to undertake reasonable efforts to remedy a known constitutional violation constituted deliberate indifference. .............37

A.    Defendants waived their deliberate indifference argument by failing to develop it in the district court and on appeal. ........................................................................37

B.    The district court's well-reasoned and well-supported deliberate indifference findings should be upheld. ...................................................................................38

1.    Standard of review. ............................................................................38

2.    Minimal or ineffectual efforts at remediation of a known, persistent constitutional injury are insufficient to prevent a finding of deliberate indifference. ........................................................................................38

C.    Defendants failed to show the district court's finding of deliberate indifference was clearly erroneous because their efforts were not reasonable. ..........................41

1.    Hormone therapy..............................................................................42

2.    Surgery .............................................................................................43

3.    Social transition. ..............................................................................43

4.    Psychotherapy. .................................................................................45

CONCLUSION..............................................................................................................47

CERTIFICATE OF COMPLIANCE WITH RULE 32 ................................................48

CERTIFICATE OF SERVICE ....................................................................................49

## TABLE OF AUTHORITIES

**Cases**

*ADT Sec. servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*,
724 F.3d 854 (7th Cir. 2013) ............................................................38

*Alloway v. Hodge*,
72 Fed. App'x. 812 (10th Cir. 2003) ........................................31, 33

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985)............................................................................38

*Armstrong v. Schwarzenegger*,
622 F.3d 1058 (9th Cir. 2010)......................................................28, 29

*Autotech Technologies LP v. Integral Research & Development Corp.*,
499 F.3d 737 (7th Cir. 2007)............................................................36

*Banks v. Booth*,
3 F.4th 445 (D.C. Cir. 2021) ...........................................................31

*Cent. States, Se. & Sw. Areas Pension Fund v. Wintz Properties, Inc.*,
155 F.3d 868 (7th Cir. 1998)............................................................28

*Cleveland-Perdue v. Brutsche*,
881 F.2d 427 (7th Cir. 1989)............................................................41

*Dean v. Sullivan*,
118 F.3d 1170 (7th Cir. 1997) ..........................................................26

*Doe v. Cook Cnty., Illinois*,
798 F.3d 558 (7th Cir. 2015) ............................................................34

*eBay Inc. v. MerExchange, LLC*,
547 U.S. 388 (2006)............................................................................26

*Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*,
515 F.3d 718 (7th Cir. 2008)............................................................37

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019)..........................................................6, 29

*Eskridge v. Cook Cnty.*,
577 F.3d 806 (7th Cir. 2009) ..........................................................24

*Estelle v. Gamble*,
  429 U.S. 97 (1976)..................................................................................39

*Farmer v. Brennan*,
  511 U.S. 825 (1970)..............................................................................38, 39

*Fields v. Smith*,
  653 F.3d 550 (7th Cir. 2011) ................................................................28, 29

*Forbes v. Edgar*,
  112 F.2d 262 (7th Cir. 1997) ....................................................................6

*French v. Duckworth*,
  178 F.3d 437 (7th Cir. 1991) ...................................................................25

*Georgia Advocacy Office v. Jackson*,
  4 F.4th 1200 (11th Cir. 2021), *vacated as moot*, 33 F.4th 1325 (11th Cir. 2022) ..............31

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) .................................................................28

*Gray v. Hardy*,
  826 F.3d 1000 (7th Cir. 2016) .................................................................40

*Howe v. Hughes*,
  74 F.4th 849 (7th Cir. 2023)...................................................................41

*Jones–El v. Berge*,
  374 F.3d 541 (7th Cir. 2004) ................................................................34, 35

*Lockett v. Bonson*,
  937 F.3d 1016 (7th Cir. 2019) .................................................................40

*Loeb Indus., Inc. v. Sumitomo Cor*p.,
  306 F.3d 469 (7th Cir. 2002) ..................................................................33

*Mayweathers v. Newland*,
  258 F.3d 930 (9th Cir. 2001) ..................................................................31

*McDonough Power Equip., Inc. v. Greenwood*,
  454 U.S. 548 (1984)............................................................................32, 33

*Miller v. French*,
  530 U.S. 327 (2000)..............................................................................25

*Motorola, Inc. v. Computer Displays Int'l, Inc.*,
  739 F.2d 1149 (7th Cir. 1984) ........................................................36

*Petties v. Carter*,
  836 F.3d 722 (7th Cir. 2016) ............................................38, 39, 40

*Puckett v. U.S.*,
  556 U.S. 129 (2009).........................................................................26

*Puffer v. Allstate Ins. Co.*,
  675 F.3d 709 (7th Cir. 2012) .........................................................36

*Rasho v. Jeffreys*,
  22 F.4th 703 (7th Cir. 2022) .................................................. *passim*

*Rock Hemp Corp. v. Dunn*,
  51 F.4th 693 (7th Cir. 2022) .........................................................24

*Rose v. Franchetti*,
  979 F.2d 81 (7th Cir. 1992) ...........................................................33

*Shinseki v. Sanders*,
  556 U.S. 396 (2009).........................................................................33

*Smith v. Arkansas Dep't of Corr.*,
  103 F.3d 637 (8th Cir. 1996) .........................................................28

*Smith v. Edwards*,
  88 F.4th 1119 (5th Cir. 2023) ........................................................31

*United Airlines, Inc. v. U.S. Bank N.A.*,
  406 F.3d 918 (7th Cir. 2005) .........................................................36

*U.S. v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948).........................................................................38

*United States v. Berkowitz*,
  927 F.2d 1376 (7th Cir. 1991) ..................................................35, 37

*United States v. Dunkel*,
  927 F.2d 955 (7th Cir. 1991) .........................................................37

*United States v. Sec'y, Florida Dept. of Corr.*,
  778 F.3d 1223 (11th Cir. 2015) ......................................................31

*White v. United States*,
    8 F.4th 547 (7th Cir. 2021)..................................................................28

*Whiting v. Wexford Health Sources, Inc.*,
    839 F.3d 658 (7th Cir. 2016).........................................................40, 46

*Williams v. Edwards*,
    87 F.3d 126 (5th Cir. 1996)................................................................29

*Winforge, Inc. v. Coachmen Indus., Inc.*,
    691 F.3d 856 (7th Cir. 2012)..............................................................38

## Statutes

18 U.S.C. § 3626(a)(1).........................................................................28, 30

18 U.S.C. § 3626(a)(2)........................................................................ *passim*

18 U.S.C. § 3626(b)...................................................................................2

18 U.S.C. § 3626(f)(1)......................................................................11, 25

28 U.S.C. § 2111........................................................................22, 32, 33

28 U.S.C. § 1291..................................................................................3, 33

28 U.S.C. § 1292(a)................................................................................33

28 U.S.C. § 1292(a)(1)........................................................................2, 33

28 U.S.C. § 1331......................................................................................1

42 U.S.C. § 1983......................................................................................1

## Rules

7th Cir R. 28(b)........................................................................................1

Fed. R. App. P. 28(b)...............................................................................1

Fed. R. Civ. P. 52(a)...............................................................................38

Fed. R. Civ. P. 53....................................................................................11

Fed. R. Civ. P. 58...........................................................................................................31

Fed. R. Civ. P. 58(d)......................................................................................................26

Fed. R. Civ. P. 60(a)......................................................................................................32

Fed. R. Civ. P. 60(b)................................................................................... *passim*

Fed. R. Civ. P. 61...........................................................................................................32

## JURISDICTIONAL STATEMENT

Under Fed. R. App. P. 28(b) and Cir. R. 28(b), Defendants' jurisdictional statement is incomplete and incorrect, so Plaintiffs file this complete jurisdictional summary.

On January 31, 2018, Plaintiffs Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed, all transgender women living in the custody of the Illinois Department of Corrections ("IDOC") filed this class action on behalf of all IDOC prisoners who have requested evaluation or treatment for gender dysphoria, seeking declarative and injunctive relief. Doc. 1. Plaintiffs sued under 42 U.S.C. § 1983 claiming that Defendants, the Governor[1] and IDOC Chief of Health Services, IDOC Mental Health Supervisor and IDOC Director, in their official capacities, subjected Plaintiffs and the class to a "substantial risk of serious harm and injury from inadequate and delayed evaluation and treatment of gender dysphoria" in violation of the U.S. Constitution's Eighth Amendment. *Id.* at 36. The district court's subject matter jurisdiction is based on 28 U.S.C. § 1331 because the Eight Amendment claim raises a federal question.

After a hearing, the district court entered a preliminary injunction in December 2019 (Doc. 187). In March 2020, the court amended the preliminary injunction (Docs. 211-12) and certified the class (Doc. 213). On August 9, 2021, after a bench trial (Docs. 319-20, 324, 327), the court found that the "evidence introduced at trial shows serious ongoing violations of the Eighth Amendment" (SA40-SA53[2]) and entered a preliminary injunction (Docs. 332, 336).

On February 7, 2022, the court issued a memorandum and order which summarized the trial evidence, factual findings, and conclusions of law, incorporating the August 2021

---

[1] The court dismissed the governor as a defendant in 2018. Doc. 97.
[2] References to Defendants' Appendix have a prefix of "A," to Plaintiffs' attached Supplemental Appendix "SA," and to Defendants' opening brief, "Br."

memorandum and order. A1-A87. That day, the court entered an injunction mislabeled preliminary. *See* A88; A140. Afterward, Defendants never filed an appeal of the injunction under 28 U.S.C. § 1292(a)(1), a motion for reconsideration or to vacate, and never moved to modify or terminate the injunction under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(b).

On November 14, 2022, Plaintiffs moved for contempt because Defendants failed to provide the mandated medical care to the class. Doc. 455. From December 2022 to May 2023, the court took the contempt motion under advisement, held multiple status conferences, and entered three enforcement orders. *See* A101-A130. On May 31, 2023, Defendants moved under Fed. R. Civ. P. 60(b) to vacate the enforcement orders (Doc. 587) and moved to stay compliance with them (Doc. 588). In July 2023, Plaintiffs moved to transfer class members out of Pinckneyville Correctional Center. Docs. 606-07. The court held an evidentiary hearing in October. Docs. 669-70.

On November 16, 2023, the court denied Defendants' motion to vacate, finding the motion to stay moot, and partially granted the motion of contempt but did not enter sanctions. A131-A156. The court explained that it made a "mistake" when it titled the February 7, 2022 injunction "preliminary" and "outlined the standard for preliminary injunctive relief." A140. The February 2022 order and injunction's substance, "along with the ongoing actions of the Court and the parties," reflected a permanent injunction. A141. The court directed the clerk to modify the docket text to read as a permanent injunction and enter judgment for Plaintiffs under the order entered on February 7, 2022. A156. The court retained jurisdiction to enforce and monitor compliance with the injunction. *Id.* Also, the court partially granted Plaintiffs' motion to transfer class members out of Pinckneyville. Doc. 680. Finally, the clerk entered a Rule 58 judgment. A157-A161.

On December 14, 2023, Defendants filed a timely notice of appeal of the order denying the motion to vacate the enforcement orders and partially granting contempt and the judgment entered on November 16, 2023. Doc. 699. This Court has jurisdiction over the motion to vacate the enforcement orders and final judgment under 28 U.S.C § 1291. This Court does not have jurisdiction under 28 U.S.C. § 1291 over the partial contempt ruling because there were no sanctions.

Several issues remain with the district court. First, Defendants did not appeal the order granting the motion to transfer class members out of Pinckneyville. Second, on December 21, 2023, Plaintiffs filed a motion to transfer class members out of Menard Correctional Center. Doc. 705. On December 29, 2023, Defendants filed a motion for a stay pending appeal (Doc.709) but the court has not ruled. Plaintiffs moved for fees and costs (Doc. 756) and Defendants moved to stay that motion until after the appeal is resolved, or extend time to respond (Doc. 759). Finally, the court ordered the parties to recommend candidates to replace the Co-Monitor. Doc. 766.

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion when denying the motion to vacate the enforcement orders because the underlying February 7, 2022 injunction was permanent and did not expire under the Prison Litigation Reform Act?

2.      Whether Defendants demonstrated clear error when the district court found (after trial) that Defendants were deliberately indifferent to the class's serious medical needs in violation of the Eighth Amendment?

## STATEMENT OF THE CASE

In January 2018, Plaintiffs Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed filed this lawsuit on behalf of a class of all prisoners in the IDOC who requested evaluation or treatment for gender dysphoria. The complaint alleged that Defendants the Governor, the Director of IDOC, the IDOC Chief of Health Services, and the IDOC statewide Mental Health Supervisor, systematically failed to provide necessary medical treatment for gender dysphoria in violation of the Eighth Amendment of the U.S. Constitution, and sought declaratory and injunctive relief. Doc. 1.

### December 2019 Preliminary Injunction

In May 2019, Plaintiffs moved to certify the class and for a preliminary injunction. Docs. 123-24. On July 31 and August 1, 2019, the district court held a preliminary injunction hearing, including testimony from Plaintiffs Melendez, Reed, and Monroe; Plaintiffs' experts Dr. Tangpricha and Dr. Ettner; and IDOC Chief of Psychiatry Dr. Puga.

In December 2019, the district court issued its memorandum and order granting a preliminary injunction (the "December 2019 Order"). SA1-SA39. The court found that gender dysphoria refers to "a condition in which a person experiences clinically significant distress

stemming from incongruence between one's experienced or expressed gender and one's assigned gender." SA3. The court found the World Professional Association for Transgender Health ("WPATH") "dictates medically-accepted Standards of Care for treating gender dysphoria." SA3. The treatment options for gender dysphoria were social role transition, cross-sex hormone therapy, psychotherapy, and surgery. SA3-SA4. Further, IDOC "purports to follow the Standards of Care." SA3. The court made findings of fact about social role transition in a prison setting (SA4); the functions of psychotherapy and surgery in treating gender dysphoria (SA5); and that Medicare had in 2014 declared gender-affirming surgery to be medically necessary and safe, with studies indicating that fewer than one percent of patients world-wide experienced regret (SA5). The court also made findings about using hormone therapy to treat gender dysphoria including the Endocrine Society Guidelines which are the "internationally recognized baseline guidelines for adequate treatment" (SA5-SA6); the requirements for adequate testing, and that therapy that falls below the guidelines is "less-than-adequate treatment" (SA6); and that hormones alone may not alleviate the symptoms of gender dysphoria (SA7). The court also found that WPATH provides "minimum qualifications a mental health professional must attain in order to assess and treat gender dysphoria." SA3-SA4. However, "[n]one of [the] individuals" on IDOC's Transgender Committee which reviewed placements, security concerns, "overall health-related treatment plans," and gender-related accommodations "[met] WPATH's minimum qualifications" and "two have no medical training" at all. SA7.

As to the two elements of an Eighth Amendment violation—a serious medical condition and deliberate indifference to that condition—the district court noted that the parties agreed that "gender dysphoria is an objectively serious medical condition," but "differ on what constitutes constitutionally adequate treatment." SA29-SA30. Defendants argued that WPATH delineates

"the *highest* level of care" not "constitutionally adequate care." SA30. The district court acknowledged the "well-settled" rule that prisoners are not entitled to demand "the best care possible," and cited *Forbes v. Edgar*, 112 F.2d 262, 267 (7th Cir. 1997) (*id.*). However, the district court observed that the WPATH Standards of Care were "endorsed as the standards for treating gender dysphoria" by a host of professional organizations, including the American Medical Association and the National Commission on Correctional Health, as well as that Dr. Tangpricha had testified the Standards of Care are the "floor" for treating gender dysphoria, and Defendants' witness, Dr. Puga, "testified he was not familiar with any other association that rivals WPATH's level of universal acceptance in the transgender health field." SA31. Since Defendants did "not put forth a single expert to contest the Standards of Care or offer an opinion about the appropriate level of care for transgender inmates [] this Court joins many other courts who agree the Standards of Care are the appropriate benchmark for treating gender dysphoria. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (and cases cited therein)." *Id*.

As to likelihood of success, the court concluded that "IDOC is well-aware that transgender inmates are at a high risk of suffering from mental health issues and resorting to self-harm." SA32. There was also evidence that IDOC "denies and delays the diagnosis and treatment of gender dysphoria without a medical basis or penological purpose." SA32-SA33. This evidence included outright denials of care; failure to test for hormone levels or monitor side effects; unqualified personnel making medical decisions; and compounding trauma and disabling social transition through misgendering and failure to provide access even to simple things like hair brushes and undergarments. SA34-SA35. Monetary damages could not compensate the harms, and "[t]he balance of harm substantially weighs in favor of granting injunctive relief. Plaintiffs continue to suffer physical and mental anguish on a daily basis and are at risk of self-mutilation

and death. In contrast, Defendants have not identified any harm they will suffer if an injunction were granted." SA36.

The injunction, entered as a separate document (Doc. 187) focused on the needed treatment but did not specify procedures. It directed Defendants to: (1) "develop a policy to ensure that decisions about treatment for gender dysphoria are made by medical professionals who are qualified . . ."; (2) "ensure hormone therapy is provided when necessary"; (3) "develop policies and procedures which allow [] access to clinician who meet the [WPATH] competency requirements"; (4) "allow inmates to obtain evaluations for gender dysphoria"; and (5) "advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering . . ." Doc. 187 at 1-2. Finally, because Defendants did not attend the hearing, the district court also ordered them to read the hearing transcript and certify that they had done so. SA38.

In January 2020, Defendants filed a motion for reconsideration concerning hormone therapy and WPATH competency requirements for clinicians. Doc. 203. In March 2020, the district court issued an amended order, agreeing with Defendants that to the extent that the December 2019 injunction could be taken to enjoin past conduct, it should be clarified, but otherwise denying Defendants' motion. Docs. 211, 212. As to Defendants' complaint about WPATH standards, it stated: "Notably, Defendants still have not put forth a single expert to contest the WPATH Standards of Care or offer an opinion about the appropriate level of care for transgender inmates . . . Unless Defendants offer an alternative constitutionally adequate standard of treatment or an expert who can speak to differing medically accepted treatment criteria regarding gender dysphoria, the Court will continue to use the WPATH Standards of Care

as guidelines for constitutionally adequate care under the Eighth Amendment." Doc. 211 at 6-7. Defendants did not appeal.

The district court also, on March 4, 2020, certified the class of "all prisoners in the custody of IDOC who have requested evaluation or treatment for gender dysphoria." Doc. 213. To prepare for trial, the district court lifted the stay on merits discovery. Doc. 214; *see also* Doc. 216.

In August 2020, Plaintiffs filed a renewed request for a Monitor. Doc. 225. Defendants responded in part that the preliminary injunction expired by operation of the PLRA, 18 U.S.C. § 3626(a)(2). Doc. 226, refiled as Doc. 263, at 17. The district court denied the motion, explained that it had made the required PLRA findings, and added that "[i]f Defendants believe that the injunction has indeed expired, then they can raise that in a motion to vacate the preliminary injunction order." Doc. 246 at 5. No such motion was ever filed.

**August 2021 Trial and Preliminary Injunction**

In August 2021, the court conducted a four-day trial, which was universally recognized as a trial on the merits. Docs. 314; 328 at 4-5 ("Notably, the request for preliminary injunctive relief was vigorously opposed by counsel, *as was permanent injunctive relief during this trial*.") (emphasis added). This trial, identified as a bench trial on the docket, was clearly differentiated from the prior preliminary injunction hearing, which was explicitly labeled as such. The court's final pretrial order outlined agreed-upon legal issues, including "[w]hether granting a *permanent* injunction disserves the public interest." Doc. 314 at 9 (emphasis added). Additionally, Plaintiffs' counsel consistently advocated for permanent injunctive relief in both opening statements and closing arguments. Docs. 347 at 14, 24; 349 at 206.

At the end of trial, the court gave preliminary a ruling from the bench. *See generally* Doc. 328. The court acknowledged the "changes ordered will take time and [] that COVID [] caused delays" but the pandemic was not an excuse to deny hormone therapy, not monitor hormone levels, or not conduct diagnostic testing. *Id.* at 5. "I find that IDOC is not in compliance with the preliminary injunction order and that the reasons for issuing preliminary injunctive relief as set forth in my December 19, 2019 order and the one that followed that still call for injunctive relief." *Id.* at 5-6. The court added that: "So, obviously I am going to have to continue to follow up with permanent injunctive relief and may at some point consider the appointment of an independent monitor to ensure ongoing compliance . . ." *Id.* at 7-8. Noting that it still had to review evidence, the court added that, "there are simply some issues that have to come to light in the past four days that are so serious, such serious violations of the Eighth Amendment, that they must be immediately addressed." *Id.* at 9. Alluding to the 2019 preliminary injunction, the court further noted that "that was the right decision, because now, quite a few months down the road, there are still ongoing violations." *Id.* at 10. The court quoted the requirements of the PLRA, adding, "I am trying to do that. That's why I haven't ordered that specific things are done, but, instead, that they are competently evaluated and considered." *Id.* The court was emphatic that it "[did]not want to run the Department of Corrections," but that there must be "constitutionally adequate medical care and treatment for gender dysphoria." *Id*. at 9.

The court stated that treatment delays can constitute deliberate indifference, finding that Plaintiffs continued to be harmed by many delays, along with no gender-affirming surgery, unmonitored hormone levels, harassment, cross-gender searches by male guards, and transgender women being forced to shower without privacy in male facilities. *Id.* at 11-12. "Plaintiffs' pain has been prolonged and in some cases their injuries exacerbated." *Id*. at 12. Based on the

evidence, the court ordered a series of "actions" but left the record open for further evidence and injunctive relief. *Id.* at 14.

On August 9, 2021, the district court issued a memorandum and order explaining its reasoning and formalizing the injunctive relief ordered immediately post-trial (SA40-SA53); that relief was also entered in a separate order (Doc. 332). The court repeated the elements of the December 2019 injunction and noted that it was "adopt[ing] the discussion of the claims in its previous order (Doc. 186)" and would provide a further summary of evidence "prior to the entry of final judgment." SA41. The district court reiterated that "the evidence presented at trial shows that the hormone levels of class members receiving hormone therapy are not being monitored" and doses are not adjusted "in response to bloodwork." SA47. "As the Court stated at the conclusion of trial, it's like a physician ordering a cholesterol test, the results coming back over 300, and yet the physician does nothing but put the lab results in the chart." *Id.* Transfer request and review policies were "still flawed," "some class members have inexplicably been taken off hormones [] for absolutely no medical reason," and "not a single inmate has received gender affirming surgery." *Id.* Further:

> [T]here continue to be instances of cross-gender strip searches of transgender inmates, and transgender female inmates being forced to shower without privacy in male facilities. Meanwhile, there have been more suicide attempts, more threats of suicide, attempted self-castration, and untreated serious medical conditions (like elevated prolactin levels), ongoing harassment and humiliation, and ongoing misgendering by inmates and staff.

> Even [Defendants' witness] Dr. Conway, testified—in fact volunteered—that if an IDOC inmate "ha[s] the diagnosis of gender dysphoria, they should be treated … there's no decision that has to be made regarding hormone therapy. It should be done and it should be done immediately[.]"

SA48.

The district court noted that "[n]ot *one* defense witness rebutted (or even attempted to rebut) the opinions of Plaintiffs' expert endocrinologist [] about unmonitored hormone levels, hormone levels not within range, and lack of dose titration," and finally that "inexplicably, some class members are being treated by medical and mental health staff who do not understand gender dysphoria and refuse to treat them[.]" SA48 (emphasis original). The court ordered the parties to submit post-trial briefing directed at revisions to the IDOC Administrative Directive for transgender care. SA52-SA53.

In December 2021, the district court notified the parties of its intent to appoint a monitor under Fed. R. Civ. P. 53 and 18 U.S.C. § 3626(f)(1), which permits the court to appoint a Special Master "during the remedial phase of the action," with a finding that the "remedial phase will be sufficiently complex to warrant the appointment." Doc. 370 at 5-6.

**The Post-Trial February 2022 Order and the Mislabeled Permanent Injunction**

On February 7, 2022, the district court issued an 87-page post-trial Memorandum and Order (the "February 2022 Order"). A1-A87. The February 2022 Order summarized the case history, the claims, the post-trial briefing, and status reports (60- and 120-day) submitted by Defendants. It continued with a review of the nature of the serious medical condition, gender dysphoria, and of the WPATH treatments (social role transition, cross-sex hormone therapy, psychotherapy, and surgery), the Endocrine Society standards that are part of those treatments, and that IDOC "purports to follow" the WPATH standards. A5-A9. The court found that the committees handling transgender care in IDOC continued to have members with no medical training, and no voting member who met minimum WPATH qualifications. A9-A11.

The court then summarized the testimony of each of the witnesses at trial, starting with named Plaintiffs Melendez, Kuykendall, Monroe, and two other class members, who had

testified to protracted interruptions in hormone therapy, depression, suicidal ideation, and suicide attempts, and routine harassment by staff. A12-A28.

Defendant IDOC Chief of Mental Health Melvin Hinton testified that he was aware that untreated gender dysphoria could lead to severe mental decompensation and suicide and was aware of IDOC prisoners who had attempted suicide and self-harm, and that no one had progressed to gender-affirming surgery since 2019. A28.

Plaintiffs' security expert, James Aiken, had testified that there was no security reason for denying transgender prisoners medically necessary social transition including clothing, grooming items, and being addressed by name and pronouns consistent with gender; no legitimate reasons for denying transgender prisoners medically-recommended housing placements aligned with gender identity; and that "sound correctional practices" support giving transgender prisoners option of gender-appropriate searches. Additionally, sourcing medically-necessary items that meet a facility's security needs is an essential prison healthcare function, and placement of transgender women in a female facility reduces the possibility of random and systemic violence. A31-A34. Further, Prison Rape Elimination Act ("PREA") standards require individualized placement determinations and DOJ regulations also reject the practice of housing based on genitals only. A31-A33. IDOC's policy of assigning housing failed to comply with these regulations and decision process improperly relied on security concerns to deny medically-necessary placements recommended by medical staff. *Id*.

Dr. Tangpricha testified that the problems he identified in 2019 remained virtually unsolved in 2021, including that IDOC rarely tested Plaintiffs or class members for therapeutic hormone levels or associated health risks, or adjusted dosages as needed; some providers seemed

unaware of appropriate hormone levels. A36-A42. Class members remained at risk because hormone therapy remained woefully inadequate. *Id.*

Dr. Ettner, Plaintiffs' psychologist expert, testified that she had seen modest improvements in the treatment for two Plaintiffs (only), but otherwise, treatment remained below the standard of care, and Plaintiffs and class members continued to suffer harm including major depression, self-harm, and suicidal ideation. A42-A47.

IDOC's Dr. Reister testified that most IDOC mental health providers who treat gender dysphoria have "volunteered" to do so but some had never attended the "mandatory" WPATH training. Dr. Reister was developing the "PRISM" program to house both transgender and non-transgender prisoners at Centralia Correctional Center, and had surveyed the 139 class members known to IDOC in August 2021, which showed 97 desired surgery but he was unaware of any approved as of August 2021. A47-A50. Dr. Conway, IDOC Deputy Chief of Health Services, nevertheless testified that six class members had been approved for surgery; she was the chair of the committee charged with medical decisions for class members, but had never participated in diagnosing gender dysphoria; and despite various initiatives as to transgender care in process none were in place. A50-A54.

Defendants' witness Dr. Puga, first testified that he believed that IDOC had stopped "mechanically assigning" housing based on genitalia but then admitted that new prisoners are placed on basis of genitalia. A56-A57. Although he had testified in 2019 that IDOC had a quality improvement program to ensure that WPATH standards were followed, he admitted that no such program existed either in 2019 or in 2021. A57. He also acknowledged that gender-affirming items were not yet reliably available, and that cross-gender searches had continued. A55-A60.

Finally, Defendants' expert Dr. Anderson, consultant to IDOC since 2020, acknowledged that security and non-medical staff had not yet been trained and that new policies discussed at trial had not been implemented. A61-A62. The district court found that Defendants violated the Eighth Amendment, explaining that their "persistence in a course of action known to be ineffective" in the face of pervasive and systemic deficiencies in care met the standard for deliberate indifference under circuit precedent. A62-A63. While the court cited the standards for preliminary injunctive relief (A63-A64), it also cited PLRA prospective relief standards and found that Plaintiffs had established the existence of ongoing constitutional violations, not just the likelihood of violations. *See* A66 ( "the evidence introduced at trial showed serious ongoing violations of the Eighth Amendment").

"Defendants long ago conceded that gender dysphoria is a serious medical condition," and "evidence at the August 2021 trial amply demonstrated that Defendants were aware that Plaintiffs were not receiving adequate medical care or social transition for their gender dysphoria and have suffered serious harm including suicide attempts as a result—yet they allowed these conditions to persist over the two-year period following the 2019 evidentiary hearing." A63-A64. The court adopted its discussions of entitlement to relief from its previous orders (SA1-SA53), and further noted:

> . . . Plaintiffs' trial testimony underscored the irreparable harm that they have experienced and continue to suffer from—anxiety, depression, suicidal ideation and suicide attempts, and self-mutilation—due to Defendants' failure to provide even minimally adequate treatment of their gender dysphonia. Monetary damages cannot compensate for these harms. The balance of harms and the public interest continue to weigh heavily in favor of granting injunctive relief, and the trial evidence and supplemental filings demonstrate that constitutional violations persist.

A64-A65.

However, as to IDOC's transgender care Administrative Directive, the court agreed with Defendants that it could not "under Seventh Circuit jurisprudence, implement the wide-sweeping revisions" to the directive that Plaintiffs had sought; revisions to the directive would be for the Monitor to "explore with the parties." "The focus must be on the *outcome* . . . " A65-A68. In conclusion, the court reiterated "the evidence introduced at trial shows serious ongoing violations of the Eighth Amendment." A70.

The court entered a separate "Preliminary Injunction." A88. Defendants did not appeal the February 2022 Order, file a motion for reconsideration, or a motion to modify or terminate the injunction under the PLRA.

**Post-February 2022 Order and Injunction: Appointment of Monitors and Reports**

The court began monitoring Defendants' compliance with the post-trial injunction and in April and May 2022, appointed two Co-Monitors: Dr. Amanda Harris, to evaluate Defendants' provision of medical care to the class (Doc. 418), and therapist julie graham, to evaluate the medically-necessary social transition for class members (Doc. 423). These areas reflect the February 2022 injunction. Doc. 418 at 2-4; Doc. 423 at 3-4.

The orders appointing Monitors directed broad access to IDOC personnel, facilities, and records. Doc. 370 at 7-13; Doc. 418 at 3; Doc. 423 at 5. Dr. Harris's first report issued on August 3, 2022, found significant deficiencies in hormone treatment and no completed surgeries. Doc. 439 at 8, 11. Data was not available to assess or track the number of transfers. Doc. 439 at 12-13. Co-Monitor julie graham's first report on August 31, 2022, likewise found data deficiencies and substantive failures, including that class members in multiple facilities reported that "they were called slurs, told they are men when they are women, taunted, sneered at . . .". Doc. 444 at 5. In short, they "are afraid for their safety and for their lives." *Id.*

In response, Defendants expressed commitment to work to comply with the court's orders, but not that the orders had expired. Doc. 446; Doc. 448 at 4; *see also* Doc. 454 at 1.

**Plaintiffs' November 2022 Motion for a Finding of Contempt**

In November 2022, Plaintiffs filed a motion seeking a finding of contempt for Defendants' failures to comply with the court's now-longstanding orders. Doc. 455. Defendants' Response asserted for the first time that no permanent injunction or "final relief" had been entered but did not otherwise argue this point. Doc. 462 at 1.

**December 2022 through May 2023 Status Conferences and Orders**

On December 15, 2022, the court took Plaintiffs' contempt motion under advisement, and set reporting and other deadlines for Defendants, the parties together, and the Co-Monitors, including a date to confer on a schedule "to achieve compliance with the Court's orders for injunctive relief." Doc. 494 at 1-2.

At a January 2023 status conference, the district court set additional deadlines, including a deadline for Defendants to report on "providers contacted" concerning gender-affirming surgery and for the parties and Co-Monitors to confer on a "kit" for class members as "standard-issue medical care." A103-A104.

In February and March 2023, the district court held additional status conferences, and in an April 4 order noted although "some progress has been made in certain areas" "[u]nfortunately [] progress has continued to be sluggish in several key areas." Violations of the search requirement were still reported: "**This is not acceptable,**" stated the court. A108. The court set new deadlines. A109-A115.

After another status conference in April 2023, the court issued an order on May 11. The May 11 order noted Co-Monitor graham's ongoing work to investigate reports of private shower

noncompliance ("this is . . . frustrating for the Court as it should have been a straightforward matter for Defendants to provide private showers for class members as ordered ***long ago***") (A118) (emphasis original); reports of noncompliance "[d]espite Defendants' assurances and certifications of compliance[;]" (A108) and photographs of shower doors "at Pinckneyville [which] currently have a large hole through which the person showering can be seen." A118. The order noted that Defendants had simply failed to comply with "two previous orders [] to report whether and when another surgical provider at Rush Medical Center will start accepting patients" and had also failed "to file a list of other providers contacted"; stating "[***t]his track record does not demonstrate reasonable diligence*** to comply with the ordered injunctive relief. In fact, Defendants have flouted this Court's Orders to identify additional providers . . ." A123 (emphasis in original). The district court warned that if Defendants failed to comply with the court's directives, they would be held in contempt and sanctions would be imposed. A124.

At none of the five hearings held from December 2022 through April 2023 did Defendants allege that no permanent injunction existed, or that the enforcement orders were not PLRA-compliant. Docs. 574-76, 581.

**Defendants' Motion to Vacate the Enforcement Orders**

On May 31, 2023, Defendants filed a Rule 60(b) "Motion to Vacate Recent Enforcement Orders and Request an Evidentiary Hearing Prior to Ordering Further Relief[,]" alleging that the February 2022 post-trial Order had expired as a "preliminary injunction" in May 2022 under 18 U.S.C. § 3626(a)(2) of the PLRA. Thus, it could not support the enforcement orders issued in January, April, and May 2023, which lacked independent PLRA findings. Doc. 587 at 4-7. Defendants simultaneously moved to stay. Doc. 588.

**November 16, 2023 Orders**

On November 16, 2023, the court ruled on the motion to vacate. A131-A156. That Memorandum and Order (the "November 2023 Memorandum") explained the case's history starting with the preliminary injunction in August 2019 and the August 2021 trial, at which the "testimony . . . made clear that IDOC demonstrated only minimal progress since the inception of the case, even with the prior preliminary injunctive relief. (Docs. 319-328, 331, 332, 326.)" "[S]erious constitutional violations abounded . . ." A132-A133. The court discussed the post-trial relief ordered "to immediately address some of the most egregious constitutional violations . . . until the Court could finalize its findings"; the issuance of the "Final Findings of Fact and Conclusions of Law on February 7, 2022"; the appointment of the two Co-Monitors; Plaintiffs' contempt motion and subsequent hearings and orders. A132-A136. The district court discussed the standards governing Rule 60(b) motions, the distinct requirements for preliminary and permanent injunctive relief, and PLRA's requirements for prospective relief in the February 2022 Order. A136-A140.

The court stated that the February 2022 Order "endeavored to explain" its final findings of fact and law from the August 2021 trial." A140. The court "issued a ruling on the merits of the case finding that Defendants acted with deliberate indifference to Plaintiffs' serious medical need . . ." *Id*.

> As a result, the Court ordered prospective injunctive relief as an equitable remedy to this constitutional violation. Admittedly, the Court, throughout its February 2022 Order, referred to either "preliminary relief" or simply "injunctive relief," outlined the standard for preliminary injunctive relief, and titled the accompanying injunction a "Preliminary Injunction." Simply put, this was a mistake.

> But from the substance of the February 2022 Order and operative injunction, along with the context and ongoing actions of the Court and the parties, it is clear that the relief was intended and understood to be *permanent* injunctive relief resulting from the evidence presented at the bench trial.

A140-A141 (emphasis in original). Further, the February 2022 Order satisfied the requirements for **permanent** injunctive relief, finding not only that "remedies available at law inadequately compensated Plaintiffs' injuries, the balance of hardships between Plaintiffs and Defendants warranted a remedy in equity, and the injunction served public interest" (SA65), but also that Plaintiffs had succeeded on the merits:

> To issue permanent injunctive relief, as opposed to preliminary relief, a court must find actual success on the merits of the claim rather than likelihood of success. In its February 2022 Order, the Court explicitly made such a finding. The Court held that, based on the evidence presented at trial thoroughly recounted in the Order, Defendants violated Plaintiffs' Eighth Amendment rights for failure to provide constitutionally required treatment for gender dysphoria and exhibited ongoing deficiencies in delivery of medically necessary treatments on a systemic, statewide level in IDOC correctional institutions. (Doc. 383, pp. 66, 70). With this finding, the permanent injunctive relief was appropriate and provided closure on the merits after the bench trial.

A141. As to PLRA findings required for "prospective relief," the court noted that these requirements also were satisfied in the February 2022 Order, as these require a "' finding that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures.' *Armstrong*, 622 F.3d at 1071." The adoption of the WPATH standards as the "constitutional floor"—for which Plaintiffs presented expert testimony and to which Defendants had never, despite many opportunities, offered any alternative—set the baseline for adequate care, and the court's orders had been tailored to those standards. A142. At the same time, the court was careful not to "intrude upon IDOC's discretion to develop solutions, policies, and procedures to deliver constitutionally required care to transgender inmates." A143. Rather, the "primary focus" of the injunctive relief was "outcomes that raise IDOC's treatment on the constitutional floor rather than prescribing the methods for how IDOC achieves those outcomes. *Id.* (*citing* A66-A68).

The appointment of the monitors for the "remedial phase" of the case, combined with the parties' behavior through the filing of Defendants' motion to vacate, which "[u]unsurprisingly . . . arrives on the heels of threatened sanctions for their noncompliance," confirmed the understood nature of the permanent relief in the February 2022 Order. A144. Defendants' attempt to "seriously disrupt this case" accompanied by "unreasonable delay" was "impermissible at this stage." A145-A146. The court stated that it had directed the Defendants to make their "expiration argument" by motion in 2020, and they had not done so. A146, citing Doc. 226 and 246.

Finally, the court rejected Defendants' arguments that the enforcement orders from January, April, and May 2023 were unenforceable. A146-A147. They were tied to the "operative" February 2022 Order, did not constitute "new relief," and did not require new PLRA findings. A147-A150. As to Defendants' specific complaints about the enforcement orders, relating to surgical providers and the "kit" of gender-affirming items, the court observed that the "one surgeon" plan "is clearly ineffective and is causing [] constitutional harms"; that "Defendants can exercise their discretion as to which other medical providers to use, how to find those providers, and how to evaluate those providers"; and that, as to the "kit," the "Court has simply directed Defendants to create a list of gender-affirming versions of items already provided to cisgender inmates." A151. The court accordingly denied Defendants' motion to vacate, and as moot, their motion to stay. *Id.*

The November 2023 Memorandum addressed Plaintiffs' contempt motion; the court concluded that clear and convincing evidence showed that Defendants had failed to act with reasonable diligence in complying with the court's orders. A152-A155. Due to the passage of time, however, the court did not impose sanctions, instead expressing the intention to direct other actions to "get this case back on track." A155.

In that Memorandum, it also directed the clerk "to clean up the mistakes" by modifying the "docket text for the operative injunction to read: "PERMANENT INJUNCTION (to be interpreted in accordance with the Court's Order at Doc. 678)." The Clerk's Office is also DIRECTED to enter judgment for Plaintiffs, as should have been done after the entry of the February 2022 Order. Judgment should be entered without closing the case as the Court retains jurisdiction to enforce and monitor compliance with its injunction." A156. Accordingly, the clerk entered a Judgment in a Civil Action, stating that: "This action was tried to the Court. On February 7, 2022, the undersigned issued her Final Findings of Fact and Conclusions of Law. (Doc. 383). IT IS ORDERED AND ADJUDGED that, pursuant to the Order entered on February 7, 2022, judgment is entered in favor of Plaintiffs and against Defendants. As such, permanent injunctive relief is stated as follows:" A157. Following this, the February 2022 Order is reissued, changed only to reflect that dates which at the time were in the future were now in the past. A157-A161.

Between Defendants' motion to vacate and the November ruling, the court had held an evidentiary hearing on Plaintiffs' motion for transfer of class members out of Pinckneyville Correctional Center. On November 16, 2023, the court granted in part the Pinckneyville motion, ordering Defendants to evaluate the class members' transfer requests, but not ordering their transfer to specific facilities. Doc. 680.

The Notice of Appeal was timely filed on December 14, 2023. Doc. 699.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it denied Defendants' Rule 60(b) motion to vacate the enforcement orders on November 16, 2023. Contrary to Defendants' contention, the underlying February 7, 2022 injunction which the court properly enforced was permanent and did not automatically expire after 90 days under Section 3626(a)(2) of the PLRA. The court did not need to make new findings under the PLRA to simply enforce the injunction.

Although the February 7, 2022 injunction was mislabeled preliminary, it was functionally permanent and supported by merits finding after trial. The district court found that Defendants violated the Eighth Amendment because they were deliberately indifferent to Plaintiffs' and class members' serious medical needs since 2019. The court also made the "needs, narrowness, and intrusiveness" findings required to order prospective relief under the PLRA. Moreover, the parties treated the injunction as permanent. For over a year, the parties continued to appear at status conferences about Defendants' non-compliance with the ordered relief, the Monitors were appointed and filed reports, and Plaintiffs filed a motion for contempt. After the court threatened sanctions in May 2023, Defendants filed their motion to vacate.

The district court's mislabeling of the February 2022 injunction, and correction in November 2023 (including entering judgment for Plaintiffs), was a harmless error. Defendants have not met their burden under 28 U.S.C. § 2111, to show that this error affected their substantial rights. They always had the right to appeal the injunction or file a motion to terminate the injunction under the PLRA.

Defendants' skeletal challenge to the district court's February 2022 finding that Defendants were deliberately indifferent to the class's serious medical needs also must fail.

Defendants have never developed a challenge to the merits of the February 2022 finding in the district court or on appeal, so it is waived.

Even if this Court does not deem this argument as waived, Defendants have not met their burden to show the district court made a clear error. Defendants' minimal efforts of remediation presented at trial, and identified in their appeal, were not enough to prevent a finding of deliberate indifference. The record reflected that Defendants continuously failed to provide the constitutional floor of care in hormone therapy, surgery (no Plaintiffs received surgery), social transition, and psychotherapy. Thus, the Court should find there is no clear error warranting a reversal of the judgment.

Finally, this Court does not have appellate jurisdiction over the partial contempt finding because the district court did not enter sanctions, and if the Court determines that it does, Defendants' scant arguments should be deemed waived.

.

# ARGUMENT

**I.     The district court did not abuse its discretion in refusing to vacate its orders.**

   **A.     Defendants do not acknowledge the standard of review for denial of their Rule 60(b) motion or address the district court's ruling.**

This appeal arises from the denial of Defendants' Rule 60(b) motion to vacate. Defendants claim that the district court's mislabeling of its February 2022 Order should permit them to evade their duty to obey the court's orders in this six-year-old case. The motion to vacate was filed in May 2023, when Defendants were on the verge of being held in contempt of the February 2022 Order. The district court denied Defendants' Rule 60(b) motion in its November 2023 Memorandum.

In their attack on the February 2022 Order, Defendants fail to mention that the decision triggering this appeal was a denial of their Rule 60(b) motion, or to address the standard of review for denial of such a motion. This Court has said repeatedly that denials of Rule 60(b) motions are reviewed "under an extremely deferential abuse of discretion standard." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 705 (7th Cir. 2022) (cleaned up). It is a "formidable challenge" to demonstrate "that the district court abused its considerable discretion in denying relief" under Rule 60(b), and requires a showing that "no reasonable person could agree" with the decision to deny relief. *Eskridge v. Cook Cnty.*, 577 F.3d 806, 807-10 (7th Cir. 2009) (citations omitted).

Defendants' Rule 60(b) motion advanced the same arguments made here: that the February 2022 post-trial Order was merely a preliminary injunction that "expired," by operation of Section 3626(a)(2) of the PLRA, after 90 days, and as such could not support the later enforcement orders. Doc. 587. The November 2023 Memorandum explains that the February 2022 Order unmistakably included the critical difference between a preliminary and permanent injunction: a finding of wrongdoing, not just a "likelihood of success" on that claim. A140. It

details the history of the case through trial, the subsequent appointment of two Co-Monitors permitted by the PLRA "during the remedial phase" (18 U.S.C. § 3626(f)(1)), and Plaintiffs' November 2022 contempt motion and subsequent proceedings, during which Defendants "responded that [they were making] diligent, ongoing efforts to comply" with the court's orders, not that those orders were unenforceable. A4.

In the February 2022 Order, the district court admittedly referenced the standards for a preliminary, not a permanent injunction. A63-A64. As the district court also noted, however, this mis-citation was of no practical consequence, since the findings of the February 2022 Order supported the entry of permanent injunctive relief. A140-A142; *see also French v. Duckworth*, 178 F.3d 437, 441 (7th Cir. 1999) ("[T]he district court simply cited the wrong statutory section, a mistake to which we need not attach any significance unless it affects the substantial rights of the parties . . . ."), *rev'd on other grounds sub nom. Miller v. French*, 530 U.S. 327 (2000).

Defendants make no effort to explain why the district court's detailed ruling amounted to an abuse of discretion. At the end of the November 2023 Memorandum, the court directed the clerk to correct the court's mistakes and to "enter judgment for Plaintiffs, as should have been done after the entry of the February 2022 Order." A156.[3] Defendants do not address the history of the case and their conduct, explain why a post-trial order with a merits finding was not final (as they treated it for over fifteen months), or say how the court's actions were insufficient to correct its mistakes. Defendants ignore the district court's ruling.

Defendants' complaint about the finality of the February 2022 Order is untimely. Defendants' only argument against the district court's position on the order's finality is to complain that "the court did *not* enter a final judgment at that time". Br. at 39 (emphasis in

---

[3] The court also did not close the case and retained "jurisdiction to enforce and monitor compliance with its injunction." A156.

original). Rule 58 is clear that "[a] party may [always] request that judgment be set out in a separate document[.]" Fed. R. Civ. P. 58(d). Defendants did not make this request. Instead, they waited until the district court's patience had met its limit in May 2023 to raise their complaint about the February 2022 Order. "If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. If he fails to do so in a timely manner, his claim for relief from the error is forfeited." *Puckett v. U.S.*, 556 U.S. 129, 134 (2009). "In the case of an actual or invited procedural error, the district court can often correct or avoid the mistake so that it cannot possibly affect the ultimate outcome. And of course the contemporaneous-objection rule prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Id.* (citations omitted); *see also Dean v. Sullivan*, 118 F.3d 1170, 1172 (7th Cir. 1997) ("A disputant cannot stand by during arbitration, withholding certain arguments, then, upon losing the arbitration, raise such arguments in federal court. We will not tolerate such sandbagging."). By strategically waiting to raise their argument that the February 2022 Order had expired, Defendants forfeited any right to make this claim about the district court's mistakes.

1. **The February 2022 Order was a permanent injunction satisfying PLRA standards. The February 2022 Order included findings for permanent injunctive relief.**

For permanent relief, the injunction-seeker must show: (1) irreparable injury absent the injunction, for which (2) "remedies at law"—in particular monetary relief—cannot compensate, that (3) the balance of harms between plaintiff and defendant warrant a remedy in equity for the plaintiff, and that (4) the public interest not be "disserved" by a permanent injunction. A138 (citing *eBay Inc. v. MerExchange*, *LLC*, 547 U.S. 388, 391 (2006)). As the November 2023 Memorandum explains, as to first of these components, the evidence at trial had served to

establish that Plaintiffs, who concededly suffered from a serious medical need requiring treatment, were put at regular risk of everything from profound psychological suffering to persistent suicidal ideation and attempts at self-castration. A141-A142. To abate these harms, the only available remedy was the known set of medically established and effective treatments testified to at both the August 2019 hearing and August 2021 trial, whose authoritative status and efficacy were supported by expert testimony and never challenged by Defendants. *Id.* "Plaintiffs' 2021 trial testimony underscored the irreparable harm that they have experienced and continue to suffer from—anxiety, depression, suicidal ideation and suicide attempts, and self-mutilation— due to Defendants' failure to provide even minimally adequate treatment of their gender dysphoria. Monetary damages cannot compensate for these harms." A65. The February 2022 Order also found, post-trial, that the balance of harms weighed "heavily" in favor of injunctive relief in the face of the testimony of irreparable harm. *Id.*

There is one respect in which the standards for preliminary and permanent injunctive relief are critically different. A138. Because "permanent injunctive relief is a form of relief on the merits," after a trial on the merits, "a plaintiff must demonstrate not simply a probability of success on the merits but actual success." *Id.*. This most important prerequisite for permanent injunctive relief was repeatedly and clearly articulated in the February 2022 Order. The district court stated multiple times that the trial evidence had shown "serious ongoing violations of the Eighth Amendment." A64, A66, A70. The trial evidence had shown the "persistence in a course of action known to be ineffective" which this Circuit has found to be a hallmark of deliberate indifference. A63 (citing *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022)).

As the district court held, it is the substance, not the packaging of the "operative" order that matters. Defendants were left in no doubt about what they were supposed to do and why

they needed to do it. *See Cent. States, Se. & Sw. Areas Pension Fund v. Wintz Properties, Inc.*, 155 F.3d 868, 874 (7th Cir. 1998) ("The parties treated the underlying order as an injunction at the time it was entered, and that is how we will treat it here . . . . [N]omenclature does not determine whether an order is a preliminary injunction . . . .") (citations omitted). The nature of the February 2022 Order was clear.

### 2.    Defendants ignore the PLRA findings of the February 2022 Order.

A permanent injunction directed at prison conditions, as "prospective relief," requires the so-called "need/narrowness/intrusiveness" findings set out in the PLRA. *See* 18 U.S.C. § 3626(a)(1). Although Defendants vaguely assert that the district court's orders do not satisfy PLRA requirements, they did not below and do not here argue in any detail that the February 2022 Order failed to meet the prospective relief standards. The November 2023 Memorandum noted the same: "To be sure, in [the] Motion to Vacate, Defendants do not appear to challenge the February 2022 Order for lacking a narrowness-need-intrusiveness finding, but rather they argue that the subsequent enforcement orders lack such a finding . . . ." A143. This argument is accordingly waived, but its undeveloped state is also a tacit admission that it is unfounded. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021) ("[P]erfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). The PLRA does not change the findings required to grant an injunction. *See Fields v. Smith*, 653 F.3d 550, 558 (7th Cir. 2011). Other circuit courts agree. *See, e.g.*, *Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) ("[The PLRA] has not substantially changed the threshold findings and standards required to justify an injunction."); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010) ("[T]he PLRA does not suggest that Congress intended a provision-by-provision explanation of a district court's findings . . . ."); *Smith v. Arkansas Dep't of Corr.*, 103 F.3d 637, 647 (8th Cir.

1996); *Williams v. Edwards*, 87 F.3d 126, 133 n.21 (5th Cir. 1996). The PLRA's "need-narrowness-intrusiveness" requirement does not require a "provision-by-provision explanation of a district court's findings." *Fields*, 653 F.3d at 558 (quoting *Armstrong*, 622 F.3d at 1070). Instead, the court is required to show that it "evaluated the record as a whole and identified evidence that fully supports the scope of the injunctive relief granted." *Fields*, 653 F.3d at 558.

As the November 2023 Memorandum observes, the relationship between the PLRA factors and the ordered relief was obvious. It does not require an elaborate analysis to say that the most narrowly tailored and least intrusive relief that can be ordered to treat a serious medical condition consists of the only known treatment. From the December 2019 preliminary injunction forward, the district court was scrupulous about identifying the "constitutional floor"—the minimum standards for adequate care for gender dysphoria—and tailoring its orders to that floor. SA31. The floor, for the court, was set by the WPATH standards, supplemented by the Endocrine Society guidelines. *Id.* These standards were testified to by experts (SA30-SA32; A34-A47), and supposedly integrated by IDOC into its treatment standards (SA3; A5). The relief ordered in the February 2022 Order did no more than direct the accepted and necessary range of treatments for gender dysphoria recognized by professionals in the field, which were the proper point of reference for medically acceptable care. *See Edmo*, 935 F.3d at 769 (collecting cases). The district court had repeatedly advised Defendants, up to, through, and after the August 2021 trial, that if they believed there were legitimate alternatives to the set of treatments testified to by Plaintiffs' experts, they needed to present these alternatives. Defendants never provided alternatives.

The court nevertheless recognized that some aspects of those treatments, especially as they affected housing for the class members, might impinge upon prison management, and

considered potential "intrusiveness" and public safety concerns, as the PRLA requires. The court reviewed public safety considerations, as testified to at trial. A31-A34. Post-trial, the court ordered briefing on IDOC's Administrative Directive for prisoners with gender dysphoria—its core policy document—which covered transfer, placement, and commissary issues, which were under the authority of a committee whose staffing Plaintiffs believed was unqualified. argued for significant changes to the policy, including eeliminating the committee and hiring of new, qualified professionals. A66-A67. Defendants had objected that such changes could not be ordered consistent with the PLRA's constraints, "warn[ing] that an injunction that does not defer to IDOC on how to plan and implement the relief ordered" would "run afoul" of the PLRA. A67-A68. Citing circuit precedent, the district court agreed, *refusing* to order Plaintiffs' proposed changes, and directing instead that these issues should be "explore[d]" with the special master the court intended to appoint, with a focus not on specifying how things were to be done, but what "outcomes" needed to be achieved. A68.

### B. Because the February 2022 Order was a permanent injunction, the PLRA's 90-day "expiration" for preliminary injunctions is irrelevant.

Defendants' other unfounded PLRA argument, here and in their Rule 60(b) motion, is that the February 2022 order was a preliminary, not permanent injunction that expired by the terms of the PLRA 90 days after entry. Section 3626(a)(2) of the PLRA provides that, "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final . . . ." 18 U.S.C. § 3626(a)(1). Instead of engaging with the district court's explanations and the substance of the February 2022 Order, Defendants repeat that the injunction was a preliminary injunction because it was mislabeled, and therefore it expired because the court did not enter a "final judgment." But Section 3626(a)(2) is irrelevant because this was not a

preliminary injunction that the court then needed to "make[] final"; it was a permanent

injunction, the post-*trial* order. The PLRA does not specify particular actions that need to be

taken to enter a permanent injunction other than complying with the "prospective relief"

standards. It does not state that a court needs to enter a Rule 58 judgment to create a permanent

injunction.

This Court has not considered Section 3626(a)(2) before, but the few appellate cases that

have demonstrate how irrelevant it is to the issues here. They concern orders entered after a

preliminary injunction hearing, not a trial on the merits, and most involve situations in which the

district court concededly had not made PLRA findings within 90 days. *See, e.g.*, *United States v.*

*Sec'y, Florida Dept. of Corr.*, 778 F.3d 1223, 1226 (11th Cir. 2015); *Alloway v. Hodge*, 72 Fed.

Appx. 812, 817 (10th Cir. 2003); *Smith v. Edwards*, 88 F.4th 1119, 1124 (5th Cir. 2023);

*Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001); *Banks v. Booth*, 3 F.4th 445, 448

(D.C. Cir. 2021). In the only opinion to consider directly what "makes the order final" might

mean a divided panel concluded that it means enter a permanent injunction, without even

considering a Rule 58 "final judgment." *Georgia Advocacy Office v. Jackson*, 4 F.4th 1200, 1215

(11th Cir. 2021), *vacated as moot*, 33 F.4th 1325 (11th Cir. 2022).

### C. Defendants' claimed lack of understanding of the February 2022 Order is not credible.

Defendants claim that they were expecting the court, "after evaluating the Co-Monitors'

assessment of "what revisions to [Department] policies and Administrative Directives [were]

necessary," A70, to either replace the preliminary injunction with a permanent injunction or "let"

the February 2022 Order expire. Chronologically, this claim does not make sense. If the district

court was waiting for opinions from the Co-Monitors, under Defendants' "reading" of the

February 2022 Order, it would long have expired before that happened given the Co-Monitors'

dates of appointment. Further, as noted above, the February 2022 Order states explicitly why the district court is not taking action related to the Administrative Directive (the subject of extensive post-trial briefing) and is never going to do so. A66-67. Accordingly, Defendants' claim that they were "waiting" for something that the court had said was not going to happen because of the arguments *they* had made and *succeeded on* is not credible.

Defendants also claim that Plaintiffs "understood" the February 2002 Order to be "preliminary." It would have made no sense for Plaintiffs to ask the district court to hold Defendants in contempt in *November* 2022 if the order in question had expired in *May*, or to seek further relief, as Plaintiffs continued to do.

## II. Defendants fail to show how the district court's mislabeling of the February 2022 injunction and later correction, affected their substantial rights.

Defendants mischaracterize the district court's correction of a harmless labeling error of the February 2022 injunction as a "retroactive modification." The court corrected the mislabeling error of "preliminary" to "permanent" on the injunction but made no other changes to the relief. A140-46. Correcting mistakes or omissions in orders is within the court's authority. *See* Fed. R. Civ. P. 60(a) ("The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice."). The clerk then entered a judgment that repeated the relief ordered in February 2022. A157.

The district court's mislabeling of the injunction was harmless. This Court should "give judgment after examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; *see also McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (explaining Section 2111 applies to appellate courts, incorporating harmless error principle of Fed. R. Civ. P. 61).

Defendants have not met their burden under 28 U.S.C. § 2111 to show how the district court's labeling error or correction affected their substantial rights. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he party that seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.") (citations omitted). They suggest "prejudice" when the clerk "entered a judgment after the time for appealing the February 2022 order expired, the court unfairly altered [their] expectations and appeal rights." Br. at 42. But Defendants acknowledge that they had the right to appeal the February 2022 injunction under 28 U.S.C. § 1292(a)(1). *See id.* They also could have sought clarification from the court or moved to terminate the injunction if they thought it had expired under the PLRA (*see, e.g.*, *Alloway*, 72 Fed. App'x. at 814), but they did not. At most their "calculus" to appeal was affected but that is strategy, not a substantial right.

To determine whether a procedural error is harmless, this Court asks if appellants have shown prejudice or did they have the "full opportunity" to exercise their right. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 478-80 (7th Cir. 2002) (no prejudice when court converted motion to dismiss into summary judgment without notice because plaintiffs had "full opportunity to bring all material disputes to the court's attention" at class certification hearing and in subsequent litigation). Here, Defendants were not prejudiced because they had "full opportunity" to appeal the February 2022 injunction under 28 U.S.C. § 1292(a), and after the judgment, Defendants appealed under 28 U.S.C. § 1291.

Also, this Court has found harmless error when the district court's action was the "functional equivalent" of the proper action. *See Rose v. Franchetti*, 979 F.2d 81, 86 (7th Cir. 1992) (default judgment for defendant's failure to participate in discovery was "functional equivalent" of rule to show cause where defendant had notice and hearing). Here, the record

reflects that the February 2022 Order was a "functional equivalent" of a permanent injunction. First, at the August trial on the merits, Plaintiffs sought a permanent injunction, which Defendants opposed. Doc. 349; 217: 21-2. At the trial's end, the court stated, "So, obviously I am going to have to continue to follow up with permanent injunctive relief and may at some point consider the appointment of an independent monitor to ensure ongoing compliance, but that's an issue for another day." *Id.*; 219:21-5. The court entered verbal warnings, preliminary findings of fact, conclusions of law (SA1-SA14) and a preliminary injunction (Docs. 332, 336). Then in February, the court found "serious ongoing violations of the Eighth Amendment." *See* 70. The court entered an injunction with comprehensive relief including a Monitor. *See* A88-100. For over a year, Defendants treated the February injunction as permanent, attending court statuses, meetings with the Co-Monitors, providing data to the Monitors, and filing reports. They never sought clarification, appealed, or filed a motion to terminate the injunction.

Because Defendants had full opportunity to appeal or file a motion to terminate and the record reflects that the injunction was functionally permanent, the mislabeling error was harmless.

## III. The district court had the authority to enforce its February 2022 injunction.

Contrary to Defendants' contention, because the February 2022 injunction was permanent, the district court was not required to make new PLRA findings for prospective relief under 18 U.S.C § 3626, to enforce it. "Simple enforcement" of a court order providing prospective relief "does not require a new round of findings under § 3626." *Doe v. Cook Cnty., Illinois*, 798 F.3d 558, 564 (7th Cir. 2015) (citing *Jones–El v. Berge*, 374 F.3d 541, 545 (7th Cir. 2004)). As this Court has found, "[c]hallenges to the appropriateness of [an enforcement order] based upon the PLRA can only be properly brought as § 3626(b) motion to terminate or modify

the [injunction]." *Jones-El*, 374 F.3d at 545 (affirming enforcement order because defendants had not filed motion to terminate or modify underlying decree). Defendants have never moved to terminate or modify the underlying February 2022 injunction, so the orders are valid.

Defendants' argument that the enforcement orders imposed new obligations (Br. at 43), does not invalidate them either. *See Jones-El*, 374 F.3d at 543-45 (affirming enforcement order directing the DOC to install air conditioning by a certain date, even though it created new obligation subject to contempt). While Defendants claim that three enforcement orders are invalid, they identify only two "onerous" requirements: (1) the parties and Co-Monitors conferring on a gender-affirming kit of commissary items and a distribution date and (2) Defendants creating "an internal training for administrative staff to hold their subordinates accountable." Br. at 44.[4] These requirements implement two injunction terms: (1) "each Plaintiff class members shall immediately be provided to access to gender-affirming items in the commissary" (A91) and (2) "ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment" (A92) (emphasis original).[5] These requirements, however, do not limit Defendants' substantial discretion like the injunction in *Rasho*, which "ordered IDOC to hire and maintain precise numbers and types of personnel." 22 F.4th 703, 712 (7th Cir. 2022). The first requirement merely directs Defendants to discuss with Plaintiffs and the Co-Monitors a kit of gender-affirming items and a date of

---

[4] Defendants' challenge to the other portions of the enforcement orders must be waived. *See U.S. v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . .").
[5] Defendants' suggestion that they had provided"initial training to staff in 2022" (Br. at 44), was a test training (*see* A105), not "ongoing training for all correctional staff." Defendants do not identify any evidence of providing gender-affirming commissary items to the class.

distribution. The second requirement clarifies that training for "*all* correctional staff" includes administrative staff.

In short, the district court was not required to make new PLRA findings to simply enforce its injunction and Defendants have not properly challenged the orders by filing a motion to terminate or modify the injunction.

## IV. This Court lacks jurisdiction over the district court's contempt finding, or the argument should be deemed waived.

Despite Defendants violating the court's unambiguous orders—such as repeatedly failing to identify additional surgical providers as ordered four times, and neglecting to provide private showers at most facilities—Defendants still complain about the court finding them in contempt, even though there was no accompanying sanction. Defendants' argument overlooks a significant issue: An order of contempt is a final and appealable order *only if* it includes the imposition of a sanction. *Motorola, Inc. v. Computer Displays Int'l, Inc.*, 739 F.2d 1149, 1154 (7th Cir. 1984) ("An order finding a party in civil contempt disposes of all the issues raised only if it includes both a finding of contempt *and* the imposition of a sanction."); *see also United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 923 (7th Cir. 2005); *Autotech Technologies LP v. Integral Research & Development Corp.*, 499 F.3d 737, 745-46 (7th Cir. 2007). As no sanction has been imposed for the finding of contempt in this case, there is no final order properly before this Court on appeal. *See* A155 ("[T]he Court is inclined to avoid imposing sanctions at this time."). Accordingly, the district court's finding of contempt was an interlocutory order and nonappealable.

Even if the contempt issue fell within appellate jurisdiction, Defendants' utterly fail to develop this argument (Br. at 45-47 ), and it is therefore waived. *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("[E]ven arguments that have been raised may still be waived on

appeal if they are underdeveloped, conclusory, or unsupported by law."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.").

## V. The district court properly found Defendants' failure to undertake reasonable efforts to remedy a known constitutional violation constituted deliberate indifference.

Defendants had numerous opportunities to prove they were providing constitutionally adequate care to Plaintiffs, but failed to do so at every instance. The district court did not clearly err in finding that Defendants were deliberately indifferent, and this court should uphold its well-reasoned and clearly supported findings.

### A. Defendants waived their deliberate indifference argument by failing to develop it in the district court and on appeal.

Defendants' failure to challenge the district court's 2022 deliberate indifference finding below waives their argument here. *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 720 (7th Cir. 2008) ("[I]t is axiomatic that an issue not first presented to the district court may not be raised before the appellate court as a ground for reversal."). Defendants' sole challenge to deliberate indifference below was in the context of whether a *continued* finding was appropriate more than a year post-trial. Doc. 587 at 13-15. Defendants have never challenged the propriety of the court's February 2022 finding of deliberate indifference.

Even if this Court finds that Defendants preserved their challenge to the deliberate indifference finding, Defendants' argument here is so undeveloped and perfunctory that it should be deemed waived. *See Berkowitz,* 927 F.2d at 1384. After years of litigation, a four-day trial, and extensive briefing, the district court made detailed factual findings (A66) that should not be overturned on appeal based on Defendants' cursory, two-paragraph critique of that holding.

Br. at 50-51. Defendants' lack of legal analysis and engagement with the record is not sufficient to warrant appellate review.

**B.  The district court's well-reasoned and well-supported deliberate indifference findings should be upheld.**

**1.  Standard of review.**

When reviewing a district court's finding of an Eighth Amendment violation, factual findings are reviewed for clear error, entry of an injunction for abuse of discretion, and application of the law *de novo*. Br. at 50; *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,* 724 F.3d 854, 863 (7th Cir. 2013). Defendants bear the burden of showing that the court's findings were clearly erroneous. *Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 868 (7th Cir. 2012). Reviewing courts must "give due regard to the [district court's] opportunity to judge the witnesses' credibility" (Fed. R. Civ. P. 52(a)), and reversal is only appropriate if, on review of the whole record, "the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). This standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985).

**2.  Minimal or ineffectual efforts at remediation of a known, persistent constitutional injury are insufficient to prevent a finding of deliberate indifference.**

A violation of the Eighth Amendment based on insufficient treatment of medical conditions within a prison requires a showing that (1) "plaintiff suffered from an objectively serious medical condition" and (2) "defendant was deliberately indifferent to that [medical] condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511

U.S. 825, 834 (1970)). Since 2019, the parties have agreed that gender dysphoria is an objectively serious medical condition. SA29-SA30.

Deliberate indifference is demonstrated by subjective recklessness—that is, knowing about a substantial risk of harm, and failing to take steps to prevent it. *Farmer*, 511 U.S. at 839. Subjective knowledge may be established "through inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citations omitted). A plaintiff might show such knowledge through evidence that a particular policy was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it . . . ." *Id.*

Once knowledge is established, the court must find that officials failed to address the harm. While responding reasonably may be enough to show that officials were not deliberately indifferent, this does not mean that taking just ***any*** action is sufficient. *Rasho*, 22 F.4th at 710. If officials "persist[] in taking steps they knew were insufficient to prevent the harm," the response is not reasonable. *Id.* at 711 (citing *Petties*, 836 F.3d at 730-31). So, while "plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Rasho*, 22 F.4th at 713 (citations omitted).

In medical contexts, deliberate indifference may be demonstrated by "unnecessary and wanton infliction of pain" whether "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Evidence of systemic medical negligence may also be sufficient. It is a "well-

settled principle that while a single negligent act cannot support an inference of deliberate indifference, persistence in a course of action known to be ineffective can" support such a finding. *Rasho*, 22 F.4th at 710 (citing to *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016)).

Contrary to Defendants' argument that their *de minimis* attempts to remediate the constitutional deprivations repeatedly identified by the district court should defeat a finding of deliberate indifference, this Court has "repeatedly . . . rejected the notion that the provision of *some* care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment." *Petties*, 836 F.3d at 731. Instead, the Eighth Amendment requires that Defendants "protect[] prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (citations omitted). This includes requests for medical care that go ignored, as well as situations where "the risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. Doctors and healthcare providers in prisons must provide care that demonstrates at least "minimally competent medical judgment" to pass constitutional muster. *Id*.

Situations evincing grossly inadequate medical care include "a doctor refus[ing] to take instructions from a specialist"; a doctor "fail[ing] to follow an existing protocol"; "persist[ing] in a course of treatment known to be ineffective"; "resort[ing] to an easier course of treatment that they know to be ineffective"; or "an inexplicable delay in treatment which serves no penological interest" and "exacerbate[s] the injury or unnecessarily prolong[s] the pain." *Id*. at 729-30; *see also Gray v. Hardy*, 826 F.3d 1000, 1009 (7th Cir. 2016) ("Knowingly persisting in an approach

that does not make a dent in the problem is evidence from which [the factfinder] could infer deliberate indifference.").

The district court acknowledged the proper legal standard for deliberate indifference, and found "pervasive deficiencies in delivery of medically necessary care and treatment on a systemic, statewide level in IDOC correctional institutions." A62; *Rasho*, 22 F.4th at 710; *see also Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430-31 (7th Cir. 1989) (recognizing systemic deficiencies as a distinct category of deliberate indifference). The court concluded that Defendants knowingly allowed deficient conditions to "persist over the two year period following the 2019 . . . Preliminary Injunction." A64.

### C. Defendants failed to show the district court's finding of deliberate indifference was clearly erroneous because their efforts were not reasonable.

Defendants attempt to refute the district court's careful findings with initiatives that had not yet been implemented and policies that had not yet been completed as of the February 2022 Order. Br. at 50-51. To avoid a continued finding of deliberate indifference, Defendants must make reasonable efforts to meet the constitutional floor for care. *Rasho*, 22 F.4th at 711. Expert testimony as to what is "necessary to remedy the constitutional violation" is extremely useful in properly determining the constitutional floor and crafting goals for progress. *Id*. at 713; *see also Howe v. Hughes*, 74 F.4th 849, 857 (7th Cir. 2023) (finding courts may set numeric targets for injunctions so long as they do not exceed the constitutional floor). Following trial, the court found Defendants had made little or no progress since it set the constitutional floor for medically necessary treatment in 2019. A64. Plaintiffs continued to suffer irreparable harm "due to Defendants' failure to provide even minimally adequate treatment of their gender dysphoria." A64-A65.

Defendants claim that they "pursued an array of measures designed to improve the level of care provided to the class," and thus, even if unsuccessful, they cannot be found deliberately indifferent. Br. at 51. But Defendants' measures did not improve Plaintiffs' care. Defendants *knew* that their measures were not working and continued them anyway.

### 1. Hormone therapy.

The court found that between 2019 and 2021, Defendants' administration of hormones continued to be dangerously deficient, despite having clear guidelines for care. After more than two years, the totality of Defendants' work amounted to "finalizing partnerships with the UIC clinic to provide direct patient hormone therapy." Br. at 51. At trial, Defendants' expert Dr. Anderson acknowledged that the policies, including "providing hormone treatment in accordance with endocrine guidelines" had not yet been implemented. A61-A62. Defendants' witness Dr. Puga admitted that he knew of a physician who was overseeing a class member's care and who was "continuing to not prescribe hormones despite directions from Wexford." A57. One of the named Plaintiffs testified that her hormone management in 2021 was worse than it had been in 2019, with multiple extended interruptions in her hormone therapy. A13-A14.

Dr. Tangpricha testified that his review of the medical records of a representative sample of class members revealed that physicians were still failing to make proper adjustments to medications and often failing to appropriately monitor hormone levels at all. A42. As a result, class members continued to receive dangerously inadequate treatment and, according to Dr. Tangpricha, "*none* of the five named Plaintiffs was receiving adequate hormone therapy." A39. Dr. Tangpricha concluded that "IDOC has not meaningfully improved hormone therapy for Plaintiff class members during the two years since the 2019 hearing" and consequently "Plaintiffs are still being placed at risk with ineffective and unsafe treatment." A42.

### 2. Surgery.

Progress on surgery was non-existent. No named Plaintiffs or class members received gender-affirming surgery, and only one had begun evaluation. A28-29. The surgery approvals process was still overseen by medical professionals who were not certified to treat gender dysphoria, despite the court's order in 2019 to immediately cease this practice. A65. One named Plaintiff testified that she was unable to contact anyone on the committee in charge of surgeries, and that "if she does not receive gender-affirming surgery, she will almost certainly kill herself." A18.

### 3. Social transition.

Social transition was all but absent. Despite court orders, gender-affirming commissary items were rare, cross-gender searches continued to be the norm, and no training for officers on transgender issues had begun. Defendants' newly developed policies in these areas were either unknown to or purposely ignored by corrections officers. Br. at 51. In their argument to this Court, Defendants also did not identify *any* measures they had developed to provide gender-appropriate transfers between 2019 and 2021. Br. at 50-52.

Though Defendants may have taken steps to "increase offerings of gender-affirming commissary items" (Br. at 51), they were largely unknown to Plaintiffs. At trial, one Plaintiff testified that makeup items were available in the commissary, but female undergarments were not, and she had not had a new bra since 2018. A15-A16. Another Plaintiff testified that there were no female items available in her facility's commissary. A18. As a result, she had no underwear, hair removal products, or razor, and had resorted to using nail clippers to pull hair out of her face. A18. Yet another Plaintiff was unable to access female items because she "did not yet have a permit." A23.

Regarding cross-gender searches, Defendants claim that their new ID card system allowed class members to choose the gender of the officer searching them and that they trained correction staff on this policy. Br. at 51. However, at trial, Dr. Puga admitted that he was aware that cross-gender searches were still occurring. A58. One Plaintiff testified that when she requested to be searched by a female officer she was "threatened with mace and a beating if she did not submit to a strip search by a male officer." A14. On another occasion the same Plaintiff tried to raise the issue with the Warden, and the Warden "grabbed [Plaintiff's] copy of the [Preliminary Injunction order], threw it off the gallery, and said that [Plaintiff] was a man, she is in a male institution, she has a penis, and she will be searched by men." A15. Another Plaintiff was strip-searched by male officers, over her vehement protests, as a prerequisite to her being transported under a court order to testify at trial about *exactly that constitutional violation*. A23.

As is abundantly clear from the above and the record at trial, "at the time of trial, IDOC had offered no training for correctional officers or other staff regarding the new Administrative Directives." A69. At trial, Defendant's expert, Dr. Anderson, testified that "[n]o training on matters relating to transgender prisoners had yet been prepared or offered to correctional officers . . . though proposals for such training have been solicited." A61. The court found that the Administrative Directive was "not sufficient to inform prison staff of class members' right to choose the searching officer's gender prior to undergoing a search, and cross-gender searches are still routine." A65.

All testifying Plaintiffs reported differing combinations of cross-gender searches, misgendering, harassment, or frequent verbal abuse by IDOC staff based on their gender identity, some at levels worse than in 2019. *See* A13-A15, A19, A23, A26. Plaintiffs' correctional security expert Aiken testified, "having a policy is only the first step in making changes; it will be

necessary for all officials from the top down to personify and model the changes, engaging staff in discussions to manage change, reinforcing behavior, and moving staff into compliance and commitment to the policy." A34. Without any teeth to back up the policies, cruel treatment by staff across IDOC facilities continued to be the norm for Plaintiffs.

### 4. Psychotherapy.

Provision of mental health care was similarly constitutionally deficient. Defendants' mental health providers continued to be unqualified to treat gender dysphoria. The two-day training touted by Defendants was an introductory course that did not confer qualification to provide constitutionally adequate treatment for gender dysphoria according to the WPATH Standards of Care. A46. Several of Defendants' mental health providers had not even attended this minimal training, and there was no way to verify that those who did attend had paid attention. A69. Dr. Puga admitted that there was no quality assurance program in place at all, either in 2019 or at the time of trial, to ensure that standards of care were followed for transgender prisoners. A57.

Plaintiffs continued to be harmed by having their care administered by medical staff who were ignorant about gender dysphoria. One Plaintiff testified that her mental health provider wanted to talk about Plaintiff's religious beliefs rather than her mental health, and asked Plaintiff how god would feel about her "desecrating the temple" of her body by transitioning. A16. Dr. Ettner testified to examples of mental health professionals failing to understand the difference between mental health concerns and gender dysphoria, denying recommendations for hormones for medically improper reasons, and many instances of "misgendering and lack of basic understanding and vocabulary surrounding gender dysphoria." A44. Even setting aside WPATH certification, Dr. Ettner felt that IDOC providers had not "displayed minimal competence in

treating gender dysphoria, and members of the THAW Committee [were] not providing adequate care for transgender prisoners." A45.

Following the presentation of these facts at trial, the court found there were "still serious violations of Plaintiffs' constitutional rights happening every day," and "Defendants continue to be deliberately indifferent to Plaintiff's gender dysphoria by either not adequately addressing their needs or delaying changes required by the preliminary injunction." SA8. The court was particularly disturbed that "some class members are being treated by medical and mental health staff who do not understand gender dysphoria and refuse to treat them for it" leading the court to opine that it had "never seen such deliberate indifference to a serious medical need." SA9. The district court properly applied this Court's standard for deliberate indifference to all facts presented at trial, determining that Defendants' efforts did no more than continue a course of action that they knew to be insufficient to remedy Plaintiffs' constitutional injury, and thus could not be reasonable. A65; *Rasho*, 22 F.4th at 711. This was not a case where Defendants' chosen "treatment did not work" (*see* Br. at 49, citing *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 664 (7th Cir. 2016))—this was a case where the only acceptable treatment was *not provided*.

## CONCLUSION

For the above reasons, Plaintiffs-Appellees request that this Court affirm the district court's denial of Defendants-Appellants' motion to vacate enforcement orders and affirm the permanent injunction and judgment, or in the alternative, remand the case to the district court for a trial on the merits.

Dated: April 24, 2024                    Respectfully submitted,

                                         /s/ Camille E. Bennett

Amelia H. Bailey
KIRKLAND & ELLIS LLP
300 N. LaSalle St.
Chicago, IL 60654
312-862-2000
amelia.bailey@kirkland.com

Brent P. Ray
KING & SPALDING LLP
110 N. Wacker Dr., Ste. 3800
Chicago, IL 60606
312-995-6333
bray@kslaw.com

Abby L. Parsons
KING & SPALDING LLP
1100 Louisiana St., Ste. 4100
Houston, TX 77002
713-752-3294
aparsons@kslaw.com

Camille E. Bennett
  *Counsel of Record*
Michelle Teresa García
Alexis Picard
Mason Strand
ROGER BALDWIN FOUNDATION
  OF ACLU, INC.
150 N. Michigan Ave., Ste. 600
Chicago, IL 60601
312-201-9740
cbennett@aclu-il.org
mgarcia@aclu-il.org
apicard@aclu-il.org
mstrand@aclu-il.org

*Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

The undersigned, counsel of record for Plaintiffs-Appelleess, furnishes the following in compliance with Fed. R. App. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) and 7th Cir. R. 32 for a brief produced with a proportionally spaced font. The length of this brief is 13,827 words.

/s/ Camille E. Bennett
Camille E. Bennett
*Attorney for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2024, I filed the foregoing BRIEF OF PLAINTIFFS-APPELLEES AND SUPPLEMENTAL APPENDIX with the Clerk of Court for the U.S. Court of Appeals for the Seventh Circuit using that Court's CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

/s/ Camille E. Bennett
Camille E. Bennett
*Attorney for Plaintiffs-Appellees*

**SUPPLEMENTAL APPENDIX OF PLAINTIFFS-APPELLEES**

December 19, 2019 Memorandum and Order (Doc. 186) ................................... SA1-SA39

August 9, 2021 Memorandum and Order (Doc. 331) ....................................... SA40-SA53

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE, MARILYN
MELENDEZ, EBONY STAMPS, LYDIA
HELENA VISION, SORA
KUYKENDALL, and SASHA REED,

        Plaintiffs,

v.

JOHN BALDWIN, STEVE MEEKS, and
MELVIN HINTON,

        Defendants.

Case No. 18-CV-00156-NJR-MAB

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Janiah Monroe, Marilyn Melendez, Ebony Stamps, Lydia Helena Vision, Sora Kuykendall, and Sasha Reed are transgender women in the custody of the Illinois Department of Corrections ("IDOC") (Doc. 1). They filed this putative class action under 42 U.S.C. § 1983, alleging IDOC provides transgender inmates inadequate treatment for gender dysphoria, in violation of the Eighth Amendment (*Id.*). Plaintiffs bring this suit against the IDOC Director, Chief of Health Services, and Mental Health Supervisor in their official capacities (*Id.*).

### THE COMPLAINT

According to the Complaint, IDOC utilizes a committee of unqualified officials to oversee the security, placement, and treatment of transgender inmates ("the Transgender Committee") (Doc. 1). Through the Transgender Committee and other flawed policies,

IDOC often delays or denies hormone therapy for reasons not recognized by the medical community; fails to provide adequate hormone therapy and hormone monitoring; fails to consider and provide surgery as part of medically necessary treatment for gender dysphoria; prevents and fails to permit, accommodate, and facilitate social transition necessary to treat gender dysphoria; and fails to provide access to clinicians competent to treat gender dysphoria, resulting in misdiagnosis and inappropriate treatment.

Plaintiffs seek a preliminary injunction directing Defendants to: (1) cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria resulting in denials and delays of treatment; (2) cease the policy and practice of denying and delaying hormone therapy for reasons that are not recognized as contraindications to treatment; (3) cease IDOC's policy and practice of refusing to evaluate and provide surgery to treat gender dysphoria; and (4) cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia.

Plaintiffs also seek medically necessary treatment for Plaintiffs and the putative class members, including: (1) access to clinicians who meet the competency requirements stated in the Standards of Care to treat gender dysphoria; (2) evaluation for gender dysphoria upon request or clinical indications of the condition; (3) timely medically prescribed treatment for gender dysphoria, including, but not limited to, hormone therapy and monitoring and gender-affirming surgery; (4) medically necessary social transition, including individualized placement determinations, avoidance of cross-

gender strip searches, and access to gender-affirming clothing and grooming items; and (5) training for IDOC staff on the importance of social transition, including using proper names and pronouns for transgender inmates. Finally, Plaintiffs request the Court appoint a medical expert in gender dysphoria to oversee IDOC's implementation of the above-referenced relief.

The Court held a two-day hearing on the motion for preliminary injunction and now makes the following findings of facts and conclusions of law (Docs. 155 & 156).

<u>FACTS</u>

### <u>*Treatment of Gender Dysphoria*</u>

Gender dysphoria refers to a condition in which a person experiences clinically significant distress stemming from incongruence between one's experienced or expressed gender and one's assigned gender (Doc. 157, p. 95; Doc. 158, p. 14). Gender dysphoria is considered a medical condition and has been removed from the mental and behavioral disorders in the World Health Organization Classification of Diseases and the Diagnostic Statistical Manual of Mental Disorders (Doc. 158, p. 95). The World Professional Association for Transgender Health ("WPATH") is a professional association dedicated to understanding and treating gender dysphoria (Doc. 157, p. 98). WPATH dictates medically-accepted Standards of Care for treating gender dysphoria (*Id.* at p. 7). According to WPATH, its Standards of Care are "the highest standards of health care" for transgender people (Doc. 123, Ex. 13, p. 8). IDOC purports to follow the Standards of Care and has updated its mental health standards operating procedure manual to incorporate them (Doc. 143, Ex. 4, pp. 4, 10). According to WPATH, treatment options for

gender dysphoria include social role transition, cross-sex hormone therapy, psychotherapy, and surgery (Doc. 158, p. 14).

WPATH lists the minimum qualifications a mental health professional must attain in order to assess and treat gender dysphoria (*Id.* at p. 25). Specifically, a person must: hold a master's degree in behavioral science; be familiar with the Diagnostic Statistical Manual of Mental Disorders or the International Classification of Diseases; have documented supervision in psychotherapy; understand the variations of gender identities and gender expressions; have continuing education in the assessment and treatment of gender dysphoria; have cultural competence; and be aware of the growing body of literature in the area (*Id.* at pp. 25-26). Individuals who are new to the field should work under the supervision of someone with competence who is regarded as an expert in gender dysphoria (*Id.* at p. 26).

**Social Role Transition**

Social role transition is living in the role congruent to one's affirmed identity. For instance, in the case of a transgender woman, social transition would include wearing a female hairstyle, female clothing, and makeup, and using a feminine name, female toiletries, and a female bathroom (Doc. 158, p. 16). In a prison setting, social transition would require a transgender woman be afforded the same canteen items that female prisoners can access, have means to safe and effective hair removal, be referred to by a female name, and be permitted to wear makeup or clothing that affirms her gender (*Id.* at p. 17).

**Psychotherapy**

Psychotherapy helps individuals become more resilient, deal with stigma, manage family situations, and cope with the social problems that are attendant to gender dysphoria (*Id.* at p. 14).

**Surgery**

There are different surgical options for transgender individuals, including reconstruction of the genitalia, also known as gender-affirming surgery (*Id.* at pp. 20, 90). Reconstruction eliminates the major source of hormones that contribute to and cause gender dysphoria (*Id.* at pp. 20-21). After reconstruction, the urogenital organs function and appear the same as one's peers (*Id.*). In 2014, Medicare declared gender-affirming surgery to be medically necessary and safe (*Id.* at p. 88). Studies indicate that less than one percent of patients who undergo gender-affirming surgery around the world experience regret (*Id.* at p. 90). Other studies show suicide and self-harm dramatically decrease following reconstruction surgery (*Id.*). Other surgical options include removal of the breasts and chest reconstruction (*Id.* at p. 21).

**Cross-Sex Hormone Therapy**

Cross-sex hormone therapy involves taking hormones to masculinize or feminize the body (*Id.* at p. 14). An individual should not begin hormone therapy unless he or she has well-documented gender dysphoria above the age of majority and has no significant mental health concerns that prevent him or her from giving informed consent (*Id.* at p. 19). Hormone therapy is often a necessary component of treating gender dysphoria (*Id.* at p. 156).

The Endocrine Society Guidelines are internationally recognized baseline

guidelines for the adequate treatment of gender dysphoria (Doc. 157, p. 91). Hormone therapy that falls below the Guidelines is considered less-than-adequate treatment (*Id.* at pp. 98-99). The Guidelines state that once a person begins hormone therapy, they should undergo baseline lab testing to monitor hormone levels (*Id.* at p. 102). Hormone levels need to be checked every two to three months for the first year of treatment, and dosages should be adjusted accordingly until a target hormone level is achieved (*Id.*). After this period, hormone levels should be checked once or twice each year (*Id.*). An individual who suddenly stops taking hormones is at risk for serious medical or mental health complications (*Id.* at p. 103).

Spironolactone and Estradiol are the two main agents involved in hormone therapy for transgender women (*Id.* at pp. 103-04). Spironolactone is a testosterone-blocker, and Estradiol is estrogen (*Id.* at pp. 104, 109). Estradiol is administered at a starting dose of two milligrams and titrated to four or six milligrams (*Id.* at p. 104). Four milligrams typically results in target concentrations (*Id.* at p. 105). For transgender men, hormone treatment involves testosterone injections (*Id.* at p. 106).

Spironolactone is a diuretic that can elevate potassium levels and cause heart arrhythmias, kidney failure, and death (*Id.* at p. 107). Estradiol enlarges the pituitary gland, which can cause blindness if the gland gets too big (*Id.* at pp. 107-08). Thus, monitoring hormone levels is important for efficacy and safety (*Id.* at p. 108).

There are other forms of estrogen besides Estradiol, but the Endocrine Society Guidelines do not recommend them because they are very difficult to monitor (*Id.* at pp. 109-110). For example, Premarin and Menest, which are conjugated estrogens, are not

naturally produced by the body; they come from pregnant horse urine (*Id.* at p. 110).

Transgender people may receive hormone therapy but still experience symptoms of gender dysphoria because their body does not match their gender identity (*Id.* at p. 109). Hormone therapy does not shrink genitals or make them disappear (*Id.*).

### *IDOC's Policies on Transgender Inmates*

IDOC's Administrative Directive 04.03.104, "Evaluation of Offenders with Gender Identity Disorders," sets forth the policies and procedures for evaluating and treating inmates with gender dysphoria ("the GID Directive") (Doc. 1, p. 17; Doc. 123, Ex. 10). The GID Directive creates the Transgender Committee, which is a group of IDOC officials who are responsible for reviewing placements, security concerns, and overall health-related treatment plans for transgender prisoners with gender dysphoria, as well as overseeing gender-related accommodations (Doc. 61, p. 29). The Transgender Committee has five voting members: IDOC's Chief of Psychiatry, Chief of Health Services, Chief of Mental Health Services, Chief of Operations, and Transfer Coordinator (Doc. 158, pp. 102, 146-52; Doc. 61, pp. 20-21). None of these individuals meets WPATH's minimum qualifications for treating transgender people and two have no medical training (Doc. 158, pp. 146-51).

The Committee meets once each month to review inmates' treatment and care (*Id.* at p. 105). The Committee reviews approximately twenty cases at each meeting and goes over treatment plans and inmate requests (*Id.*). IDOC's therapists present issues to the Transgender Committee on behalf of the inmate (*Id.* at pp. 111-13). The Committee reviews information about each inmate, including the inmate's treatment plan, but does

not review an inmate's complete medical records (*Id.* at pp. 113, 163). The Committee generally allots six minutes to hear an inmate's case (*Id.* at p. 162). The Committee decides issues based on a majority vote of its five members, but nonmedical members do not vote on medical issues (*Id.* at pp. 157, 187). After the Committee renders a decision, the inmate's therapist or physician is responsible for carrying out the plan (*Id.* at p. 113). There is no formal appeals process for challenging the Committee's decisions (*Id.* at pp. 160-61).

### Dr. William Puga

Dr. William Puga is a physician who specializes in psychiatry (Doc. 158, p. 102). He has served as IDOC's Chief of Psychiatry since March 2018 (Doc. 158, pp. 102, 135). He oversees the psychiatric treatment at all thirty-one facilities and is the chairman of the Transgender Committee (*Id.* at p. 104). Since he began working with the Committee, Dr. Puga has become familiar with the Standards of Care, has read about endocrinology and surgical issues, and has studied how other states work with transgender offenders (*Id.* at p. 109). Dr. Puga also authors a newsletter for the psychiatric staff that discusses psychiatrists' role in treating and evaluating transgender inmates (*Id.*).

The Committee considers whether or not an inmate should begin hormone therapy (*Id.* at p. 114). Dr. Puga estimates that about seventy IDOC inmates are on hormones (*Id.*). According to Dr. Puga, if an inmate was taking hormones prior to incarceration, the Committee generally approves the continuation of hormone therapy without much scrutiny (*Id.*). But if an inmate wants to begin hormone therapy for the first time, the Committee conducts a review to determine whether therapy is appropriate and

safe (*Id.*). Periodically, the Committee denies requests to begin hormone therapy if the inmate is psychiatrically unstable or if hormone therapy is contraindicated due to an inmate's medical history of conditions like embolisms, liver disease, or cardiac issues (*Id.* at pp. 114-15). If the Committee approves hormone therapy, the inmate's physician administers the hormones (*Id.* at p. 121).

Hormone therapy can cause complications (*Id.* at p. 117). For instance, in April 2019, a transgender inmate had a stroke that left her partially paralyzed and affected her speech (*Id.*). IDOC concluded that the hormones caused the stroke (*Id.* at pp. 117-18).

IDOC has raised the issue of misgendering (calling transgender people by the wrong pronouns) with its employees and has provided education and training for correctional officers on dealing with transgender inmates (*Id.* at p. 125). IDOC also encourages facilities to call inmates by their preferred name and has terminated employees who are verbally abusive to transgender inmates (*Id.* at pp. 126-27).

Dr. Puga testified the Committee will entertain requests for gender-affirming surgery but it has not actually evaluated a specific inmate as a surgical candidate (*Id.* at p. 120). Also, the Committee addresses social transition issues, but the therapists and the facilities make many decisions such as showering accommodations and access to commissary items (*Id.* at pp. 123-24).

The Committee reviews transfer requests from transgender female inmates who want to reside at female facilities (*Id.* at p. 128). Dr. Puga contacts the inmate's current facility, reviews disciplinary and medical records, speaks with the inmate's therapist, and gathers as much relevant information as he can to present to the Committee (*Id.* at

pp. 128-29, 132). Dr. Puga believes a total of two transgender females have transferred to a female facility (*Id.*). Dr. Puga testified that one of the inmates was "fairly successful" at the female facility (*Id.*). The other inmate, Janiah Monroe, stopped taking her hormones and was sexually active (*Id.*). Dr. Puga talked to the warden and mental health staff at the female facility, who reported the transgender women were not well received (*Id.* at p. 129). Dr. Puga stated that many women in IDOC's care have been exposed to domestic, physical, or emotional violence, and transgender women sometimes scare the other women (*Id.* at p. 130). Dr. Puga received information that Monroe threatened staff and other inmates (*Id.* at pp. 134-35). Women at the facility filed complaints against Monroe under the Prison Rape Elimination Act; some were false but many were legitimate (*Id.* at p. 130). The female facility eventually placed Monroe in segregation for her own safety (*Id.* at pp. 135-36). According to Dr. Puga, these difficulties have not deterred the Committee from considering transfer requests on an individual basis (*Id.*).

Dr. Puga does not recall learning about gender dysphoria in medical school (*Id.* at p. 139). He treated two transgender patients while in private practice, three transgender patients while working at a hospital, and three transgender patients while working as a consultant to a school district (*Id.*). Dr. Puga did not serve as these individuals' primary provider for gender dysphoria (*Id.* at p. 141). Dr. Puga has never treated a transgender individual under the supervision of a WPATH-certified physician, prescribed hormones to a transgender patient, been involved in monitoring hormone levels of a transgender patient, approved surgery for a transgender patient, or presided over the social transition of a transgender patient (*Id.* at pp. 144-45). He is unaware of any standards for prescribing

SA10

hormones and testified, "For psychiatry I have guidelines for medications that we prescribe but I don't know how medicine works, frankly" (*Id.* at p. 175). He stated, "Dr. Reister has probably the most experience out of everybody [on the Committee] as far as working with [transgender patients]" (Doc. 158, p. 103).

**Dr. Shane Reister**

Dr. Shane Reister is the southern regional psychologist for IDOC who consults the Transgender Committee (Doc. 143, Ex. 3, pp. 6-7). He has a doctorate in psychology and his experience includes a practicum at an LGBT specialty site (*Id.* at p. 5). Dr. Reister worked at a correctional facility in Rushville, Illinois, where he organized an LGBT group therapy program (*Id.*). He also attended a WPATH conference a couple of years ago and is scheduled to attend a second conference this year (*Id.* at pp. 5-6). He has been a member of WPATH for five years (*Id.*). Dr. Reister developed sensitivity training for IDOC staff, which is designed to help employees interact appropriately with transgender inmates (*Id.* at p. 7). Dr. Reister does not prescribe hormones; he defers to Dr. Puga for medical treatment of patients with gender dysphoria because these decisions are outside Dr. Reister's competency (*Id.* at p. 16).

*Expert Testimony*

**Dr. Vin Tangpricha**

Dr. Vin Tangpricha testified on behalf of Plaintiffs (*Id.* at p. 88). He is board-certified in endocrinology and specializes in treating transgender individuals (*Id.*). Dr. Tangpricha holds a medical degree from Tufts University and a Ph.D. from Boston University (*Id.*). He estimates he has treated more than 360 transgender patients and has

published thirty peer-reviewed articles related to gender dysphoria, including the WPATH Standards of Care (*Id.* at pp. 90-91). Dr. Tangpricha was also involved in creating the Endocrine Society Guidelines (*Id.* at p. 91). The first version of the Guidelines was published in 2008, and an updated version was published in 2017 (*Id.* at p. 145). Dr. Tangpricha is the president of WPATH, on the board of directors for the American Association for Clinical Endocrinologists ("AACE"), and chairs AACE's national education committee (*Id.* at p. 92).

Dr. Tangpricha testified that gender dysphoria is a serious medical condition and that failure to properly treat the condition can result in anxiety, depression, self-harm, and suicide (*Id.* at p. 95). Dr. Tangpricha reviewed the record in this case and is familiar with the Transgender Committee (*Id.* at p. 11). He does not believe any of the voting members on the Committee are qualified to make decisions about hormone therapy (*Id.*). Dr. Tangpricha reviewed an IDOC medical record where the Committee denied an inmate's request for an increased dosage of estrogen and a bra without providing a medical reason or completing a blood test to determine hormone levels (*Id.* at pp. 115-16). In another record, the Committee denied a request for an increased dosage of estrogen because the inmate was not "stable" (*Id.* at pp. 117-18). But the remarks under the mental health section of the document state "Currently stable. Attending all programming. Working full-time in inmate commissary" (*Id.*). Dr. Tangpricha could not find any medical rationale for the denial of the request (*Id.*). He reviewed other similar documents and noted the Committee was denying requests for increased hormones without testing hormone levels (*Id.*). The Committee also denied requests for injections without a

reasoned basis; injections can be necessary when someone's body does not absorb the hormone pills (*Id.* at p. 119-20).

Dr. Tangpricha reviewed Plaintiffs' medical records and determined IDOC's treatment for each woman failed to comply with the Endocrine Society Guidelines. For instance, IDOC prescribed Plaintiffs Menest and Premarin (*Id.* at pp. 124), delayed hormone therapy for Plaintiffs without medical justification (*Id.* at p. 126-27), and failed to monitor Plaintiffs' hormone levels (*Id.* at pp. 124-28). The few times IDOC conducted blood tests on Plaintiffs, their hormone levels were below therapeutic levels (*Id.* at pp. 121-28). Dr. Tangpricha reviewed medical records from other transgender inmates in IDOC's custody and found the same deficiencies in treatment (*Id.* at pp. 129-38). In one circumstance, an inmate was prescribed Spironolactone but no Estradiol, so the estrogen had little effect (*Id.* at pp. 140-41). In a psychiatry record in the inmate's file, the mental health professional refers to "gender identity disorder," which is an outdated and offensive term (*Id.* at p. 139). The professional also referred to the inmate with male pronouns and called her gender dysphoria a delusion:

> He is cooperative in a very limited sense, his judgment and inside rapport, but he knows he's still a male. He tries to show that he is female. He is in some kind of a delusion that he is female, and once his voice starts getting a high pitch, he will start talking.

(*Id.*).

Dr. Tangpricha also noted there are records of inmates on hormone therapy with elevated potassium, prolactin, and creatinine levels, which place these individuals at risk for complications (*Id.* at p. 142). Of all the records Dr. Tangpricha reviewed, IDOC did not monitor ninety percent of the inmates in accordance with the Endocrine Society

Guidelines (*Id.* at p. 143). Approximately twenty-five to fifty percent of the inmates were not monitored at all (*Id.* at p. 144). Also, over ninety percent of the inmates who IDOC did monitor had hormone levels that fell below the therapeutic range (*Id.* at p. 143).

**Dr. Randi Ettner**

Dr. Randi Ettner is a clinical and forensic psychologist with a specialty in the assessment and treatment of gender dysphoria (Doc. 158, p. 5). She received a Ph.D. from Northwestern University and has been licensed as a psychologist since 1980 (*Id.*). She has authored over thirty peer-reviewed publications on transgender health and "seen" over 3,000 individuals with gender incongruity (*Id.* at pp. 6-7). Dr. Ettner has consulted surgeons and mental health professionals on transgender health and chairs the WPATH's committee for incarcerated people (*Id.* at pp. 7-8).

Dr. Ettner reviewed Plaintiffs' medical records and grievances; analyzed the Committee reports; and interviewed and administered psychodiagnostics testing to Plaintiffs (*Id.* at p. 9). She concluded Plaintiffs have severe gender dysphoria and IDOC provides inadequate and inappropriate care by delaying hormone therapy, failing to facilitate social transition, and not assessing anyone for surgical intervention (*Id.* at pp. 9-10, 38). Dr. Ettner reviewed the records of other transgender IDOC inmates and observed the same pattern of inadequate treatment (*Id.* at pp. 10-12, 37-38). She stated that individuals with gender dysphoria who do not have access to treatment typically engage in self-treatment (auto-castration or auto-penectomy), experience psychological decompensation, or commit suicide (*Id.* at pp. 26-27, 58).

SA14

Dr. Ettner testified that the Committee has denied inmates' requests for hormone therapy for a number of reasons that are not medically justified (*Id.* at pp. 34-44). For instance, the Committee denied hormone therapy because inmates suffered from PTSD, did not have social support, were "faking" gender dysphoria, had unresolved trauma, and/or needed to show more stability (*Id.*; Pls. Exs. 11-16).

Dr. Ettner does not believe any of the members of the Transgender Committee are competent to treat gender dysphoria (Doc. 158, p. 50). Based on her review of the Committee's decisions and inmates' medical records, Dr. Ettner concluded the Committee is making decisions that fall below the Standards of Care and place inmates at risk (*Id.* at p. 51). Also, Dr. Ettner believes IDOC's mental health staff, in general, is incompetent to treat gender dysphoria based on records of misgendering inmates and conflating sexual identity with gender identity (*Id.* at pp. 55-56).

Dr. Ettner reviewed the minutes from IDOC's Suicide Task Force Committee meeting held on October 14, 2015 (*Id.* at pp. 56-58; Pl. Ex. 20). The note states a transgender woman committed suicide on May 31, 2015 (*Id.*). The inmate had requested hormone therapy in May 2014 and was evaluated for gender dysphoria in April 2015 but was never prescribed hormones (*Id.*). One of the members of the Suicide Task Force Committee stated, "[L]apse in presentation to Transgender Committee could have been a reason for the suicide" (*Id.*). Prior to her death, however, the inmate had been in segregation for one year and had an "encounter with a staff member" just two days before (*Id.*).

Dr. Ettner testified that transgender inmates are still at risk for self-harm, psychological decompensation, and suicide because there is no evidence they are

receiving necessary medical treatment for gender dysphoria in a timely manner (*Id.* at pp. 58-59). She stated these problems can be addressed by qualified individuals who conduct in-person assessments of inmates and generate a treatment plan (*Id.* at p. 58). According to Dr. Ettner, there are prison systems that send inmates with gender dysphoria to meet with a trained expert for evaluation (*Id.*). Thus, IDOC would not necessarily have to hire an expert for every facility (*Id.*). Also, IDOC staff could go through the training to receive certification in treating gender dysphoria, but this involves classes, mentoring, testing, and participating in clinical cases (*Id.* at p. 59).

Dr. Ettner has evaluated over forty inmates for gender dysphoria throughout the country (*Id.* at p. 84). All of these evaluations were for litigation purposes and on behalf of plaintiffs (*Id.* at p. 85). She concluded that three of the inmates she evaluated were receiving adequate care (*Id.* at pp. 85-86). Dr. Ettner opined that the named Plaintiffs in this case should be evaluated for surgery (*Id.* at p. 99).

### *The Plaintiffs*

#### Janiah Monroe

Janiah Monroe has been in IDOC custody since 2008; at the time of the evidentiary hearing, she resided at Logan Correctional Center ("Logan"), a female facility (Doc. 157, pp. 184-85).[1] Monroe was assigned male at birth and grew up in Chicago and New York with a very religious family (*Id.* at p. 185). Monroe knew from a young age that she was a female; she told her parents on her third birthday that she wanted to be their daughter

---

[1] The Court notes that according to filings after the hearing in this case, there have been a number of issues concerning Monroe's placement and her health. Thus, the Court requests an update on these matters from Plaintiffs' counsel.

(*Id.*). In her youth, Monroe enjoyed playing with her female cousins, playing jump rope, and fixing her hair (*Id.* at p. 186). She wore both male and female clothing (*Id.* at p. 187). When Monroe would exhibit feminine characteristics, her father beat her (*Id.* at p. 185).

Monroe began taking hormones and birth control pills when she was about eleven years old (*Id.* at p. 188). Monroe hated being perceived as a male and felt anxiety and shame; she felt hatred toward herself, her body, and the way she sounded (*Id.* at p. 189). Monroe's struggles with gender dysphoria drove her to attempt suicide (*Id.*).

When Monroe was first incarcerated in 2008, she informed IDOC she was transgender and requested gender reassignment surgery, hormone therapy, and electrolysis (*Id.* at pp. 191-92). IDOC told her it would not provide hormone therapy to inmates unless they were legally on hormones prior to incarceration (*Id.* at p. 192). The denial of treatment was "[e]xcruciatingly painful" for Monroe (*Id.* at p. 193). She attempted self-castration, chewed through the arteries in both of her arms, chewed out a vein, carved a swastika in her wrist to symbolize self-hate, and hung herself (*Id.*).

For the first decade of her incarceration, Monroe was housed in male facilities, where she was subjected to verbal harassment, physical assaults, and sexual abuse at the hands of other inmates and correctional officers (*Id.* at pp. 194-96). Monroe described living in male facilities as "terrifying" (*Id.* at p. 196). When she stood up for herself, the correctional officers would purposely place her in a cell with a sexually violent inmate and laugh at her when she called for help (*Id.* at p. 197). During pat-downs, male officers commented on Monroe's body and inappropriately groped her (*Id.* at p. 204). Monroe filed grievances over the mistreatment but rarely received a response (*Id.* at p. 198).

IDOC did not diagnose Monroe with gender dysphoria until 2012—four years after she was first incarcerated (*Id.* at p. 199). After multiple unsuccessful requests for treatment, Monroe began hormone therapy in April 2012 (*Id.* at p. 200). Hormone therapy helps Monroe's gender dysphoria to some extent, but she describes it as "putting a Band-Aid on a wound that needs stitches" (*Id.* at p. 202). Monroe believes her hormone dosages are inadequate (*Id.* at p. 202). Monroe has cut her penis and scrotum so many times that she cannot recall each instance; she hopes her genitals become infected so IDOC is forced to remove them (*Id.* at pp. 201-02). Monroe believes she needs breast implants, vaginoplasty, and clitoroplasty, so her "mind and [] body can be one" (*Id.* at p. 213). She has made countless requests and filed at least ten grievances asking for surgery, but has never been evaluated as a surgical candidate (*Id.* at pp. 213-14).

At the female facility, Monroe has access to female undergarments, makeup, brushes, combs, and beauty shops, and is searched by female officers (*Id.* at pp. 203-04). At male facilities, transgender inmates only have access to a bra (*Id.*). After transferring to the female facility, Monroe became involved in a sexual relationship with a female inmate (*Id.* at pp. 210-12). Consensual sexual encounters among inmates at the female facility are not uncommon (*Id.* at p. 212). The woman Monroe was involved with accused Monroe of sexual assault, but IDOC determined the allegations were false (*Id.* at pp. 211-12, 221). Monroe believes her accuser was jealous of her friendship with another woman (*Id.*). Monroe testified her penis is not fully functioning and has not functioned at any time since she was transferred to Logan (*Id.* at p. 222).

**Marilyn Melendez**

Marilyn Melendez is an inmate in IDOC custody who, at the time of the evidentiary hearing, was housed at Pontiac Correctional Center ("Pontiac"), a male facility (*Id.* at p. 13). Melendez was assigned male at birth but, at a young age, her mother explained that she was a girl born in a boy's body (*Id.* at p. 14). When Melendez was eight or nine years old, her mother started her on hormones, testosterone blockers, and estrogen (*Id.* at p. 15). Melendez developed breasts, but when she was thirteen, her mother could no longer afford the treatment (*Id.* at pp. 15-16, 40). Melendez went through male puberty; she grew taller, her shoulders broadened, she developed muscles, her voice deepened, and she began experiencing erections (*Id.* at p. 16). Melendez "felt like a monster" and her peers made fun of her (*Id.*). She was involved in a lot of fights and started doing drugs, which led to her incarceration (*Id.*).

Melendez came under IDOC's custody in 2012 and was initially housed at Stateville Correctional Center ("Stateville") (*Id.*). She immediately told Stateville she was transgender, but she was never evaluated for gender dysphoria (*Id.*). Two weeks later, Melendez was transferred to Menard Correctional Center ("Menard") (*Id.* at pp. 16-17). She reiterated to the chaplain, a grievance counselor, and the mental health department that she was transgender and requested hormone therapy (*Id.* at pp. 17-18). Melendez was denied hormone therapy and never evaluated for gender dysphoria (*Id.*). Melendez was transferred to Pontiac one year later and told the facility she was transgender (*Id.* at p. 18). Pontiac officials told Melendez she was a cross dresser and just seeking attention (*Id.*). In 2015, Melendez was transferred back to Stateville (*Id.* at pp. 18-19). She was

evaluated for gender dysphoria but told she needed additional counseling before a she could receive a final diagnosis (*Id*. at p. 19). Melendez was finally diagnosed with gender dysphoria in March 2015 (*Id*. at p. 20).

The Transgender Committee initially denied Melendez's request for hormone therapy because it believed she needed further counseling (*Id.* at p. 21). Melendez was approved for hormone therapy in 2015 and began treatment in July or August 2015 (*Id.* at p. 22). But Melendez testified IDOC has not addressed her needs for hormone therapy (*Id.* at p. 23). IDOC started Melendez on the lowest dosage of hormones for a ninety-day period to see if she would experience any complications, and IDOC was supposed to conduct blood tests after the ninety days to determine an appropriate dosage (*Id.*). After the ninety days, Melendez was still growing excess facial and body hair, she was experiencing erections, her skin was oily, and she did not develop any breast tissue (*Id.*). Melendez was transferred to Pontiac, where she told the medical director she was unsatisfied with the dosage (*Id.* at p. 24). The physician told Melendez he did not "really know anything about transgender health" (*Id.*). Melendez filed grievances, and IDOC increased her dosage (*Id.*). Melendez is still unsatisfied with her hormone therapy as she has frequent erections, her testicles have not shrunk, and she grows excess hair (*Id.* at p. 25).

Melendez requested gender-affirming surgery but was told IDOC does not pay for sexual reassignment surgery (*Id.* at p. 26). Melendez believes she needs penile inversion surgery or the removal of her genitals, hair removal surgery, liposuction, breast augmentation, brow shaving, chin shaving, and cartilage shaving (*Id.* at p. 28). Living

without surgery is "upsetting" and "depressing," and brings Melendez "disgust and discomfort" (*Id.* at p. 27). Using the restroom and showering makes her feel like a "freak" (*Id.*).

IDOC denied Melendez's request for hair removal because inmates are already allowed accessed to Magic Shave (hair-removal cream) and razors (*Id.* at pp. 29, 48). Melendez testified that hormones make skin softer and more sensitive, so the Magic Shave makes her skin peel and blister (*Id.* at p. 48). Melendez wants access to all of the products that inmates in the female facilities can access (*Id.* at p. 33). Melendez testified that living without feminine products is depressing (*Id.* at pp. 33-34). She has dry skin and, for an entire year, brushed her hair with her fingers and a spork (*Id.* at p. 34). She is forced to use men's soap and aftershave (*Id.*).

Melendez requested a bra in 2015 and received one in 2017 (*Id.* at p. 32). She wants additional gender-affirming clothes and undergarments (*Id.* at p. 33). Melendez requested gender-affirming clothes from health care, mental health, commissary, and the warden, but is still waiting for an answer (*Id.* at pp. 29-30, 36). The lack of gender-affirming clothing has negatively impacted her social transition (*Id.* at p. 35).

Melendez has never been housed in a female facility (*Id.* at p. 36). Melendez is strip-searched by men in front of male inmates, and the correctional officers laugh at her (*Id.* at p. 52). Correctional officers have verbally harassed and groped Melendez and she is often misgendered (*Id.* at pp. 37-38). IDOC staff has called Melendez "him," "dude," "it," and "he-she" (*Id.* at p. 38). Melendez requested to be moved to a female facility in the past, but has not recently requested a transfer because she heard transgender women

in female facilities are segregated (*Id.* at p. 86).

Melendez has contemplated suicide in the past year and testified that if her current treatment persists, she will kill herself or put herself in a position where someone else kills her (*Id.* at pp. 38-39).

**Sasha Reed**

Sasha Reed is a transgender woman who, at the time of the evidentiary hearing, was incarcerated at Lawrence Correctional Center ("Lawrence"), a male facility (*Id.* at pp. 54, 71). When Reed was three years old, she was placed in her aunt's care and sexually and physically abused (*Id.*). Reed first understood she is female when she was eight years old (*Id.*). Her caretakers in the Department of Child and Family Services were not supportive of her female gender identity (*Id.* at p. 55). She felt "horrible" when people treated her as a male, and she felt stressed and depressed (*Id.* at p. 56). When Reed was seventeen, she began wearing female clothing (*Id.* at p. 55). Prior to her incarceration, Reed never received any type of treatment for gender dysphoria (*Id.* at p. 56).

When Reed came under IDOC's care in July 2013, she alerted officials at Stateville that she was transgender and requested to speak to a mental health professional (*Id.* at pp. 56-57, 60). Reed never met with anyone on the Transgender Committee, spoke with any mental health professionals, or received any treatment for gender dysphoria while she was at Stateville (*Id.* at pp. 57-58). Reed was depressed, anxious, and suicidal (*Id.* at p. 58). She attempted suicide because IDOC was not treating her gender dysphoria (*Id.*).

Reed was transferred to Pontiac for a year and a half and told a nurse that she was transgender (*Id.* at p. 59). Reed never received any sort of treatment for gender dysphoria

while at Pontiac (*Id.*). Reed was transferred to Menard, and in 2015, she alerted officials she was transgender (*Id.* at p. 60). She was diagnosed with gender dysphoria and began receiving treatment in November 2015 (*Id.*).

Reed started hormone therapy in March 2017 and is still taking hormones today (*Id.* at p. 61). Prior to starting therapy, Reed had to submit a survey to the Transgender Committee (*Id.*). The Committee met with Reed a month or two later and denied her request for hormone therapy (*Id.* at p. 62). The Committee told Reed she had to stop taking her medication for schizophrenia for six weeks before taking hormones (*Id.*). Reed complied, but the Committee still denied therapy (*Id.* at p. 63). Reed was attending mental health sessions every two weeks during this period and told her doctor she was depressed, anxious, and had thoughts of self-harm (*Id.* at p. 63). Reed was eventually prescribed hormones in March 2017 (*Id.* at p. 64).

In 2016, Reed filed a grievance requesting female clothing, soap, deodorant, shampoo, and body wash, and a transfer to a female facility; her request was denied (*Id.* at pp. 64-65). She filed another grievance in 2016, which was also denied (*Id.* at p. 65). Along with filing grievances, Reed requested female grooming items from mental health professionals and the warden (*Id.*). The warden told Reed, "[T]his is a man [sic] facility, we don't do that" (*Id.* at p. 66). Reed also requested a bra in 2016 and 2017, but her grievances were denied because the facility stated a bra was not medically necessary (*Id.* at pp. 66-67). Reed finally received a bra in 2017 (*Id.* at p. 67). Reed wants access to female grooming products because she does not feel comfortable using products created for men (*Id.* at pp. 81-82).

In 2016 and 2017, Reed filed grievances for gender-affirming surgery, but IDOC denied the requests (*Id.* at pp. 68-69). She testified she is a woman and does not feel comfortable having male "parts" (*Id.* at p. 68). Reed felt suicidal after IDOC denied her grievances and without surgery she does not feel hopeful about her future (*Id.*). Reed's mental health professional told her IDOC is not permitting any surgeries (*Id.*).

Reed does not feel safe at a male facility (*Id.* at p. 71). IDOC staff and fellow inmates verbally harass Reed because of her gender identity (*Id.* at pp. 71-72). Men try to get her to show them her breasts or they try to grope her (*Id.* at p. 72). Reed filed a complaint about the harassment but has not received a response (*Id.* at pp. 72-73). Male correctional officers strip-search Reed, which makes her feel violated (*Id.* at p. 73). Reed has requested that female officers perform the searches, but the facility told her there is no policy about having females search transgender inmates in male facilities (*Id.* at p. 74). When Reed told IDOC she was transgender, she was never evaluated for a transfer to a female facility (*Id.* at pp. 74-75).

When Reed was first incarcerated, she told mental health professionals she heard voices in her head that instructed her to cut herself (*Id.* at p. 76). In July 2013, IDOC staff found Reed in her cell with a sheet around her neck, giving the thumbs up sign (*Id.*). Reed admitted she suffers from symptoms that cause depression and self-harm aside from gender dysphoria (*Id.* at pp. 79-80). Reed attends group therapy but is still upset that she is not receiving the right treatment for gender dysphoria (*Id.* at pp. 83-84). Sometimes she is suicidal (*Id.* at p. 84). Reed brings up her feelings to mental health staff, but they do not listen to her (*Id.*).

IDOC classifies Reed as a "vulnerable" inmate and restricts her housing assignments and jobs (*Id.* at p. 82). As a vulnerable inmate, Reed is permitted to shower separately from other inmates, in private (*Id.* at pp. 81-82).

**Sora Kuykendall**

Sora Kuykendall first identified as a female when she was about five years old (Doc. 123, Ex. 6, p. 1). Kuykendall's family did not support her gender identity, so she was never evaluated for gender dysphoria (*Id.*).

Kuykendall experienced extreme depression when she went through male puberty (*Id.* at pp. 1-2). When she was a teenager, she attempted suicide because of the despair she felt from being trapped in a man's body (*Id.* at p. 2).

Kuykendall came under IDOC's care in November 2014 and, at the time of the evidentiary hearing, was housed in a male facility (*Id.* at pp. 2, 4). She requested hormone therapy within a week, but IDOC denied her request and refused to evaluate her for gender dysphoria (*Id.* at p. 2). IDOC eventually evaluated her for gender dysphoria after she attempted self-castration in 2015 (*Id.*). Kuykendall began taking Spironolactone and Menest in February 2015 (*Id.*). She has repeatedly requested IDOC officials conduct blood and laboratory tests to monitor her hormone levels, but as of April 2019, her hormone levels had never been monitored (*Id.*). Kuykendall has developed breasts and she requested a bra in June 2015; however, she did not receive a bra until six months later (*Id.*). Kuykendall has repeatedly requested feminine grooming and cosmetic products by filing formal grievances, but IDOC has denied or ignored her requests (*Id.* at pp. 2-3).

Kuykendall still suffers from gender dysphoria (*Id.* at p. 3). She is disturbed by her

genitals and body hair (*Id.*). She has continuously requested gender-affirming surgery since June 2015, but IDOC has not evaluated her for surgery (*Id.*). Kuykendall feels extremely depressed and anxious, and she has frequent thoughts of self-harm (*Id.*).

Kuykendall is strip-searched by male officers and in the presence of other males, which makes her feel humiliated and violated (*Id.*). She filed a grievance in March 2017 requesting to be strip-searched by females, but has not received a response (*Id.*). Kuykendall testified that IDOC staff, including mental health professionals, are consistently disrespectful and refer to her with male pronouns and call her "it" (*Id.* at p. 4). She feels unsafe and is verbally harassed on a daily basis (*Id.*).

**Lydia Helena Vision**

Lydia Helena Vision knew from a young age that she was female (Doc. 123, Ex. 5, p. 1). She entered IDOC custody in June 2004 and, at the time of the evidentiary hearing, was housed at Danville Correctional Center ("Danville") (*Id.*). Vision told IDOC personnel she was transgender in 2015 and was diagnosed with gender dysphoria in March 2016 (*Id.*). Since her diagnosis, Vision has requested hormone therapy, female clothing, and gender-affirming grooming items, but IDOC repeatedly denied her requests (*Id.* at pp. 1-2). IDOC told Vision she had to attend sessions for PTSD before beginning hormone therapy (*Id.* at p. 2).

In July 2016, IDOC referred Vision to a psychiatrist who evaluated her via Skype and confirmed the diagnosis of gender dysphoria (*Id.*). Vision stated the psychiatrist confirmed that the lack of hormone therapy was causing Vision extreme distress and recommended she discuss hormone therapy with a physician (*Id.*). IDOC still refused to

provide Vision hormone therapy; her treatment plan consisted of monthly counseling sessions with counselors who misgendered her and were unfamiliar with transgender issues (*Id.*).

Vision was forced to continue showering in general population for several months after her diagnosis (*Id.*). She had panic attacks while showering (*Id.*). At some point, Danville organized a transgender group, and Vision began attending sessions (*Id.* at p. 3). She also attended regular therapy sessions and requested more material on gender dysphoria (*Id.*). She joined an outside LGBTQ organization and wrote to other transgender people (*Id.*). Vision tried to take measures to feminize her appearance, such as following a special weightlifting program to enhance her breast size (*Id.*). Nonetheless, she felt increasingly depressed and anxious without access to hormone treatment and feminine products (*Id.*). Vision quit her job in the laundry room because of depression (*Id.* at p. 4).

Vision filed several grievances throughout her incarceration requesting hormones, gender-affirming clothes, grooming products, and placement in a cell with another transgender inmate (*Id.* at p. 3). IDOC eventually gave Vision a bra in 2017 but denied her remaining requests (*Id.*).

A psychiatrist evaluated Vision in October 2017 and recommended IDOC consider her for hormone therapy (*Id.*). IDOC still failed to start Vision on hormones (*Id.*). Another psychiatrist evaluated Vision in January 2018 and confirmed her diagnosis of gender dysphoria (*Id.*). Again, IDOC did not prescribe Vision hormones (*Id.*). Vision was transferred to Graham Correctional Center in May 2018 (*Id.*). In June 2018, yet another

psychiatrist evaluated Vision and confirmed her diagnosis of gender dysphoria (*Id.* at p. 5). Vision was becoming more anxious and depressed and had trouble eating and sleeping (*Id.*). In late 2018, thirty-two months after her original diagnosis of gender dysphoria, Vision finally began hormone therapy (*Id.*).

Vision is still "terrified" she will never receive the treatment she needs (*Id.*). She has trouble accessing information about treatment and has had problems with prescription changes and hormone dosages (*Id.*). Also, Vison wants to be housed at a female facility (*Id.* at p. 6).

## LEGAL STANDARDS

Preliminary injunctions are extraordinary and drastic remedies that should not be granted unless the movant makes a clear showing that it has carried its burden of persuasion. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Under Federal Rule of Civil Procedure ("Rule") 65, the party moving for an injunction has the burden of showing that it has some likelihood of succeeding on the merits, that no adequate remedy at law exists, and that it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the movant establishes these elements, the Court must then balance the potential harm to the movant if the preliminary injunction were wrongfully denied, against the potential harm to the non-movant if the injunction were wrongfully granted. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). The Court should also take into consideration the effect that granting or denying the injunction will have on the public. *Girl Scouts*, 549 F.3d at 1086.

SA28

The Prison Litigation Reform Act ("PLRA") applies to suits filed by incarcerated people and limits the equitable relief a district court can order. 42 U.S.C. § 1997e & 18 U.S.C. § 3626. "The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation." *Brown v. Plata*, 563 U.S. 493, 530 (2011) (citing 18 U.S.C. § 3626(a). "When determining whether these requirements are met, courts must give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." *Id.* (internal quotations omitted).

Here, Plaintiffs allege IDOC is deliberately indifferent in its treatment of transgender inmates. "Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011) (internal quotations and citations omitted). The deliberate indifference inquiry has two parts. The Court examines (1) whether a plaintiff suffered from an objectively serious medical condition and (2) whether the defendants were deliberately indifferent to that condition. *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019). "To prove deliberate indifference, 'mere negligence is not enough . . . [A] plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).

## DISCUSSION

The parties agree that gender dysphoria is an objectively serious medical

condition. *See Campbell*, 936 F.3d at 545. The parties differ, however, on what constitutes constitutionally adequate treatment. Plaintiffs contend IDOC puts transgender prisoners' health and lives at risk by delaying the evaluation and treatment of gender dysphoria; permitting the Transgender Committee to make medical decisions for transgender inmates; improperly administering hormone treatment; denying transgender inmates the ability to socially transition; and failing to provide gender-affirming surgery to inmates. The linchpin of Plaintiffs' arguments seems to be that IDOC does not comport with WPATH's Standards of Care.

Plaintiffs' experts, Dr. Ettner and Dr. Tangpricha, both relied on the Standards of Care and the Endocrine Society Guidelines to conclude that IDOC provides inadequate treatment to transgender inmates. But Defendants argue the Standards of Care delineate the *highest* level of care, rather than the constitutionally adequate care IDOC must provide. After all, it is well-settled that prisoners are not "entitled to demand specific care" or "the best care possible." *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Along the same lines, Defendants assert the Court should discount the opinions of Dr. Ettner and Dr. Tangpricha as biased and unreliable.

Defendants discredit Dr. Ettner and Dr. Tangpricha because of their involvement in WPATH and their experience testifying for plaintiffs in cases involving gender dysphoria. "Rule 702's reliability elements require the [Court] to determine only that the expert is providing testimony that is based on a correct application of a [valid] methodology and that the expert considered sufficient data to employ the methodology." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). "The focus, therefore, 'must

be solely on principles and methodology, not on the conclusions that they generate.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) (quoting *Daubert v. Merrell Pharm., Inc.*, 509 U.S. 570, 595 (1993)).

Here, Dr. Ettner and Dr. Tangpricha based their testimony on WPATH's Standards of Care, which are endorsed as the standards for treating gender dysphoria by the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Family Practice Association, the Endocrine Society, and the National Commission on Correctional Health (Doc. 158, p. 24). Dr. Tangpricha testified the Standards of Care are the "floor" for treating gender dysphoria (Doc. 157, p. 98). Defendants' own witness, Dr. Puga, testified he was not familiar with any other association that rivals WPATH's level of universal acceptance in the transgender health field (Doc. 158, p. 142). Moreover, Defendants have not put forth a single expert to contest the Standards of Care or offer an opinion about the appropriate level of care for transgender inmates. Thus, this Court joins many other courts who agree the Standards of Care are the appropriate benchmark for treating gender dysphoria. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (and cases cited therein).

Also, Dr. Ettner and Dr. Tangpricha's involvement with WPATH does not overshadow their qualifications as experts in transgender health. Together, they have treated thousands of individuals with gender issues, authored roughly sixty peer-reviewed articles on transgender health, and earned a medical degree and Ph.Ds.

Defendants point out Dr. Tangpricha testified he did not recall seeing any medical

records where an inmate refused hormone therapy (Doc. 157, p. 157). At the hearing, however, Defendants confronted Dr. Tangpricha with records where an inmate refused to take hormones on several occasions (*Id.* at pp. 176-79). Defendants indicated they were going to move to admit the records into evidence, but did not do so. Thus, it is impossible to infer how the records affect Dr. Tangpricha's reliability. Even so, Dr. Tangpricha's unfamiliarity with a few pages of medical documents out of the thousands in this case does not weigh on his credibility. In sum, the opinions of Dr. Tangpricha and Dr. Ettner are based on well-recognized scientific and medical standards and they have established themselves as experts in the field of transgender health.

### Likelihood of Success on the Merits

For purposes of a preliminary injunction, Plaintiffs must demonstrate a likelihood of success on the merits, *i.e.*, that they have a "better than negligible" chance of proving their claims. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001). Because the parties agree that gender dysphoria constitutes an objectively serious medical condition, Plaintiffs must show IDOC consciously disregarded a known and substantial risk of harm associated with gender dysphoria. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

IDOC is well-aware that transgender inmates are at a high risk of suffering from mental health issues and resorting to self-harm. Plaintiffs' grievances and medical records document a pattern of genital mutilation and suicide attempts among the transgender population (Pl. Exs. 4, 9, 10, 12, 14, 15, 16, 17). Unfortunately, a transgender inmate successfully committed suicide while in IDOC's care in May 2015 (Pl. Ex. 20).

Despite these known risks, there is evidence that IDOC denies and delays the

diagnosis and treatment of gender dysphoria without a medical basis or penological purpose. For instance, Monroe was not diagnosed with gender dysphoria until four years after she first sought treatment from IDOC, Melendez had to wait three years to receive a diagnosis and treatment, and Kuykendall and Reed waited almost two years. During these periods, Reed attempted suicide and Kuykendall attempted self-castration. Medical records of the putative class members demonstrate the same pattern of delaying hormone therapy with no medical justification. Also, IDOC denies inmate requests to increase dosages of hormones without testing hormone levels or providing a medical basis. In cases where IDOC did test hormone levels, they were below the therapeutic range.

Moreover, Plaintiffs' experts testified surgery can be medically necessary to treat gender dysphoria, but IDOC has not evaluated a single transgender inmate for surgery. Failing to provide care for a non-medical reason or inexplicably delaying treatment with no penological purpose can amount to deliberate indifference. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Also, "[r]efusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture." *Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011).

In addition, IDOC is aware of the serious side effects of the hormones it administers to transgender inmates. Dr. Puga testified hormones caused a transgender inmate to have a stroke that left her partially paralyzed and impaired her speech. Spironolactone and Estradiol, the two agents involved in hormone therapy for transgender women, can cause heart arrhythmias, kidney failure, blindness, and death. Despite these potentially lethal side effects, IDOC does not monitor inmates who take

hormones in accordance with the Endocrine Society Guidelines. Dr. Tangpricha reviewed relevant medical records from all putative class members and testified IDOC did not monitor ninety percent of those inmates in accordance with the Endocrine Society Guidelines and did not monitor approximately twenty-five to fifty percent of the inmates at all. For instance, IDOC did not monitor Kuykendall's hormone levels until two years after she started hormone therapy.

Plaintiffs also have put forth evidence that the Transgender Committee is unqualified to make medical decisions for transgender inmates. Dr. Puga is the Chair of the Committee but has never treated a patient primarily for gender dysphoria and is not familiar with the Endocrine Society Guidelines. Dr. Meeks, a medical doctor on the Committee, has never prescribed hormones to a patient (Doc. 123, Ex. 11). Although the Committee consults with Dr. Reister, he testified he defers medical decisions to Dr. Puga, and he is not familiar with the Guidelines. Dr. Puga testified, however, that Dr. Reister has the most experience with transgender health. Dr. Ettner testified the Committee's uninformed decisions place transgender inmates at risk. "The Eighth Amendment protects a [prisoner] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis in original).

There is also evidence that IDOC prevents Plaintiffs' social transitions by misgendering inmates and denying them access to female commissary items. Social transition is "an important component of medical treatment" and misgendering someone

with gender dysphoria is "traumatic" (Doc. 158 pp. 15, 18). Here, Plaintiffs have repeatedly requested access to commissary items like lotion, makeup, hair brushes, and female undergarments. IDOC often denies or fails to respond to these requests. At best, IDOC provides a bra to transgender inmates residing at male facilities. Also, Plaintiffs testified IDOC staff members call transgender inmates "him," "dude," "it," and "he-she" (Doc. 157, p. 38). IDOC's denial and/or delay of necessary social transition items has exacerbated Plaintiffs' deteriorating mental states. Based on the above, Plaintiffs have met their burden of showing a likelihood of success on the merits for purposes of a preliminary injunction.

**Irreparable Harm and Inadequate Remedy at Law**

The party moving for a preliminary injunction must demonstrate he or she will likely suffer irreparable harm absent the injunctive relief. *Whitaker By Whitake v. Kenosha Unified School district No. 1 Board of Education*, 858 F.3d 1034, 1044 (7th Cir. 2017). "This requires more than a mere possibility of harm" but "does not, however, require that the harm actually occur before injunctive relief is warranted." *Id.* Also, the moving party must demonstrate there is no adequate remedy at law because "any award would be seriously deficient as compared to the harm suffered." *Id.* at 1046 (internal quotations omitted).

Here, Plaintiffs testified that the lack of proper treatment for gender dysphoria has caused them serious mental health issues. Kuykendall stated, "Every day my requests for gender-affirming surgery, hormone monitoring, gender-affirming clothing, and being able to be myself in a women's facility go ignored, I feel myself slipping into a deeper

SA35

depression. I am struggling with constant thoughts of self-harm." Melendez stated her inability to socially transition is "extremely upsetting" and she has experienced thoughts of suicide in the recent past. Monroe has already attempted suicide because of her gender dysphoria and has mutilated her genitals on several occasions. Moreover, Dr. Ettner and Dr. Tangpricha testified that untreated gender dysphoria can lead to anxiety, depression, self-harm, and suicide. In this case, there is no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages. *See Whitaker*, 858 F.3d at 1045-46 (suicide and diminished well-being do not have an adequate remedy at law and are irreparable harms).

### Balance of Harms and Public Interest

"Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Id.* at 1053. The balance of harm substantially weighs in favor of granting injunctive relief. Plaintiffs continue to suffer physical and mental anguish on a daily basis and are at risk of self-mutilation and death. In contrast, Defendants have not identified any harm they will suffer if an injunction were granted.

Moreover, the public has the "highest" interest in preventing the violation of a party's constitutional rights. *See United States v. Raines*, 362 U.S. 17, 27 (1960) ("[T]here is the highest public interest in the due observance of all the constitutional guarantees."). Also, "[t]he public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *Flynn v. Doyle*, 630 F.Supp.2d 987, 993 (E.D. Wis. Apr. 24, 2009). Accordingly, Plaintiffs have met their burden in moving for a preliminary injunction.

**Ongoing Violations**

Defendants argue Plaintiffs are not entitled to injunctive relief because they cite medical records from several years ago and do not put forth recent evidence to establish an ongoing violation. But Plaintiffs have provided plenty of evidence that IDOC continuously fails to provide adequate treatment to inmates with gender dysphoria. Melendez stated her hormone dosage is ineffective (Doc. 157, pp. 23-24); Reed and Melendez testified they do not have access to female commissary items that would facilitate their social transitions (*Id.* at pp. 33-24, 81-82); the Transgender Committee has never evaluated a single inmate for surgical intervention (Doc. 158, p. 120); and the medical records suggest IDOC fails to adequately monitor inmates' hormones (Doc. 123, Ex. 6, p. 2).

### INJUNCTIVE RELIEF

For the reasons set forth above, the Court **GRANTS** Plaintiffs' request for preliminary injunctive relief (Doc. 123). The Court **ORDERS** Defendants to immediately:

1. cease the policy and practice of allowing the Transgender Committee to make the medical decisions regarding gender dysphoria and develop a policy to ensure that decisions about treatment for gender dysphoria are made by medical professionals who are qualified to treat gender dysphoria;

2. cease the policy and practice of denying and delaying hormone therapy for reasons that are not recognized as contraindications to treatment, ensure timely hormone therapy is provided when necessary, and perform routine monitoring of hormone levels; and

3. cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition, including by mechanically assigning housing based on genitalia and/or physical size or appearance.

SA37

The Court **FURTHER ORDERS** Defendants to:

1. develop policies and procedures which allow transgender inmates access to clinicians who meet the competency requirements stated in the WPATH Standards of Care to treat gender dysphoria;

2. allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications of the condition;

3. develop a policy to allow transgender inmates medically necessary social transition, including individualized placement determinations, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items; and

4. advise the Court what steps, if any, IDOC has taken to train all correctional staff on transgender issues, including the harms caused by misgendering and harassment—by both IDOC staff and other inmates.

As an additional point, the Court notes that no IDOC representative attended *any* portion of the two-day preliminary injunction hearing. Because the Court is concerned that IDOC is not taking Plaintiffs' allegations in this lawsuit seriously, the Court **ORDERS** that each named Defendant shall read the transcript of the evidentiary hearing held on July 31-August 1, 2019 (*see* Docs. 157, 158) and certify to the Court, on or before **January 6, 2020**, that he has done so.

The Court recognizes that these changes will take time, but it in light of the serious deficiencies in IDOC's treatment of transgender inmates set forth above, the undersigned seeks assurance that progress is underway. There is a long way to go, and the issue must be promptly addressed. Thus, on or before **January 22, 2020**, Defendants **SHALL** notify the Court in writing what actions they have taken to implement the directives of this Order. The Court will at that point address Plaintiffs' request for a court-appointed medical expert to oversee implementation of the preliminary injunctive relief in this

Order.

In light of its rulings above, the Court **DENIES** at this time Plaintiffs' motions for leave to supplement the record (Docs. 166, 175). Plaintiffs will be given an opportunity to respond to IDOC's compliance with the Court's Order. As set forth in footnote 1, Plaintiffs' counsel shall advise the Court in writing concerning Ms. Monroe's current condition on or before **January 6, 2020**.

Finally, the Court **DENIES** the recently filed motion for status conference (Doc. 185). A status conference will be set after Defendants have an opportunity to respond to the Court's Order.

Pursuant to *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, 940 F.3d 922 (7th Cir. 2019), the Court will enter the terms of the preliminary injunctive relief set forth above in a separate document.

**IT IS SO ORDERED.**

**DATED:  December 19, 2019**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JANIAH MONROE,
MARILYN MELENDEZ,
LYDIA HELÉNA VISION,
SORA KUYKENDALL, and
SASHA REED, individually and on
behalf of a class of similarly situated
individuals,

      Plaintiffs,

v.

                              Case No. 3:18-CV-00156-NJR

STEVE MEEKS,
MELVIN HINTON, and
ROB JEFFREYS,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This litigation was brought on behalf of a class of Plaintiffs, consisting of all prisoners in the custody of IDOC (Illinois Department of Corrections) who have requested evaluation or treatment for gender dysphoria. (Doc. 213). The named Plaintiffs are transgender women currently incarcerated in IDOC facilities. The named Defendants are, respectively, the IDOC Chief of Health Services, IDOC Mental Health Supervisor, and the IDOC Director, all sued in their official capacity. The Court previously granted preliminary injunctive relief on December 19, 2019 (Docs. 186, 187, amended at Doc. 212) and certified the class in an order dated March 4, 2020 (Doc. 231).

The preliminary injunction ordered Defendants to cease the policy and practice of allowing the Transgender Care Review Committee to make medical decisions regarding

SA40

gender dysphoria, to develop a policy to ensure that treatment decisions for inmates with gender dysphoria are made by medical professionals qualified to treat gender dysphoria; to ensure that timely hormone therapy is provided when medically necessary, including the administration of hormone dosage adjustments, and to perform routine monitoring of hormone levels; to cease the policy and practice of depriving gender dysphoric prisoners of medically necessary social transition and to develop a policy to allow such transition (including individualized placement decisions, avoidance of cross-gender strip searches, and access to gender-affirming clothing and grooming items); to develop policies and procedures allowing transgender inmates access to clinicians who meet the WPATH[1] competency requirements; to allow inmates to obtain evaluations for gender dysphoria upon request or clinical indications; and to advise the Court regarding steps taken to train all correctional staff on transgender issues. (Doc. 212).

The Court adopts the discussion of the claims in its previous order (Doc. 186) regarding preliminary injunctive relief here and, prior to the entry of final judgment, will summarize the testimony of each witness at trial and the depositions and exhibits submitted at the trial. The Court now briefly summarizes IDOC's response to the Court's order granting preliminary injunctive relief entered on December 19, 2019, and amended on March 4, 2020, and some of the evidence introduced at trial as it relates to that response. This order is not meant to be an exhaustive recitation of the evidence; it is being issued simply to provide *some* of the bases for the Court's verbal findings and rulings

---

[1] World Professional Association for Transgender Health. This organization's Standards of Care for the treatment of gender dysphoria are the benchmark for appropriate care of individuals with this diagnosis. (Doc. 186, pp. 3-4, 31).

issued at the conclusion of trial last week.

In January 2020, IDOC contracted with Dr. Erica Anderson, a clinical psychologist, as a consultant to improve delivery of transgender health care. Her contract currently extends through December 2021. Dr. Anderson has 40 years' experience in her field as a university professor, healthcare executive, and over the last 10 years, as a consultant on transgender issues. Transgender herself, Dr. Anderson has provided meaningful guidance which has led to some positive changes in IDOC. Specifically, she worked with IDOC officials and consultant Wendy Leach to help draft IDOC's new Administrative Directives to comply with the preliminary injunction, including ensuring that medical decisions regarding transgender prisoners' care would be made by qualified providers, changing the structure of delivery of care, and implementing training and education of IDOC staff. At her recommendation, the former Transgender Care Review Committee was split into two separate committees, the Transgender Health and Wellness Committee ("THAW") and the Transgender Administrative Committee ("TAC"), in an effort to separate medical and mental health care decisions from issues relating to security and administration. Dr. Anderson continues to serve as a non-voting advisor to those committees.

Dr. Lamenta Conway, a physician board certified in internal medicine, was hired by IDOC in September 2019 as the Deputy Chief of Health Services (trial testimony August 4, 2021, Doc. 326, pp. 652-53). Following the entry of the preliminary injunction, Dr. Conway's responsibilities were expanded to include the care of transgender inmates. (Doc. 326, pp. 656-657). She serves on IDOC's THAW and TAC committees.

IDOC has contracted with an endocrinologist, Dr. Ravi Iyengar, and is working to finalize a contract with a surgeon who specializes in gender-affirming surgery, Dr. Loren Schechter.

On April 1, 2021, IDOC adopted two new Administrative Directives: (1) Administrative Directive 04.03.104 "Evaluation, Treatment and Correctional Management of Transgender Offenders" (Trial Exhibit 600; Doc. 323, p. 502), and (2) Administrative Directive 05.01.113 "Search of Offenders" (Trial Exhibit 601, Doc. 323, p. 502). Administrative Directive 04.03.104 mandates a number of new procedures related to transgender inmates. One of its most notable changes involves dismantling the former Transgender Care Review Committee ("TCRC") discussed at length in the Court's order granting preliminary injunctive relief. The TCRC is now replaced by two committees, the THAW Committee and TAC. Each committee meets monthly. The THAW Committee considers inmate requests for gender affirming surgery (as presented by the inmate's medical/mental health provider(s)) and other medical needs. The TAC reviews requests for inmate transfers such as when a transgender woman requests a transfer from a men's to a women's facility and matters such as what gender-affirming commissary items will be available to transgender inmates. Although the duties are divided in an attempt to separate medical and mental health issues from security considerations, the identity of members on each committee is similar to those previously serving on the TCRC. For instance, Dr. Puga (Chief of Psychiatry), Dr. Hinton (Chief of Mental Health), Dr. Conway (Deputy Chief of Health Services), and Dr. Shane Reister (Southern Regional Psychologist Administrator) all served on the former TCRC and now serve on the THAW Committee.

Dr. Puga, Dr. Conway, and Dr. Reister also serve on the TAC along with other officials including the chief of operations, chief of women's services, and transfer coordinator. (trial transcript, August 5, 2021). Administrative Directive 05.01.113 set forth new procedures governing Searches of Offenders.

IDOC also has offered training to its medical and mental health staff. Some of it was mandatory; some of it was not. Dr. Reister has developed and provided training on transgender issues for IDOC mental health clinicians, and an hour and twenty-minute training for all IDOC staff. (Doc. 325, pp. 604-08). A 2-day entry level WPATH Global Education Initiative ("GEI") training has been offered on three separate occasions—in late 2020, February 2021, and May 2021—to IDOC mental health providers. While the training was designated as "mandatory," the certificates of attendance document that several mental health providers who had problematic interactions with named Plaintiffs never attended this training. (Doc. 325, pp. 619-23; Doc. 326, pp. 628-30). This introductory course, taught by WPATH faculty, was held virtually due to the ongoing pandemic. Besides all required personnel not participating, there is no way to verify that those who joined the virtual training paid attention during the course, and there was no quiz to verify a basic understanding of the materials. And Plaintiffs' expert Dr. Ettner testified that recent comments by medical staff and mental health professionals in the records suggest that many still lack the most basis understanding of gender dysphoria. (Doc. 323, pp. 515-516).

Dr. Puga attended an online training session offered through the Mayo clinic. He and Dr. Anderson have met with staff at Logan Correctional Center to discuss

SA44

transgender issues, including transfers. And there have been many meetings between IDOC personnel and their consultants. There has not, however, been any training offered to correctional officers. There likewise has been no training to staff regarding the new Administrative Directives, though one is apparently in the works for some time soon.

At this point, as set forth on the record at the conclusion of the trial and below, the Court finds that adoption of IDOC's new Administrative Directives has not resulted in improved treatment and care of members of the class. While there are certainly some flaws in the policy, the bigger problem is that the policy is not being fully implemented and all staff are not following it. Simply put, IDOC has not accomplished what the Court previously ordered it to do.

While it will take time to analyze the flaws in the new policy (and, as set forth below, the Court has invited the parties to weigh in), the undersigned finds that the evidence introduced at trial shows serious ongoing violations of the Eighth Amendment that must be immediately addressed. Progress has certainly been made, including some training, the hiring of consultants on transgender policies and medical issues, and an attempt to separate medical/mental health treatment for transgender inmates and security issues. The Court is now satisfied that IDOC is taking the issue of its care and treatment of transgender inmates seriously. The Court noted in the order granting preliminary injunctive relief that the changes ordered "will take time"—and the COVID-19 global pandemic understandably caused some delays. But IDOC relies too heavily on the pandemic to excuse its ongoing constitutionally inadequate care and treatment of transgender inmates. Of course transfers were not possible for over a year between the

time of the preliminary injunction order and trial, and during that time, staff was consumed with other issues when they otherwise could have been developing new policies and procedures and getting them implemented. But the pandemic is not an excuse for hormone therapy to be denied or delayed or hormone levels for those on hormone therapy to go unmonitored, or for the failure to titrate medication doses in response to bloodwork to bring hormone levels into acceptable ranges, or for the failure to order additional, medically necessary diagnostic testing.

Although progress has been made (two inmates, including named Plaintiffs Janiah Monroe and Lydia Vision have been transferred to a women's facility, and two members of the class have consulted with a surgeon,[2] and further progress is underway, the Court must ensure that there is follow through, completion, and implementation of the work that has been started. While IDOC urges the Court to simply "let the process play out," in light of the amount of time between when this case was filed in 2018, the grant of preliminary injunctive relief in December 2019, and four days of trial testimony in the first week of August 2021—and the minimal amount of progress that has been made— the undersigned finds that further injunctive relief is appropriate.

The Court previously found that Defendants were displaying deliberate indifference to Plaintiffs' serious medical needs related to their gender dysphoria. While IDOC argues that its new Administrative Directives and the changes underway have

---

[2] Although, as will be explained in more detail in a subsequent order, the priority given to reviewing requests for gender affirming surgery and transfer is nonsensical. In other words, the THAW Committee seems to pick and choose who gets evaluated and sometimes spends time reviewing requests for individuals likely not in the class certified by this Court.

changed that, there are still serious violations of Plaintiffs' constitutional rights happening every day. Specifically, there are ongoing delays in treatment that constitute deliberate indifference because those delays have injured members of the class and unnecessarily prolonged their suffering in some cases. *See Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). For the same reasons stated in the order granting preliminary injunctive relief, Defendants continue to be deliberately indifferent to Plaintiffs' gender dysphoria by either not adequately addressing their needs or delaying changes required by the preliminary injunction. In a nutshell, without discussion of the testimony of each witness at this time, the evidence presented at trial shows that the hormone levels of class members receiving hormone therapy are not being monitored, and their hormone doses are not titrated in response to bloodwork. As the Court stated at the conclusion of trial, it's like a physician ordering a cholesterol test, the results coming back over 300, and yet the physician does nothing but put the lab results in the chart. In addition, there are still some class members who are being denied hormone therapy treatment for gender dysphoria. Even under the new Administrative Directive, transfer request and review policies and procedures are still flawed (medical/mental health issues sometimes blurred with security issues); some class members have inexplicably been *taken off* hormones for a period of time for absolutely no medical reason (such as being transferred to segregation); and not a single inmate has received gender affirming surgery, although IDOC is working to contract with a surgeon for that purpose. While IDOC claims it has provided access to gender affirming items in the commissary at each facility, the testimony at trial shows that the items are sometimes not available. Even more troubling,

SA47

there continue to be instances of cross-gender strip searches of transgender inmates, and transgender female inmates being forced to shower without privacy in male facilities. Meanwhile, there have been more suicide attempts, more threats of suicide, attempted self-castration, and untreated serious medical conditions (like elevated prolactin levels), ongoing harassment and humiliation, and ongoing misgendering by inmates and staff. Even Dr. Conway, testified—in fact volunteered—that if an IDOC inmate "ha[s] the diagnosis of gender dysphoria, they should be treated … there's no decision that has to be made regarding hormone therapy. It should be done and it should be done immediately[.]" (Doc. 326, pp. 660-61).

Not *one* defense witness rebutted (or even attempted to rebut) the opinions of Plaintiffs' expert endocrinologist Dr. Vin Tangpricha about unmonitored hormone levels, hormone levels not within range, and lack of dose titration. (Doc. 323, pp. 376-480). And, inexplicably, some class members are being treated by medical and mental health staff who do not understand gender dysphoria and refuse to treat them for it (in one case, asking a transgender inmate to ponder what Jesus would think about her request). This Court has never seen such deliberate indifference to a serious medical need. *Such providers should have no contact with class members from this point forward*.

The evidence presented at trial establishes that gender dysphoria is a serious medical condition with mental health components that requires treatment. The first issue should be to address the medical need. And, *of course*, there are security issues attendant to transgender inmates, as opposed to a transgender individual in the general community. *But the lines cannot be blurred*. The medical and mental health issues must be

SA48

addressed first and foremost, and security issues cannot be used as a trump card that results in unconstitutional care and treatment of class members.

Fortunately, IDOC knows the identity of some, if not all, of the class members who are being subjected to deliberate indifference. IDOC's Southern Regional Psychologist Administrator, Dr. Shane Reister, recently did a survey which at a minimum reflects individuals interested in consult/evaluation for hormone therapy, gender affirming surgery, and transfer. (Doc. 326, pp. 634-641). And Dr. Tangpricha's unrefuted testimony shows that eleven class members do not have hormone levels within the range set out in the Endocrine Society Guidelines and many inmates have unmonitored and untitrated hormone therapy treatment. At the end of the day, there are less than 130 individuals in the class; we are not talking about thousands of people.

Thus, having heard the evidence presented by the parties during the bench trial held on August 2-5, 2021, and issued preliminary factual findings, the Court hereby **CONTINUES** its previous preliminary injunction (Doc. 212) and **ORDERS** the following additional relief to members of the class:

1. Plaintiffs Sora Kuykendall and Sasha Reed shall, within **7 days** of the date of this Order, be given lab tests to check their prolactin levels. If those levels are still elevated, they shall be given an MRI test within **5 days** of receipt of the prolactin results.

2. Each member of the Plaintiff class who is currently receiving hormone therapy shall, within **14 days** of the date of this Order, be given blood tests to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males). Thereafter, if the hormone levels are not within the appropriate range set forth by the Endocrine Society Hormone Guidelines (for transgender females, testosterone of less than 15 nanograms/deciliter and estradiol between 100-200 picograms/milliliter; for transgender males,

SA49

testosterone levels between 400-600 nanograms/deciliter), Defendants shall ensure that the individual's hormone medication is titrated following receipt of the bloodwork results and bloodwork repeated at least every **3 months** until the levels are within an appropriate range.

3. Any Plaintiff class member who has requested hormone therapy to date shall, within **21 days** of the date of this Order, get baseline bloodwork done and hormone therapy started within **14 days** thereafter, with follow-up bloodwork at least every **3 months** until the levels are within an appropriate range.

4. Each Plaintiff class member receiving hormone therapy shall get bloodwork done at least once a year to assess hormone levels, as well as potassium, creatinine, and prolactin levels (for transgender females) and hemoglobin/hematocrit levels (for transgender males) and shall be treated as medically indicated by the results. No Plaintiff class member shall be prescribed conjugated estrogen.

5. Any Plaintiff class member whose hormone levels are within the appropriate range, and who has requested evaluation for gender affirming surgery, shall be evaluated for such surgery within **120 days** of the date of this Order with inmates being evaluated in *chronological* order of the date of the inmate's original request for surgery. Each class member so evaluated shall be provided a prompt written notification of the decision and, if surgery is denied, the written notification shall include an explanation of the reasons for denial and a timeframe to request another evaluation thereafter.

6.  Plaintiff class members shall be allowed to choose the gender of the correctional officer who will conduct a search of their person, and the search **SHALL BE** conducted by a correctional officer of the gender requested.

7. Each Plaintiff class member who has requested transfer to a facility matching his or her expressed gender (female facility for transgender women, male facility for transgender men) shall be evaluated for transfer within **120 days** of the date of this Order, with inmates being evaluated in *chronological* order of the date of the inmate's original request for transfer. Each class member so evaluated and denied transfer shall be promptly provided with a written explanation of each reason for the denial and allowed to request another evaluation for transfer within **180 days** thereafter.

8. Each Plaintiff class member shall immediately be provided with access to

SA50

gender affirming items in the commissary and shall immediately be provided with a list of available gender affirming items. Defendants shall immediately ensure all approved gender affirming items are available at the commissary at each class member's institution. Defendants shall, within **30 days** of the date of this Order, provide the Court with a list of all commissary items available at each facility.

9. Defendants shall immediately ensure that medical care and mental health treatment of Plaintiff class members shall be conducted only by medical staff and mental health professionals who have taken WPATH training and are committed to continuing education on issues of transgender health. Similarly, medical providers and mental health professionals who hold personal or religious beliefs that prohibit their treatment of inmates with gender dysphoria shall have no contact with any member of the class from this date forward.

10. Defendants shall immediately ensure that transgender inmates are allowed access to a private shower.

Again, the Court acknowledges Defendants have made some progress toward compliance with the Court's orders for preliminary injunctive relief (Docs. 186, 187, amended at Doc. 212), and recognizes that the COVID-19 pandemic has caused some of the delays in accomplishing compliance. This progress must continue. To that end, the Court further **ORDERS** Defendants to finalize the following "in progress" projects **within 120 days** of this Order.

1. Finalize the contract with Wexford to provide hair removal services to Plaintiff class members;

2. Finalize the contract with Dr. Schechter to provide gender affirming surgery to Plaintiff class members who are approved to receive such surgery;

3. Finalize and implement the CQI (Continuing Quality Improvement) program for transgender care;

4. Finalize IDOC's written surgical standards for transgender care;

SA51

5. Finalize and implement the PRISM project (the special population program) (discussed in Doc. 326, pp. 640, 648-49, 651)

6. Finalize and implement additional and ongoing training for *all* correctional staff on transgender issues and awareness, including the harm caused by misgendering and harassment;

7. Finalize and implement training for inmates and staff at Logan Correctional Center regarding incoming/transferred transgender inmates;

8. Finalize and implement IDOC's transgender identification policy.

The Court further **ORDERS** Defendants to provide the Court and Plaintiffs' counsel with a report on the status of each Plaintiff class member's (1) hormone levels; (2) status of any request for transfer; and (3) status of any request for surgery within **60 days** of the date of this Order. This report shall be filed under seal.

As recently ordered on the record following the bench trial, Plaintiffs are granted additional time, up to and including **30 days** from the date of this Order, to file supplemental evidence obtained in late produced documents referenced in the motion for sanctions (Doc. 316).

Plaintiffs shall provide supplemental briefing outlining the deficiencies in the new Administrative Directive they assert were proven at trial (with citations to the testimony and exhibits supporting their position) on or before **Monday, August 16, 2021**. Plaintiffs may also request additions and changes to the above injunctive relief at that time.

Defendants shall seek clarification of anything in this order on or before **Monday, August 16, 2021**.

Defendants shall respond to Plaintiffs' briefing on or before **Monday, August 30, 2021**, specifically identifying which proposed changes are reasonable to them, which ones

are not (and why), and, where appropriate, propose alternative language. Defendants

shall make specific citations to the testimony/exhibits when objecting to the proposed

changes and suggesting alternative language.

**IT IS SO ORDERED.**

**DATED:   August 9, 2021**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**

SA53

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule

30(a) and (b) are in included in the supplemental appendix.


/s/ Camille E. Bennett
Camille E. Bennett
*Attorney for Plaintiffs-Appellees*